CANADA                                                YAR No. 353654

PROVINCE OF NOVA SCOTIA


IN THE SUPREME COURT OF NOVA SCOTIA


TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY
                                                PLAINTIFFS


- VERSUS -

DOUG K. HANDSHOE AND JANE DOE
(ANNEMARIEBOUDREAUX@YAHOO.COM)


                                                DEFENDANTS


DECISION


HEARD BEFORE:   The Honourable Justice Suzanne
                Hood

COUNSEL:        Dr. Charles Leary Self-Represented
                as Agent and Officer of Trout
                Point Lodge Limited

PLACE:          Yarmouth JC1, Yarmouth, N.S.

DATE HEARD:     February 1, 2012

EXHIBIT

"5"

INDEX
TROUT POINT LODGE V. HANDSHOE
FEBRUARY 1, 2012

Oral Decision   ..................................... 3

EXHIBITS

EXHIBIT   DESCRIPTION ------------------------- PAGE

None

1    **FEBRUARY 1, 2012 AT 10:23 A.M.**

2

3       **THE COURT:**   We   begin   by   saying   that

4    because   I   am   giving   this   decision   orally   I

5    reserve   the   right,   should   it   be   required   to   be

6    reduced   to   writing,   to   edit   but   not   of   course

7    change the substance of it.

8       Trout   Point   Lodge,   Charles   Leary   and   Vaughn

9    Perret   have   obtained   default   judgment   against

10   Doug   Handshoe   in   an   action   filed   in   August   2011

11   and   amended   in   September   2011   for   defamation,

12   invasion   of   privacy,   injurious   falsehood,

13   intentional   interference   with   contractual

14   relations,   intentional   interference   with   economic

15   relations,   intentional   infliction   of   emotional

16   and   mental   distress   and   assault.      Default

17   judgment   was   entered   on   December   12,   2011   with

18   damages to be assessed.

19      The   plaintiffs   move   for   an   assessment   of

20   damages   on   January   12th,   2012.   Mr.   Handshoe   was

21   given   notice   of   a   hearing   for   the   assessment   of

22   damages.

1    The plaintiffs have provided a copy of a
2    FedEx tracking slip showing delivery to Mr.
3    Handshoe's home in Mississippi.   It notes the
4    materials were left at the house.   Efforts were
5    also made according to the testimony of Mr. Leary
6    to fax the documents to Mr. Handshoe's fax number
7    but the transmission was not complete as the fax
8    appeared to have been disconnected.   These
9    materials appear also to have been sent by email
10   and these documents are at Tab 3 to the materials
11   presented in evidence by Mr. Leary at the
12   hearing.   It appears from Mr. Handshoe's blog
13   that he had knowledge of the hearing since he
14   referred to receiving, "nastygrams," from Mr.
15   Leary and Mr. Perret in a blog dated January
16   17th, 2012.   Mr. Handshoe did not appear or
17   participate in the assessment of damages.
18   Default judgment is conclusive of a claim
19   set out in the statement of claim and that's in
20   the authority for that, among others, **is E. Sands**
21   **and Associates versus Dextras Engineering.**   The

1   amended statement of claim sets out in detail the

2   claims against Mr. Handshoe which are now to be

3   treated by this court as proven.   The statement

4   of claim lists many examples of the defamatory

5   comments made by Mr. Handshoe, below is a brief

6   summary of them.   The defamatory comments

7   originated with a news story which was published

8   in the Times-Picayune newspaper in Louisiana

9   about Jefferson Parish President Aaron Broussard

10  being involved in a political corruption scandal.

11  The plaintiffs were erroneously identified as

12  being connected with Mr. Broussard in a business

13  venture and Mr. Broussard was named in error as

14  owning Trout Point Lodge.   The allegations

15  against him are kickback schemes, money

16  laundering and fraud while in his office as

17  Parish President.

18      The defamatory comments later included

19  claims that Trout Point Lodge, Mr. Leary and Mr.

20  Perret had misled ACOA and that Mr. Leary

21  committed perjury in litigation with ACOA.   The

1   defamation continued with statements that Trout

2   Point Lodge was losing business or going bankrupt

3   because of the investigation of Mr. Broussard and

4   his inability to continue to support it.   Also

5   there were claims that Charles Leary and Vaughn

6   Perret had been involved in a series of

7   businesses which failed and are con men.   The

8   statements also contained anti-gay rhetoric and

9   homophobic comments.

10       After the original story was retracted by

11   the Louisiana newspaper that published it Mr.

12   Handshoe made statements that Mr. Leary and Mr.

13   Perret had improperly influenced it to retract

14   the story.   He also said that Mr. Leary and Mr.

15   Perret were improperly using the legal system by

16   commencing the defamation action.   Individual

17   plaintiffs have filed affidavits and in his

18   affidavit Mr. Leary has related incidents

19   affecting him and Trout Point Lodge.   He said in

20   that affidavit in Paragraph 26,

21
22       "Due to the publications on

1           Slabbed and by Mr. Handshoe
2           elsewhere on the internet I
3           have a very real fear that
4           anyone performing due
5           diligence on us as business
6           people or innkeepers will
7           discover and believe
8           Handshoe's publications."
9

10  He also said in Paragraph 27,

11
12           "I felt embarrassed in my
13           local community. Mr. Perret
14           and I have at times, changes
15           our usual shopping patterns in
16           Yarmouth in order to avoid
17           persons we consider friends
18           who may have read the Slabbed
19           publications."
20

21  He also testified about the stress of the

22  defamation on him in Paragraph 30 of the

23  affidavit where he said,

24
25           "In April 2011 at the time when
26           Handshoe's publication about us
27           became threatening and homophobic I
28           experienced tightened shoulder and
29           neck muscles, sleeplessness and
30           developed a severe outbreak of fever
31           blisters for which I had to take
32           Zovirax, and antiviral medication.
33           Previously I always slept very well
34           never waking up early. Since April
35           2011 I have experienced regular
36           sleeplessness particularly waking up

1     early in the morning worrying about
2     Slabbed and its effect on our
3     business."
4

5     His affidavit concluded with Paragraph 39 where

6     Mr. Leary says,

7
8          "I'm seriously concerned about
9          Slabbed hurting the Lodge's business
10         which Mr. Perret and I rely on as
11         our primary source of income. In
12         2011 occupancy rates at Trout Point
13         were three percent lower than in
14         2010. This represents a value of at
15         least $15,000."
16

17    Mr. Leary testified in court as well and his

18    evidence was about since the Notice of Action was

19    served and about the effect of the words of the

20    defendant on him and Trout Point Lodge. Mr.

21    Perret also filed an affidavit in which he stated

22    the effects of the defamation on him. He said in

23    his affidavit in Paragraphs 9 and 10,

24
25         "Mr. Handshoe's internet
26         publications have added a great deal
27         of stress to our lives including the
28         physical manifestations. I felt
29         genuinely afraid of his published
30         threats and of the existence of the
31         Slabbed Nation and members of that

1                     group being in Nova Scotia.  I now
2                     keep my doors locked at night
3                     whereas previously I never feared
4                     for my safety in my own home."
5

6      He says in his affidavit at Paragraph 11,

7

8                     "I have told my personal physicians
9                     in Spain and Nova Scotia about
10                   stress and sleeplessness related to
11                   the Handshoe publications.  My
12                   physician Dr. Fernandez Negrara had
13                   prescribed medication to help me
14                   sleep after the Slabbed publications
15                   commenced and to help control my
16                   anxiety.  I have also experienced
17                   embarrassment, humiliation and
18                   irritability.  It was hard to get
19                   through work in 2011 knowing that
20                   nearly every day a new source of
21                   embarrassment and business
22                   disruption might be published by
23                   Handshoe.  I've been embarrassed
24                   that friends and acquaintances in
25                   Yarmouth might confront me about the
26                   Slabbed allegations.  I could never
27                   be sure that members of the local
28                   community might secretly harbour a
29                   belief in the truth of the blogs
30                   allegations."
31

32      In Paragraph 13 he says,

33

34                     "Mr. Handshoe has also made
35                   publications about my mother stating
36                   that I "split" and left her with a
37                   surrogate son in Louisiana.  I was
38                   traumatized by his suggestions that

1               I had somewhat neglected or abused

2               my mother."

3

4     Mr. Perret also testified briefly, he said he had

5     lost his appetite in the last two weeks as a

6     result of the material which has been published

7     by Mr. Handshoe and the volume of it.   In

8     addition, materials were submitted to the court

9     which were testified to by Charles Leary.   These

10    included defamatory comments made after the

11    Louisiana newspaper printed a retraction of the

12    story.   They include references to a cover-up of

13    a crime and dirty secrets April 20th, 2011 that

14    Charles Leary and Vaughn Perret and others were

15    "bag holders" for Aaron Broussard and the

16    purported owners of Trout Point Lodge.   That same

17    blog referred to the fleecing of investors in

18    Trout Point Lodge by Mr. Broussard and his close

19    connection to Mr. Leary and Mr. Perret.   It also

20    refers to Charles Leary as a liar and a perjurer

21    in the litigation with ACOA.   And that blog was

22    April 26, 2011.

1    On August 15th, 2011 the blog refers to "a
2    Trout Point Lodge Jefferson Parish political
3    corruption scandal update" linking Trout Point
4    Lodge with the corruption scandal involving Aaron
5    Broussard. In that same blog he refers to Charles
6    Leary and Vaughn Perret in the context of "by
7    reporter, get a good story."

8    On August 16th his blog said that he was
9    meticulously laying down "the trail of scams and
10   political corruption that leads to Nova Scotia
11   and Trout Point Lodge."

12   After being served with a Notice of Action
13   further defamatory comments were made.  On August
14   18th he wrote,

15
16           "First class bitches, common thugs
17           or just plain old morons."
18

19   He also refers to the "elite fraternity of crooks
20   and miscreants" who have sued him.   On August
21   24th, 2011 he referred to "political wrongdoing
22   involving Leary and Perret in Canada and it had
23   nothing to do with Broussard *per se*."

1    He continues to make accusations of fraud

2    against them and in bilking local contractors.

3    He refers to "the chances Trout Point Lodge will

4    be bankrupt within a year" and he said that on

5    August 30th, 2011.  In the same blog he refers to

6    the "nefarious practices" of Charles Leary and

7    Vaughn Perret.  He refers to them being involved

8    in money laundering.  He calls them "grifters"

9    and "grafters."  He accuses them of fabricating

10   positive reviews of Trout Point Lodge.

11   Ultimately he links them with organized crime.

12   These types of comments continued throughout

13   2011 and further defamatory comments were made

14   earlier this month, January 2012, when the Notice

15   of Assessment of Damages was served on him.  I

16   mentioned a few additional postings as follows.

17   There's a posting from September 14th, 2011,

18
19   "I'll add here, in case it is not
20   self-evident that I bill complete
21   dossiers on all the players in this
22   social group and I intend through
23   time to roll out each and every one
24   in excruciating detail as long as
25   the lawsuit in Canada is an

1                    outstanding issue for Slabbed.   The
2                    reason for this is that this band of
3                    gay men act as a unit that will also
4                    scatter like cockroaches when the
5                    heat is applied."
6

7    In January of 2012 the blog says,

8
9                    "Some of those names of the property
10                  owners at Trout Point have well
11                  documented connections to organized
12                  crime here in the U.S.   From my
13                  standpoint flushing all this out
14                  only gets better from here."
15

16    Another blog from September 14th, 2011, sorry,

17    no, that's the same one.   A blog from January

18    29th of 2012,

19
20                    "When I'm done even Perret's niece
21                  who filed an affidavit in that **Fox 8**
22                  case will understand her uncle is a
23                   grifting scumbag pussy."
24

25    And on January 26, 2012 the blog says, "He,"

26    meaning Daquila (sp), "also has enough stroke to

27    tell Charles and Vaughn what to do at Broussard's

28    request."

29        There are many, many more blogs which

30    contained defamatory materials such as this which

1   are included in the materials filed with the

2   Court on January 30th.

3        Turning to the hearing, a comprehensive

4   brief was filed with the Court with many case

5   authorities.  Mr. Leary made an oral submissions

6   to the Court outlining the principles the Court

7   should consider in deciding the quantum of

8   damages for defamation, aggravated damages and

9   punitive damages.  In addition he referred to a

10  recent Ontario Court of Appeal decision with

11  respect to invasion of privacy which is also

12  claimed by the individual plaintiffs.

13       In questioning by the Court, Mr. Leary said

14  that the plaintiffs' other claims are subsumed in

15  the Claim of Defamation, that is the claims were

16  intentional interference with economic relations

17  for intentional interference with contractual

18  relations and injurious falsehood.

19       Mr. Leary submits that the invasion of

20  privacy, assault and intentional infliction of

21  emotional and mental distress stand alone and

1    individual   plaintiffs   seek   damages   for   these

2    separate from the defamation in related claims.

3         The plaintiffs seek damages of $250,000 for

4    each of the three plaintiffs.  Aggravated damages

5    for each individual plaintiff as well as punitive

6    damages.   They say that their original demand of

7    aggravated  damages  of  $300,000  each  should  be

8    increased because the amount was requested before

9    the   recent   defamatory   remarks   which   have

10   continued since default judgment was entered and

11   in particular since Mr. Handshoe was given notice

12   of the assessment of damages.   He said they would

13   seek special damages for loss of business but it

14   is too difficult to prove although he believes

15   they   have   lost   business   because   of   the

16   defamation.

17        In addition, the individual plaintiffs, as

18   I've said, seek damages for invasion of privacy.

19   In the **Jones** Decision the Ontario Court of Appeal

20   said that the range for such damages is up to

21   $20,000.   In that case the Court of Appeal

1   awarded damages in the amount of $10,000.   The

2   plaintiffs here say that the extent of the

3   invasion of privacy in that case was less than is

4   the case here.   plaintiffs also seek an

5   injunction preventing further defamatory comments

6   and a mandatory injunction seeking to have the

7   existing comments removed.

8        The leading case on defamation in Canada is

9   the Supreme Court of Canada Decision is **Hill v.**

10  **Church of Scientology of Toronto.**   In that case

11  Justice Cory writing for the majority referred to

12  the fact that the defamatory comments were

13  published on the local television news, reported

14  in the Globe and Mail and reported on by CBC.   He

15  referred to the audience numbers of those media

16  outlets and said that the audience for the local

17  T.V. station was approximately 132,000.   The

18  Globe circulation that day was 108,000 and the

19  CBC broadcast was seen by approximately 118,000.

20  He refers to that in Paragraph 26 of the

21  decision.

1          He said in Paragraph 108, and I quote,

2

3               "False allegations can so very
4               quickly and completely destroy a
5               good reputation. A reputation
6               tarnished by libel can seldom regain
7               its former lustre."

8

9     And he said with respect to defamatory statements

10    in Paragraph 166,

11

12              "A defamatory statement can seep
13              into the crevices of the
14              subconscious and lurk there, ever
15              ready to spring forth and spread its
16              cancerous evil. The unfortunate
17              impression left by a libel may last
18              a lifetime. Seldom does a defamed
19              person have the opportunity of
20              replying and correcting the record
21              in a manner that will truly remedy
22              the situation."

23

24    Justice Cory later said in Paragraph 178 with

25    respect to Mr. Hill,

26

27              "He would never know who, as a
28              result of the libellous statement,
29              had some lingering suspicion that he
30              was guilty of misconduct which was
31              criminal in nature. He would never
32              know who might have believed that he
33              was a person without integrity who
34              would act criminally in the
35              performance of his duties as a Crown

1  counsel.  He would never be certain
2  who would accept the allegation that
3  he was guilty of a criminal breach
4  of trust which was the essential
5  thrust of the libel."
6

7  In considering whether the jury award of damages

8  was appropriate, the Court quote from **Gatley** on

9  libel and slander in Paragraph 182.  In that text

10  the author states,

11
12  "The amount of damages is peculiarly
13  the province of the jury who in
14  assessing them will naturally be
15  governed by all the circumstances of
16  the particular case.  They're
17  entitled to take into their
18  consideration the conduct of the
19  plaintiff, his position in standing,
20  the nature of the libel, the mode
21  and extent of publication, the
22  absence or refusal of any retraction
23  or apology and 'the whole conduct of
24  the defendant from the time the
25  libel was published down to the very
26  moment of their verdict.  They may
27  take into consideration the conduct
28  of the defendant before action,
29  after action and in court on the
30  trial of the action.'  And also it
31  is submitted that the conduct of his
32  counsel who cannot shelter his
33  client by taking responsibility for
34  the conduct of the case.  They
35  should also allow 'for the sad truth
36  that no apology, retraction or
37  withdrawal can ever be guaranteed

1
2
3
4
5
6

          completely to undo the harm it has
done or the hurt it has caused.'
They should also take into account
the evidence led in aggravation or
litigation of the damages."

7     The Court then said in Paragraph 184,

8
9               "In considering and applying the
10          factors pertaining to general
11          damages in this case it will be
12          remembered that the reports in the
13          press were widely circulated and the
14          television broadcast had a wide
15          coverage.  The setting and the
16          persons involved gave the coverage
17          an air of credibility and
18          significance that must have
19          influenced all who saw and read the
20          accounts.  The insidious harm of the
21          orchestrated libel was indeed spread
22          widely throughout the community."
23

24    In considering the issue of aggravated damages

25    Justice Cory again quoted from **Gatley** in

26    Paragraph 183.

27
28          "The conduct of the defendant, his
29          conduct of the case and his state of
30          mind are thus all matters which the
31          plaintiff may rely on his
32          aggravating the damages."
33

34          "Moreover it is very well
35          established that in cases where the

1  damages are at large the jury or the
2  judge, if the award is left to him,
3  can take into account the motives
4  and conduct of the defendant where
5  they aggravate the injury done to
6  the plaintiff. There may
7  malevolence or spite or the manner
8  of committing the wrong may be such
9  as to injure the plaintiffs' proper
10  feelings of dignity and pride.
11  These are matters which the jury can
12  take into account in assessing the
13  appropriate compensation."
14

15  "In awarding aggravated damages the
16  natural indignation of the Court at
17  the injury inflicted on the
18  plaintiff is a perfectly legitimate
19  motive in making it generous rather
20  than a more moderate award to
21  provide an adequate solution. That
22  is because the injury to the
23  plaintiff is actually greater and as
24  a result of the conduct, exciting
25  the indignation, demands a more
26  generous solatium."
27

28  The Court then referred to the aggravating

29  circumstances in that case at Paragraph 185.

30
31  "The misconduct of the Appellants
32  continued after the first
33  publication. Prior to the
34  commencement of the hearing of the
35  contempt motion before Justice
36  Cromarty, Scientology was aware that
37  the allegations it was making
38  against Casey Hill were false. Yet

1                                  it persisted with the contempt
2                                  hearings as did Morris Manning.   At
3                                  the conclusion of the contempt
4                                  hearing both appellants were aware
5                                  of the falsity of the allegations.
6                                  Nevertheless when the libel action
7                                  was instituted the defensive
8                                  justification was put forward by
9                                  both of them.   The statement of
10                               defense alleging justification or
11                               truth of the allegation was open for
12                               all the public to see.   Despite
13                               their knowledge of its falsity the
14                               appellants continued to publish the
15                               libel."
16

17       Finally the manner in which Hill was crossed

18   examined by the Appellant coupled with the manner

19   in which they presented their position to the

20   jury in light of their knowledge of the falsity

21   of their allegations are further aggravating

22   factors to be taken into account.

23       Justice Cory dealt with the issue of

24   aggravated damages in Paragraphs 188 and 189.

25
26                                "Aggravated damages may be awarded
27                               in circumstances where the
28                               defendant's conduct has been
29                               particularly high handed or
30                               oppressive thereby increasing the
31                               plaintiffs' humiliation and anxiety
32                               arising from the libellous
33                               statement."

The nature of these damages was aptly described by Justice Robins in **Walker v. CFTO Limited** in these words,

> "Where the defendant is guilty of insulting, high handed, spiteful, malicious or oppressive conduct which increase the mental distress the humiliation and indignation, anxiety, grief, fear and the like, suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as aggravated damages. These damages take into account the additional harm caused to the plaintiffs' feeling by the defendant's outrageous and malicious conduct. Like general or special damages they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant part of the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant."

In Paragraph 191 Justice Cory considered the factors in that case that warranted an award of aggravated damages. There are a number of

1   factors that a jury may properly take into

2   account in assessing aggravated damages. For

3   example, was there a withdrawal of the libellous

4   statement made by the defendants and an apology

5   tendered. If there was this may go far to

6   establishing that there was no malicious conduct

7   on the part of the defendant warranting an award

8   of aggravated damages. The jury may also

9   consider whether there was a repetition of the

10  libel, conduct that was calculated to deter the

11  plaintiff from proceeding with the libel action,

12  a prolonged and hostile examination of the

13  plaintiff or plea of justification which the

14  defendant knew was bound to fail. The general

15  manner in which the defendant presented its case

16  is also relevant. Further it is appropriate for

17  a jury to consider the conduct of the defendant

18  at the time of the publication of the libel. For

19  example was it clearly aimed at obtaining the

20  widest possible publicity in circumstances that

21  were the most adverse possible to the plaintiff.

1      The Supreme Court of Canada also considered

2    the issue of punitive damages beginning at

3    Paragraph 196 where the Court said,

4
5          "Punitive damages may be awarded in
6          the situation where the defendant's
7          conduct is so malicious, oppressive
8          and high handed that it offends…"
9

10     - missing a page.  Can we just, we'll just go

11    off the record for a moment, I have to find the

12    rest of that quote.

13
14                 **[RECESS 10:47 - 10:48 A.M.]**
15

16    **THE COURT:**      The Supreme Court of Canada

17    dealt with the issue of punitive damages

18    beginning at Paragraph 196, where the Court said,

19

20          "Punitive damages may be awarded in
21          situations where the defendant's
22          misconduct is so malicious,
23          oppressive and high handed that it
24          offends the Court's sense of
25          decency."
26

27       Punitive damages bear no relation to what

28    the plaintiff should receive by way of

1    compensation.   Their aim is not to compensate the

2    plaintiff but rather to punish the defendant.   It

3    is the means by which the jury or Judge expresses

4    its   outrage   at   the   egregious   conduct   of   the

5    defendant.   They are in the nature of a fine

6    which is meant to act as a deterrent to the

7    defendant   and   to   others   from   acting   in   this

8    manner.   It   is   important   to   emphasize   that

9    punitive damages should only be awarded in those

10   circumstances where the combined award of general

11   and   aggravated   damages   would   be   insufficient   to

12   achieve the goal of punishment and deterrents.

13        One   of   the   important   factors   for   the   Court

14   was set out in Paragraph 202,

15

16        "During   the   appeal   it   was   conceded
17        and   the   evidence   and   events
18        confirmed that in all likelihood no
19        amount   of   general   or   aggravated
20        damages   would   have   deterred
21        Scientology.   Clearly then this was
22        an appropriate case for an award of
23        punitive damages."
24

25        It   is   important   that   each   case   of

1    defamation must be looked at on its own facts and

2    the awards given in other decisions are therefore

3    not of much assistance.

4         The Supreme Court of Canada acknowledged

5    this in the Hill Decision in Paragraph 187.

6    **Barrick Gold** is a decision of the Ontario Court

7    of Appeal dealing with defamation in the internet

8    context.   Justice Blair said in Paragraph 28

9    about internet defamation,

10
11            "Is there something about defamation
12            on the internet, cyber libel as it's
13            sometimes called, that distinguishes
14            it for purposes of damages from
15            defamation in another medium?  My
16            response to that question is yes."
17

18   He referred to the principles set out in **Hill** and

19   then in Paragraph 30 quoted from an Australian

20   decision the quote, "Ambiguity, universality and

21   utility," of the internet.   He continued in

22   Paragraph 31,

23
24            "Thus of the criteria mentioned
25            above, the mode and extent of
26            publication is particularly relevant
27            in the internet context, and must be

1          considered carefully.  Communication
2          via the internet is instantaneous,
3          seamless,   interactive,   blunt,
4          borderless and far reaching.  It is
5          also impersonal and the anonymous
6          nature of such communication has
7          made itself create a greater risk
8          that the defamatory remarks are
9          believed."
10

11    He then said in Paragraph 34,

12
13          "Internet       defamation     is
14          distinguished   from   its   less
15          pervasive cousins in terms of its
16          potential to damage the reputation
17          of individuals in corporations by
18          the   features   described   above
19          especially its interactive nature,
20          its potential for being taken at
21          face value and its absolute and
22          immediate worldwide ubiquity and
23          accessibility.  The mode and extent
24          of  publication  is  therefore
25          particularly     significant
26          consideration in assessing damages
27          in internet defamation cases."
28

29     In **Barrick Gold** an injunction was issued.

30    Justice Blair said in Paragraph 75,

31
32          "A highly transmissible nature of
33          the tortious misconduct at issue
34          here is a factor to be addressed in
35          considering whether a permanent
36          injunction should be granted.  The
37          courts are faced with a dilemma.  On

1  the one hand they can throw up their
2  collective hands in despair taking
3  the view that enforcement against
4  such (inaudible due to mumbling…)
5  transmissions around the world is
6  ineffective and concluding therefore
7  that only the jurisdiction where the
8  originator of the communication may
9  happen to be found can enjoin the
10 offending conduct.   On the other
11 hand they can at least protect
12 against the impugned conduct in
13 their own jurisdiction."
14

15 In this respect I agree with the following

16 observation of Justice Kirby in **Dow Jones**,

17
18 "Any suggestion that there can be no
19 effective remedy for the tort of
20 defamation or other civil wrongs
21 committed by the use of the internet
22 or such wrongs must simply be
23 tolerated as the price to be paid
24 for the advantages of the medium is
25 self-evidently unacceptable."
26

27 A permanent injunction was granted and the Court

28 said in Paragraph 78,

29 "I would set aside the decision of
30 the motions judge in this regard and
31 grant a permanent injunction as
32 requested restraining the defendants
33 from disseminating, posting on the
34 internet or publishing further
35 defamatory statements concerning
36 Barrick or its officers, directors

1                     or employees."
2

3        In **Astley v. Verdun** The Ontario Supreme

4    Court of Justice, Superior Court of Justice cited

5    **Barrick Gold** and ordered an injunction and a

6    mandatory injunction against the defendant.   In

7    that case the defendant stated that in spite of

8    jury verdict against him he would continue to

9    "disparage and discredit the reputation of the

10   plaintiff," quoting from Paragraph 16.

11        Justice Chapnik in that case said in

12   Paragraph 33,

13
14           "Injunctive relief is an exceptional
15           remedy that will not be imposed by
16           the Courts lightly.   I certainly
17           agree with the defendant when he
18           states that any form of prior
19           restraint on freedom of speech is
20           extremely serious and can only be
21           imposed in the clearest and rarest
22           of cases.   This however is one of
23           those cases."
24

25   He then outlined in Paragraph 34 the

26   circumstances of the case which caused him to

27   grant in injunction.   He said,

1
2           "This is so given the plaintiffs'
3           high reputation and position in the
4           business community and the wide
5           circulation of the defamatory
6           statements calculated to destroy
7           that reputation as well as the
8           strong likelihood that the
9           publishing of defamatory statements
10          against the plaintiff will continue
11          and the real possibility that the
12          plaintiff will not actually be
13          compensated by the payment of
14          damages."
15

16   A prudent injunction was granted and the Court

17   said in Paragraph 35,

18
19          "Accordingly I order a permanent
20          injunction to issue against the
21          defendant, J. Robert Verdun
22          restraining him from disseminating,
23          posting on the internet or
24          publishing in any manner whatsoever,
25          directly or indirectly, any
26          statements or comments about the
27          plaintiff Robert M. Astley."
28

29   He also granted a mandatory injunction.  He said

30   in Paragraph 36,

31

32          "There will also be a mandatory
33          injunction requiring the defendant
34          to forthwith remove his blog
35          postings dated April 29, 2011 and

1     May 2nd, 2011 from the internet and
2     any similar postings that refer to
3     the    plaintiff    directly    or
4     indirectly."
5

6     In **Mina Mar Group v. Divine** Justice Perell

7     also quoted **Barrick Gold**.     He granted an

8     injunction issuing out of an Ontario Court

9     against the defendant in New Jersey.   He simply

10    said in Paragraph 28,

11
12    "In    accordance    with    the    above
13    authorities,  I  also  grant  a
14    permanent injunction restraining the
15    defendants    from    disseminating,
16    posting   on   the   internet   or
17    publishing    further    defamatory
18    statements      concerning      the
19    plaintiffs."
20

21    On the issue of invasion of privacy Mr.

22    Leary provided to the Court the recent decision

23    dated January 18th of 2012 of the Ontario Court

24    of Appeal in **Jones v. Tsige** in which the Court

25    concluded there is, at least in Ontario, a tort

26    of invasion, intrusion into seclusion otherwise

27    called invasion of privacy which is claimed by

28    the individual plaintiffs in this matter.   The

1    facts in that case are very different from those

2    in this case.   The defendant had accused, had

3    accessed  the  plaintiff's  personal  banking

4    information on 174 occasions over a period of

5    four years.   However she did not publish or

6    distribute it but used it for her own purposes in

7    a  dispute  with  the  plaintiff's  partner,  the

8    former husband of the defendant.   She apologized

9    for her actions and the Court concluded she was

10   embarrassed and contrite.   The plaintiff claimed

11   $70,000 in damages for invasion of privacy and

12   exemplary damages of $20,000. The Court said the

13   range of damages for this claim is up to $20,000

14   and awarded $10,000.

15       I am satisfied that in an appropriate case

16   in Nova Scotia there can be an award for invasion

17   of privacy or as the Ontario Court of Appeal

18   called it, the intrusion upon seclusion.   I must

19   determine if in this case it is warranted

20   considering the principles set out in **Jones**.   In

21   **Jones** there was no accompanying claim for

1    defamation as there was no publication of

2    defamatory statements about the plaintiff.

3        In **Nitsopoulos v. Wong** the action was for

4    deceit and invasion of privacy. The action

5    concerned gaining entry to the plaintiff's home

6    and publishing information gained while there.

7    The action was brought outside the limits, the

8    time limits for a defamation action.

9        The facts in this case are that Mr.

10   Handshoe, on his blog, disclosed Mr. Leary's

11   business and home address and his location when

12   he was visiting Spain. With respect to Mr.

13   Perret, he said that he had abandoned his mother

14   when he left Louisiana for Canada and Mr. Perret

15   said he was traumatized by this statement.

16       Mr. Handshoe made extremely derogatory and

17   homophobic comments of the most outrageous kind

18   about Mr. Leary and Mr. Perret and their sexual

19   orientation including and posting as what I will

20   refer to as doctored photographs of a sexual

21   nature depicting them.

1          Invasion of privacy in the **Jones** case was

2     private and personal banking information having

3     been looked at many, many times.  That sort of

4     financial and banking information is not usually

5     disclosed by people even to their closest friends

6     yet another bank employee who was not known to

7     the plaintiff looked at her private bank

8     information on numerous occasions.

9          In **Nitsopoulos** the defendant posed as a maid

10     for a Toronto cleaning service so she could write

11     a series of articles for the Globe and Mail

12     entitled "Maid for a Month."  She gained access

13     to the plaintiff's home and her experiences are

14     profiled in the second of these articles.  The

15     article published private details about the life

16     of the plaintiffs that she gained while in their

17     home.  The plaintiffs alleged that they would not

18     have permitted the reporter into their home had

19     she not fraudulently misrepresented herself to

20     them.  They claimed that they suffered harm to

21     their dignity, interests and personal autonomy,

1   their personal and home security and their mental

2   wellbeing.    The Court refused to grant summary

3   judgment to the defendants which they had sought

4   on the basis that there was no cause of action

5   for invasion of privacy.

6        In the **Jones** case the Ontario Court of

7   Appeal dealt with the issue of whether Ontario

8   law recognized a cause of action for invasion of

9   privacy.    Justice Sharpe writing for the Court

10  said in Paragraph 15,

11
12          "Aspects of privacy have long been
13          protected by causes of action such
14          as breach of confidence, defamation,
15          breach of copyright, nuisance, and
16          various property rights. Although
17          the individual's privacy interest is
18          a fundamental value underlying such
19          claims, the recognition of a
20          distinct right of action for breach
21          of privacy remains uncertain."
22

23       Justice Sharpe referred to an article by

24  William L. Prosser entitled *Privacy* which was

25  published in the California Law Review 383.    He

26  said there were four torts which were quoted in

27  Paragraph 18;

1

2          1.          Intrusion   upon   the   plaintiff's

3   seclusion   or   solitude,   or   into   his   private

4   affairs;

5          2.          Public   disclosure   of   embarrassing

6   private facts about the plaintiff;

7          3.          Publicity which places the plaintiff

8   in a false light in the public eye;

9          4.          Appropriation,  for  the  defendant's

10   advantage, of the plaintiff's name or likeness.

11

12          He  said  the  most  relevant  of  these  is  the

13   intrusion   upon   seclusion   and   he   quoted   in

14   Paragraph   19   its   definition   from   *Restatement*,

15   *second restatement of torts* as follows,

16
17                   "One   who   intentionally   intrudes,
18          physically  or  otherwise,  upon  the
19          seclusion of another or his private
20          affairs or concerns, is subject to
21          liability to the other for invasion
22          of  his  privacy,  if  the  invasion
23          would  be  highly  offensive  to  a
24          reasonable person."
25

26          He continued in Paragraph 20,

"The comment section of the *Restatement* elaborates this proposition and explains that the tort includes physical intrusions into private places as well as listening or looking, with or without mechanical aids, into the plaintiff's private affairs. Of particular relevance to this appeal, is the observation that other non-physical forms of investigation or examination into private concerns may be actionable. These include opening private and personal mail or examining a private bank account, even though there is no publication or other use of any kind of the information obtained."

The decisions he then (inaudible due to mumbling…) dealt largely with the collection of personal data. Chartered jurisprudence dealing with privacy has focussed on search and seizure in the criminal law context.

Justice Sharpe said in Paragraph 41 that there are three distinct privacy interests, the third being a relevant one in **Jones**. That is the informational privacy. He quoted from the Decision of the **Queen v. Tessling** in Paragraph 41 where the Supreme Court of Canada said,

1

2      "Beyond our bodies and the places
3      where we live and work, however,
4      lies the thorny question of how much
5      information about ourselves and
6      activities we are entitled to shield
7      from the curious eyes of the state.
8      This includes commercial information
9      locked in a safe kept in a
10      restaurant owned by the accused.
11      Informational privacy has been
12      defined as 'the claim of
13      individuals, groups, or institutions
14      to determine for themselves when,
15      how, and to what extent information
16      about them is communicated to
17      others.' Its protection is
18      predicated on the assumption that
19      all information about a person is,
20      in a fundamental way, his own for
21      him to communicate or retain as he
22      sees fit."
23

24  In Paragraph 44 he referred to the *Universal*

25  *Declaration of Human Rights* which provides,

26
27      "No one shall be subjected to
28      arbitrary interference with his
29      privacy, home or correspondence and
30      proclaims that everyone has the
31      right to the protection of the law
32      against such interference or
33      attacks."
34

35  Justice Sharpe said in Paragraph 45,

36

1    "While the *Charter* does not apply to
2    common law disputes between private
3    individuals, the Supreme Court has
4    acted on several occasions to
5    develop the common law in a manner
6    consistent with *Charter* values."
7
8
9    Justice Sharpe then reviewed privacy legislation
10   in Canada and the development of privacy law in
11   other jurisdictions.   He then said in Paragraph
12   67,
13
14   "For over one hundred years,
15   technological change has motivated
16   the legal protection of the
17   individual's right to privacy. In
18   modern times, the pace of
19   technological change has accelerated
20   exponentially. Legal scholars such
21   as Peter Burns have written of 'the
22   pressing need to preserve privacy
23   which is being threatened by science
24   and technology to the point of
25   surrender.' The internet and digital
26   technology have brought an enormous
27   change in the way we communicate and
28   in our capacity to capture, store
29   and retrieve information. As the
30   facts of this case indicate,
31   routinely kept electronic data bases
32   render our most personal financial
33   information vulnerable. Sensitive
34   information as to our health is
35   similarly available, as are records
36   of the books we have borrowed or
37   bought, the movies we have rented or
38   downloaded, where we have shopped,

1                     where we have travelled, and the
2                     nature of our communications by cell
3                     phone, e-mail or text message".
4

5        He then deals with law as it applied to the

6   case before the Court.  He said in Paragraph 71,

7

8                     "The key features of this cause of
9                     action are, first, that the
10                    defendant's conduct must be
11                    intentional, within which I would
12                    include reckless; second that the
13                    defendant must have invaded, without
14                    lawful justification, the
15                    plaintiff's private affairs or
16                    concerns; and third, that a
17                    reasonable person would regard the
18                    invasion as highly offensive causing
19                    distress, humiliation or anguish.
20                    However, proof of harm to a
21                    recognized economic interest is not
22                    an element of the cause of action. I
23                    return below to the question of
24                    damages, but state here that I
25                    believe it important to emphasize
26                    that given the intangible nature of
27                    the interest protected, damages for
28                    intrusion upon seclusion will
29                    ordinarily be measured by a modest
30                    conventional sum."
31

32   He continued in Paragraph 72,

33
34                    "These elements make it clear that
35                    recognizing this cause of action
36                    will not open the floodgates. A

> "claim for intrusion upon seclusion will arise only for deliberate and significant invasions of personal privacy. Claims from individuals who are sensitive or unusually concerned about their privacy are excluded: it is only intrusions into matters such as one's financial or health records, sexual practices and orientation, employment, diary or private correspondence that, viewed objectively on the reasonable person standard, can be described as highly offensive."

He then referred to the competing claims of freedom of expression and freedom of the press. He said in Paragraph 73,

> "Suffice it to say, no right to privacy can be absolute and many claims for the protection of privacy will have to be reconciled with, or even yield to, such competing claims."

In Paragraph 87 Justice Sharpe set out the considerations in determining damages where an intrusion on seclusion has been found to exist.

In **Jones** there was no issue about freedom of expression or freedom of the press.  The Ontario Court of Appeal therefore did not have to

1    consider the balance to be struck between those

2    rights and privacy rights.

3        Justice   Sharpe   specifically   mentioned

4    intrusion   into   matters   involving   a   person's

5    sexual   practices   and   orientation   as   being

6    possible subjects for a claim of intrusion upon

7    seclusion.   However he said these intrusions must

8    be   viewed   objectively   and   be   viewed   as   highly

9    offensive.   Weight   against   this   is   freedom   of

10   persons to express their opinions.

11       Certainly the comments made by Mr. Handshoe

12   deal   with   Mr.   Leary's   and   Mr.   Perret's   sexual

13   orientation.   They're   anti-gay   and   homophobic,

14   they   were   very   upsetting   to   both   as   were   the

15   doctored   up   photographs,   they're   highly

16   offensive.   However   the   issue   of   weighing   the

17   effect   of   the   intrusion   on   seclusion   against   the

18   issue   of   freedom   of   expression   was   not   argued

19   before me.   In such circumstances I conclude this

20   is   not   an   appropriate   case   for   the   award   of

21   damages for intrusion of seclusion.

1       In this regard I note as well the comments

2    of Justice Cory in **Hill** where he said with

3    respect to defamation,

4

5           "Reputation is intimately related to

6           the right to privacy which has been

7           accorded constitutional protection."

8

9       This passage was also quoted by Justice

10    Sharpe in Paragraph 43 of the **Jones** decision.

11       Because this is also a defamation action I

12    conclude this is a further reason to leave the

13    issue of a cause of action for intrusion on

14    seclusion for another day in another proceeding.

15       Now turning to the damage award with respect

16    to Trout Point Lodge.  With respect to the

17    corporate plaintiff it is clear that a

18    corporation can be defamed.  Damages were awarded

19    to the Barrick Gold Corporation and to Dover

20    Investments Limited.  In the latter decision the

21    Court set out the principles in awarding damages

22    to a corporate plaintiff.

23       The Court said in Paragraph 19,

1

2  "Damages for a corporate plaintiff
3  are to compensate for the harm to
4  its goodwill and business
5  reputation. The factors to be
6  considered in assessing damages
7  include the defendant's conduct, his
8  position and standing, the nature of
9  the defamation, the absence of an
10 apology or refusal to apologize and
11 his conduct throughout up to and
12 including at trial. In addition to
13 general damages for defamation a
14 corporate plaintiff may be entitled
15 to special damages for specific
16 economic loss. In addition general
17 damages for defamation in
18 exceptional cases a corporate
19 plaintiff may be entitled to an
20 award of punitive damages for
21 malicious, oppressive and high-
22 handed conduct. Punitive damages
23 are intended to punish a defendant
24 rather than compensate a plaintiff.
25 Compensatory damages of substantial
26 may also be considered punishment
27 and should be taken into account
28 when determining whether an award of
29 punitive damages is warranted."
30

31 Trout Point Lodge has been stated to have been

32 funded by money illegally obtained through Mr.

33 Broussard and through the dishonest actions of

34 Mr. Leary and Mr. Perret and getting money from

35 ACOA and other investors. It has been said to be

36 on the verge of bankruptcy. These are things

1   which would cause potential guests to decide not
2   to come to Trout Point Lodge.

3       The defamation in my view has harmed the
4   goodwill of the business and its business
5   reputation.  It casts an unfavorable light on the
6   business which has otherwise received extremely
7   positive reviews in the Globe and Mail, the
8   National Post, US Today and the National
9   Geographic Traveler to mention just a few.

10      It has also been commended by well-known
11   publications such as Four Doors Guide to Atlantic
12   Canada and Forbes Traveller to name a few.

13      It has also been recognized as a Top 10
14   finalist in the National Geographic Society's
15   2009 Geo-tourism challenge.  Some of this
16   information is included at Tab 5 of the evidence
17   submitted at the hearing.

18              Mr. Leary points out in Paragraph 8
19         of his affidavit, "In addition to
20         its membership and prestigious hotel
21         and restaurant association Relais
22         and Chateaux Trout Point has always
23         maintained a four and one half star
24         rating from Canada Select.  It's the
25         only hotel in Atlantic Canada

1    inspected and recommended by Conde
2    Nast Johansens Guide and earned a
3    five green key rating from the hotel
4    association of Canada."
5

6    The defendant is persistent in his

7    statements that Trout Point Lodge is somehow

8    connected to the Jefferson Parish corruption

9    scandal and has benefitted financially from funds

10   illegally obtained.  The defendant knows that the

11   original story linking Mr. Broussard with Trout

12   Point Lodge has been retracted and an apology

13   published.   In the face of this the defamatory

14   comments continued.

15   Mr. Handshoe had refused to apologize or

16   retract and in fact has republished the original

17   statements and says they are true.   In addition

18   he has alleged that the business is on the verge

19   of bankruptcy and has received funds improperly.

20   All this has been done through the internet

21   which has the potential to reach untold numbers

22   of potential guests of Trout Point Lodge

23   throughout the world.

1    The defamation has gone on now for two years

2    and there is no indication that the defendant

3    intends to stop.   The defendant's conduct

4    throughout has been to attempt to destroy the

5    reputation of the business.

6    In my view it may be very difficult to

7    change the perception of Trout Point Lodge caused

8    by the defamation and its reputation as a world

9    class resort has been damaged.

10   I conclude that the appropriate award of

11   damages for the defamation of Trout Point Lodge

12   is $75,000.

13   The individual plaintiffs have been called

14   dishonest, part of money laundering scheme

15   involving Mr. Broussard and part of a political

16   corruption scandal involving Mr. Broussard which

17   is now the subject of FBI investigation.

18   They are said to have lied and misled ACOA

19   and the Court in the ACOA action. Mr. Leary has

20   said to have perjured himself in that litigation.

21   They are said to have misused the justice system

1    in Nova Scotia for their own purposes.  They are

2    referred to as participating in nefarious schemes

3    being bag holders for Mr. Broussard, being

4    unsuccessful businessmen who have had a series of

5    failed businesses and being conmen.

6        Mr. Leary has said they have changed their

7    patterns of running errands to avoid running into

8    people who may ask them about the internet

9    information published about them.  They are

10   embarrassed and stressed by the defamation.

11       To paraphrase the Supreme Court of Canada

12   decision in **Hill**,

13
14           "They will never know who, as a
15       result of the defamation, still has
16       a lingering suspicion that they are
17       dishonest, schemers and con men and
18       were involved with Aaron Broussard
19       in the political corruption of which
20       he is accused.  They will never know
21       who might believe that they are
22       without integrity and were involved
23       in criminal activity."
24

25       These unfounded statements about the

26   character, business dealings and financial acumen

27   of these businessmen merit an award of damages

1    for each in the amount of $100,000.

2        Aggravated damages are beyond the damages

3    already awarded which are given when the injury

4    to a plaintiff are aggravated.   As Gatley on

5    libel and slander described it, they reflect a

6    natural indignation of the Court of the injury

7    inflicted.   As Justice Cory said in **Hill** they

8    take into account the additional harm caused to

9    the plaintiff's feelings by the defendant's

10   outrageous and malicious conduct.

11       Justice Cory in **Hill** considered the factors

12   in that case which the Court believed made such

13   an award by the jury in that case a reasonable

14   one.

15       I conclude that the following factors in

16   this case call for such an award here.   The

17   original story was retracted by the Times-

18   Picayune in New Orleans, nevertheless Mr.

19   Handshoe continued to spread the defamation.   He

20   then came up with additional statements

21   concerning events in Nova Scotia which defamed

1   the defendants beyond the original defamation.

2   He commented on other business ventures of the

3   plaintiffs and other legal matters in which they

4   were involved misrepresenting facts and attacking

5   the reputations with statements that they were

6   dishonest, fraudsters and liars.   The widespread

7   defamatory continued to the date of this hearing

8   in a meeting well suited to spreading the

9   defamation far and wide to a vast number of

10  internet users.

11      Furthermore there was conduct by the

12  defendant in trying to stop the plaintiffs from

13  continuing their action against him.    He

14  threatened to release dossiers of information he

15  had about the plaintiffs and other unnamed people

16  unless the action was discontinued.   All of this

17  is outrageous conduct in the face of true facts

18  about the plaintiffs.

19      Malice is an essential element of an award

20  of aggravated damages and in this case malice is

21  alleged in the statement of claim in Paragraph 93

1      and other places and is therefore deemed admitted

2      by virtue of the default judgment.

3            I therefore award an additional $50,000 to

4      each of Mr. Leary and Mr. Perret in aggravated

5      damages to express the indignation of the court.

6            As the Supreme Court of Canada said in **Hill**,

7      punitive damages are not compensatory in nature

8      but are meant to punish the defendant. There

9      must be a rational purpose in awarding punitive

10     damages. In **Hill** the Supreme Court of Canada

11     considered the actions of the Church of

12     Scientology and its officers during the course of

13     the litigation and focussed on its oppressive and

14     high handed conduct and the malice of which it

15     acted throughout.

16         The defendant in this case continued his

17     defamation after the newspaper printed a

18     retraction of its story linking Trout Point

19     Lodge, Mr. Leary and Mr. Perret with Aaron

20     Broussard and the serious criminal allegations

21     against him. He redoubled his efforts after

1   being sued and continued his defamation after

2   judgment had been entered against him.   He

3   repeated the original defamatory statements.

4       Just prior to the hearing about damages

5   there were further defamatory statements.

6       Mr. Handshoe has stated that because of

7   legislation in the United States it would be

8   impossible for the plaintiffs to recover judgment

9   against him.   This is a factor in awarding

10  punitive damages.

11      I conclude there is a rational reason for

12  awarding punitive damages in this case for the

13  defendant's egregious misconduct which offends

14  the court's sense of decency.   It is to act as a

15  deterrent not only to Mr. Handshoe but also to

16  others who might be inclined to defame someone in

17  this fashion.

18      With respect to Trout Point Lodge I conclude

19  that the defamation award itself is an

20  appropriate award to punish the defendant for his

21  defamation of the corporate plaintiff.   With

1    respect to Mr. Leary and Mr. Perret I conclude

2    that there is a need for additional punishment of

3    the defendant because the defamation of them goes

4    beyond what has been said about the company.

5        In my view the award of general and

6    aggravated damages to Charles Leary and Vaughn

7    Perret is insufficient to properly denounce the

8    actions of Mr. Handshoe and serve the goal of

9    deterrence.

10       I therefore conclude that there should be an

11    additional $25,000 awarded to each of Charles

12    Leary and Vaughn Perret as punitive damages

13    against Mr. Handshoe.

14       I'm satisfied that an injunction should

15    issue. The principles for granting of

16    injunctions in defamation cases were set out in

17    **Astley**. **Barrick Gold** made it clear that

18    injunctions are available in cases of defamation.

19    In **Astley** Justice Chapnik said in Paragraph 21,

20

21          "Permanent injunctions have
22          consistently been ordered after

findings of defamation where either:
(1) there is a likelihood that the
defendant will continue to publish
defamatory statements despite the
finding that he is liable to the
plaintiff for defamation; or (2)
there is a real possibility that the
plaintiff will not receive any
compensation, given that enforcement
against the defendant of any damage
award may not be possible."

Applying these factors to this case I look at the conduct of the defendant which, from the beginning, was defamatory and continued with more fervor after a retraction was printed, was published. It became stronger and more malicious and derogatory as the action was commenced and as it proceeded to this assessment of damages. There's been no retraction or apology but a continued campaign of defamation against these plaintiffs and homophobic comments about their sexual preference.

It is clear from the evidence before me that Mr. Handshoe will continue to publish the defamatory material. He says he's protected from foreign defamation judgments such as the default

1   judgment in this proceeding by legislation in the

2   United States.

3       It also may be difficult if not impossible

4   for the plaintiffs to recover on their judgment.

5   It's not known what assets Mr. Handshoe has or

6   whether enforcement in the U.S. on the monetary

7   judgment will be possible.

8       I therefore conclude that an injunction

9   should issue. Mr. Handshoe is therefore enjoined

10  from dissemination, posting on the internet,

11  distributing or publishing in any manner

12  whatsoever, directly or indirectly statements or

13  comments about Trout Point Lodge, Charles Leary

14  and Vaughn Perret. This includes statements or

15  comments which refer to the three plaintiffs by

16  name, depiction or description. The mandatory

17  injunction shall also issue requiring Douglas

18  Handshoe to remove the defamatory comments,

19  statements and depictions from any internet site

20  on which he has posted them and any links to

21  those sites.

1  The plaintiffs seek solicitor client costs
2  of these proceedings.   However they have not
3  retained the services of counsel but have
4  represented themselves throughout.   It is true
5  that Vaughn Perret is a law graduate and has
6  practised law.   However he has non-practising
7  status and has never been approved to practise
8  law in Nova Scotia.   I therefore cannot conclude
9  that solicitor client costs are warranted.   That
10 is not to say that self-represented parties are
11 not entitled to their costs.   In Nova Scotia it
12 has been said that costs can be awarded to self-
13 represented parties beginning with the decision
14 in **MacBeth v. Dalhousie University** and more
15 recently in the Court of Appeal decision in **Crewe**
16 **v. Crewe.**

17 I've awarded the costs in the modest amount
18 of $4,000 to self-represented parties in **Salman**
19 **v. Al-Sheik Ali.**   In that case the self-
20 represented parties took part in multi-party
21 litigation and were well prepared and did not

1   cause any delays of five and one half days.

2       I conclude that in the circumstances of this

3   case there should be a modest costs award to

4   reflect the time spent on this matter by the

5   individual plaintiffs.  They brought the matter

6   on to court and obtained a default judgment.

7   They were well prepared for the one half day

8   hearing to assess damages but it was unopposed.

9       I therefore award them costs in the total

10  amount of $2,000.

11      The self-represented parties of the **Salman**

12  matter were also entitled their disbursements as

13  are the plaintiffs in this case.  They however

14  have not provided me with their disbursements.

15  If they wish to provide that information I will

16  consider their out of pocket costs and render a

17  further brief decision.   I should note however

18  that the final order in this matter therefore

19  cannot be issued until that is done.

20      That concludes my oral decision and I guess

21  the only question I have for the parties is do

1    you wish to make a claim for the disbursements

2    which will mean that the order can't be issued in

3    this proceeding until that's done.

4          **MALE VOICE:**   No My Lady, we would forego

5    the out of pocket costs.

6          **THE COURT:**   Thank you, so the order can

7    be issued sooner rather than later.   Thank you,

8    that concludes the matter.

9

10               **[END OF RECORDING 11:22 P.M.]**

11

12

13

14

15

16

17

18

19

20

21

22

1

2

3

4  ## CERTIFICATE OF COURT TRANSCRIBER

5

6  I, Rita Newton, Court Transcriber, hereby certify that

7  I have transcribed the foregoing and that it is a true

8  and accurate transcript of an oral decision given in

9  the matter of **Trout Point Lodge versus Douglas**

10 **Handshoe, YAR No. 353654,** taken by way of electronic

11 recording in Yarmouth, Nova Scotia on February 1,

12 2012.

13

14 _____

15          **Rita Newton, Certificate No. 2006-56**

16          **CERTIFIED COURT TRANSCRIBER,**
17          **PROVINCE OF NOVA SCOTIA**
18

19          Halifax, Nova Scotia

20          June 12, 2012