### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**TROUT POINT LODGE, LIMITED, A Nova Scotia
Limited Company; VAUGHN PERRET and
CHARLES LEARY**                                        **PLAINTIFFS**

**VERSUS**                              **CIVIL ACTION NO:  1:12CV00090 LG-JMR**

**DOUG K. HANDSHOE**                                    **DEFENDANT**

---

### BRIEF OF PLAINTIFFS TROUT POINT LODGE, LTD., A NOVA SCOTIA
### LIMITED COMPANY; VAUGHN PERRET; AND CHARLES LEARY
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

### I.

### INTRODUCTION

On or about September 1, 2011, Plaintiffs, Trout Point Lodge, Limited, a Nova Scotia

Limited Company, Vaughn Perret and Charles Leary, filed their 1st Amended Statement of

Claim (Amended Complaint) in the Supreme Court of Nova Scotia, Canada for defamation and

related relief against Defendant, Doug K. Handshoe. Exhibit "1" to Motion for Summary

Judgment, 1st Amended Statement of Claim.

Among the several services of process on Defendant, Plaintiffs served Defendant through

a Louisiana based process server with 1st Amended Notice of Action (Summons) and 1st

Amended Statement of Claim (Amended Complaint) on September 13, 2011, at Defendant's

place of business in Wiggins, Mississippi.  Exhibit "1" to Motion for Summary Judgment, 1st

Amended Statement of Claim.

Defendant made no appearance in the Canadian Court, see Exhibit "3" to Motion for Summary Judgment at p. 3, Order for Judgment Against Douglas K. Handshoe, and Plaintiffs moved for and obtained an order assessing damages on January 12, 2012. Exhibit "2" to Motion for Summary Judgment, Order.

On February 2, 2012, the Supreme Court of Nova Scotia entered Judgment against Defendant and in favor of Plaintiffs, and awarded Trout Point Lodge $75,000.00 in general damages; Vaughn Perret $100,000.00 in general damages, $50,000.00 in aggravated damages and $25,000.00 in punitive damages; and Charles Leary $100,000.00 in general damages, $50,000.00 in aggravated damages, and $25,000.00 in punitive damages, with costs in favor of Plaintiffs in the amount of $2,000.00. Exhibit "2" to Motion for Summary Judgment, Order.

On March 8, 2012, Plaintiffs filed their Motion to Enroll the favorable Nova Scotia Judgment in the Circuit Court of Hancock County, Mississippi. Exhibit "4" to Motion for Summary Judgment, Motion to Enroll Foreign Judgment.

On March 26, 2012, Defendant filed his notice of removal of that motion in this Court pursuant to Securing the Protection of Our Enduring and Established Constitutional Heritage Act ("SPEECH Act"). *See* 28 U.S.C. § 4101, *et seq.*

II.

ARGUMENT

A. THE NOVA SCOTIA COURT'S DECISION

The individual Plaintiffs, Vaughn Perret and Charles Leary, are United States citizens residing in Canada, and own Trout Point Lodge, Limited, a Nova Scotia Limited Company, which is an award winning lodge in Nova Scotia, Canada. After hearing all of the evidence the Plaintiffs presented in Defendant's absence, since he chose not to appear, the Nova Scotia Court

dictated into the Record a fifty-nine page opinion that painstakingly analyzed the facts, jurisdiction, claims, and damages on February 1, 2012. *See* Exhibit "5" to Motion for Summary Judgment, Nova Scotia Court Decision.   Some of Justice Hood's findings are crucial to understanding this litigation:

> The plaintiffs move for an assessment of damages on January 12th, 2012.   Mr. Handshoe was given notice of a hearing for the assessment of damages.

Exhibit "5" to Motion for Summary Judgment at p. 3, Nova Scotia Court Decision.

> The plaintiffs have provided a copy of a FedEx tracking slip showing delivery to Mr. Handshoe's home in Mississippi. It notes the materials were left at the house.   Efforts were also made according to the testimony of Mr. Leary to fax the documents to Mr. Handshoe's fax number but the transmission was not complete as the fax appeared to have been disconnected.   These materials appear also to have been sent by email and these documents are at Tab 3 to the materials presented in evidence by Mr. Leary at the hearing.   It appears from Mr. Handshoe's blog that he had knowledge of the hearing since he referred to receiving, "nastygrams," from Mr. Leary and Mr. Perret in a blog dated January 17th, 2012. Mr. Handshoe did not appear or participate in the assessment of damages.

Exhibit "5" to Motion for Summary Judgment at p. 4, Nova Scotia Court Decision.

> The statement of claim lists many examples of the defamatory comments made by Mr. Handshoe, below is a brief summary of them.   The defamatory comments originated with a news story which was published in the Times-Picayune newspaper in Louisiana about Jefferson Parish President Aaron Broussard being involved in a political corruption scandal.   The plaintiffs were erroneously identified as being connected with Mr. Broussard in a business venture and Mr. Broussard was named in error as owning Trout Point Lodge.   The allegations against him are kickback schemes, money laundering and fraud while in his office as Parish President.
>
> The defamatory comments later included claims that Trout Point Lodge, Mr. Leary and Mr. Perret had misled ACOA and that Mr. Leary committed perjury in litigation with ACOA.   The defamation continued with statements that Trout Point Lodge was losing business or going bankrupt because of the investigation of

Mr. Broussard and his inability to continue to support it.  Also there were claims that Charles Leary and Vaughn Perret had been involved in a series of businesses which failed and are con men. The statements also contained anti-gay rhetoric and homophobic comments.

After the original story was retracted by the Louisiana newspaper that published it Mr. Handshoe made statements that Mr. Leary and Mr. Perret had improperly influenced it to retract the story. He also said that Mr. Leary and Mr. Perret were improperly using the legal system by commencing the defamation action.

Exhibit "5" to Motion for Summary Judgment at pp. 5-6, Nova Scotia Court Decision.

On August 15th, 2011 the blog refers to "a Trout Point Lodge Jefferson Parish political corruption scandal update" linking Trout Point Lodge with the corruption scandal involving Aaron Broussard.  In that same blog he refers to Charles Leary and Vaughn Perret in the context of "by reporter, get a good story."

On August 16th his blog said that he was meticulously laying down "the trail of scams and political corruption that leads to Nova Scotia and Trout Point Lodge."

After being served with the Notice of Action further defamatory comments were made.  On August 18th he wrote,

"First class bitches, common thugs or just plain old morons."

He also refers to the "elite fraternity of crooks and miscreants" who have sued him. On August 24th, 2011 he referred to "political wrongdoing involving Leary and Perret in Canada and it had nothing to do with Broussard *per se*."

Exhibit "5" to Motion for Summary Judgment at p. 11 Nova Scotia Court Decision (emphasis in original).

In addition, materials were submitted to the court which were testified to by Charles Leary.   These included defamatory comments made after the Louisiana newspaper printed a retraction of the story.  They include references to a cover-up of a crime and dirty secrets April 20th, 2011 that Charles Leary and Vaughn Perret and others were "bag holders" for Aaron Broussard and the purported owners of Trout Point Lodge.  That same blog referred to the fleecing of investors in Trout Point Lodge by Mr. Broussard

and his close connection to Mr. Leary and Mr. Perret.  It also refers to Charles Leary as a liar and a perjurer  in the litigation with ACOA.  And that blog was April 26, 2011.

Exhibit "5" to Motion for Summary Judgment at p. 10, Nova Scotia Court Decision.

He continues to make accusations of fraud against them and in bilking local contractors.  He refers to "the chances Trout Point Lodge will be bankrupt within a year" and he said that on August 30th, 2011.  In the same blog he refers to the "nefarious practices" of Charles Leary and Vaughn Perret.  He refers to them being involved in money laundering.  He calls them "grifters" and "grafters."  He accuses them of fabricating positive reviews of Trout Point Lodge.  Ultimately he links them with organized crime.

Exhibit "5" to Motion for Summary Judgment at p. 12, Nova Scotia Court Decision.

Furthermore there was conduct by the defendant in trying to stop the plaintiffs from continuing their action against him.   He threatened to release dossiers of information he had about the plaintiffs and other unnamed people unless the action was discontinued.  All of this is outrageous conduct in the face of true facts about the plaintiffs.

Exhibit "5" to Motion for Summary Judgment at p. 50, Nova Scotia Court Decision.

Another blog from September 14, 2011, sorry, no, that's the same one.  A blog from January 29th of 2012,

"When I'm done even Perret's niece who filed an affidavit in that **Fox 8** case will understand her uncle is a grifting scumbag pussy."

\*\*\*

There are many, many more blogs which contained defamatory materials such as this which are included in the materials filed with the Court on January 30th.

Exhibit "5" to Motion for Summary Judgment at p. 13-14, Nova Scotia Court Decision

(emphasis in original); *see also* Exhibit "6" to Motion for Summary Judgment, Hearing Book

Exhibits for Damages Assessment Hearing "Book 1 of 2" and "Book 2 of 2."

Based on the Nova Scotia Court's analysis of the facts and law, it determined that judgment should be entered in favor of Plaintiffs against Defendant.  The following day, the Court dictated its Decision, and judgment was entered in favor of the Plaintiffs against Defendant as follows:

> The Defendant Douglas K [sic] Handshoe of Mississippi as a joint and concurrent tortfeasor shall pay to the plaintiffs the following damages:
>
> - to Trout Point Lodge: $75,000 in general damages
> - to Vaughan [sic] Perret, $100,000 in general damages; $50,000 in aggravated damages; and $25,000.00 in punitive damages;
> - to Charles Leary, $100,000 in general damages; $50,000 in aggravated damages; and $25,000 in punitive damages;
>
> as well as costs of $2,000.

Exhibit "2" to Motion for Summary Judgment, Order.

B.   THE SPEECH ACT.

Defendant removed Plaintiffs' Motion to Enroll Judgment from the Hancock County, Mississippi, Circuit Court pursuant to the Securing the Protection of Our Enduring and Established Constitutional Heritage Act ("SPEECH Act") codified at 28 U.S.C. § 4101, *et seq.*  Congress found that defamation plaintiffs were obtaining judgments in foreign countries in cases that would not meet constitutional muster if brought in the United States federal or state courts, and this was abridging Americans' First Amendment right to freedom of speech.

The SPEECH Act specifically arose out of instances of "libel tourism," sometimes called "libel terrorism," and some state legislatures' reaction (for example, New York Libel Terrorism Protection Act, 2008 and California Libel Tourism Act, 2009). The most prominent case of libel tourism—where a plaintiff forum shops a defamation action—was that involving the Saudi Arabian citizen Khalid bin Mahfouz and two members of his family. They sued Rachel

Ehrenfeld, an Israeli born writer and United States citizen, over her 2003 book on terrorist financing, *Funding Evil*, which asserted that Mahfouz and his family provided financial support to Islamic terrorist groups. *See Ehrenfeld v. Bin Mahfouz*, 881 N.E.2d 830 (N.Y., 2007). The Mahfouz plaintiffs obtained a default judgment against Ehrenfeld in the United Kingdom. *Id.* at 833.

In August 2010, the United States Congress passed the legislation into law by the unanimous votes of both houses.   Congress also detailed a number of Findings at the commencement of the SPEECH Act. It is well established that there exists a deference that federal courts "customarily must pay to the duly enacted and carefully considered decision of a coequal and representative branch of our Government." *See Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 319 (1985).

The Findings of the SPEECH Act include:

> Some persons are obstructing the free expression rights of United States authors and publishers, and in turn chilling the first amendment to the Constitution of the United States interest of the citizenry in receiving information on matters of importance, by seeking out foreign jurisdictions that do not provide the full extent of free-speech protections to authors and publishers that are available in the United States, and suing a United States author or publisher in that foreign jurisdiction.

The Findings also refer to a study by a United Nations Human Rights Committee, which concluded that:

> in some instances the law of libel has served to discourage <u>critical media reporting</u> on <u>matters of serious public interest</u>, adversely affecting the ability of <u>scholars and journalists</u> to publish their work. The advent of the internet and the international distribution of <u>foreign media</u> also create the danger that one country's unduly restrictive libel law will affect freedom of expression worldwide on <u>matters of valid public interest</u>. (emphasis added)

It is clear that Congress' intention in legislating the SPEECH Act was to prevent libel tourism and forum shopping, as well as the chilling of substantive, truthful speech by journalists and intellectuals on matters of "serious" and "valid" public interest.

C.    PLAINTIFFS HAVE MET THE REQUIREMENTS OF THE SPEECH ACT.

1.    The Nova Scotia Court had jurisdiction.

The SPEECH Act enables an American defamation defendant to remove a defamation plaintiff's proceeding to enforce a judgment entered in the court of a foreign nation, as Defendant in the instant case has done. *See* 28 U.S.C. § 4103.

Upon removal, the SPEECH Act imposes the defamation plaintiff with the burden to prove the foreign court had jurisdiction over the American defamation defendant:

> The party seeking recognition or enforcement of the foreign judgment shall bear the burden by making the showing that the foreign court's exercise of personal jurisdiction comported with the due process requirements that are imposed on domestic courts by the Constitution of the United States.

28 U.S.C. § 4102(b)(2).

Plaintiffs in the instant case meet that burden.  Among the variety of ways Plaintiffs served Defendant with process and placed Defendant upon actual notice of the proceedings against him, on September 13, 2011, Plaintiffs personally served Defendant with process. *See* Exhibit "1" to Motion for Summary Judgment, 1st Amended Notice of Action.   In fact, Defendant admits that Plaintiffs served him with process and that he actually knew about the Canadian proceedings against him. *See* Exhibit "7" to Motion for Summary Judgment at ¶ 5-6, Affidavit of Charles L. Leary.

Personal service is the gold standard of giving notice in the United States and Canada. *See Greene v. Lindsey*, 456 U.S. 444 (1982).

> The fundamental requisite of due process of law is the opportunity to be heard. And the right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest. Personal service guarantees actual notice of the pendency of a legal action; it thus presents the ideal circumstance under which to commence legal proceedings against a person, and has traditionally been deemed necessary in actions styled *in personam*.

*Greene*, 456 U.S. at 449 (internal citations and quotations omitted). Personal service of process on Defendant complies with both Federal Rule of Civil Procedure 4(e)(1) and (1)(A) and Mississippi Rule of Civil Procedure 4(d)(1)(A).

Defendant's libelous publications concerned the Nova Scotia activities of Nova Scotia residents. They impugned the reputations and made allegations of moral turpitude against persons whose business and careers were centered in Nova Scotia. Many publications were drawn from Nova Scotia or Canadian sources, and the Plaintiffs suffered the brunt of the harm, in terms both of Plaintiffs' emotional distress and the injury to their professional reputations, in Nova Scotia. In sum, Nova Scotia is the focal point both of Defendant's publications and of the harm suffered. Jurisdiction over the Defendant was therefore proper in Nova Scotia based on the "effects" of his Mississippi conduct in Nova Scotia. *See e.g., Calder v. Jones*, 465 U.S. 783, 789-84 (1984). Defendant's intentional conduct satisfied both the "tort prong" of Mississippi's Long Arm Statute and the due process requirements of the United States Constitution. *See* Exhibit "7" to Motion for Summary Judgment, Affidavit of Charles L. Leary.

Defendant's publications, as reflected in the decision of Justice Hood and elsewhere, show that the subject matter of and the sources relied upon for the numerous publications were in Nova Scotia. *See e.g., Clemens v. McNamee*, 615 F.3d 374 (5th Cir., 2010) (articulating a requirement that the forum be the "focal point of the story"). On August 3, 2011, Handshoe announced the formation of a "Nova Scotia chapter" of the "Slabbed Nation." In the same

month, he gave an interview to a Nova Scotia-based tabloid journalist and admitted to "screwing with" the Plaintiffs. He also started publishing "comments" by Canadians. And in the next month, before being served, he proactively wrote to one Halifax, Nova Scotia-based journalist and soon after contacted another. *See* Exhibit "7" to Motion for Summary Judgment, Affidavit of Charles L. Leary.

Plaintiffs have therefore met their burden under the SPEECH Act by showing the Nova Scotia Court had jurisdiction.

2.    First Amendment protection provided by the SPEECH Act.

The SPEECH Act also imposes the defamation plaintiff with the burden to prove that the jurisdiction where he or she obtained the judgment afforded at least as much First Amendment free speech protection as an American court would have *or* if not, that the foreign court nonetheless afforded those rights to the defendant.  The SPEECH Act provides in pertinent part:

(a)    First Amendment considerations. --

(1) In general. -- Notwithstanding any other provision of Federal or State law, a domestic court shall not recognize or enforce a foreign judgment for defamation unless the domestic court determines that –

(A)    the defamation law applied in the foreign court's adjudication provided at least as much protection for freedom of speech and press in that case as would be provided by the first amendment to the Constitution of the United States and by the constitution and law of the State in which the domestic court is located; or

(B)    even if the defamation law applied in the foreign court's adjudication did not provide as much protection for freedom of speech and press as the first amendment to the Constitution of the United States and the constitution and law of the State, the party opposing recognition or enforcement of that foreign judgment would have been found liable for defamation by a domestic court applying the first

amendment to the Constitution of the United States and the constitution and law of the State in which the domestic court is located.

(2)     Burden of establishing application of defamation laws. – The party seeking recognition or enforcement of the foreign judgment shall bear the burden of making the showings required under subparagraph (A) or (B).

28 U.S.C. 4102(a) (alteration of original).

As it relates to the facts of this case, Canadian law afforded Defendant as much free speech protection as he would have received in a state or federal district court of the United States.

3.     Canadian protection of free speech

The Nova Scotia Court's decision cited and relied upon several Canadian decisions that dealt with defamation and the right of free speech.   One of those was *Hill v. Church of Scientology of Toronto,* [1995] 2 S.C.R. 1130 (July 20, 1995), a leading Canadian Supreme Court defamation case, a copy of which is attached to this Brief as an Appendix.  *See* Exhibit "5" to Motion for Summary Judgment at unnumbered p. 16, Nova Scotia Court Decision.

*Hill* found in pertinent part:

Much has been written of the great importance of free speech. Without this freedom to express ideas and to criticize the operation of institutions and the conduct of individual members of government agencies, democratic forms of government would wither and die.  See, for example, *Reference re Alberta Statutes,* [1938] S.C.R. 100, at p. 133; *Switzman v. Elbling,* [1957] S.C.R. 285, at p. 306; and *Boucher v. The King,* [1951] S.C.R. 265, at p. 326.  More recently, in *Edmonton Journal, supra,* at p. 1336, it was said:

It is difficult to imagine a guaranteed right more important to a democratic society than freedom of expression. Indeed a democracy cannot exist without that freedom to express new ideas and to put forward opinions about the functioning of public institutions. The concept of free and

> uninhibited speech permeates all truly democratic societies and institutions. The vital importance of the concept cannot be over-emphasized.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 101.

> However, freedom of expression has never been recognized as an absolute right.  Duff C.J. emphasized this point in *Reference re Alberta Statutes, supra,* at p. 133:

>> The right of public discussion is, of course, subject to legal restrictions; those based upon considerations of decency and public order, and other conceived for the protection of various private and public interests with which, for example, the laws of defamation and sedition are concerned.  <u>In a word, freedom of discussion means ... "freedom governed by law."</u> [Emphasis added.]

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 102 (emphasis in original).

> There is a great difference in the nature of the tort of defamation and that of negligence.  <u>Defamation is the intentional publication of an injurious false statement.</u>  While it is true that an actual intention to defame is not necessary to impose liability on a defendant, the intention to do so is nevertheless inferred from the publication of the defamatory statement.  This gives rise to the presumption of malice which may be displaced by the existence of a qualified privilege.  Personal injury, on the other hand, results from negligence which does not usually arise from any desire to injure the plaintiff.  Thus, if it were known in advance what amount the defamer would be required to pay in damages (as in the personal injury context), a defendant might look upon that sum as the maximum cost of a license to defame.  A cap would operate in a manner that would change the whole character and function of the law of defamation.  It would amount to a radical change in policy and direction for the courts.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 170 (emphasis added).

> **1452.  Aggravated damages**.  The conduct of the defendant, his conduct of the case, and his state of mind are thus all matters which the plaintiff may rely on as aggravating the damages.  "Moreover, it is very well established that in cases where the damages are at large the jury (or the judge if the award is left to him) can take into account the

> motives and conduct of the defendant where they aggravate the injury done to the plaintiff. There may be malevolence or spite or the manner of committing the wrong may be such as to injure the plaintiff's proper feelings of dignity and pride. These are matters which the jury can take into account in assessing the appropriate compensation."
> "In awarding `aggravated damages' the natural indignation of the court at the injury inflicted on the plaintiff is a perfectly legitimate motive in making a generous, rather than a more moderate award to provide an adequate solatium . . . that is because the injury to the plaintiff is actually greater, and, as the result of the conduct exciting the indignation, demands a more generous solatium."

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 183 (emphasis in original).

> Aggravated damages may be awarded in circumstances where the defendants' conduct has been particularly high-handed or oppressive, thereby increasing the plaintiff's humiliation and anxiety arising from the libellous statement. The nature of these damages was aptly described by Robins J.A. in *Walker v. CFTO Ltd., supra,* in these words at p. 111:

> > Where the defendant is guilty of insulting, high-handed, spiteful, malicious or oppressive conduct which increases the mental distress -- the humiliation, indignation, anxiety, grief, fear and the like -- suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as "aggravated damages".

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 188.

> These damages take into account the additional harm caused to the plaintiff's feelings by the defendant's outrageous and malicious conduct. Like general or special damages, they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant prior to the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 189.

If aggravated damages are to be awarded, there must be a finding that the defendant was motivated by <u>actual malice</u>, which increased the injury to the plaintiff, either by spreading further afield the damage to the reputation of the plaintiff, or by increasing the mental distress and humiliation of the plaintiff.  See, for example, *Walker v. CFTO Ltd., supra,* at p. 111; *Vogel, supra,* at p. 178; *Kerr v. Conlogue* (1992), 65 B.C.L.R. (2d) 70 (S.C.), at p. 93; and *Cassell & Co. v. Broome, supra,* at pp. 825−26.  <u>The malice may be established by intrinsic evidence derived from the libellous statement itself and the circumstances of its publication, or by extrinsic evidence pertaining to the surrounding circumstances which demonstrate that the defendant was motivated by an unjustifiable intention to injure the plaintiff.</u>  See *Taylor v. Despard, supra,* at p. 975.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 190 (emphasis added).

There are a number of factors that a jury may properly take into account in assessing aggravated damages.  For example, was there a withdrawal of the libellous statement made by the defendants and an apology tendered?  If there was, this may go far to establishing that there was no malicious conduct on the part of the defendant warranting an award of aggravated damages.  The jury may also consider whether there was a repetition of the libel, conduct that was calculated to deter the plaintiff from proceeding with the libel action, a prolonged and hostile cross−examination of the plaintiff or a plea of justification which the defendant knew was bound to fail.  The general manner in which the defendant presented his case is also relevant.  Further, it is appropriate for a jury to consider the conduct of the defendant at the time of the publication of the libel.  For example, was it clearly aimed at obtaining the widest possible publicity in circumstances that were the most adverse possible to the plaintiff?

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 190.

Punitive damages may be awarded in situations where the defendant's misconduct is so malicious, oppressive and high−handed that it offends the court's sense of decency.  Punitive damages bear no relation to what the plaintiff should receive by way of compensation.  Their aim is not to compensate the plaintiff, but rather to punish the defendant.  It is the means by which the jury or judge expresses its outrage at the egregious conduct of the defendant.  They are in the nature of a fine which is meant to act as a deterrent to the defendant and to others from acting in this manner.  It is important to emphasize that punitive damages should only be awarded in those circumstances where the combined award

of general and aggravated damages would be insufficient to achieve the goal of punishment and deterrence.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 196.

Unlike compensatory damages, punitive damages are not at large. Consequently, courts have a much greater scope and discretion on appeal.  The appellate review should be based upon the court's estimation as to whether the punitive damages serve a rational purpose.  In other words, was the misconduct of the defendant so outrageous that punitive damages were rationally required to act as deterrence?

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 197.

This was the test formulated by Robins J.A. in *Walker v. CFTO Ltd., supra.*  In that case, he found that the general damages award of $908,000 was obviously sufficient to satisfy whatever need there was for punishment and deterrence.  He found that, in those circumstances, the $50,000 punitive damage award served no rational purpose.  The Court of Appeal, in the case at bar, applied the same reasoning and upheld the award of punitive damages.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 198.

Punitive damages can and do serve a useful purpose.  But for them, it would be all too easy for the large, wealthy and powerful to persist in libelling vulnerable victims.  Awards of general and aggravated damages alone might simply be regarded as a licence fee for continuing a character assassination.  The protection of a person's reputation arising from the publication of false and injurious statements must be effective.  The most effective means of protection will be supplied by the knowledge that fines in the form of punitive damages may be awarded in cases where the defendant's conduct is truly outrageous.

*Hill,* [1995] 2 S.C.R. 1130, at ¶ 199.

Justice Corie, the author of the *Hill* decision, defined Canadian actual malice in *Botiuk v. Toronto Free Press Publ'ns Ltd.*, [1995] 3 S.C.R. 3 Sept. 21, 1995):

A distinction in law exists between "carelessness" with regard to the truth, which does not amount to actual malice, and "recklessness", which does.  In *The Law of Defamation in Canada, supra,* R. E. Brown refers to the distinction in this way (at pp. 16-29 to 16-30):

> . . . a defendant is not malicious merely because he relies solely on gossip and suspicion, or because he is irrational, impulsive, stupid, hasty, rash, improvident or credulous, foolish, unfair, pig-headed or obstinate, or because he was labouring under some misapprehension or imperfect recollection, although the presence of these factors may be some evidence of malice.

*Botiuk*, [1995] 3 S.C.R. 3, at ¶ 96.

At paragraph 79 of that decision, Justice Corie had summarized:

> Malice is commonly understood as ill will toward someone, but it also relates to any indirect motive which conflicts with the sense of duty created by the occasion. **Malice may be established by showing that the defendant either knew that he was not telling the truth, or was reckless in that regard.**[1]

*Id.* at 79 (emphasis added).

In *Hill* the Canada Supreme Court refused to adopt the landmark American decision of *New York Times v. Sullivan,* 376 U.S. 254 (1964), which requires the public figure defamation plaintiff to prove constitutional malice, or publication with reckless disregard for the truth. *Hill,* [1995] 2 S.C.R. 1130, at ¶ 137. In the instant case, however, the difference between Canadian and American law is moot as the Plaintiffs are not public figures. *New York Times* therefore is inapplicable. Additionally, since *Hill,* the Supreme Court of Canada has moved decisively toward greater protections for free speech. Notably in *Bou Malhab v. Diffusion Métromédia CMR Inc.,* [2011] 1 S.C.R. 214 (Feb. 17, 2011) at ¶ 20, the Court referred to, rather than distinguished, the *New York Times* decision in the context of pointing to a modern-day trend toward giving greater weight to freedom of expression. In *Grant v. Torstar Corp.,* [2009] 3 S.C.R. 640 (Dec. 22, 2009), Chief Justice McLachlin articulated a new defense of "responsible

---

[1] Canada and the United States therefore recognize that "malice" is reckless disregard for the truth. *See New York Times,* 376 U.S. at 279.

communication on a matter of public interest," stating, "[t]he law of defamation should be modified to provide greater protection for communications on matters of public interest." Likewise in *Crookes v. Newton*, [2011] 3 SCR 269 (Oct. 19, 2011), a case Plaintiffs cite in their brief to the Canadian judge, Canada's highest court upheld the "publication rule" that requires the Defendant must have acted intentionally or negligently in publishing the defamatory statement to a third party regardless of a strict liability standard.

Handshoe is guilty of publishing numerous defamatory stories, as well as posting defamatory words on third party web sites and sending emails to Nova Scotia journalists, in reckless disregard for the truth, thereby crossing the punitive damages conduct line. In Canadian and American courts such gross misconduct amounts to a degree of fault that triggers liability for the defamation.

In conclusion of this point, the laws of Canada and the United States are the same concerning an award for damages for loss of reputation when the words are defamatory and published in malicious and reckless disregard for the truth. As will be elaborated below, the Canadian Court in the instant case correctly found that Defendant maliciously published the defamatory statements concerning. *See* Exhibit "5" to Motion for Summary Judgment at unnumbered p. 25, Nova Scotia Court Decision.

4.   The Nova Scotia Court heard and decided the case as American Courts would have, including Mississippi state courts

The publications at issue charged Plaintiffs with crimes of moral turpitude; therefore, those publications are, under Mississippi law, defamatory *per se*. *See Speed v. Scott*, 787 So. 2d 626, 632-34 (Miss. 2001). Plaintiffs are thus entitled to recover for their loss of reputations and for emotional distress, as the Nova Scotia Court appropriately decided. *See id.* at 632, 635.

Pursuant to Mississippi law, Plaintiffs are also entitled to recover punitive damages, whether or not they proved damages to reputations (which they did), since the publications at issue were defamatory *per se* and were made with malice and reckless disregard for the truth.

> [W]here the defamation complained of is actionable per se, it is generally held that punitive damages may be awarded even though the amount of actual damages is neither found nor shown, for in such a case the requirement of a showing of actual damages is satisfied by the presumption of injury which arises from a showing of libel or slander that is actionable per se.   But where the defamation is not actionable per se, punitive damages cannot be allowed unless either general or special damage is shown.[2]

*Newson v. Henry,* 443 So. 2d 817, 824 (Miss. 1984) (citing 50 Am. Jur. 2d Libel and Slander § 352 (1970)).

The Nova Scotia Court awarded punitive damages due to Handshoe's reckless disregard for the truth, i.e., his constitutional malice toward Plaintiffs.

This is not a case where Defendant merely published defamatory statements about Plaintiffs negligently.   As the Nova Scotia Court properly found, Defendant repeatedly hammered away at Plaintiffs with total disregard for the truth.   That clear, unmistakable, and unrebutted point should make it easy for this Court to determine that the Nova Scotia Court decided liability and damages as an American court would have.   That is, the words published are defamatory, Plaintiffs are entitled to recover for their loss of reputation, Plaintiffs are entitled to recover for their emotional distress they suffered, and Plaintiffs are entitled to punitive damages so as to deter Defendant from committing the same egregious conduct in the future. Canadian law, as applied by the Nova Scotia Court, is in perfect harmony with American defamation law, including Mississippi's defamation law, as viewed through the prism of United States First Amendment free speech protection.   Defendant's gross misbehavior is not protected

---

[2] Plaintiffs proved special damages.   *See* Exhibit "5" to Motion for Summary Judgment at p. 45, Nova Scotia Court Decision.

speech.  Any American court faced with this case's facts would be free, if not compelled, to find Defendant's published words concerning the Plaintiffs are defamatory, thus entitling them to the Nova Scotia Judgment for the damages.

III.

CONCLUSION

Congress legislated the SPEECH Act to assure that a defamation plaintiff suing a U.S. citizen in a foreign country's court would have to show the defendant's right to free speech as recognized prior to enforcing any judgment against him or her.  The SPEECH Act creates a level playing field for American citizens.  It does not give the defamation defendant carte blanche to ruin lives and reputations through defamatory publications made in reckless disregard of their truth.

Defendant's defamatory publications have been continuous and unrelenting.  They began before Plaintiffs sued him in the Supreme Court of Nova Scotia, and they have continued long afterward.

Plaintiffs, Trout Point Loge, Limited, a Nova Scotia Limited Company, Vaughn Perret, and Charles Leary, bear the burden to show compliance with the SPEECH Act.  They have done exactly that.

Defendant knew of the Nova Scotia suit that arose from his numerous intentional contacts there, yet he thumbed his nose at that court, and refused to appear for trial.  Plaintiffs personally served Defendant pursuant to Rule 4 of both the Federal and Mississippi Rules of Civil Procedure, and the Canadian court had jurisdiction of this defamation case.

Plaintiffs have already demonstrated that the Canadian laws and the American laws are almost identical in protecting Defendant's right to free speech.  Likewise, the Nova Scotia Court

found, as any American state or federal court would have found, that Defendant was liable for punitive damages for misconduct of the grossest order.  His reckless disregard for the truth of his publications that defamed Plaintiffs requires that summary judgment be entered in favor of the Plaintiffs and that they be allowed to execute their Nova Scotia Judgment.

Respectfully submitted, this the 20th day of June, 2012.

Trout Point Lodge, Limited, Vaughn Perret and Charles Leary, Judgment Creditors

By:   s/ Henry Laird
      Henry Laird, Mississippi Bar No. 1774

## CERTIFICATE OF SERVICE

I, Henry Laird, do hereby certify that I have sent a true and correct copy of the foregoing Brief in Support of Motion for Summary Judgment by using the ECF system to the following:

G. Gerald Cruthird, Esquire
Post Office Box 1050
Picayune, Mississippi  39466
Email:  ggeraldc@bellsouth.net

Jack E. Truitt, Esquire
The Truitt Law Firm, LLC
149 North New Hampshire Street
Covington, LA  70433
Email:  mail@truittlaw.com

This the 20th day of June, 2012.

s/  Henry Laird _____
Henry Laird

Henry Laird (MSB No. 1774)
Email:  hlaird@joneswalker.com
Jaklyn Wrigley (MSB No. 103773)
Email:  jwrigley@joneswalker.com
Jones, Walker, Waechter, Poitevent,
Carrère & Denègre, LLP
2510 14th Street, Suite 1125 (39501)
Post Office Drawer 160
Gulfport, MS  39502
Telephone: (228) 864-3094
Facsimile: (228) 864-0516