CANADA                                    YAR No. 353654

PROVINCE OF NOVA SCOTIA


<u>IN THE SUPREME COURT OF NOVA SCOTIA</u>


TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY
                                          PLAINTIFFS


– VERSUS –

DOUG K. HANDSHOE AND JANE DOE
(<u>ANNEMARIEBOUDREAUX@YAHOO.COM</u>)


                                          DEFENDANTS


<u>DECISION</u>


HEARD BEFORE:   The Honourable Justice Suzanne
                Hood

COUNSEL:        Dr. Charles Leary Self-Represented
                as Agent and Officer of Trout
                Point Lodge Limited

PLACE:          Yarmouth JC1, Yarmouth, N.S.

DATE HEARD:     February 1, 2012

<u>INDEX</u>
<u>TROUT POINT LODGE V. HANDSHOE</u>
<u>FEBRUARY 1, 2012</u>

Oral Decision    ..................................  3

<u>EXHIBITS</u>

<u>EXHIBIT    DESCRIPTION</u>------------------------- <u>PAGE</u>

None

Exhibit 2

| 1 | **<u>FEBRUARY 1, 2012 AT 10:23 A.M.</u>** |
| 2 | |

3     **<u>THE COURT:</u>**   We begin by saying that

4     because I am giving this decision orally I

5     reserve the right, should it be required to be

6     reduced to writing, to edit but not of course

7     change the substance of it.

8     Trout Point Lodge, Charles Leary and Vaughn

9     Perret have obtained default judgment against

10     Doug Handshoe in an action filed in August 2011

11     and amended in September 2011 for defamation,

12     invasion of privacy, injurious falsehood,

13     intentional interference with contractual

14     relations, intentional interference with economic

15     relations, intentional infliction of emotional

16     and mental distress and assault. Default

17     judgment was entered on December 12, 2011 with

18     damages to be assessed.

19     The plaintiffs move for an assessment of

20     damages on January 12th, 2012. Mr. Handshoe was

21     given notice of a hearing for the assessment of

22     damages.

1    The plaintiffs have provided a copy of a

2  FedEx tracking slip showing delivery to Mr.

3  Handshoe's home in Mississippi.    It notes the

4  materials were left at the house.    Efforts were

5  also made according to the testimony of Mr. Leary

6  to fax the documents to Mr. Handshoe's fax number

7  but the transmission was not complete as the fax

8  appeared to have been disconnected.    These

9  materials appear also to have been sent by email

10  and these documents are at Tab 3 to the materials

11  presented in evidence by Mr. Leary at the

12  hearing.    It appears from Mr. Handshoe's blog

13  that he had knowledge of the hearing since he

14  referred to receiving, "nastygrams," from Mr.

15  Leary and Mr. Perret in a blog dated January

16  17th, 2012.    Mr. Handshoe did not appear or

17  participate in the assessment of damages.

18    Default judgment is conclusive of a claim

19  set out in the statement of claim and that's in

20  the authority for that, among others, **is E. Sands**

21  **and Associates versus Dextras Engineering.**    The

1    amended statement of claim sets out in detail the

2    claims against Mr. Handshoe which are now to be

3    treated by this court as proven.  The statement

4    of claim lists many examples of the defamatory

5    comments made by Mr. Handshoe, below is a brief

6    summary of them.   The defamatory comments

7    originated with a news story which was published

8    in the Times-Picayune newspaper in Louisiana

9    about Jefferson Parish President Aaron Broussard

10    being involved in a political corruption scandal.

11    The plaintiffs were erroneously identified as

12    being connected with Mr. Broussard in a business

13    venture and Mr. Broussard was named in error as

14    owning Trout Point Lodge.   The allegations

15    against him are kickback schemes, money

16    laundering and fraud while in his office as

17    Parish President.

18        The defamatory comments later included

19    claims that Trout Point Lodge, Mr. Leary and Mr.

20    Perret had misled ACOA and that Mr. Leary

21    committed perjury in litigation with ACOA.  The

1    defamation continued with statements that Trout

2    Point Lodge was losing business or going bankrupt

3    because of the investigation of Mr. Broussard and

4    his inability to continue to support it.   Also

5    there were claims that Charles Leary and Vaughn

6    Perret had been involved in a series of

7    businesses which failed and are con men.   The

8    statements also contained anti-gay rhetoric and

9    homophobic comments.

10       After the original story was retracted by

11   the Louisiana newspaper that published it Mr.

12   Handshoe made statements that Mr. Leary and Mr.

13   Perret had improperly influenced it to retract

14   the story.   He also said that Mr. Leary and Mr.

15   Perret were improperly using the legal system by

16   commencing the defamation action.   Individual

17   plaintiffs have filed affidavits and in his

18   affidavit Mr. Leary has related incidents

19   affecting him and Trout Point Lodge.   He said in

20   that affidavit in Paragraph 26,

21
22       "Due to the publications on

```
 1                    Slabbed  and  by  Mr.  Handshoe
 2                    elsewhere  on  the  internet  I
 3                    have  a  very  real  fear  that
 4                    anyone      performing      due
 5                    diligence  on  us  as  business
 6                    people   or   innkeepers   will
 7                    discover   and      believe
 8                    Handshoe's publications."
 9

10      He also said in Paragraph 27,

11
12                    "I   felt   embarrassed   in   my
13                    local  community.   Mr.  Perret
14                    and  I  have  at  times,  changes
15                    our  usual  shopping patterns  in
16                    Yarmouth  in  order  to  avoid
17                    persons   we   consider   friends
18                    who  may  have  read  the  Slabbed
19                    publications."
20

21      He   also   testified   about   the   stress   of   the

22      defamation   on   him   in   Paragraph   30   of   the

23      affidavit where he said,

24
25                    "In  April  2011  at  the  time  when
26                    Handshoe's   publication   about   us
27                    became  threatening  and  homophobic  I
28                    experienced  tightened  shoulder  and
29                    neck   muscles,   sleeplessness   and
30                    developed  a  severe  outbreak  of  fever
31                    blisters  for  which  I  had  to  take
32                    Zovirax,  and  antiviral  medication.
33                    Previously  I  always  slept  very  well
34                    never  waking  up  early.   Since April
35                    2011  I  have  experienced  regular
36                    sleeplessness  particularly  waking  up
```

1  early in the morning worrying about
2  Slabbed and its effect on our
3  business."
4

5  His affidavit concluded with Paragraph 39 where

6  Mr. Leary says,

7
8  "I'm seriously concerned about
9  Slabbed hurting the Lodge's business
10  which Mr. Perret and I rely on as
11  our primary source of income. In
12  2011 occupancy rates at Trout Point
13  were three percent lower than in
14  2010. This represents a value of at
15  least $15,000."
16

17  Mr. Leary testified in court as well and his

18  evidence was about since the Notice of Action was

19  served and about the effect of the words of the

20  defendant on him and Trout Point Lodge.    Mr.

21  Perret also filed an affidavit in which he stated

22  the effects of the defamation on him.  He said in

23  his affidavit in Paragraphs 9 and 10,

24
25  "Mr. Handshoe's internet
26  publications have added a great deal
27  of stress to our lives including the
28  physical manifestations. I felt
29  genuinely afraid of his published
30  threats and of the existence of the
31  Slabbed Nation and members of that

```
1          group being in Nova Scotia.  I now
2          keep my doors locked at night
3          whereas previously I never feared
4          for my safety in my own home."
5
```

6      He says in his affidavit at Paragraph 11,

```
7
8          "I have told my personal physicians
9          in Spain and Nova Scotia about
10         stress and sleeplessness related to
11         the Handshoe publications.  My
12         physician Dr. Fernandez Negrara had
13         prescribed medication to help me
14         sleep after the Slabbed publications
15         commenced and to help control my
16         anxiety. I have also experienced
17         embarrassment, humiliation and
18         irritability.  It was hard to get
19         through work in 2011 knowing that
20         nearly every day a new source of
21         embarrassment and business
22         disruption might be published by
23         Handshoe.  I've been embarrassed
24         that friends and acquaintances in
25         Yarmouth might confront me about the
26         Slabbed allegations.  I could never
27         be sure that members of the local
28         community might secretly harbour a
29         belief in the truth of the blogs
30         allegations."
31
```

32     In Paragraph 13 he says,

```
33
34         "Mr. Handshoe has also made
35         publications about my mother stating
36         that I "split" and left her with a
37         surrogate son in Louisiana.  I was
38         traumatized by his suggestions that
```

1          I had somewhat neglected or abused
2          my mother."
3

4    Mr. Perret also testified briefly, he said he had

5    lost his appetite in the last two weeks as a

6    result of the material which has been published

7    by Mr. Handshoe and the volume of it.    In

8    addition, materials were submitted to the court

9    which were testified to by Charles Leary.    These

10   included defamatory comments made after the

11   Louisiana newspaper printed a retraction of the

12   story.    They include references to a cover-up of

13   a crime and dirty secrets April 20th, 2011 that

14   Charles Leary and Vaughn Perret and others were

15   "bag holders" for Aaron Broussard and the

16   purported owners of Trout Point Lodge.    That same

17   blog referred to the fleecing of investors in

18   Trout Point Lodge by Mr. Broussard and his close

19   connection to Mr. Leary and Mr. Perret.    It also

20   refers to Charles Leary as a liar and a perjurer

21   in the litigation with ACOA.    And that blog was

22   April 26, 2011.

1   On August 15th, 2011 the blog refers to "a
2   Trout Point Lodge Jefferson Parish political
3   corruption scandal update" linking Trout Point
4   Lodge with the corruption scandal involving Aaron
5   Broussard. In that same blog he refers to Charles
6   Leary and Vaughn Perret in the context of "by
7   reporter, get a good story."

8   On August 16th his blog said that he was
9   meticulously laying down "the trail of scams and
10  political corruption that leads to Nova Scotia
11  and Trout Point Lodge."

12  After being served with a Notice of Action
13  further defamatory comments were made.  On August
14  18th he wrote,

15
16              "First class bitches, common thugs
17              or just plain old morons."
18

19  He also refers to the "elite fraternity of crooks
20  and miscreants" who have sued him.  On August
21  24th, 2011 he referred to "political wrongdoing
22  involving Leary and Perret in Canada and it had
23  nothing to do with Broussard *per se*."

1    He continues to make accusations of fraud

2    against them and in bilking local contractors.

3    He refers to "the chances Trout Point Lodge will

4    be bankrupt within a year" and he said that on

5    August 30th, 2011.  In the same blog he refers to

6    the "nefarious practices" of Charles Leary and

7    Vaughn Perret.  He refers to them being involved

8    in money laundering.  He calls them "grifters"

9    and "grafters."  He accuses them of fabricating

10   positive reviews of Trout Point Lodge.

11   Ultimately he links them with organized crime.

12       These types of comments continued throughout

13   2011 and further defamatory comments were made

14   earlier this month, January 2012, when the Notice

15   of Assessment of Damages was served on him.  I

16   mentioned a few additional postings as follows.

17   There's a posting from September 14th, 2011,

18
19               "I'll add here, in case it is not
20          self-evident that I bill complete
21          dossiers on all the players in this
22          social group and I intend through
23          time to roll out each and every one
24          in excruciating detail as long as
25          the lawsuit in Canada is an

1
2
3
4
5
6

7

8
9
10
11
12
13
14
15

16

17

18

19
20
21
22
23
24

25

26

27

28

29

30

> outstanding issue for Slabbed.   The
> reason for this is that this band of
> gay men act as a unit that will also
> scatter like cockroaches when the
> heat is applied."

In January of 2012 the blog says,

> "Some of those names of the property
> owners at Trout Point have well
> documented connections to organized
> crime here in the U.S.   From my
> standpoint flushing all this out
> only gets better from here."

Another blog from September 14th, 2011, sorry,

no, that's the same one.   A blog from January

29th of 2012,

> "When I'm done even Perret's niece
> who filed an affidavit in that **Fox 8**
> case will understand her uncle is a
> grifting scumbag pussy."

And on January 26, 2012 the blog says, "He,"

meaning Daquila (sp), "also has enough stroke to

tell Charles and Vaughn what to do at Broussard's

request."

   There are many, many more blogs which

contained defamatory materials such as this which

1    are included in the materials filed with the

2    Court on January 30th.

3        Turning to the hearing, a comprehensive

4    brief was filed with the Court with many case

5    authorities.  Mr. Leary made an oral submissions

6    to the Court outlining the principles the Court

7    should consider in deciding the quantum of

8    damages for defamation, aggravated damages and

9    punitive damages.  In addition he referred to a

10   recent Ontario Court of Appeal decision with

11   respect to invasion of privacy which is also

12   claimed by the individual plaintiffs.

13       In questioning by the Court, Mr. Leary said

14   that the plaintiffs' other claims are subsumed in

15   the Claim of Defamation, that is the claims were

16   intentional interference with economic relations

17   for intentional interference with contractual

18   relations and injurious falsehood.

19       Mr. Leary submits that the invasion of

20   privacy, assault and intentional infliction of

21   emotional and mental distress stand alone and

Exhibit 2

1  individual plaintiffs seek damages for these

2  separate from the defamation in related claims.

3      The plaintiffs seek damages of $250,000 for

4  each of the three plaintiffs. Aggravated damages

5  for each individual plaintiff as well as punitive

6  damages. They say that their original demand of

7  aggravated damages of $300,000 each should be

8  increased because the amount was requested before

9  the recent defamatory remarks which have

10 continued since default judgment was entered and

11 in particular since Mr. Handshoe was given notice

12 of the assessment of damages. He said they would

13 seek special damages for loss of business but it

14 is too difficult to prove although he believes

15 they have lost business because of the

16 defamation.

17     In addition, the individual plaintiffs, as

18 I've said, seek damages for invasion of privacy.

19 In the **Jones** Decision the Ontario Court of Appeal

20 said that the range for such damages is up to

21 $20,000. In that case the Court of Appeal

1    awarded damages in the amount of $10,000.   The
2    plaintiffs here say that the extent of the
3    invasion of privacy in that case was less than is
4    the case here.   plaintiffs also seek an
5    injunction preventing further defamatory comments
6    and a mandatory injunction seeking to have the
7    existing comments removed.

8        The leading case on defamation in Canada is
9    the Supreme Court of Canada Decision is **Hill v.**
10   **Church of Scientology of Toronto.**   In that case
11   Justice Cory writing for the majority referred to
12   the fact that the defamatory comments were
13   published on the local television news, reported
14   in the Globe and Mail and reported on by CBC.   He
15   referred to the audience numbers of those media
16   outlets and said that the audience for the local
17   T.V. station was approximately 132,000.   The
18   Globe circulation that day was 108,000 and the
19   CBC broadcast was seen by approximately 118,000.
20   He refers to that in Paragraph 26 of the
21   decision.

1      He said in Paragraph 108, and I quote,

2

3          "False   allegations   can   so   very
4          quickly  and  completely  destroy  a
5          good   reputation.    A   reputation
6          tarnished by libel can seldom regain
7          its former lustre."

8

9      And he said with respect to defamatory statements

10     in Paragraph 166,

11

12         "A  defamatory  statement  can  seep
13         into    the    crevices    of    the
14         subconscious  and  lurk  there,  ever
15         ready to spring forth and spread its
16         cancerous  evil.   The  unfortunate
17         impression left by a libel may last
18         a  lifetime.   Seldom does a defamed
19         person  have  the  opportunity  of
20         replying and correcting the record
21         in a manner that will truly remedy
22         the situation."

23

24     Justice  Cory  later  said  in  Paragraph  178  with

25     respect to Mr. Hill,

26

27         "He  would  never  know  who,  as  a
28         result  of  the  libellous  statement,
29         had  some  lingering  suspicion  that  he
30         was  guilty  of  misconduct  which  was
31         criminal in nature.  He would never
32         know who might have believed that he
33         was  a  person  without  integrity  who
34         would   act   criminally   in   the
35         performance  of  his  duties  as  a  Crown

1    counsel.  He would never be certain
2    who would accept the allegation that
3    he was guilty of a criminal breach
4    of trust which was the essential
5    thrust of the libel."
6

7    In considering whether the jury award of damages

8    was appropriate, the Court quote from **Gatley** on

9    libel and slander in Paragraph 182.  In that text

10   the author states,

11
12   "The amount of damages is peculiarly
13   the province of the jury who in
14   assessing them will naturally be
15   governed by all the circumstances of
16   the particular case.  They're
17   entitled to take into their
18   consideration the conduct of the
19   plaintiff, his position in standing,
20   the nature of the libel, the mode
21   and extent of publication, the
22   absence or refusal of any retraction
23   or apology and 'the whole conduct of
24   the defendant from the time the
25   libel was published down to the very
26   moment of their verdict.  They may
27   take into consideration the conduct
28   of the defendant before action,
29   after action and in court on the
30   trial of the action.'  And also it
31   is submitted that the conduct of his
32   counsel who cannot shelter his
33   client by taking responsibility for
34   the conduct of the case.  They
35   should also allow 'for the sad truth
36   that no apology, retraction or
37   withdrawal can ever be guaranteed

```
 1          completely to undo the harm it has
 2          done or the hurt it has caused.'
 3          They should also take into account
 4          the evidence led in aggravation or
 5          litigation of the damages."
 6
 7    The Court then said in Paragraph 184,
 8
 9          "In considering and applying the
10          factors pertaining to general
11          damages in this case it will be
12          remembered that the reports in the
13          press were widely circulated and the
14          television broadcast had a wide
15          coverage.  The setting and the
16          persons involved gave the coverage
17          an air of credibility and
18          significance that must have
19          influenced all who saw and read the
20          accounts.  The insidious harm of the
21          orchestrated libel was indeed spread
22          widely throughout the community."
23
24     In considering the issue of aggravated damages
25    Justice Cory again quoted from **Gatley** in
26    Paragraph 183.
27
28          "The conduct of the defendant, his
29          conduct of the case and his state of
30          mind are thus all matters which the
31          plaintiff may rely on his
32          aggravating the damages."
33
34          "Moreover it is very well
35          established that in cases where the
```

1  damages are at large the jury or the
2  judge, if the award is left to him,
3  can take into account the motives
4  and conduct of the defendant where
5  they aggravate the injury done to
6  the plaintiff. There may
7  malevolence or spite or the manner
8  of committing the wrong may be such
9  as to injure the plaintiffs' proper
10 feelings of dignity and pride.
11 These are matters which the jury can
12 take into account in assessing the
13 appropriate compensation."
14

15 "In awarding aggravated damages the
16 natural indignation of the Court at
17 the injury inflicted on the
18 plaintiff is a perfectly legitimate
19 motive in making it generous rather
20 than a more moderate award to
21 provide an adequate solution. That
22 is because the injury to the
23 plaintiff is actually greater and as
24 a result of the conduct, exciting
25 the indignation, demands a more
26 generous solatium."
27

28 The Court then referred to the aggravating

29 circumstances in that case at Paragraph 185.

30
31 "The misconduct of the Appellants
32 continued after the first
33 publication. Prior to the
34 commencement of the hearing of the
35 contempt motion before Justice
36 Cromarty, Scientology was aware that
37 the allegations it was making
38 against Casey Hill were false. Yet

Exhibit 2

1          it persisted with the contempt
2   hearings as did Morris Manning. At
3   the conclusion of the contempt
4   hearing both appellants were aware
5   of the falsity of the allegations.
6   Nevertheless when the libel action
7   was instituted the defensive
8   justification was put forward by
9   both of them. The statement of
10  defense alleging justification or
11  truth of the allegation was open for
12  all the public to see. Despite
13  their knowledge of its falsity the
14  appellants continued to publish the
15  libel."
16

17      Finally the manner in which Hill was crossed

18  examined by the Appellant coupled with the manner

19  in which they presented their position to the

20  jury in light of their knowledge of the falsity

21  of their allegations are further aggravating

22  factors to be taken into account.

23      Justice Cory dealt with the issue of

24  aggravated damages in Paragraphs 188 and 189.

25
26      "Aggravated damages may be awarded
27  in circumstances where the
28  defendant's conduct has been
29  particularly high handed or
30  oppressive thereby increasing the
31  plaintiffs' humiliation and anxiety
32  arising from the libellous
33  statement."

The nature of these damages was aptly described by Justice Robins in **Walker v. CFTO Limited** in these words,

> "Where the defendant is guilty of insulting, high handed, spiteful, malicious or oppressive conduct which increase the mental distress the humiliation and indignation, anxiety, grief, fear and the like, suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as aggravated damages. These damages take into account the additional harm caused to the plaintiffs' feeling by the defendant's outrageous and malicious conduct. Like general or special damages they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant part of the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant."

In Paragraph 191 Justice Cory considered the factors in that case that warranted an award of aggravated damages. There are a number of

1    factors that a jury may properly take into

2    account in assessing aggravated damages.    For

3    example, was there a withdrawal of the libellous

4    statement made by the defendants and an apology

5    tendered.    If there was this may go far to

6    establishing that there was no malicious conduct

7    on the part of the defendant warranting an award

8    of aggravated damages.    The jury may also

9    consider whether there was a repetition of the

10   libel, conduct that was calculated to deter the

11   plaintiff from proceeding with the libel action,

12   a prolonged and hostile examination of the

13   plaintiff or plea of justification which the

14   defendant knew was bound to fail.    The general

15   manner in which the defendant presented its case

16   is also relevant.    Further it is appropriate for

17   a jury to consider the conduct of the defendant

18   at the time of the publication of the libel.    For

19   example was it clearly aimed at obtaining the

20   widest possible publicity in circumstances that

21   were the most adverse possible to the plaintiff.

1      The Supreme Court of Canada also considered

2  the issue of punitive damages beginning at

3  Paragraph 196 where the Court said,

4
5          "Punitive damages may be awarded in
6      the situation where the defendant's
7      conduct is so malicious, oppressive
8      and high handed that it offends…"
9

10     – missing a page.  Can we just, we'll just go

11  off the record for a moment, I have to find the

12  rest of that quote.

13
14              [RECESS 10:47 – 10:48 A.M.]
15

16  **THE COURT:**    The Supreme Court of Canada

17  dealt with the issue of punitive damages

18  beginning at Paragraph 196, where the Court said,

19

20          "Punitive damages may be awarded in
21      situations where the defendant's
22      misconduct is so malicious,
23      oppressive and high handed that it
24      offends the Court's sense of
25      decency."
26

27     Punitive damages bear no relation to what

28  the plaintiff should receive by way of

1   compensation.   Their aim is not to compensate the

2   plaintiff but rather to punish the defendant.   It

3   is the means by which the jury or Judge expresses

4   its   outrage   at   the   egregious   conduct   of   the

5   defendant.   They   are   in   the   nature   of   a   fine

6   which   is   meant   to   act   as   a   deterrent   to   the

7   defendant   and   to   others   from   acting   in   this

8   manner.     It   is   important   to   emphasize   that

9   punitive damages should only be awarded in those

10   circumstances where the combined award of general

11   and   aggravated   damages   would   be   insufficient   to

12   achieve the goal of punishment and deterrents.

13        One of the important factors for the Court

14   was set out in Paragraph 202,

15

16        "During   the   appeal   it   was   conceded
17        and   the   evidence   and   events
18        confirmed that in all likelihood no
19        amount   of   general   or   aggravated
20        damages   would   have   deterred
21        Scientology.   Clearly   then   this   was
22        an   appropriate   case   for   an   award   of
23        punitive damages."
24

25        It   is   important   that   each   case   of

1    defamation must be looked at on its own facts and

2    the awards given in other decisions are therefore

3    not of much assistance.

4        The Supreme Court of Canada acknowledged

5    this in the Hill Decision in Paragraph 187.

6    **Barrick Gold** is a decision of the Ontario Court

7    of Appeal dealing with defamation in the internet

8    context.   Justice Blair said in Paragraph 28

9    about internet defamation,

10
11           "Is there something about defamation
12           on the internet, cyber libel as it's
13           sometimes called, that distinguishes
14           it for purposes of damages from
15           defamation in another medium?   My
16           response to that question is yes."
17

18   He referred to the principles set out in **Hill** and

19   then in Paragraph 30 quoted from an Australian

20   decision the quote, "Ambiguity, universality and

21   utility," of the internet.   He continued in

22   Paragraph 31,

23
24           "Thus of the criteria mentioned
25           above, the mode and extent of
26           publication is particularly relevant
27           in the internet context, and must be

1    considered carefully.  Communication
2    via the internet is instantaneous,
3    seamless,    interactive,    blunt,
4    borderless and far reaching.  It is
5    also  impersonal  and  the  anonymous
6    nature  of  such  communication  has
7    made  itself  create  a  greater  risk
8    that  the  defamatory  remarks  are
9    believed."
10

11   He then said in Paragraph 34,

12

13   "Internet      defamation      is
14   distinguished    from    its    less
15   pervasive  cousins  in  terms  of  its
16   potential  to  damage  the  reputation
17   of  individuals  in  corporations  by
18   the    features    described    above
19   especially  its  interactive  nature,
20   its  potential  for  being  taken  at
21   face  value  and  its  absolute  and
22   immediate  worldwide  ubiquity  and
23   accessibility.  The  mode  and  extent
24   of   publication   is   therefore
25   particularly         significant
26   consideration  in  assessing  damages
27   in  internet  defamation  cases."
28

29   In **Barrick Gold** an  injunction  was  issued.

30   Justice Blair said in Paragraph 75,

31
32   "A  highly  transmissible  nature  of
33   the  tortious  misconduct  at  issue
34   here  is  a  factor  to  be  addressed  in
35   considering   whether   a   permanent
36   injunction  should  be  granted.  The
37   courts  are  faced  with  a  dilemma.  On

1  the one hand they can throw up their
2  collective hands in despair taking
3  the view that enforcement against
4  such (inaudible due to mumbling...)
5  transmissions around the world is
6  ineffective and concluding therefore
7  that only the jurisdiction where the
8  originator of the communication may
9  happen to be found can enjoin the
10 offending conduct.    On the other
11 hand they can at least protect
12 against the impugned conduct in
13 their own jurisdiction."
14

15 In  this  respect  I  agree  with  the  following

16 observation of Justice Kirby in **Dow Jones**,

17
18 "Any suggestion that there can be no
19 effective remedy for the tort of
20 defamation or other civil wrongs
21 committed by the use of the internet
22 or  such  wrongs  must  simply  be
23 tolerated as the price to be paid
24 for the advantages of the medium is
25 self-evidently unacceptable."
26

27 A permanent injunction was granted and the Court

28 said in Paragraph 78,

29 "I would set aside the decision of
30 the motions judge in this regard and
31 grant  a  permanent  injunction  as
32 requested restraining the defendants
33 from disseminating, posting on the
34 internet  or  publishing  further
35 defamatory  statements  concerning
36 Barrick or its officers, directors

Exhibit 2

1       or employees."
2

3      ' In **Astley v. Verdun** The Ontario Supreme
4      Court of Justice, Superior Court of Justice cited
5      **Barrick Gold** and ordered an injunction and a
6      mandatory injunction against the defendant.   In
7      that case the defendant stated that in spite of
8      jury verdict against him he would continue to
9      "disparage and discredit the reputation of the
10     plaintiff," quoting from Paragraph 16.
11          Justice Chapnik in that case said in
12     Paragraph 33,

13
14          "Injunctive relief is an exceptional
15          remedy that will not be imposed by
16          the Courts lightly.   I certainly
17          agree with the defendant when he
18          states that any form of prior
19          restraint on freedom of speech is
20          extremely serious and can only be
21          imposed in the clearest and rarest
22          of cases.   This however is one of
23          those cases."
24

25     He then outlined in Paragraph 34 the
26     circumstances of the case which caused him to
27     grant in injunction.  He said,

1
2          "This is so given the plaintiffs'
3          high reputation and position in the
4          business community and the wide
5          circulation of the defamatory
6          statements calculated to destroy
7          that reputation as well as the
8          strong likelihood that the
9          publishing of defamatory statements
10         against the plaintiff will continue
11         and the real possibility that the
12         plaintiff will not actually be
13         compensated by the payment of
14         damages."
15

16   A prudent injunction was granted and the Court

17   said in Paragraph 35,

18
19         "Accordingly I order a permanent
20         injunction to issue against the
21         defendant, J. Robert Verdun
22         restraining him from disseminating,
23         posting on the internet or
24         publishing in any manner whatsoever,
25         directly or indirectly, any
26         statements or comments about the
27         plaintiff Robert M. Astley."
28

29   He also granted a mandatory injunction.  He said

30   in Paragraph 36,

31
32         "There will also be a mandatory
33         injunction requiring the defendant
34         to forthwith remove his blog
35         postings dated April 29, 2011 and

Exhibit 2

1     May 2nd, 2011 from the internet and
2     any similar postings that refer to
3     the plaintiff directly or
4     indirectly."
5

6     In **Mina Mar Group v. Divine** Justice Perell

7     also quoted **Barrick Gold**.   He granted an

8     injunction issuing out of an Ontario Court

9     against the defendant in New Jersey.   He simply

10    said in Paragraph 28,

11
12     "In accordance with the above
13     authorities, I also grant a
14     permanent injunction restraining the
15     defendants from disseminating,
16     posting on the internet or
17     publishing further defamatory
18     statements concerning the
19     plaintiffs."
20

21    On the issue of invasion of privacy Mr.

22    Leary provided to the Court the recent decision

23    dated January 18th of 2012 of the Ontario Court

24    of Appeal in **Jones v. Tsige** in which the Court

25    concluded there is, at least in Ontario, a tort

26    of invasion, intrusion into seclusion otherwise

27    called invasion of privacy which is claimed by

28    the individual plaintiffs in this matter.   The

1  facts in that case are very different from those

2  in this case.   The defendant had accused, had

3  accessed the plaintiff's personal banking

4  information on 174 occasions over a period of

5  four years.   However she did not publish or

6  distribute it but used it for her own purposes in

7  a dispute with the plaintiff's partner, the

8  former husband of the defendant.   She apologized

9  for her actions and the Court concluded she was

10  embarrassed and contrite.   The plaintiff claimed

11  $70,000 in damages for invasion of privacy and

12  exemplary damages of $20,000. The Court said the

13  range of damages for this claim is up to $20,000

14  and awarded $10,000.

15      I am satisfied that in an appropriate case

16  in Nova Scotia there can be an award for invasion

17  of privacy or as the Ontario Court of Appeal

18  called it, the intrusion upon seclusion.   I must

19  determine if in this case it is warranted

20  considering the principles set out in **Jones**.   In

21  **Jones** there was no accompanying claim for

Exhibit 2

1    defamation as there was no publication of

2    defamatory statements about the plaintiff.

3         In **Nitsopoulos v. Wong** the action was for

4    deceit and invasion of privacy. The action

5    concerned gaining entry to the plaintiff's home

6    and publishing information gained while there.

7    The action was brought outside the limits, the

8    time limits for a defamation action.

9         The facts in this case are that Mr.

10   Handshoe, on his blog, disclosed Mr. Leary's

11   business and home address and his location when

12   he was visiting Spain. With respect to Mr.

13   Perret, he said that he had abandoned his mother

14   when he left Louisiana for Canada and Mr. Perret

15   said he was traumatized by this statement.

16        Mr. Handshoe made extremely derogatory and

17   homophobic comments of the most outrageous kind

18   about Mr. Leary and Mr. Perret and their sexual

19   orientation including and posting as what I will

20   refer to as doctored photographs of a sexual

21   nature depicting them.

1          Invasion of privacy in the **Jones** case was

2     private and personal banking information having

3     been looked at many, many times.  That sort of

4     financial and banking information is not usually

5     disclosed by people even to their closest friends

6     yet another bank employee who was not known to

7     the plaintiff looked at her private bank

8     information on numerous occasions.

9          In **Nitsopoulos** the defendant posed as a maid

10    for a Toronto cleaning service so she could write

11    a series of articles for the Globe and Mail

12    entitled "Maid for a Month."  She gained access

13    to the plaintiff's home and her experiences are

14    profiled in the second of these articles.  The

15    article published private details about the life

16    of the plaintiffs that she gained while in their

17    home.  The plaintiffs alleged that they would not

18    have permitted the reporter into their home had

19    she not fraudulently misrepresented herself to

20    them.  They claimed that they suffered harm to

21    their dignity, interests and personal autonomy,

1   their personal and home security and their mental

2   wellbeing.   The Court refused to grant summary

3   judgment to the defendants which they had sought

4   on the basis that there was no cause of action

5   for invasion of privacy.

6       In the **Jones** case the Ontario Court of

7   Appeal dealt with the issue of whether Ontario

8   law recognized a cause of action for invasion of

9   privacy.   Justice Sharpe writing for the Court

10   said in Paragraph 15,

12       "Aspects of privacy have long been
13       protected by causes of action such
14       as breach of confidence, defamation,
15       breach of copyright, nuisance, and
16       various property rights.   Although
17       the individual's privacy interest is
18       a fundamental value underlying such
19       claims, the recognition of a
20       distinct right of action for breach
21       of privacy remains uncertain."

23       Justice Sharpe referred to an article by

24   William L. Prosser entitled *Privacy* which was

25   published in the California Law Review 383.   He

26   said there were four torts which were quoted in

27   Paragraph 18;

1

2          1.          Intrusion upon the plaintiff's

3     seclusion or solitude, or into his private

4     affairs;

5          2.          Public disclosure of embarrassing

6     private facts about the plaintiff;

7          3.          Publicity which places the plaintiff

8     in a false light in the public eye;

9          4.          Appropriation, for the defendant's

10    advantage, of the plaintiff's name or likeness.

11

12         He said the most relevant of these is the

13    intrusion upon seclusion and he quoted in

14    Paragraph 19 its definition from *Restatement*,

15    *second restatement of torts* as follows,

16
17              "One who intentionally intrudes,
18         physically or otherwise, upon the
19         seclusion of another or his private
20         affairs or concerns, is subject to
21         liability to the other for invasion
22         of his privacy, if the invasion
23         would be highly offensive to a
24         reasonable person."
25

26         He continued in Paragraph 20,

> "The comment section of the *Restatement* elaborates this proposition and explains that the tort includes physical intrusions into private places as well as listening or looking, with or without mechanical aids, into the plaintiff's private affairs. Of particular relevance to this appeal, is the observation that other non-physical forms of investigation or examination into private concerns may be actionable. These include opening private and personal mail or examining a private bank account, even though there is no publication or other use of any kind of the information obtained."

The decisions he then (inaudible due to mumbling…) dealt largely with the collection of personal data. Chartered jurisprudence dealing with privacy has focussed on search and seizure in the criminal law context.

Justice Sharpe said in Paragraph 41 that there are three distinct privacy interests, the third being a relevant one in **Jones**. That is the informational privacy. He quoted from the Decision of the **Queen v. Tessling** in Paragraph 41 where the Supreme Court of Canada said,

"Beyond our bodies and the places where we live and work, however, lies the thorny question of how much information about ourselves and activities we are entitled to shield from the curious eyes of the state. This includes commercial information locked in a safe kept in a restaurant owned by the accused. Informational privacy has been defined as 'the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others.' Its protection is predicated on the assumption that all information about a person is, in a fundamental way, his own for him to communicate or retain as he sees fit."

In Paragraph 44 he referred to the *Universal Declaration of Human Rights* which provides,

"No one shall be subjected to arbitrary interference with his privacy, home or correspondence and proclaims that everyone has the right to the protection of the law against such interference or attacks."

Justice Sharpe said in Paragraph 45,

Exhibit 2

1  "While the *Charter* does not apply to
2  common law disputes between private
3  individuals, the Supreme Court has
4  acted on several occasions to
5  develop the common law in a manner
6  consistent with *Charter* values."
7
8
9  Justice Sharpe then reviewed privacy legislation

10  in Canada and the development of privacy law in

11  other jurisdictions.  He then said in Paragraph

12  67,

13
14  "For over one hundred years,
15  technological change has motivated
16  the legal protection of the
17  individual's right to privacy. In
18  modern times, the pace of
19  technological change has accelerated
20  exponentially. Legal scholars such
21  as Peter Burns have written of 'the
22  pressing need to preserve privacy
23  which is being threatened by science
24  and technology to the point of
25  surrender.' The internet and digital
26  technology have brought an enormous
27  change in the way we communicate and
28  in our capacity to capture, store
29  and retrieve information. As the
30  facts of this case indicate,
31  routinely kept electronic data bases
32  render our most personal financial
33  information vulnerable. Sensitive
34  information as to our health is
35  similarly available, as are records
36  of the books we have borrowed or
37  bought, the movies we have rented or
38  downloaded, where we have shopped,

where we have travelled, and the
nature of our communications by cell
phone, e-mail or text message".

He then deals with law as it applied to the
case before the Court.  He said in Paragraph 71,

"The key features of this cause of
action are, first, that the
defendant's conduct must be
intentional, within which I would
include reckless; second that the
defendant must have invaded, without
lawful justification, the
plaintiff's private affairs or
concerns; and third, that a
reasonable person would regard the
invasion as highly offensive causing
distress, humiliation or anguish.
However, proof of harm to a
recognized economic interest is not
an element of the cause of action. I
return below to the question of
damages, but state here that I
believe it important to emphasize
that given the intangible nature of
the interest protected, damages for
intrusion upon seclusion will
ordinarily be measured by a modest
conventional sum."

He continued in Paragraph 72,

"These elements make it clear that
recognizing this cause of action
will not open the floodgates. A

1        claim for intrusion upon seclusion
2        will arise only for deliberate and
3        significant invasions of personal
4        privacy. Claims from individuals who
5        are sensitive or unusually concerned
6        about their privacy are excluded: it
7        is only intrusions into matters such
8        as one's financial or health
9        records, sexual practices and
10       orientation, employment, diary or
11       private correspondence that, viewed
12       objectively on the reasonable person
13       standard, can be described as highly
14       offensive."
15

16    He then referred to the competing claims of

17   freedom of expression and freedom of the press.

18   He said in Paragraph 73,

19
20       "Suffice it to say, no right to
21       privacy can be absolute and many
22       claims for the protection of privacy
23       will have to be reconciled with, or
24       even yield to, such competing
25       claims."
26

27    In Paragraph 87 Justice Sharpe set out the

28   considerations in determining damages where an

29   intrusion on seclusion has been found to exist.

30    In **Jones** there was no issue about freedom of

31   expression or freedom of the press.   The Ontario

32   Court of Appeal therefore did not have to

1   consider the balance to be struck between those

2   rights and privacy rights.

3        Justice Sharpe specifically mentioned

4   intrusion into matters involving a person's

5   sexual practices and orientation as being

6   possible subjects for a claim of intrusion upon

7   seclusion. However he said these intrusions must

8   be viewed objectively and be viewed as highly

9   offensive. Weight against this is freedom of

10  persons to express their opinions.

11       Certainly the comments made by Mr. Handshoe

12  deal with Mr. Leary's and Mr. Perret's sexual

13  orientation. They're anti-gay and homophobic,

14  they were very upsetting to both as were the

15  doctored up photographs, they're highly

16  offensive. However the issue of weighing the

17  effect of the intrusion on seclusion against the

18  issue of freedom of expression was not argued

19  before me. In such circumstances I conclude this

20  is not an appropriate case for the award of

21  damages for intrusion of seclusion.

Exhibit 2

1      In this regard I note as well the comments

2      of Justice Cory in **Hill** where he said with

3      respect to defamation,

4
5              "Reputation is intimately related to
6              the right to privacy which has been
7              accorded constitutional protection."
8

9      This passage was also quoted by Justice

10     Sharpe in Paragraph 43 of the **Jones** decision.

11     Because this is also a defamation action I

12     conclude this is a further reason to leave the

13     issue of a cause of action for intrusion on

14     seclusion for another day in another proceeding.

15     Now turning to the damage award with respect

16     to Trout Point Lodge.   With respect to the

17     corporate plaintiff it is clear that a

18     corporation can be defamed.   Damages were awarded

19     to the Barrick Gold Corporation and to Dover

20     Investments Limited.   In the latter decision the

21     Court set out the principles in awarding damages

22     to a corporate plaintiff.

23     The Court said in Paragraph 19,

1
2 "Damages for a corporate plaintiff
3 are to compensate for the harm to
4 its goodwill and business
5 reputation. The factors to be
6 considered in assessing damages
7 include the defendant's conduct, his
8 position and standing, the nature of
9 the defamation, the absence of an
10 apology or refusal to apologize and
11 his conduct throughout up to and
12 including at trial. In addition to
13 general damages for defamation a
14 corporate plaintiff may be entitled
15 to special damages for specific
16 economic loss. In addition general
17 damages for defamation in
18 exceptional cases a corporate
19 plaintiff may be entitled to an
20 award of punitive damages for
21 malicious, oppressive and high-
22 handed conduct. Punitive damages
23 are intended to punish a defendant
24 rather than compensate a plaintiff.
25 Compensatory damages of substantial
26 may also be considered punishment
27 and should be taken into account
28 when determining whether an award of
29 punitive damages is warranted."
30

31 Trout Point Lodge has been stated to have been

32 funded by money illegally obtained through Mr.

33 Broussard and through the dishonest actions of

34 Mr. Leary and Mr. Perret and getting money from

35 ACOA and other investors. It has been said to be

36 on the verge of bankruptcy. These are things

1    which would cause potential guests to decide not

2    to come to Trout Point Lodge.

3         The defamation in my view has harmed the

4    goodwill of the business and its business

5    reputation.  It casts an unfavorable light on the

6    business which has otherwise received extremely

7    positive reviews in the Globe and Mail, the

8    National Post, US Today and the National

9    Geographic Traveler to mention just a few.

10        It has also been commended by well-known

11   publications such as Four Doors Guide to Atlantic

12   Canada and Forbes Traveller to name a few.

13        It has also been recognized as a Top 10

14   finalist in the National Geographic Society's

15   2009 Geo-tourism challenge.  Some of this

16   information is included at Tab 5 of the evidence

17   submitted at the hearing.

18             Mr. Leary points out in Paragraph 8
19             of his affidavit, "In addition to
20             its membership and prestigious hotel
21             and restaurant association Relais
22             and Chateaux Trout Point has always
23             maintained a four and one half star
24             rating from Canada Select.  It's the
25             only hotel in Atlantic Canada

1  inspected and recommended by Conde
2  Nast Johansens Guide and earned a
3  five green key rating from the hotel
4  association of Canada."
5

6      The defendant is persistent in his

7  statements that Trout Point Lodge is somehow

8  connected to the Jefferson Parish corruption

9  scandal and has benefitted financially from funds

10  illegally obtained. The defendant knows that the

11  original story linking Mr. Broussard with Trout

12  Point Lodge has been retracted and an apology

13  published. In the face of this the defamatory

14  comments continued.

15      Mr. Handshoe had refused to apologize or

16  retract and in fact has republished the original

17  statements and says they are true. In addition

18  he has alleged that the business is on the verge

19  of bankruptcy and has received funds improperly.

20      All this has been done through the internet

21  which has the potential to reach untold numbers

22  of potential guests of Trout Point Lodge

23  throughout the world.

1    The defamation has gone on now for two years
2    and there is no indication that the defendant
3    intends to stop.    The defendant's conduct
4    throughout has been to attempt to destroy the
5    reputation of the business.

6    In my view it may be very difficult to
7    change the perception of Trout Point Lodge caused
8    by the defamation and its reputation as a world
9    class resort has been damaged.

10   I conclude that the appropriate award of
11   damages for the defamation of Trout Point Lodge
12   is $75,000.

13   The individual plaintiffs have been called
14   dishonest, part of money laundering scheme
15   involving Mr. Broussard and part of a political
16   corruption scandal involving Mr. Broussard which
17   is now the subject of FBI investigation.

18   They are said to have lied and misled ACOA
19   and the Court in the ACOA action. Mr. Leary has
20   said to have perjured himself in that litigation.
21   They are said to have misused the justice system

1   in Nova Scotia for their own purposes.  They are

2   referred to as participating in nefarious schemes

3   being bag holders for Mr. Broussard, being

4   unsuccessful businessmen who have had a series of

5   failed businesses and being conmen.

6       Mr. Leary has said they have changed their

7   patterns of running errands to avoid running into

8   people who may ask them about the internet

9   information published about them.  They are

10  embarrassed and stressed by the defamation.

11      To paraphrase the Supreme Court of Canada

12  decision in **Hill**,

13
14       "They will never know who, as a
15       result of the defamation, still has
16       a lingering suspicion that they are
17       dishonest, schemers and con men and
18       were involved with Aaron Broussard
19       in the political corruption of which
20       he is accused.  They will never know
21       who might believe that they are
22       without integrity and were involved
23       in criminal activity."
24

25      These unfounded statements about the

26  character, business dealings and financial acumen

27  of these businessmen merit an award of damages

Exhibit 2

1    for each in the amount of $100,000.

2    Aggravated damages are beyond the damages

3    already awarded which are given when the injury

4    to a plaintiff are aggravated.   As Gatley on

5    libel and slander described it, they reflect a

6    natural indignation of the Court of the injury

7    inflicted.   As Justice Cory said in **Hill** they

8    take into account the additional harm caused to

9    the plaintiff's feelings by the defendant's

10   outrageous and malicious conduct.

11   Justice Cory in **Hill** considered the factors

12   in that case which the Court believed made such

13   an award by the jury in that case a reasonable

14   one.

15   I conclude that the following factors in

16   this case call for such an award here.   The

17   original story was retracted by the Times-

18   Picayune in New Orleans, nevertheless Mr.

19   Handshoe continued to spread the defamation.   He

20   then came up with additional statements

21   concerning events in Nova Scotia which defamed

1  the defendants beyond the original defamation.

2  He commented on other business ventures of the

3  plaintiffs and other legal matters in which they

4  were involved misrepresenting facts and attacking

5  the reputations with statements that they were

6  dishonest, fraudsters and liars.  The widespread

7  defamatory continued to the date of this hearing

8  in a meeting well suited to spreading the

9  defamation far and wide to a vast number of

10 internet users.

11     Furthermore there was conduct by the

12 defendant in trying to stop the plaintiffs from

13 continuing their action against him.  He

14 threatened to release dossiers of information he

15 had about the plaintiffs and other unnamed people

16 unless the action was discontinued.  All of this

17 is outrageous conduct in the face of true facts

18 about the plaintiffs.

19     Malice is an essential element of an award

20 of aggravated damages and in this case malice is

21 alleged in the statement of claim in Paragraph 93

1   and other places and is therefore deemed admitted

2   by virtue of the default judgment.

3   I therefore award an additional $50,000 to

4   each of Mr. Leary and Mr. Perret in aggravated

5   damages to express the indignation of the court.

6   As the Supreme Court of Canada said in **Hill**,

7   punitive damages are not compensatory in nature

8   but are meant to punish the defendant.  There

9   must be a rational purpose in awarding punitive

10  damages.  In **Hill** the Supreme Court of Canada

11  considered the actions of the Church of

12  Scientology and its officers during the course of

13  the litigation and focussed on its oppressive and

14  high handed conduct and the malice of which it

15  acted throughout.

16  The defendant in this case continued his

17  defamation after the newspaper printed a

18  retraction of its story linking Trout Point

19  Lodge, Mr. Leary and Mr. Perret with Aaron

20  Broussard and the serious criminal allegations

21  against him.  He redoubled his efforts after

1  being sued and continued his defamation after

2  judgment had been entered against him.    He

3  repeated the original defamatory statements.

4      Just prior to the hearing about damages

5  there were further defamatory statements.

6      Mr. Handshoe has stated that because of

7  legislation in the United States it would be

8  impossible for the plaintiffs to recover judgment

9  against him.    This is a factor in awarding

10  punitive damages.

11      I conclude there is a rational reason for

12  awarding punitive damages in this case for the

13  defendant's egregious misconduct which offends

14  the court's sense of decency.    It is to act as a

15  deterrent not only to Mr. Handshoe but also to

16  others who might be inclined to defame someone in

17  this fashion.

18      With respect to Trout Point Lodge I conclude

19  that the defamation award itself is an

20  appropriate award to punish the defendant for his

21  defamation of the corporate plaintiff.    With

1  respect to Mr. Leary and Mr. Perret I conclude

2  that there is a need for additional punishment of

3  the defendant because the defamation of them goes

4  beyond what has been said about the company.

5  In my view the award of general and

6  aggravated damages to Charles Leary and Vaughn

7  Perret is insufficient to properly denounce the

8  actions of Mr. Handshoe and serve the goal of

9  deterrence.

10  I therefore conclude that there should be an

11  additional $25,000 awarded to each of Charles

12  Leary and Vaughn Perret as punitive damages

13  against Mr. Handshoe.

14  I'm satisfied that an injunction should

15  issue. The principles for granting of

16  injunctions in defamation cases were set out in

17  **Astley**. **Barrick Gold** made it clear that

18  injunctions are available in cases of defamation.

19  In **Astley** Justice Chapnik said in Paragraph 21,

20

21  "Permanent injunctions have
22  consistently been ordered after

1  findings of defamation where either:
2  (1) there is a likelihood that the
3  defendant will continue to publish
4  defamatory statements despite the
5  finding that he is liable to the
6  plaintiff for defamation; or (2)
7  there is a real possibility that the
8  plaintiff will not receive any
9  compensation, given that enforcement
10 against the defendant of any damage
11 award may not be possible."
12

13    Applying these factors to this case I look
14 at the conduct of the defendant which, from the
15 beginning, was defamatory and continued with more
16 fervor after a retraction was printed, was
17 published.  It became stronger and more malicious
18 and derogatory as the action was commenced and as
19 it proceeded to this assessment of damages.
20 There's been no retraction or apology but a
21 continued campaign of defamation against these
22 plaintiffs and homophobic comments about their
23 sexual preference.
24    It is clear from the evidence before me that
25 Mr. Handshoe will continue to publish the
26 defamatory material.  He says he's protected from
27 foreign defamation judgments such as the default

1    judgment in this proceeding by legislation in the

2    United States.

3        It also may be difficult if not impossible

4    for the plaintiffs to recover on their judgment.

5    It's not known what assets Mr. Handshoe has or

6    whether enforcement in the U.S. on the monetary

7    judgment will be possible.

8        I therefore conclude that an injunction

9    should issue. Mr. Handshoe is therefore enjoined

10   from dissemination, posting on the internet,

11   distributing or publishing in any manner

12   whatsoever, directly or indirectly statements or

13   comments about Trout Point Lodge, Charles Leary

14   and Vaughn Perret.  This includes statements or

15   comments which refer to the three plaintiffs by

16   name, depiction or description.  The mandatory

17   injunction shall also issue requiring Douglas

18   Handshoe to remove the defamatory comments,

19   statements and depictions from any internet site

20   on which he has posted them and any links to

21   those sites.

1       The plaintiffs seek solicitor client costs

2   of these proceedings.  However they have not

3   retained the services of counsel but have

4   represented themselves throughout.  It is true

5   that Vaughn Perret is a law graduate and has

6   practised law.  However he has non-practising

7   status and has never been approved to practise

8   law in Nova Scotia.  I therefore cannot conclude

9   that solicitor client costs are warranted.  That

10  is not to say that self-represented parties are

11  not entitled to their costs.  In Nova Scotia it

12  has been said that costs can be awarded to self-

13  represented parties beginning with the decision

14  in **MacBeth v. Dalhousie University** and more

15  recently in the Court of Appeal decision in **Crewe**

16  **v. Crewe.**

17      I've awarded the costs in the modest amount

18  of $4,000 to self-represented parties in **Salman**

19  **v. Al-Sheik Ali.**  In that case the self-

20  represented parties took part in multi-party

21  litigation and were well prepared and did not

Exhibit 2

1    cause any delays of five and one half days.

2         I conclude that in the circumstances of this

3    case there should be a modest costs award to

4    reflect the time spent on this matter by the

5    individual plaintiffs.  They brought the matter

6    on to court and obtained a default judgment.

7    They were well prepared for the one half day

8    hearing to assess damages but it was unopposed.

9         I therefore award them costs in the total

10   amount of $2,000.

11        The self-represented parties of the **Salman**

12   matter were also entitled their disbursements as

13   are the plaintiffs in this case.  They however

14   have not provided me with their disbursements.

15   If they wish to provide that information I will

16   consider their out of pocket costs and render a

17   further brief decision.  I should note however

18   that the final order in this matter therefore

19   cannot be issued until that is done.

20        That concludes my oral decision and I guess

21   the only question I have for the parties is do

1    you wish to make a claim for the disbursements

2    which will mean that the order can't be issued in

3    this proceeding until that's done.

4         **MALE VOICE:**    No My Lady, we would forego

5    the out of pocket costs.

6         **THE COURT:**    Thank you, so the order can

7    be issued sooner rather than later.   Thank you,

8    that concludes the matter.

9

10                  **[END OF RECORDING 11:22 P.M.]**

11

12

13

14

15

16

17

18

19

20

21

22

## CERTIFICATE OF COURT TRANSCRIBER

I, Rita Newton, Court Transcriber, hereby certify that I have transcribed the foregoing and that it is a true and accurate transcript of an oral decision given in the matter of **Trout Point Lodge versus Douglas Handshoe,** taken by way of electronic recording in Halifax, Nova Scotia on February 1, 2012.

_____

Rita Newton, Certificate No. 2006-56

CERTIFIED COURT TRANSCRIBER,
PROVINCE OF NOVA SCOTIA

Halifax, Nova Scotia

February 20, 2012