*Indexed as:*

## Grant v. Torstar Corp.

**Peter Grant and Grant Forest Products Inc.,
Appellants/Respondents on cross-appeal;
v.
Torstar Corporation, Toronto Star Newspapers Limited, Bill
Schiller, John Honderich and Mary Deanne Shears,
Respondents/Appellants on cross-appeal, and
Ottawa Citizen, Canadian Newspaper Association, Ad
IDEM/Canadian Media Lawyers Association, RTNDA
Canada/Association of Electronic Journalists, Magazines
Canada, Canadian Association of Journalists, Canadian
Journalists for Free Expression, Writers' Union of Canada,
Professional Writers Association of Canada, Book and
Periodical Council, PEN Canada, Canadian Broadcasting
Corporation, Canadian Civil Liberties Association and Danno
Cusson, Interveners.**

[2009] 3 S.C.R. 640

[2009] 3 R.C.S. 640

[2009] S.C.J. No. 61

[2009] A.C.S. no 61

2009 SCC 61

File No.: 32932.

Supreme Court of Canada

Heard: April 23, 2009;
Judgment: December 22, 2009.

**Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish,
Abella, Charron, Rothstein and Cromwell JJ.**

(146 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Catchwords:*

*Torts -- Defamation -- Defences -- Responsible communication on matters of public interest -- Newspaper and reporter being sued for libel after article was published concerning proposed private golf course development -- Whether traditional defences for defamatory statements of fact are inconsistent with values underlying freedom of expression -- Whether law of defamation [page641] should be modified to recognize defence of responsible communication on matters of public interest.*

*Torts -- Defamation -- Defences -- Responsible communication on matters of public interest -- Elements of defence -- Respective roles of judge and jury.*

*Torts -- Defamation -- Defences -- Fair comment -- Newspaper and reporter being sued for libel after article was published concerning proposed private golf course development -- Whether trial judge erred in his charge to jury on fair comment.*

**Summary:**

G and his company brought a libel action against a newspaper and reporter after an article was published concerning a proposed private golf course development on G's lakefront estate. The story aired the views of local residents who were critical of the development's environmental impact and suspicious that G was exercising political influence behind the scenes to secure government approval for the new golf course. The article quoted a neighbour who said that "[e]veryone thinks it's a done deal" because of G's influence. The reporter, an experienced journalist, attempted to verify the allegations in the article, including asking G for comment, which G chose not to provide. At trial, without rejecting the possibility of an expanded qualified privilege defence based on a concept of public interest responsible journalism, the trial judge ruled that the defence would not apply in these circumstances and the case went to the jury essentially on the defences of truth and fair comment. The jury rejected these defences and awarded the plaintiffs general, aggravated and punitive damages. The Court of Appeal concluded that the trial judge had erred in failing to leave the new responsible journalism defence with the jury. It also concluded that the jury instructions were flawed, and ordered a new trial. G and his company appealed to reinstate the jury verdict. The newspaper defendants cross-appealed, asking the Court to apply the new defence in this case, and dismiss the action. In the alternative, they asked the Court to dismiss the action on the basis of fair comment.

*Held*: The appeal and the cross-appeal should be dismissed.

[page642]

*Per* McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Charron, Rothstein and Cromwell JJ.: The law of defamation should be modified to provide greater protection for communications on matters of public interest. The current law with respect to statements that are reliable and important to public debate does not give adequate weight to the constitutional value of free expression. The first two rationales for the freedom of expression guarantee in s. 2(*b*) of the *Canadian Charter of Rights and Freedoms* -- the proper functioning of democratic governance and getting at the truth -- squarely apply to communications on matters of public interest, even those which contain false imputations. Freewheeling debate on matters of public interest is to be encouraged and the vital role of the communications media in providing a vehicle for such debate is explicitly recognized in the text of s. 2(*b*) itself. While the law must protect reputation, the current level of

Exhibit 4

http://www.lexis.com/research/retrieve/frames/PrintDoc.do?jobHa...

protection -- in effect a regime of strict liability -- is not justifiable. The law of defamation accords no protection for statements on matters of public interest published to the world at large if they cannot be proven to be true. To insist on court-established certainty in reporting on matters of public interest may have the effect not only of preventing communication of facts which a reasonable person would accept as reliable and which are relevant and important to public debate, but also of inhibiting political discourse and debate on matters of public importance, and impeding the cut and thrust of discussion necessary to discovery of the truth. Although the right to free expression does not confer a licence to ruin reputation, when proper weight is given to the constitutional value of free expression on matters of public interest, the balance tips in favour of broadening the defences available to those who communicate facts it is in the public's interest to know. A consideration of the jurisprudence of other common law democracies also favours replacing the current Canadian law with a rule that gives greater scope to freedom of expression while offering adequate protection of reputation. A defence that would allow publishers to escape liability if they can establish that they acted responsibly in attempting to verify the information on a matter of public interest represents a reasonable and proportionate response to the need to protect reputation while sustaining the public exchange of information that is vital to modern Canadian society. The law of defamation should therefore be modified to recognize a defence of responsible communication on matters of public interest. [para. 7] [paras. 52-54] [paras. 57-58] [paras. 65-66] [paras. 85-86]


[page643]

The proposed change to the law should be viewed as a new defence, leaving the traditional defence of qualified privilege intact. To be protected by the defence of responsible communication, first, the publication must be on a matter of public interest. Second, the defendant must show that publication was responsible, in that he or she was diligent in trying to verify the allegation(s), having regard to all the relevant circumstances. [para. 95] [paras. 98-99]

In determining whether a publication is on a matter of public interest, the judge must consider the subject matter of the publication as a whole. The defamatory statement should not be scrutinized in isolation. To be of public interest, the subject matter must be shown to be one inviting public attention, or about which the public, or a segment of the public, has some substantial concern because it affects the welfare of citizens, or one to which considerable public notoriety or controversy has attached. Public interest is not confined to publications on government and political matters, nor is it necessary that the plaintiff be a "public figure". [para. 101] [paras. 105-106]

The judge determines whether the impugned statement relates to a matter of public interest. If public interest is shown, the jury decides whether on the evidence the defence of responsible communication is established. The following factors may aid in determining whether a defamatory communication on a matter of public interest was responsibly made: (a) the seriousness of the allegation; (b) the public importance of the matter; (c) the urgency of the matter; (d) the status and reliability of the source; (e) whether the plaintiff's side of the story was sought and accurately reported; (f) whether the inclusion of the defamatory statement was justifiable; (g) whether the defamatory statement's public interest lay in the fact that it was made rather than its truth ("reportage"); and (h) any other relevant circumstances. [para. 110] [para. 126] [para. 128]

While the "repetition rule" holds that repeating a libel has the same legal consequences as originating it, under the reportage exception, the repetition rule does not apply to fairly reported statements whose public interest lies in the fact that they were made rather than in their truth or falsity. If a dispute is itself a matter of public interest and the allegations are fairly reported, the report will be found to be responsible even if some of the statements made may be defamatory and untrue, provided: (1) the report attributes the statement to a person, preferably identified, thereby avoiding total [page644] unaccountability; (2) the report indicates, expressly or implicitly, that its truth has not been verified; (3) the report sets out both sides of the dispute fairly; and (4) the report provides the context in which the statements were made. [paras. 119-120]

The evidence in this case revealed a basis for three defences: justification, fair comment, and responsible communication on a matter of public interest. All three defences should have been left to the jury. It was open to the jury to consider the statement attributed to a neighbour that "[e]veryone thinks it's a done deal" as a comment, or statement of opinion. This would raise the defence of fair comment. While the defence was left to the jurors, the trial judge failed to instruct them

Exhibit 4

that since the reporter was the conduit for the comment and not its maker, the fact that he did not honestly believe it could not be used as a foundation for finding malice unless in the context of the article, he had adopted the comment as his own. Additionally, the "fair-minded" component of the traditional test should not form part of a charge on fair comment. These problems in the trial judge's charge could have led the jury to wrongly conclude that the fair comment defence had been defeated by malice. It was also open to the jury to consider the critical "done deal" remark as a statement of fact. Read literally, this statement can be taken as an assertion that government approval for the development was actually already sealed, either formally behind closed doors or by tacit understanding. This raises the defence of responsible communication on a matter of public interest. The trial judge did not leave this defence or any similar defence to the jury. Taken together, the errors set out amount to a substantial wrong or miscarriage of justice and require a new trial pursuant to s. 134(6) of the Ontario *Courts of Justice Act*. [paras. 136-140]

*Per* Abella J.: The majority's reasons for adding the "responsible communication" defence to Canadian defamation law were agreed with, as was their view that determining the availability of this defence entails a two-step analysis. However, the jury should not decide the second step. Deciding whether the applicable standard of responsibility has been met in a given case is, like the public interest analysis in the first step, a matter for the judge to determine. The responsible communication [page645] analysis requires that the defendant's interest in freely disseminating information and the public's interest in the free flow of information be weighed against the plaintiff's interest in protecting his or her reputation. This exercise involves balancing freedom of expression, freedom of the press, the protection of reputation, privacy concerns, and the public interest. Weighing these often competing interests is a legal determination, thereby taking the defence beyond the jury's jurisdiction except for disputed facts, and squarely into judicial territory. [paras. 142-143] [para. 145]

**Cases Cited**

By McLachlin C.J.

**Referred to:** *Cusson v. Quan*, 2007 ONCA 771, 231 O.A.C. 277, rev'd 2009 SCC 62, [2009] 3 S.C.R. 712; *WIC Radio Ltd. v. Simpson*, 2008 SCC 40, [2008] 2 S.C.R. 420; *Horrocks v. Lowe*, [1975] A.C. 135; *Toogood v. Spyring* (1834), 1 C.M. & R. 181, 149 E.R. 1044; *Ross v. New Brunswick Teachers' Assn.*, 2001 NBCA 62, 201 D.L.R. (4) 75; *Douglas v. Tucker*, [1952] 1 S.C.R. 275; *Globe and Mail Ltd. v. Boland*, [1960] S.C.R. 203; *Banks v. Globe and Mail Ltd.*, [1961] S.C.R. 474; *Jones v. Bennett*, [1969] S.C.R. 277; *Parlett v. Robinson* (1986), 5 B.C.L.R. (2d) 26; *Grenier v. Southam Inc.*, [1997] O.J. No. 2193 (QL); *Leenen v. Canadian Broadcasting Corp.* (2000), 48 O.R. (3d) 656, aff'd (2001), 54 O.R. (3d) 612; *Young v. Toronto Star Newspapers Ltd.* (2003), 66 O.R. (3d) 170, aff'd (2005), 77 O.R. (3d) 680; *Reference re Alberta Statutes*, [1938] S.C.R. 100; *Saumur v. City of Quebec*, [1953] 2 S.C.R. 299; *Switzman v. Elbling*, [1957] S.C.R. 285; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130; *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *R. v. Salituro*, [1991] 3 S.C.R. 654; *Irwin Toy Ltd. v. Quebec (Attorney General)*, [1989] 1 S.C.R. 927; *R. v. Keegstra*, [1990] 3 S.C.R. 697; *R. v. Zundel*, [1992] 2 S.C.R. 731; *R. v. Lucas*, [1998] 1 S.C.R. 439; *R. v. Dyment*, [1988] 2 S.C.R. 417; *R. v. O'Connor*, [1995] 4 S.C.R. 411; *Ballina Shire Council v. Ringland* (1994), 33 N.S.W.L.R. 680; *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967); *Lange v. Australian Broadcasting Corp.* (1997), 145 A.L.R. 96; *Lange v. Atkinson*, [1998] 3 N.Z.L.R. 424; *Lange v. Atkinson*, [2000] 1 N.Z.L.R. 257; *Lange v. Atkinson*, [2000] 3 N.Z.L.R. 385; *Du Plessis v. De Klerk*, 1996 (3) SA 850; *National Media Ltd. v. Bogoshi*, 1998 (4) SA 1196; *Reynolds v. Times Newspapers Ltd.*, [1999] 4 All E.R. 609; *Jameel v. Wall Street Journal Europe SPRL*, [2006] UKHL 44, [2007] 1 A.C. 359, [page646] rev'g [2005] EWCA Civ 74, [2005] 4 All E.R. 356; *Seaga v. Harper*, [2008] UKPC 9, [2008] 1 All E.R. 965; *Charman v. Orion Publishing Group Ltd.*, [2007] EWCA Civ 972, [2008] 1 All E.R. 750; *Theophanous v. Herald & Weekly Times Ltd.* (1994), 124 A.L.R. 1; *N.M. v. Smith*, [2007] ZACC 6, 2007 (5) SA 250; *Khumalo v. Holomisa*, [2002] ZACC 12, 2002 (5) SA 401; *Mthembi-Mahanyele v. Mail & Guardian Ltd.*, [2004] ZASCA 67, 2004 (6) SA 329; *Loutchansky v. Times Newspapers Ltd.*, [2001] EWCA Civ 1805, [2002] 1 All E.R. 652; *London Artists, Ltd. v. Littler*, [1969] 2 All E.R. 193; *Simpson v. Mair*, 2004 BCSC 754, 31 B.C.L.R. (4) 285; *Miller v. Associated Newspapers Ltd.*, [2005] EWHC 557 (QB) (BAILII); *Galloway v. Telegraph Group Ltd.*, [2004] EWHC 2786 (QB) (BAILII); *"Truth" (N.Z.) Ltd. v. Holloway*, [1960] 1 W.L.R. 997; *Al-Fagih v. H.H. Saudi Research & Marketing (U.K.) Ltd.*, [2001] EWCA Civ 1634 (BAILII); *Prince Radu of Hohenzollern v. Houston*, [2007] EWHC 2735 (QB) (BAILII); *Roberts v. Gable*, [2007] EWCA Civ 721, [2008] 2 W.L.R. 129; *Bonnick v. Morris*, [2002] UKPC 31, [2003] 1 A.C. 300; *Pizza Pizza Ltd. v. Toronto Star Newspapers Ltd.* (1998), 42 O.R. (3d) 36; *Scott v. Fulton*, 2000 BCCA 124, 73 B.C.L.R. (3d) 392.

By Abella J.

Referred to: *Edmonton Journal v. Alberta (Attorney General)*, [1989] 2 S.C.R. 1326; *Canadian Broadcasting Corporation v. New Brunswick (Attorney General)*, [1991] 3 S.C.R. 459; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130; *WIC Radio Ltd. v. Simpson*, 2008 SCC 40, [2008] 2 S.C.R. 420; *Australian Broadcasting Corp. v. Reading*, [2004] NSWCA 411 (AustLII); *Jameel v. Wall Street Journal Europe SPRL*, [2005] EWCA Civ 74, [2005] 4 All E.R. 356.

**Statutes and Regulations Cited**

*Canadian Charter of Rights and Freedoms*, ss. 1, 2(*b*).

*Courts of Justice Act*, R.S.O. 1990, c. C.43, ss. 108, 134(6).

*Jury Act*, R.S.A. 2000, c. J-3, s. 17(1).

*Libel Act, 1792* (U.K.), 32 Geo. 3, c. 60.

*Libel and Slander Act*, R.S.O. 1990, c. L.12, s. 14.

*Privacy Act*, R.S.B.C. 1996, c. 373, s. 1(1).

*Privacy Act*, R.S.M. 1987, c. P125, s. 2(1).

*Privacy Act*, R.S.N.L. 1990, c. P-22, s. 3.

*Privacy Act*, R.S.S. 1978, c. P-24, s. 2.

*Supreme Court Rules*, B.C. Reg. 221/90, r. 39(27).

**Authors Cited**

Anderson, David A. "Is Libel Law Worth Reforming?" (1991-1992), 140 U. Pa. L. Rev. 487.


[page647]

Beattie, Kate. "New Life for the *Reynolds* 'Public Interest Defence'? *Jameel v Wall Street Journal Europe*", [2007] *E.H.R.L.R.* 81.

Boivin, Denis W. "Accommodating Freedom of Expression and Reputation in the Common Law of Defamation" (1997), 22 Queen's L.J. 229.

Bonnington, Alistair J. "Reynolds Rides Again" (2006), 11 *Comms. L.* 147.

Brown, Raymond E. *The Law of Defamation in Canada*, vols. 2-4, 2 ed. Scarborough, Ont.: Carswell, 1999 (loose-leaf updated 2008, release 3).

*Gatley on Libel and Slander*, 11 ed. by Patrick Milmo and W. V. H. Rogers. London: Sweet & Maxwell, 2008.

Hooper, David. "The Importance of the Jameel Case", [2007] *Ent. L.R.* 62.

Kenyon, Andrew T. "*Lange* and *Reynolds* Qualified Privilege: Australian and English Defamation Law and Practice" (2004), 28 Melb. U.L. Rev. 406.

Exhibit 4

New South Wales. Law Reform Commission. Report 75. *Defamation*, September 1995 (online: http://www.lawlink.nsw.gov.au/lrc.nsf/pages/R75CHP3).

Smolla, Rodney A. "Balancing Freedom of Expression and Protection of Reputation Under Canada's *Charter of Rights and Freedoms*", in David Schneiderman, ed., *Freedom of Expression and the Charter*. Scarborough, Ont.: Thomson Professional Publishing Canada, 1991, 272.

Weaver, Russell L., et al. "Defamation Law and Free Speech: *Reynolds v. Times Newspapers* and the English Media" (2004), 37 *Vand. J. Transnat'l L.* 1255.

**History and Disposition:**

APPEAL and CROSS-APPEAL from a judgment of the Ontario Court of Appeal (Rosenberg, Feldman and Simmons JJ.A.), 2008 ONCA 796, 92 O.R. (3d) 561, 301 D.L.R. (4) 129, 243 O.A.C. 120, 61 C.C.L.T. (3d) 195, 71 C.P.R. (4) 352, [2008] O.J. No. 4783 (QL), 2008 CarswellOnt 7155, setting aside a decision of Rivard J. and a jury award and ordering a new trial. Appeal and cross-appeal dismissed.

**Counsel:**

*Peter A. Downard*, *Catherine M. Wiley* and *Dawn K. Robertson*, for the appellants/respondents on cross-appeal.

*Paul B. Schabas*, *Erin Hoult* and *Iris Fischer*, for the respondents/appellants on cross-appeal.

*Richard G. Dearden* and *Wendy J. Wagner*, for the intervener the Ottawa Citizen.

[page648]

*Brian MacLeod Rogers* and *Blair MacKenzie*, for the interveners the Canadian Newspaper Association, Ad IDEM/Canadian Media Lawyers Association, RTNDA Canada/Association of Electronic Journalists, Magazines Canada, the Canadian Association of Journalists, the Canadian Journalists for Free Expression, the Writers' Union of Canada, the Professional Writers Association of Canada, the Book and Periodical Council, and PEN Canada.

*Daniel J. Henry*, for the intervener the Canadian Broadcasting Corporation.

*Patricia D. S. Jackson*, *Andrew E. Bernstein* and *Jennifer A. Conroy*, for the intervener the Canadian Civil Liberties Association.

*Ronald F. Caza* and *Jeff G. Saikaley*, for the intervener Danno Cusson.

_____

The judgment of McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Charron, Rothstein and Cromwell JJ. was delivered by

**McLACHLIN C.J.:--**

I.      <u>Introduction</u>

http://www.lexis.com/research/retrieve?_m=...PrintDoc.do?jobHa...

**1**    Freedom of expression is guaranteed by s. 2(*b*) of the *Canadian Charter of Rights and Freedoms*. It is essential to the functioning of our democracy, to seeking the truth in diverse fields of inquiry, and to our capacity for self-expression and individual realization.

**2**    But freedom of expression is not absolute. One limitation on free expression is the law of defamation, which protects a person's reputation from unjustified assault. The law of defamation does not forbid people from expressing themselves. It merely provides that if a person defames another, that person may be required to pay damages to the other for the harm caused to the other's reputation. However, if the defences available to a publisher are too narrowly defined, the result may be "libel chill", undermining freedom of expression and of the press.

[page649]

**3**    Two conflicting values are at stake -- on the one hand freedom of expression and on the other the protection of reputation. While freedom of expression is a fundamental freedom protected by s. 2(*b*) of the *Charter*, courts have long recognized that protection of reputation is also worthy of legal recognition. The challenge of courts has been to strike an appropriate balance between them in articulating the common law of defamation. In this case, we are asked to consider, once again, whether this balance requires further adjustment.

**4**    Peter Grant and his company Grant Forest Products Inc. ("GFP") sued the *Toronto Star* in defamation for an article the newspaper published on June 23, 2001, concerning a proposed private golf course development on Grant's lakefront estate. The story aired the views of local residents who were critical of the development's environmental impact and suspicious that Grant was exercising political influence behind the scenes to secure government approval for the new golf course. The reporter, an experienced journalist named Bill Schiller, attempted to verify the allegations in the article, including asking Grant for comment, which Grant chose not to provide. The article was published, and Grant brought this libel action.

**5**    The trial proceeded with judge and jury. The jury found the respondents (the "Star defendants") liable and awarded general, aggravated and punitive damages totalling $1.475 million.

**6**    The Star defendants argue that what happened in this trial shows that something is wrong with the traditional law of libel: a journalist or publisher who diligently tries to verify a story on a matter of public interest before publishing it can still be held liable in defamation for massive damages, simply because the journalist cannot prove to the court that all of the story was true or bring it within one of the "privileged" categories exempted from the need to prove truth. This state of the law, [page650] they argue, unduly curbs free expression and chills reporting on matters of public interest, depriving the public of information it should have. The Star defendants ask this Court to revise the defences available to journalists to address these criticisms, following the lead of courts in the United States and England. Mr. Grant and his corporation, for their part, argue that the common law now strikes the proper balance and should not be changed.

**7**    For the reasons that follow, I conclude that the common law should be modified to recognize a defence of responsible communication on matters of public interest. In view of this new defence, as well as errors in the jury instruction on fair comment, a new trial should be ordered.

II.    <u>Facts</u>

**8**    Peter Grant owns and operates a successful forestry business, GFP, in northern Ontario. GFP's executive offices and Grant's home are located on a lakefront estate on the Twin Lakes near New Liskeard, Ontario. In the mid-1990s, Grant decided to build a private three-hole golf course on the property, which he named Frog's Breath. In 1998, he began to host an annual charitable golf tournament and decided to expand the course to nine holes. For this he needed to purchase some adjacent Crown land and secure various government approvals.

**9**    Neighbouring cottagers and local residents opposed the development, citing environmental impact on the lake and quality-of-life concerns. They sent letters of objection to the Ontario Ministry of Natural Resources ("MNR"), which had

Exhibit 4

http://www.lexis.com/research/retrieve?PrintDoc.do?jobHa...

the ultimate say on approving Grant's plan, and retained an environmental consultant who evaluated the [page651] plan. The consultant substantiated their fears of a detrimental impact on the lake and its surroundings, disputing the positive claims made by Grant's own experts.

**10**    On January 13, 2001, the Hudson Lakes Association ("HLA") held a public meeting at which Grant's representatives explained the proposal and tried to assuage local concerns. Suspicion about the integrity of the approval process was already widespread, however. Grant was a long-time supporter of the Ontario Progressive Conservative Party, and a personal friend of Mike Harris, who was then the premier of the province. While he endeavoured to maintain a low public profile, his wealth and close ties to the government attracted the notice of watchers of the Ontario business and political scene.

**11**    Coincidentally, on the same day as the HLA's public meeting on the Grant development, the *Toronto Star* had published an article by veteran reporter Bill Schiller headlined "Slicing through the rules: Genesis of a land deal -- How Harris friends overcame fish habitat controls to build their dream". The article told of how another of Harris's friends, Peter Minogue, had withstood MNR objections and secured approval for a golf course and resort development called Osprey Links after complaining at "political levels" about the delay. Though Peter Grant had nothing to do with the Osprey Links development, the reports of political interference in the approval of a comparable development also involving a Harris friend heightened local concerns and was the subject of much discussion at the HLA public meeting.

**12**    A representative of the MNR was on hand at the meeting to assure the residents that the approval would go through normal bureaucratic channels [page652] and that no final decision had yet been made. But given the appearance of the Osprey Links article that very day, this assurance was not well received by the assembled group. One resident, holding up the newspaper, demanded to know "whether, given today's article in the *Toronto Star*, the final answer will come from North Bay or Queen's Park". In other words, whether the decision would be made by Ministry bureaucrats themselves or by their political masters in Toronto. Another resident expressed the concern that approval might already be a "done deal".

**13**    Dr. Lorrie Clark, a professor of English at Trent University in Peterborough who has a cottage on the Twin Lakes, attended the meeting. Following the meeting, Clark sent Bill Schiller an e-mail advising him that the Osprey Links story had "hit New Liskeard like a bombshell" and that the similarities between Osprey Links and the events surrounding Grant's golf course development were "extraordinary". She explained the situation giving rise to the public meeting and described the sentiments of local cottagers in the following manner:

> Basically, the situation is this: Peter Grant, multimillionaire owner of Grant Forest Products in Englehart and Mike Harris supporter and crony, is trying to buy 40 acres of Crown Land behind his "cottage" on Twin Lakes, just west of New Liskeard, for a private golf course... . Everyone thinks it's a done deal, because of Grant's influence (he employs 10,000 people in Northern Ontario) but most of all his Mike Harris ties... .

> There has been a constant sense from the beginning that this is, as one cottager put it last night, "a done deal," and that nothing we can do to stop a development that is NOT in the public interest -- but obviously only a very private one -- will make any difference. Everyone suspects -- although I do grant that this is perhaps all unfounded -- that there may be political pressure on the MNR people to give Mr. Grant what he wants. [A.R., vol. X, at p. 78]

[page653]

Schiller received other communications from cottagers critical of Grant's proposal and suspicious of his influence. The story captured his attention -- in his words, it was a "classic public interest story" -- and he decided to investigate.

**14**     Schiller began by examining records from Elections Ontario, which confirmed a history of large political contributions by Grant and GFP to the provincial PC Party and Mike Harris. He then went to New Liskeard and met with several local residents. He received information about the proposed development, listened to the residents' concerns, and learned more about Peter Grant and his prominence in the community. He spoke with MNR representatives and collected an array of documents dealing with the project. Schiller also attempted on several occasions to interview Grant in order to "get both sides" of the story, but was repeatedly rebuffed. When, in June, Schiller again wrote to Grant, putting to him some of the cottagers' objections and asking for a response, Grant's lawyer responded by threatening a libel suit.

**15**     In early June, the Star sent a photographer named Mike Slaughter to take photos of Grant's property for the newspaper article. Slaughter photographed Grant's property from a canoe in the lake. He also took photos of the golf course, parking by the side of a public road and walking a few steps on to the course in the process. Noticing the photographer and suspecting that he was from the Star, Grant instructed an employee, Ted Webster, to go and find out who the photographer was and try to detain him. Apparently, Grant wanted Webster to keep Slaughter there until the police responded to his trespass complaint. In any event, Webster parked his truck on the road in front of Slaughter's car in an attempt to block him in. Slaughter nonetheless drove around him, narrowly missing driving into a ditch. Webster followed him in his truck, with another Grant employee joining in the chase, [page654] but Slaughter escaped. Accounts of this event vary widely between the parties and became a significant issue at trial. According to Grant, the event constituted an egregious trespass by the Star; according to the Star, it demonstrated Grant's ruthless desire to suppress all scrutiny, and his aggressive posture toward the press.

**16**     The article, headlined "Cottagers teed off over golf course -- Long-time Harris backer awaits Tory nod on plan", was finally published on June 23, 2001. Its full text is reproduced in full in the Appendix to these reasons. (Two follow-up articles were also published, but they are not the subject of this action.) The June 23 article detailed Grant's ties to Harris and the PC Party, explained the background to the controversy and gave voice to the cottagers' concerns over the development itself and the possibility of political interference. It noted that Grant had refused to comment and mentioned that one of Grant's employees had "tried to drive the photographer's vehicle off a public road". The article included the following paragraph, which became the centrepiece of this litigation:

> "Everyone thinks it's a done deal because of Grant's influence -- but most of all his Mike Harris ties," says Lorrie Clark, who owns a cottage on Twin Lakes.

All in all, the article gave greater credence and prominence to the cottagers' side of the story than to Grant's. It did not paint Grant in a flattering light. However, its constituent facts were largely true, depending on whether the quote from Dr. Clark that "[e]veryone thinks it's a done deal" is seen as a statement of fact or opinion -- a matter to which I will return.


[page655]

**17**     As promised, Grant and GFP sued Schiller, the Star and affiliates of the paper, and Lorrie Clark. Dr. Clark settled before trial.

        III.    <u>Judicial History</u>
        A.    *Ontario Superior Court of Justice (Rivard J. sitting with a jury)*

**18**     At trial, the principal focus was on the "done deal" statement attributed to Dr. Clark, which the plaintiffs said contained the core of the article's defamatory import. The plaintiffs contended that the article effectively accused Grant of improperly using his influence to obtain government favours. The defendants countered that the article simply aired the real and legitimate concerns of local residents without actually levelling any allegation of impropriety against Grant.

**19**     In the alternative, the defendants, relying on recent English jurisprudence, argued that an expanded qualified privilege defence based on a concept of public interest responsible journalism should apply. Without rejecting the

Exhibit 4

possibility of such expansion, the trial judge ruled that the defence would not apply in these circumstances because the story was primarily one of local import and had a "very negative tone".

**20**    Accordingly, the case went to the jury essentially on the defences of truth and fair comment. The jury rejected these defences and awarded the plaintiffs general, aggravated and punitive damages totalling $1.475 million. Punitive damages alone were assessed at $1 million.

B.    *Ontario Court of Appeal (Rosenberg, Feldman and Simmons JJ.A.) (2008 ONCA 796, 92 O.R. (3d) 561)*

**21**    Fortified by the intervening decision of the Ontario Court of Appeal in *Cusson v. Quan*, 2007 ONCA 771, 231 O.A.C. 277 (reasons on appeal in [page656] this Court released concurrently: *Quan v. Cusson*, 2009 SCC 62, [2009] 3 S.C.R. 712), which recognized a new defence of responsible journalism, the Star defendants appealed the jury verdict on both liability and quantum of damages.

**22**    Writing for the Court of Appeal, Feldman J.A. affirmed the new responsible journalism defence elaborated in *Quan*, and concluded that the trial judge had erred in failing to leave this defence with the jury. Feldman J.A. held that the trial judge had applied an inappropriately narrow conception of the public interest: he should have found as a matter of law that the subject of the article was in the public interest and gone on to assess responsibility on that basis. On the issue of responsibility, Feldman J.A. took the view that the trial judge had inaccurately downplayed the extent to which Schiller actually attempted to verify the allegations. She also held that the jury should have been required to answer a preliminary question as to the meaning of the statement, since it could be interpreted in different ways.

**23**    On the defence of fair comment, Feldman J.A. identified additional problems with the trial judge's charge to the jury. Because the trial took place prior to this Court's decision in *WIC Radio Ltd. v. Simpson*, 2008 SCC 40, [2008] 2 S.C.R. 420, the trial judge understandably instructed the jury that a fair comment must be one that a "fair-minded" person could hold -- a proviso that was rejected in *WIC Radio*. Further, on the issue of malice which defeats fair comment, the trial judge instructed the jury that the key question was Schiller's honest belief in the defamatory statements, the "done deal" remark chief among them. But, as Feldman J.A. noted, this comment was attributed to Dr. Clark. Schiller's honest belief in it could only be relevant if he had adopted it as his own. This confusion meant that the jury may have found malice on improper grounds.

[page657]

**24**    Concluding that the jury instructions were flawed, the Court of Appeal ordered a new trial.

**25**    Mr. Grant and his corporation appeal to this Court to reinstate the jury verdict. The Star defendants cross-appeal, asking the Court to apply the new defence in this case and dismiss the action. In the alternative, they ask the Court to dismiss the action on the basis of fair comment.

IV.    Issues

**26**    While both fair comment and public interest responsible communication remain live issues on appeal, the principal legal question before us is whether the protection accorded to factual statements published in the public interest should be strengthened and, if so, how. This suggests the following analytical framework:

1.    Should the common law provide a defence based on responsible communication in the public interest?
2.    If so, what are the elements of the new defence?
3.    If so, what procedures should apply? In particular, what are the respective roles of

    the judge and jury?

    4.    Application to the case at bar

    (a)    Fair comment
    (b)    Responsible communication

V.    Analysis
A.    *Should the Common Law Provide a Defence Based on Responsible Communication in the Public Interest?*

**27**    I will first examine the current law, and then consider the arguments for and against change.

[page658]

(1)    The Current Law

**28**    A plaintiff in a defamation action is required to prove three things to obtain judgment and an award of damages: (1) that the impugned words were defamatory, in the sense that they would tend to lower the plaintiff's reputation in the eyes of a reasonable person; (2) that the words in fact referred to the plaintiff; and (3) that the words were published, meaning that they were communicated to at least one person other than the plaintiff. If these elements are established on a balance of probabilities, falsity and damage are presumed, though this rule has been subject to strong criticism: see, e.g., R. A. Smolla, "Balancing Freedom of Expression and Protection of Reputation Under Canada's *Charter of Rights and Freedoms*", in D. Schneiderman, ed., *Freedom of Expression and the Charter* (1991), 272, at p. 282. (The only exception is that slander requires proof of special damages, unless the impugned words were slanderous *per se*: R. E. Brown, *The Law of Defamation in Canada* (2nd ed. (loose-leaf)), vol. 3, at pp. 25-2 and 25-3.) The plaintiff is not required to show that the defendant intended to do harm, or even that the defendant was careless. The tort is thus one of strict liability.

**29**    If the plaintiff proves the required elements, the onus then shifts to the defendant to advance a defence in order to escape liability.

**30**    Both statements of opinion and statements of fact may attract the defence of privilege, depending on the occasion on which they were made. Some "occasions", like Parliamentary and legal proceedings, are absolutely privileged. Others, like reference letters or credit reports, enjoy "qualified" privilege, meaning that the privilege can be defeated by proof that the defendant acted with malice: see *Horrocks v. Lowe*, [1975] A.C. 135 (H.L.). The defences of absolute and qualified privilege reflect the fact that "common convenience and welfare of society" sometimes requires untrammelled communications: *Toogood v. Spyring* (1834), 1 C.M. & R. 181, 149 E.R. 1044, at p. 1050, *per* Parke B. [page659] The law acknowledges through recognition of privileged occasions that false and defamatory expression may sometimes contribute to desirable social ends.

**31**    In addition to privilege, statements of opinion, a category which includes any "deduction, inference, conclusion, criticism, judgment, remark or observation which is generally incapable of proof" (*Ross v. New Brunswick Teachers' Assn.*, 2001 NBCA 62, 201 D.L.R. (4th) 75, at para. 56, cited in *WIC Radio*, at para. 26), may attract the defence of fair comment. As reformulated in *WIC Radio*, at para. 28, a defendant claiming fair comment must satisfy the following test: (a) the comment must be on a matter of public interest; (b) the comment must be based on fact; (c) the comment, though it can include inferences of fact, must be recognisable as comment; (d) the comment must satisfy the following objective test: could any person honestly express that opinion on the proved facts?; and (e) even though the comment satisfies the objective test the defence can be defeated if the plaintiff proves that the defendant was actuated by express malice. *WIC Radio* expanded the fair comment defence by changing the traditional requirement that the opinion be one that a "fair-minded" person could honestly hold, to a requirement that it be one that "anyone could honestly have expressed" (paras. 49-51), which allows for robust debate. As Binnie J. put it, "[w]e live in a free country where people have as much right to

express outrageous and ridiculous opinions as moderate ones" (para. 4).

**32** Where statements of fact are at issue, usually only two defences are available: the defence that the statement was substantially true (justification); and the defence that the statement was made in a protected context (privilege). The issue in this case is whether the defences to actions for defamatory [page660] statements of fact should be expanded, as has been done for statements of opinion, in recognition of the importance of freedom of expression in a free society.

**33** To succeed on the defence of justification, a defendant must adduce evidence showing that the statement was substantially true. This may be difficult to do. A journalist who has checked sources and is satisfied that a statement is substantially true may nevertheless have difficulty proving this in court, perhaps years after the event. The practical result of the gap between responsible verification and the ability to prove truth in a court of law on some date far in the future, is that the defence of justification is often of little utility to journalists and those who publish their stories.

**34** If the defence of justification fails, generally the only way a publisher can escape liability for an untrue defamatory statement of fact is by establishing that the statement was made on a privileged occasion. However, the defence of qualified privilege has seldom assisted media organizations. One reason is that qualified privilege has traditionally been grounded in special relationships characterized by a "duty" to communicate the information and a reciprocal "interest" in receiving it. The press communicates information not to identified individuals with whom it has a personal relationship, but to the public at large. Another reason is the conservative stance of early decisions, which struck a balance that preferred reputation over freedom of expression. In a series of judgments written by Cartwright J. (as he then was), this Court refused to grant the communications media any special status that might have afforded them greater access to the privilege: *Douglas v. Tucker*, [1952] 1 S.C.R. 275; *Globe and Mail Ltd. v. Boland*, [1960] S.C.R. 203; *Banks v. Globe and Mail Ltd.*, [1961] S.C.R. 474; *Jones v. Bennett*, [1969] S.C.R. 277.

[page661]

**35** In recent decades, courts have begun to moderate the strictures of qualified privilege, albeit in an *ad hoc* and incremental way. When a strong duty and interest seemed to warrant it, they have on occasion applied the privilege to publications to the world at large. For example, in suits against politicians expressing concerns to the electorate about the conduct of other public figures, courts have sometimes recognized that a politician's "duty to ventilate" matters of concern to the public could give rise to qualified privilege: *Parlett v. Robinson* (1986), 5 B.C.L.R. (2d) 26 (C.A.), at p. 39.

**36** In the last decade, this recognition has sometimes been extended to media defendants. For example, in *Grenier v. Southam Inc.*, [1997] O.J. No. 2193 (QL), the Ontario Court of Appeal (in a brief endorsement) upheld a trial judge's finding that the defendant media corporation had a "social and moral duty" to publish the article in question. Other cases have adopted the view that qualified privilege is available to media defendants, provided that they can show a social or moral duty to publish the information and a corresponding public interest in receiving it: *Leenen v. Canadian Broadcasting Corp.* (2000), 48 O.R. (3d) 656 (S.C.J.), at p. 695, aff'd (2001), 54 O.R. (3d) 612 (C.A.), and *Young v. Toronto Star Newspapers Ltd.* (2003), 66 O.R. (3d) 170 (S.C.J.), aff'd (2005), 77 O.R. (3d) 680 (C.A.).

**37** Despite these tentative forays, the threshold for privilege remains high and the criteria for reciprocal duty and interest required to establish it unclear. It remains uncertain when, if ever, a media outlet can avail itself of the defence of qualified privilege.

[page662]

(2)    The Case for Changing the Law

Exhibit 4

**38**     Two related arguments are presented in support of broadening the defences available to public communicators, such as the press, in reporting matters of fact.

**39**     The first argument is grounded in principle. It asserts that the existing law is inconsistent with the principle of freedom of expression as guaranteed by s. 2(*b*) of the *Charter*. In the modern context, it is argued, the traditional rule has a chilling effect that unjustifiably limits reporting facts, and strikes a balance too heavily weighted in favour of protection of reputation. While the law should provide redress for baseless attacks on reputation, defamation lawsuits, real or threatened, should not be a weapon by which the wealthy and privileged stifle the information and debate essential to a free society.

**40**     The second argument is grounded in jurisprudence. This argument points out that many foreign common law jurisdictions have modified the law of defamation to give more protection to the press, in recognition of the fact that the traditional rules inappropriately chill free speech. While different countries have taken different approaches, the trend is clear. Recent Canadian cases, most notably the decision of the Ontario Court of Appeal in *Quan*, have affirmed this trend. The time has arrived, it is argued, for this Court to follow suit.

(a)     *The Argument From Principle*

**41**     The fundamental question of principle is whether the traditional defences for defamatory statements of fact curtail freedom of expression in a way that is inconsistent with Canadian constitutional values. Does the existing law strike an appropriate balance between two values vital to Canadian society -- freedom of expression on the one hand, and the protection of individuals' reputations on [page663] the other? As Binnie J. stated in *WIC Radio*, "[a]n individual's reputation is not to be treated as regrettable but unavoidable road kill on the highway of public controversy, but nor should an overly solicitous regard for personal reputation be permitted to 'chill' freewheeling debate on matters of public interest" (para. 2).

**42**     Freedom of expression and respect for vigorous debate on matters of public interest have long been seen as fundamental to Canadian democracy. Many years before the *Charter* this Court, in *Reference re Alberta Statutes*, [1938] S.C.R. 100, *per* Duff C.J., suggested that the Canadian Constitution contained an implied right of free expression on political matters. That principle, affirmed in cases like *Saumur v. City of Quebec*, [1953] 2 S.C.R. 299, and *Switzman v. Elbling*, [1957] S.C.R. 285, has stood the test of time.

**43**     In 1982, the *Charter*, through s. 2(*b*), confirmed and expanded constitutional protection for free expression, specifically extending it to the press: "Everyone has ... freedom of thought, belief, opinion and expression, including freedom of the press and other media of communication".

**44**     The constitutional status of freedom of expression under the *Charter* means that all Canadian laws must conform to it. The common law, though not directly subject to *Charter* scrutiny where disputes between private parties are concerned, may be modified to bring it into harmony with the *Charter*. As Cory J. put it in *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130, at para. 97, "*Charter* values, framed in general terms, should be weighed against the principles which underlie the common law. The *Charter* values will then provide the guidelines for any modification to the common law which the court feels is necessary."

[page664]

**45**     The argument that the *Charter* requires modification of Canadian defamation law was considered in *Hill*. Writing for a unanimous Court on this point, Cory J. declined to adopt the American "actual malice" rule from *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), which provides immunity for defamation of public officials except where malice is shown. Cory J. did, however, undertake a modest expansion of the recognized qualified privilege for reports on judicial proceedings.

http://web2.westlaw.com/result/documenttext/PrintDoc.do?jobHa...

**46**    While *Hill* stands for a rejection of the *Sullivan* approach and an affirmation of the common law of defamation's general conformity with the *Charter*, it does not close the door to further changes in specific rules and doctrines. As Iacobucci J. observed in *R. v. Salituro*, [1991] 3 S.C.R. 654, at p. 670, "[j]udges can and should adapt the common law to reflect the changing social, moral and economic fabric of the country." It is implicit in this duty that the courts will, from time to time, take a fresh look at the common law and re-evaluate its consistency with evolving societal expectations through the lens of *Charter* values.

**47**    The guarantee of free expression in s. 2(*b*) of the *Charter* has three core rationales, or purposes: (1) democratic discourse; (2) truth-finding; and (3) self-fulfillment: *Irwin Toy Ltd. v. Quebec (Attorney General)*, [1989] 1 S.C.R. 927, at p. 976. These purposes inform the content of s. 2(*b*) and assist in determining what limits on free expression can be justified under s. 1.

**48**    First and foremost, free expression is essential to the proper functioning of democratic governance. As Rand J. put it, "government by the free public opinion of an open society ... demands the [page665] condition of a virtually unobstructed access to and diffusion of ideas": *Switzman*, at p. 306.

**49**    Second, the free exchange of ideas is an "essential precondition of the search for truth": *R. v. Keegstra*, [1990] 3 S.C.R. 697, at p. 803, *per* McLachlin J. This rationale, sometimes known as the "marketplace of ideas", extends beyond the political domain to any area of debate where truth is sought through the exchange of information and ideas. Information is disseminated and propositions debated. In the course of debate, misconceptions and errors are exposed. What withstands testing emerges as truth.

**50**    Third, free expression has intrinsic value as an aspect of self-realization for both speakers and listeners. As the majority observed in *Irwin Toy*, at p. 976, "the diversity in forms of individual self-fulfillment and human flourishing ought to be cultivated in an essentially tolerant, indeed welcoming, environment not only for the sake of those who convey a meaning, but also for the sake of those to whom it is conveyed".

**51**    Of the three rationales for the constitutional protection of free expression, only the third, self-fulfillment, is of dubious relevance to defamatory communications on matters of public interest. This is because the plaintiff's interest in reputation may be just as worthy of protection as the defendant's interest in self-realization through unfettered expression. We are not talking here about a direct *prohibition* of expression by the state, in which the self-fulfillment potential of even malicious and deceptive expression can be relevant (*R. v. Zundel*, [1992] 2 S.C.R. 731), but rather a means by which individuals can hold one another civilly accountable for what they say. *Charter* principles do not provide a licence to damage another person's reputation simply to fulfill one's atavistic desire to express oneself.

[page666]

**52**    By contrast, the first two rationales for free expression squarely apply to communications on matters of public interest, even those which contain false imputations. The first rationale, the proper functioning of democratic governance, has profound resonance in this context. As held in *WIC Radio*, freewheeling debate on matters of public interest is to be encouraged, and must not be thwarted by "overly solicitous regard for personal reputation" (para. 2). Productive debate is dependent on the free flow of information. The vital role of the communications media in providing a vehicle for such debate is explicitly recognized in the text of s. 2(*b*) itself: "freedom of thought, belief, opinion and expression, <u>including freedom of the press and other media of communication</u>".

**53**    Freedom does not negate responsibility. It is vital that the media act responsibly in reporting facts on matters of public concern, holding themselves to the highest journalistic standards. But to insist on court-established certainty in reporting on matters of public interest may have the effect of preventing communication of facts which a reasonable person would accept as reliable and which are relevant and important to public debate. The existing common law rules mean, in effect, that the publisher must be certain before publication that it can prove the statement to be true in a court of law, should a suit be filed. Verification of the facts and reliability of the sources may lead a publisher to a reasonable

Exhibit 4

certainty of their truth, but that is different from knowing that one will be able to prove their truth in a court of law, perhaps years later. This, in turn, may have a chilling effect on what is published. Information that is reliable and in the public's interest to know may never see the light of day.

**54**    The second rationale -- getting at the truth -- is also engaged by the debate before us. Fear of being sued for libel may prevent the publication of information about matters of public [page667] interest. The public may never learn the full truth on the matter at hand.

**55**    Against this, it is argued that false statements cannot advance the purposes of s. 2(*b*). This contention, however, is belied by the fact the existing defence of privilege concedes: sometimes the public interest requires that untrue statements should be granted immunity, because of the importance of robust debate on matters of public interest (e.g. Parliamentary privilege), or the importance of discussion and disclosure as a means of getting at the truth (e.g. police reports, employment recommendations).

**56**    The argument also overlooks the fact that the *Charter*'s s. 2(*b*) protection is not confined to statements that a person can ultimately prove are true. As Professor Boivin puts it:

> Those who argue that false and defamatory publications have a weak claim to *Charter* protection omit to mention that it is only at trial, usually several years after publication, that a trier of fact determines whether a defence of justification is well founded. Moreover, it is only then that the defamatory nature of the publication is assessed. <u>Surely freedom of expression encompasses more than statements which, after the fact, are either proven factually accurate or do not injure someone's reputation.</u> [Emphasis added.]

> (D. W. Boivin, "Accommodating Freedom of Expression and Reputation in the Common Law of Defamation" (1997), 22 Queen's L.J. 229, at p. 270)

**57**    I conclude that media reporting on matters of public interest engages the first and second rationales of the freedom of expression guarantee in the *Charter*. The statement in *Hill* (at para. 106) that "defamatory statements are very tenuously related to the core values which underlie s. 2(*b*)" must be read in the context of that case. It is simply beyond debate that the limited defences available to press-related defendants may have the effect of inhibiting political discourse and debate on matters of public [page668] importance, and impeding the cut and thrust of discussion necessary to discovery of the truth.

**58**    This brings me to the competing value: protection of reputation. Canadian law recognizes that the right to free expression does not confer a licence to ruin reputations. In assessing the constitutionality of the *Criminal Code*'s defamatory libel provisions, for example, the Court has affirmed that "[t]he protection of an individual's reputation from wilful and false attack recognizes both the innate dignity of the individual and the integral link between reputation and the fruitful participation of an individual in Canadian society": *R. v. Lucas*, [1998] 1 S.C.R. 439, at para. 48, *per* Cory J. This applies both to private citizens and to people in public life. People who enter public life cannot reasonably expect to be immune from criticism, some of it harsh and undeserved. But nor does participation in public life amount to open season on reputation.

**59**    Related to the protection of reputation is a concern for personal privacy. This Court has recognized that protection of personal privacy is "intimately related" to the protection of reputation: *Hill*, at para. 121. While in other contexts privacy protection has been recognized as "essential for the well-being of the individual" (*R. v. Dyment*, [1988] 2 S.C.R. 417, at p. 427, *per* La Forest J.) and "an essential component of what it means to be 'free'" (*R. v. O'Connor*, [1995] 4 S.C.R. 411, at para. 113, *per* L'Heureux-Dubé J.), it does not figure prominently in defamation jurisprudence. One reason for this is that defamation law is concerned with providing recourse against *false* injurious statements, while the protection of privacy typically focusses on keeping *true* information from the public gaze. Legislation in several provinces provides a separate cause of action for the violation of privacy: see *Privacy Act*, R.S.B.C. 1996, c. 373, s. 1(1); *The Privacy Act*, R.S.S. 1978, c. P-24, s. 2; *The Privacy Act*, R.S.M. 1987, c. P125, s. 2(1); *Privacy Act*, R.S.N.L. 1990, c. P-22, s. 3. This said, protection [page669] of privacy may be a factor complementing the protection of reputation in the development of

defamation law (see paras. 102 and 111 below).

**60**    The Grant appellants argue that a defence based on the conduct of the defendant devalues the plaintiff's ability to vindicate reputation. A plaintiff's concern, it is said, is with the falsity of the libel, not the responsibility of the journalistic practices that led to its publication. To the extent that a revised defence shifts the focus of the litigation from the truth or falsity of the defamatory statements to the diligence of the defendant in verifying them, the plaintiff's very reason for bringing the suit is obscured.

**61**    The answer to this argument lies in the fact that a balanced approach to libel law properly reflects both the interests of the plaintiff and the defendant. The law must take due account of the damage to the plaintiff's reputation. But this does not preclude consideration of whether the defendant acted responsibly, nor of the social value to a free society of debate on matters of public interest. I agree with Sharpe J.A. that the partial shift of focus involved in considering the responsibility of the publisher's conduct is an "acceptable price to pay for free and open discussion" (*Quan*, at para. 142).

**62**    The protection offered by a new defence based on conduct is meaningful for both the publisher and those whose reputations are at stake. If the publisher fails to take appropriate steps having regard to all the circumstances, it will be liable. The press and others engaged in public communication on matters of public interest, like bloggers, must act carefully, having regard to the injury to reputation that a false statement can cause. A defence based on responsible conduct reflects the social concern that the media should be held accountable through the law of defamation. As Kirby P. stated in *Ballina [page670] Shire Council v. Ringland* (1994), 33 N.S.W.L.R. 680 (C.A.), at p. 700: "The law of defamation is one of the comparatively few checks upon [the media's] great power." The requirement that the publisher of defamatory material act responsibly provides accountability and comports with the reasonable expectations of those whose conduct brings them within the sphere of public interest. People in public life are entitled to expect that the media and other reporters will act responsibly in protecting them from false accusations and innuendo. They are not, however, entitled to demand perfection and the inevitable silencing of critical comment that a standard of perfection would impose.

**63**    It is also argued that a defence based on the conduct of the defendant may lead to costly and lengthy litigation over questions of journalistic practice about which claimants can have no advance knowledge: see A. T. Kenyon, "*Lange* and *Reynolds* Qualified Privilege: Australian and English Defamation Law and Practice" (2004), 28 Melb. U.L. Rev. 406, at p. 425. Of the relevant factors (see discussion of *Reynolds* below, at paras. 69-71) only the opportunity to respond to the allegation prior to publication is likely to lie within the plaintiff's knowledge, making it hard for a potential plaintiff to judge the strength of her case, it is said.

**64**    Again, the objection goes not so much to principle as to the particular test and procedures adopted. Whatever defence is accepted, it must be workable and fair to both plaintiff and defendant, as discussed in greater detail below. Procedural objections, however, do not negate the conclusion that the traditional test fails to protect reliable statements that are connected to the democratic discourse and truth-finding rationales for freedom of expression.

[page671]

**65**    Having considered the arguments on both sides of the debate from the perspective of principle, I conclude that the current law with respect to statements that are reliable and important to public debate does not give adequate weight to the constitutional value of free expression. While the law must protect reputation, the level of protection currently accorded by the law -- in effect a regime of strict liability -- is not justifiable. The law of defamation currently accords no protection for statements on matters of public interest published to the world at large if they cannot, for whatever reason, be proven to be true. But such communications advance both free expression rationales mentioned above -- democratic discourse and truth-finding -- and therefore require some protection within the law of defamation. When proper weight is given to the constitutional value of free expression on matters of public interest, the balance tips in favour of broadening the defences available to those who communicate facts it is in the public's interest to know.

(b)    *The Argument on the Jurisprudence*

Exhibit 4

**66**     A consideration of the jurisprudence of other common law democracies favours replacing the current Canadian law governing redress for defamatory statements of fact on matters of public interest, with a rule that gives greater scope to freedom of expression while offering adequate protection of reputation. Different countries canvassed have taken different approaches. Most, however, give more weight to the value of freedom of expression and robust public debate than does the traditional Canadian approach.

**67**     In *Sullivan*, the United States Supreme Court applied the First Amendment's free speech guarantee to hold that a "public official" cannot recover in defamation absent proof that the defendant was motivated by "actual malice", meaning knowledge [page672] of falsity or reckless indifference to truth. In subsequent cases, the "actual malice" rule was extended to apply to all "public figures", not only people formally involved in government or politics: *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967). *Sullivan* and its progeny have made it extremely difficult for anyone in the public eye to sue successfully for defamation. In the contest between free expression and reputation protection, free expression decisively won the day.

**68**     Commonwealth courts have rejected the precise balance struck in *Sullivan* between free expression and protection of reputation. However, the law has begun to shift in favour of broader defences for press defendants, most prominently in England, but also in Australia (*Lange v. Australian Broadcasting Corp.* (1997), 145 A.L.R. 96 (H.C.)), New Zealand (*Lange v. Atkinson*, [1998] 3 N.Z.L.R. 424 (C.A.) ("*Lange v. Atkinson No. 1*"); *Lange v. Atkinson*, [2000] 1 N.Z.L.R. 257 (P.C.) ("*Lange v. Atkinson No. 2*"); *Lange v. Atkinson*, [2000] 3 N.Z.L.R. 385 (C.A.) ("*Lange v. Atkinson No. 3*")), and South Africa (*Du Plessis v. De Klerk*, 1996 (3) SA 850 (CC); *National Media Ltd. v. Bogoshi*, 1998 (4) SA 1196 (SCA)).

       (i)     <u>United Kingdom</u>

**69**     *Reynolds v. Times Newspapers Ltd.*, [1999] 4 All E.R. 609, marked a decisive departure from the traditional pro-reputation orientation of defamation law in England. The case involved allegations of improper dealing by an Irish politician. The House of Lords, for the first time, recognized that "freedom to disseminate and receive information on political matters is essential to the proper functioning of the system of parliamentary democracy", (p. 621) and that the news media plays a vital role in furthering that interest. It followed that the law of defamation should provide greater protection to [page673] publications made on matters of public interest. A new standard was pronounced -- responsible journalism. Effectively, the House of Lords recognized a compelling duty on the press to publish such reports and a corresponding interest on the part of the public in receiving them.

**70**     In order to determine whether a publication should be covered by responsible journalism, Lord Nicholls provided a list of considerations which have come to be known as the "*Reynolds* factors" (at p. 626):

        (1)     The seriousness of the allegation. The more serious the charge, the more the public is misinformed and the individual harmed, if the allegation is not true. (2) The nature of the information, and the extent to which the subject matter is a matter of public concern. (3) The source of the information. Some informants have no direct knowledge of the events. Some have their own axes to grind, or are being paid for their stories. (4) The steps taken to verify the information. (5) The status of the information. The allegation may have already been the subject of an investigation which commands respect. (6) The urgency of the matter. News is often a perishable commodity. (7) Whether comment was sought from the plaintiff. He may have information others do not possess or have not disclosed. An approach to the plaintiff will not always be necessary. (8) Whether the article contained the gist of the plaintiff's side of the story. (9) The tone of the article. A newspaper can raise queries or call for an investigation. It need not adopt allegations as statements of fact. (10) The circumstances of the publication, including the timing.

Lord Nicholls made clear that the ultimate determination of responsibility would be a legal question for the judge, though he allowed that any dispute of "primary fact" would be decided by the jury (p. 626).

**71**     *Reynolds* was quickly recognized as a "media-friendly" development. In practical terms, however, *Reynolds* only

partially succeeded in changing the landscape. The ten *Reynolds* factors [page674] proved difficult to apply. Some courts saw them as merely an illustrative list of possible considerations, while others viewed them as a complete code for what constitutes responsible journalism. Journalists and publishers, for their part, found it difficult to anticipate what kind of conduct would satisfy the *Reynolds* criteria, applied with the benefit of judicial hindsight. (See, e.g., R. L. Weaver et al., "Defamation Law and Free Speech: *Reynolds v. Times Newspapers* and the English Media" (2004), 37 *Vand. J. Transnat'l L.* 1255, at pp. 1303-7.) As one commentator has observed:

> ... the *Reynolds* defence virtually never succeeded because the 10 pointers of responsible journalism were treated by the judges as hurdles to be surmounted. The judges applied a dollop of hindsight, finding something which *they*, as a responsible editor or journalist, would have done differently. The *Reynolds* defence spawned satellite litigation where, often for understandable reasons, the underlying facts could not be proved and much time and money had to be spent on analysing how the story was constructed. Anonymous sources tended to be viewed with suspicion and juries were given a complex list of factual issues to decide, sometimes with confusing directions as to the presumption of falsity which served to push them in the direction of disbelieving what the journalists said. [Emphasis in original.]

> (D. Hooper, "The Importance of the Jameel Case", [2007] *Ent. L.R.* 62, at p. 62. See also A. J. Bonnington, "Reynolds Rides Again" (2006), 11 *Comms. L.* 147.)

**72**     The House of Lords addressed this uncertainty in *Jameel v. Wall Street Journal Europe SPRL*, [2006] UKHL 44, [2007] 1 A.C. 359. The defendant Wall Street Journal Europe had published an article, shortly after September 11, 2001, revealing that the bank accounts of certain prominent Saudi Arabian businessmen, including the plaintiff, were being monitored for possible terrorist connections by Saudi authorities at the behest of the U.S. government, citing anonymous sources. The tone of the article was neutral and unsensational, and the article bore the indicia of responsible journalism. Nonetheless, the trial judge denied [page675] the defendants access to the *Reynolds* privilege, and the Court of Appeal upheld that denial on the sole ground that the paper had not waited long enough to hear back from the plaintiff before running the story.

**73**     The House of Lords reversed the judgment of the Court of Appeal and held that the responsible journalism defence applied. It criticized the lower courts for applying the *Reynolds* factors restrictively as "a series of hurdles to be negotiated by a publisher" (para. 33, *per* Lord Bingham), rather than as an illustrative guide to what might constitute responsible journalism on the facts of a given case. Given that the defence was meant to foster free expression and a free press, its requirements should not be pitched so high as to make its availability all but illusory. The House of Lords also emphasized that the assessment of responsible journalism is not an invitation for courts to micro-manage the editorial practices of media organizations. Rather, a degree of deference should be shown to the editorial judgment of the players, particularly professional editors and journalists. For instance, a court should be slow to conclude that the inclusion of a particular defamatory statement was "unnecessary" and therefore outside the scope of the defence. As Lord Hoffmann put it:

> The fact that the judge, with the advantage of leisure and hindsight, might have made a different editorial decision should not destroy the defence. That would make the publication of articles which are, ex hypothesi, in the public interest, too risky and would discourage investigative reporting. [para. 51]

The House of Lords also made clear that the defence is available to "anyone who publishes material of public interest in any medium", not just journalists or media companies: *Jameel*, at para. 54, *per* Lord Hoffmann; *Seaga v. Harper*, [2008] UKPC 9, [2008] 1 All E.R. 965.

[page676]

**74**    *Jameel* has been welcomed as re-affirming the liberalizing tone of *Reynolds* and providing much-needed guidance for its application: see, e.g., K. Beattie, "New Life for the *Reynolds* 'Public Interest Defence'? *Jameel v Wall Street Journal Europe*", [2007] E.H.R.L.R. 81. But questions remain.

**75**    One unresolved issue is whether the new defence is a species of privilege or a distinct defence. If the former, a further issue arises of whether it could be defeated by malice. The judges in *Jameel* discussed these issues but reached no consensus.

**76**    Another unresolved issue is the status of so-called "reportage". "Reportage" refers to defamatory statements clearly attributed to someone other than, and not adopted by, the defendant. On one view, reportage is simply the accurate reporting of facts -- the fact of what someone said. Such reportage is essential, the media argue, to comprehensive coverage of public debate. Charges flung back and forth between contending factions in a dispute are themselves, it is argued, an essential part of the story, and will be understood by the public as such. However, the reporting of defamatory statements is barred by the "repetition rule" of defamation law, which holds that someone who repeats a defamatory statement is no less liable than the person who originated it. Recent cases suggest that this rule has been attenuated in the context of actions brought against media outlets, although whether as a distinct defence or as one of the factors to consider in applying the responsible journalism standard remains unclear: *Charman v. Orion Publishing Group Ltd.*, [2007] EWCA Civ 972, [2008] 1 All E.R. 750. I will return to this question below.

(ii)    Australia

**77**    Despite the absence of a constitutional bill of rights guaranteeing freedom of expression, the [page677] High Court of Australia has increased the protection afforded to the media on factual reports. In *Lange v. Australian Broadcasting Corp.*, a case involving a former prime minister of New Zealand, the High Court confirmed the existence of a qualified privilege for publications on "government and political matters", established earlier in *Theophanous v. Herald & Weekly Times Ltd.* (1994), 124 A.L.R. 1. The High Court held that "each member of the Australian community has an interest in disseminating and receiving information, opinions and arguments concerning government and political matters that affect the people of Australia [a category that, while broad, does not extend to all matters of public interest]. The duty to disseminate such information is simply the correlative of the interest in receiving it" (p. 115). *Lange* defined "government and political matters" relatively narrowly to cover matters within the sphere of electoral politics, whether at a local, state, or federal level, adding that "discussion of matters concerning the United Nations or other countries may be protected by the extended defence of qualified privilege" (p. 115).

**78**    The burden rests on the defendant to show that publishing the information was reasonable in the circumstances. The defendant's conduct "will not be reasonable unless the defendant had reasonable grounds for believing that the imputation was true, took proper steps, so far as they were reasonably open, to verify the accuracy of the material and did not believe the imputation to be untrue" (*Lange*, at p. 118). "Reasonableness" may also require the publisher to seek a response from the person being defamed.

**79**    In its focus on reasonableness, *Lange* resembles *Reynolds* and *Jameel*. There are indications, however, that *Lange*'s reasonableness requirement has been applied more stringently than the [page678] responsibility test under its English counterparts: see Kenyon, at p. 432.

(iii)    New Zealand

**80**    New Zealand's courts have modified the common law defence of qualified privilege in a manner broadly similar to the Australian approach. Coincidentally, the leading New Zealand cases also involved former prime minister David Lange as plaintiff: see *Lange v. Atkinson Nos. 1*, *2* and *3*. In *Lange v. Atkinson No. 1*, the Court of Appeal announced a qualified privilege for "generally-published statements which directly concern the functioning of representative and responsible government, including statements about the performance or possible future performance of specific individuals in elected public office" (p. 468), basing their decision largely on New Zealand's democratic traditions and the specific dictates of the *Bill of Rights Act 1990*. Contrary to the Australian position, however, the court imposed no reasonableness requirement on the *prima facie* availability of the defence. Rather, evidence of irresponsibility can be adduced by the plaintiff to show that

Exhibit 4

the privilege has been misused.

**81**    In *Lange v. Atkinson No. 3*, on remand from the Privy Council, the Court of Appeal re-affirmed its earlier decision, rejecting *Reynolds* as ill-suited to New Zealand's needs and realities. Among the court's criticisms of *Reynolds* was the view that it devalued the traditionally central role of the jury in libel trials by placing the key determination in the hands of the judge, a concern that also arises in the case at bar. More fundamentally, the court opined that "the *Reynolds* decision appears to alter the structure of the law of qualified privilege in a way which adds to the uncertainty and chilling effect almost inevitably present in this area of law" (para. 38). The Court of Appeal's solution was to reject [page679] any requirement of reasonableness or diligence in determining the scope of the privilege itself. In the result, the scope of privileged subject matter in New Zealand is narrower than in the United Kingdom, but within that domain New Zealand law may offer stronger protection.

> (iv)    South Africa

**82**    Developments in South Africa have generally parallelled those in the other jurisdictions just discussed, the U.K. most particularly. In *Du Plessis*, the Constitutional Court of South Africa considered and rejected an argument that the common law of defamation should be liberalized and constitutionalized along the lines of *Sullivan*. The court held that s. 15 of the Constitution -- the free expression guarantee -- did "not mandate any particular rule of common law" (p. 885) because the guarantee does not apply directly to disputes between private litigants. However, echoing the Canadian "*Charter* values" approach, it held that the common law ought to be developed by courts in a manner consistent with constitutional values.

**83**    The Supreme Court of Appeal subsequently adopted a responsible journalism defence in *Bogoshi*. Writing for the court, Hefer J.A. held that "the publication in the press of false defamatory allegations of fact will not be regarded as unlawful if, upon a consideration of all the circumstances of the case, it is found to have been reasonable to publish the particular facts in the particular way and at the particular time" (p. 1212). Approving of this approach in the Constitutional Court, Sachs J. recently commented that "[i]n *Bogoshi* the SCA developed in a way that was sensitive to contemporary concerns and realities, a well-weighted [page680] means of balancing respect for individual personality rights with concern for freedom of the press": *N.M. v. Smith*, [2007] ZACC 6, 2007 (5) SA 250, at para. 203. See also *Khumalo v. Holomisa*, [2002] ZACC 12, 2002 (5) SA 401; *Mthembi-Mahanyele v. Mail & Guardian Ltd.*, [2004] ZASCA 67, 2004 (6) SA 329.

**84**    The effect of *Bogoshi* has been to establish in South African law a reasonableness defence resembling *Reynolds* in most respects, but naturally with its own distinctive features elaborated in the jurisprudence.

> (c)    *Conclusion*

**85**    A number of countries with common law traditions comparable to those of Canada have moved in recent years to modify the law of defamation to provide greater protection for communications on matters of public interest. These developments confront us with a range of possibilities. The traditional common law defence of qualified privilege, which offered no protection in respect of publications to the world at large, situates itself at one end of the spectrum of possible alternatives. At the other end is the American approach of protecting all statements about public figures, unless the plaintiff can show malice. Between these two extremes lies the option of a defence that would allow publishers to escape liability if they can establish that they acted responsibly in attempting to verify the information on a matter of public interest. This middle road is the path chosen by courts in Australia, New Zealand, South Africa and the United Kingdom.

**86**    In my view, the third option, buttressed by the argument from *Charter* principles advanced earlier, represents a reasonable and proportionate response to the need to protect reputation while sustaining the public exchange of information that is vital to modern Canadian society.

Exhibit 4

[page681]

**87**    What remains to be decided is how, consistent with *Charter* values, the new defence should be formulated.

                B.    *The Elements of the Defence of Responsible Communication*

                (1)    Preliminary Issues

**88**    The first preliminary issue is whether the defence should be considered a new defence or an extension of the traditional defence of qualified privilege.

**89**    In *Reynolds*, the House of Lords saw itself as extending the traditional law of qualified privilege in a manner appropriate to the realities of contemporary media and the imperative of free expression. Effectively, the Law Lords decided that the media has a "duty" to report on a matter of public interest and the public has a corresponding "interest" in receiving such a report. Whether the duty and interest had crystallized into a privilege in the particular case depended on whether the defendant had acted responsibly, having regard to Lord Nicholls' non-exhaustive list of factors.

**90**    The introduction of the *Reynolds* factors into the analysis, amounting in effect to a due diligence test, produced an uneasy fit with the traditional model of qualified privilege, which looked only to the occasion on which the communication was made. The conduct of the defendant was only relevant after the privilege had already been established, to show whether it was defeated by malice. By contrast, under *Reynolds*, the defendant's conduct became the dominant focus of the inquiry.

**91**    This led some courts and commentators to argue that *Reynolds* had introduced a substantially new defence into the law of defamation. For instance, in *Loutchansky v. Times Newspapers Ltd.*, [2001] EWCA Civ 1805, [2002] 1 All E.R. 652, at para. 35, Lord Phillips, M.R. (as he then [page682] was), opined that the *Reynolds* privilege is "a different jurisprudential creature from the traditional form of privilege from which it sprang".

**92**    The majority of the Law Lords in *Jameel* maintained the view that "*Reynolds* privilege" or "responsible journalism" rests at least notionally on the duty/interest analysis associated with qualified privilege. However, Lord Hoffmann, with the concurrence of Baroness Hale, insisted that responsible journalism could not be assimilated to traditional qualified privilege, adopting Lord Phillips' view that it is "a different jurisprudential creature". It is not the occasion which is protected by the new defence, but the published material itself. (See also Brown, vol. 4, at pp. 27-45 and 27-46, fn. 116.) Furthermore, it makes little sense to speak of an assertion of responsible journalism being defeated by proof of malice, because the absence of malice is effectively built into the definition of responsible journalism itself.

**93**    Characterizing the change to the law as introducing a new defence is also supported by the fact that many forms of qualified privilege would not be well served by opening up the privilege to media publications. The duties and interests of people communicating and receiving job references or police reports are definable with some precision and involve a genuine reciprocity. The reciprocal duty and interest involved in a journalistic publication to the world at large, by contrast, is largely notional.

**94**    The traditional duty/interest framework works well in its established settings of qualified privilege. These familiar categories should not be compromised or obscured by the addition of a broad new privilege based on public interest. [page683] Further, qualified privilege as developed in the cases is grounded not in free expression values but in the social utility of protecting particular communicative occasions from civil liability.

**95**    I therefore conclude that the proposed change to the law should be viewed as a new defence, leaving the traditional defence of qualified privilege intact.

**96**    A second preliminary question is what the new defence should be called. In arguments before us, the defence was referred to as the responsible journalism test. This has the value of capturing the essence of the defence in succinct style. However, the traditional media are rapidly being complemented by new ways of communicating on matters of public

interest, many of them online, which do not involve journalists. These new disseminators of news and information should, absent good reasons for exclusion, be subject to the same laws as established media outlets. I agree with Lord Hoffmann that the new defence is "available to anyone who publishes material of public interest in any medium": *Jameel*, at para. 54.

**97**    A review of recent defamation case law suggests that many actions now concern blog postings and other online media which are potentially both more ephemeral and more ubiquitous than traditional print media. While established journalistic standards provide a useful guide by which to evaluate the conduct of journalists and non-journalists alike, the applicable standards will necessarily evolve to keep pace with the norms of new communications media. For this reason, it is more accurate to refer to the new defence as responsible communication on matters of public interest.

[page684]

(2)    Formulating the Defence of Responsible Communication on Matters of Public Interest

**98**    This brings us to the substance of the test for responsible communication. In *Quan*, Sharpe J.A. held that the defence has two essential elements: public interest and responsibility. I agree, and would formulate the test as follows. First, the publication must be on a matter of public interest. Second, the defendant must show that publication was responsible, in that he or she was diligent in trying to verify the allegation(s), having regard to all the relevant circumstances.

(a)    *Was the Publication on a Matter of Public Interest?*

**99**    To be protected by the defence of responsible communication, the publication must be on a matter of public interest.

**100**    This is a matter for the judge to decide. To be sure, whether a statement's publication is in the public interest involves factual issues. But it is primarily a question of law; the judge is asked to determine whether the nature of the statement is such that protection may be warranted in the public interest. The judge acts as a gatekeeper analogous to the traditional function of the judge in determining whether an "occasion" is subject to privilege. Unlike privilege, however, the determination of whether a statement relates to a matter of public interest focusses on the substance of the publication itself and not the "occasion". Where the question is whether a particular communication fits within a recognized subject matter of public interest, it is a mixed question of fact and law, and will therefore attract more deference on appeal than will a pure determination of public interest. But it properly remains a question for the trial judge as opposed to the jury.

[page685]

**101**    In determining whether a publication is on a matter of public interest, the judge must consider the subject matter of the publication as a whole. The defamatory statement should not be scrutinized in isolation. The judge's role at this point is to determine whether the subject matter of the communication as a whole is one of public interest. If it is, and if the evidence is legally capable of supporting the defence, as I will explain below, the judge should put the case to the jury for the ultimate determination of responsibility.

**102**    How is "public interest" in the subject matter established? First, and most fundamentally, the public interest is not synonymous with what interests the public. The public's appetite for information on a given subject -- say, the private lives of well-known people -- is not on its own sufficient to render an essentially private matter public for the purposes of defamation law. An individual's reasonable expectation of privacy must be respected in this determination. Conversely, the fact that much of the public would be less than riveted by a given subject matter does not remove the subject from the public interest. It is enough that some segment of the community would have a genuine interest in receiving information on the subject.

**103**    The authorities offer no single "test" for public interest, nor a static list of topics falling within the public interest (see, e.g., *Gatley on Libel and Slander* (11th ed. 2008), at p. 530). Guidance, however, may be found in the cases on fair comment and s. 2(*b*) of the *Charter*.

**104**    In *London Artists, Ltd. v. Littler*, [1969] 2 All E.R. 193 (C.A.), speaking of the defence of fair comment, Lord Denning, M.R., described public interest broadly in terms of matters that may legitimately concern or interest people:

> There is no definition in the books as to what is a matter of public interest. All we are given is a list of examples, coupled with the statement that it is for the judge and not for the jury. I would not myself confine it within narrow limits. Whenever a matter is such as to affect [page686] people at large, so that they may be legitimately interested in, or concerned at, what is going on; or what may happen to them or to others; then it is a matter of public interest on which everyone is entitled to make fair comment. [p. 198]

**105**    To be of public interest, the subject matter "must be shown to be one inviting public attention, or about which the public has some substantial concern because it affects the welfare of citizens, or one to which considerable public notoriety or controversy has attached": Brown, vol. 2, at pp. 15-137 and 15-138. The case law on fair comment "is replete with successful fair comment defences on matters ranging from politics to restaurant and book reviews": *Simpson v. Mair*, 2004 BCSC 754, 31 B.C.L.R. (4th) 285, at para. 63, *per* Koenigsberg J. Public interest may be a function of the prominence of the person referred to in the communication, but mere curiosity or prurient interest is not enough. Some segment of the public must have a genuine stake in knowing about the matter published.

**106**    Public interest is not confined to publications on government and political matters, as it is in Australia and New Zealand. Nor is it necessary that the plaintiff be a "public figure", as in the American jurisprudence since *Sullivan*. Both qualifications cast the public interest too narrowly. The public has a genuine stake in knowing about many matters, ranging from science and the arts to the environment, religion and morality. The democratic interest in such wide-ranging public debate must be reflected in the jurisprudence.

**107**    Care must be taken by the judge making this determination to characterize the subject matter accurately. Overly narrow characterization may inappropriately defeat the defence at the outset. For example, characterizing the subject matter in [page687] this case simply as "Peter Grant's business dealings" would obscure the significant public interest engaged by the article and thus restrict the legitimate scope of public interest. Similarly, characterizing the subject matter too broadly as "Ontario politics" might render the test a mere rubber stamp and bring unworthy material within the protection of the defence.

**108**    The question then arises whether the judge or the jury should decide whether the inclusion of a particular defamatory statement in a publication was necessary to communicating on the matter of public interest. Is this question merely a subset of determining generally whether the publication is in the public interest? Or is it better treated as a factor in the jury's assessment of responsibility? Lord Hoffmann in *Jameel* took the view that determining whether a defamatory statement was necessary to communicating on a matter of public interest is a question of law for the judge, conceding, however, that this may require the judge to second-guess editorial judgment, and must be approached in a deferential way (para. 51).

**109**    In my view, if the publication, read broadly and as a whole, relates to a matter of public interest, the judge should leave the defence to the jury on the publication as a whole, and not editorially excise particular statements from the defence on the ground that they were not necessary to communicating on the matter of public interest. Deciding whether the inclusion of the impugned statement was justifiable involves a highly fact-based assessment of the context and details of the publication itself. Whereas a given subject matter either is or is not in law a matter of public interest, the justifiability of including a defamatory statement may admit of many shades of gray. It is intimately bound up in the overall determination of responsibility and should be left to the jury. It is for the jury to consider the need to include particular defamatory statements in determining whether the defendant acted responsibly in publishing what it did.

http://web2.westlaw.com/result/delivery/PrintDoc.do?jobHa...

[page688]

(b)    *Was Publication of the Defamatory Communication Responsible?*

**110**    Against this background, I turn to some relevant factors that may aid in determining whether a defamatory communication on a matter of public interest was responsibly made.

(i)    The Seriousness of the Allegation

**111**    The logic of proportionality dictates that the degree of diligence required in verifying the allegation should increase in proportion to the seriousness of its potential effects on the person defamed. This factor recognizes that not all defamatory imputations carry equal weight. The defamatory "sting" of a statement can range from a passing irritant to a blow that devastates the target's reputation and career. The apprehended harm to the plaintiff's dignity and reputation increases in relation to the seriousness of the defamatory sting. The degree to which the defamatory communication intrudes upon the plaintiff's privacy is one way in which the seriousness of the sting may be measured. Publication of the kinds of allegations traditionally considered the most serious -- for example, corruption or other criminality on the part of a public official -- demand more thorough efforts at verification than will suggestions of lesser mischief. So too will those which impinge substantially on the plaintiff's reasonable expectation of privacy.

(ii)    The Public Importance of the Matter

**112**    Inherent in the logic of proportionality is the degree of the public importance of the communication's subject matter. The subject matter will, however, already have been deemed by the trial judge to be a matter of public interest. However, not all matters of public interest are of equal importance. Communications on grave matters of national security, for example, invoke different concerns from those on the prosaic business of everyday politics. [page689] What constitutes reasonable diligence with respect to one may fall short with respect to the other. Where the public importance in a subject matter is especially high, the jury may conclude that this factor tends to show that publication was responsible in the circumstances. In many cases, the public importance of the matter may be inseparable from its urgency.

(iii)    The Urgency of the Matter

**113**    As Lord Nicholls observed in *Reynolds*, news is often a perishable commodity. The legal requirement to verify accuracy should not unduly hamstring the timely reporting of important news. But nor should a journalist's (or blogger's) desire to get a "scoop" provide an excuse for irresponsible reporting of defamatory allegations. The question is whether the public's need to know required the defendant to publish when it did. As with the other factors, this is considered in light of what the defendant knew or ought to have known at the time of publication. If a reasonable delay could have assisted the defendant in finding out the truth and correcting any defamatory falsity without compromising the story's timeliness, this factor will weigh in the plaintiff's favour.

(iv)    The Status and Reliability of the Source

**114**    Some sources of information are more worthy of belief than others. The less trustworthy the source, the greater the need to use other sources to verify the allegations. This applies as much to documentary sources as to people; for example, an "interim progress report" of an internal inquiry has been found to be an insufficiently authoritative source in the circumstances: *Miller v. Associated Newspapers Ltd.*, [2005] EWHC 557 (QB) (BAILII). Consistent with the logic of the repetition rule, the fact that someone has already published a defamatory statement does not give another person licence to repeat it. As already explained, this principle is especially vital when defamatory [page690] statements can be reproduced electronically with the speed of a few keystrokes. At the same time, the fact that the defendant's source had an axe to grind does not necessarily deprive the defendant of protection, provided other reasonable steps were taken.

**115**    It may be responsible to rely on confidential sources, depending on the circumstances; a defendant may properly be

unwilling or unable to reveal a source in order to advance the defence. On the other hand, it is not difficult to see how publishing slurs from unidentified "sources" could, depending on the circumstances, be irresponsible.

(v)   Whether the Plaintiff's Side of the Story Was Sought and Accurately Reported

**116**   It has been said that this is "perhaps the core *Reynolds* factor" (*Gatley*, at p. 535) because it speaks to the essential sense of fairness the defence is intended to promote, as well as thoroughness. In most cases, it is inherently unfair to publish defamatory allegations of fact without giving the target an opportunity to respond: see, e.g., *Galloway v. Telegraph Group Ltd.*, [2004] EWHC 2786 (QB) (BAILII), at paras. 166-67, *per* Eady J. Failure to do so also heightens the risk of inaccuracy, since the target of the allegations may well be able to offer relevant information beyond a bare denial.

**117**   The importance of this factor varies with the degree to which fulfilling its dictates would actually have bolstered the fairness and accuracy of the report. For example, if the target of the allegations could have no special knowledge of them, this factor will be of little importance: see *Jameel*, at paras. 35, and 83-85, where the House of Lords held that the plaintiff (whose group of companies had been put on a terrorism monitoring list) could not realistically have added anything material to [page691] the story because the relevant actions of the Saudi and U.S. governments were secret and entirely beyond his control.

(vi)   Whether Inclusion of the Defamatory Statement Was Justifiable

**118**   As discussed earlier (paras. 108-9), it is for the jury to determine whether inclusion of a defamatory statement was necessary to communicating on a matter of public interest. Its view of the need to include a particular statement may be taken into account in deciding whether the communicator acted responsibly. In applying this factor, the jury should take into account that the decision to include a particular statement may involve a variety of considerations and engage editorial choice, which should be granted generous scope.

(vii)   Whether the Defamatory Statement's Public Interest Lay in the Fact That It Was
Made Rather Than Its Truth ("Reportage")

**119**   The "repetition rule" holds that repeating a libel has the same legal consequences as originating it. This rule reflects the law's concern that one should not be able to freely publish a scurrilous libel simply by purporting to attribute the allegation to someone else. The law will not protect a defendant who is "willing to wound, and yet afraid to strike": *"Truth" (N.Z.) Ltd. v. Holloway*, [1960] 1 W.L.R. 997 (P.C.), at p. 1001, *per* Lord Denning. In sum, the repetition rule preserves the accountability of media and other reporting on matters of public interest. The "bald retailing of libels" is not in the public interest: *Charman*, at para. 91, *per* Sedley L.J. Maintaining the repetition rule is particularly important in the age of the Internet, when defamatory material can spread from one website to another at great speed.

**120**   However, the repetition rule does not apply to fairly reported statements whose public interest [page692] lies in the fact that they were made rather than in their truth or falsity. This exception to the repetition rule is known as reportage. If a dispute is itself a matter of public interest and the allegations are fairly reported, the publisher should incur no liability even if some of the statements made may be defamatory and untrue, provided: (1) the report attributes the statement to a person, preferably identified, thereby avoiding total unaccountability; (2) the report indicates, expressly or implicitly, that its truth has not been verified; (3) the report sets out both sides of the dispute fairly; and (4) the report provides the context in which the statements are made. See *Al-Fagih v. H.H. Saudi Research & Marketing (U.K.) Ltd.*, [2001] EWCA Civ 1634 (BAILII), at para. 52; *Charman*; *Prince Radu of Hohenzollern v. Houston*, [2007] EWHC 2735 (QB) (BAILII); *Roberts v. Gable*, [2007] EWCA Civ 721, [2008] 2 W.L.R. 129.

**121**   Where the defendant claims that the impugned publication (in whole or in part) constitutes reportage, i.e. that the dominant public interest lies in reporting what was said in the context of a dispute, the judge should instruct the jury on the repetition rule and the reportage exception to the rule. If the jury is satisfied that the statements in question are reportage, it may conclude that publication was responsible, having regard to the four criteria set out above. As always, the ultimate question is whether publication was responsible in the circumstances.

Exhibit 4

(viii)    Other Considerations

**122**    As noted, the factors serve as non-exhaustive but illustrative guides. Ultimately, all matters relevant to whether the defendant communicated responsibly can be considered.

[page693]

**123**    Not all factors are of equal value in assessing responsibility in a given case. For example, the "tone" of the article (mentioned in *Reynolds*) may not always be relevant to responsibility. While distortion or sensationalism in the manner of presentation will undercut the extent to which a defendant can plausibly claim to have been communicating responsibly in the public interest, the defence of responsible communication ought not to hold writers to a standard of stylistic blandness: see *Roberts*, at para. 74, *per* Sedley L.J. Neither should the law encourage the fiction that fairness and responsibility lie in disavowing or concealing one's point of view. The best investigative reporting often takes a trenchant or adversarial position on pressing issues of the day. An otherwise responsible article should not be denied the protection of the defence simply because of its critical tone.

**124**    If the defamatory statement is capable of conveying more than one meaning, the jury should take into account the defendant's intended meaning, if reasonable, in determining whether the defence of responsible communication has been established. This follows from the focus of the inquiry on the conduct of the defendant. The weight to be placed on the defendant's intended meaning is a matter of degree: "The more obvious the defamatory meaning, and the more serious the defamation, the less weight will a court attach to other possible meanings when considering the conduct to be expected of a responsible journalist in the circumstances" (*Bonnick v. Morris*, [2002] UKPC 31, [2003] 1 A.C. 300 (P.C.), at para. 25, *per* Lord Nicholls). Under the defence of responsible communication, it is no longer necessary that the jury settle on a single meaning as a preliminary matter. Rather, it assesses the responsibility of the communication with a view to the range of meanings the words are reasonably capable of bearing.

**125**    Similarly, the defence of responsible communication obviates the need for a separate inquiry into malice. (Malice may still be relevant where other defences are raised.) A defendant who has [page694] acted with malice in publishing defamatory allegations has by definition not acted responsibly.

(3)    Summary of the Required Elements

**126**    The defence of public interest responsible communication is assessed with reference to the broad thrust of the publication in question. It will apply where:

A.    The publication is on a matter of public interest, and
B.    The publisher was diligent in trying to verify the allegation, having regard to:

(a)    the seriousness of the allegation;
(b)    the public importance of the matter;
(c)    the urgency of the matter;
(d)    the status and reliability of the source;
(e)    whether the plaintiff's side of the story was sought and accurately reported;
(f)    whether the inclusion of the defamatory statement was justifiable;
(g)    whether the defamatory statement's public interest lay in the fact that it was made rather than its truth ("reportage"); and
(h)    any other relevant circumstances.

C.

Exhibit 4

*Procedural Issues: Judge and Jury*

**127**    As a general rule, the judge decides questions of law, while the jury decides questions of fact and applies the law to the facts. As is the case in other actions, for example negligence trials, issues of fact and law cannot be entirely disentangled. Nevertheless, it is possible to arrive at the following allocation of responsibility on the defence of responsible communication, having regard to [page695] whether the issue is predominantly legal or factual, to the traditional allocations of responsibility in defamation trials, and to relevant legislation.

**128**    The judge decides whether the statement relates to a matter of public interest. If public interest is shown, the jury decides whether on the evidence the defence is established, having regard to all the relevant factors, including the justification for including defamatory statements in the article.

**129**    As in any trial by judge and jury, the judge may, upon motion, rule out the defence on the basis that the facts as proved are incapable of supporting the inference of responsible communication. This is consistent with the power of the judge in existing jurisprudence to withdraw the issue of malice from the jury where there is no basis for an inference of malice on the evidence.

**130**    The defence of responsible communication does not require preliminary rulings from the jury on primary meaning, since it does not depend on the supposition of a single meaning. The jury should be instructed to assess the responsibility of the communication in light of the range of meanings the words are reasonably capable of bearing, including evidence as to the defendant's intended meaning.

**131**    The division of responsibility proposed here accords with the general rule that matters of law are for the judge, and matters of fact are for the jury. In preserving a central role for the jury, it is consistent with Canadian tradition and statutory enactments. Traditionally, defamation actions have usually been tried by judge and jury, and many Canadian jurisdictions continue to have special rules for jury trials in defamation cases even as juries in most other kinds of civil actions have become less common: see, e.g., British Columbia *Supreme Court Rules*, B.C. Reg. 221/90, r. 39(27); [page696] Alberta *Jury Act*, R.S.A. 2000, c. J-3, s. 17(1). In Ontario, where the case at bar arose, there is no longer any special right to a jury trial in defamation cases. However, s. 14 of the Ontario *Libel and Slander Act*, R.S.O. 1990, c. L.12, guarantees the right of a jury in a defamation action to render a general verdict (see also *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 108(5)). Courts have interpreted s. 14 to mean that the jury cannot be *required* to answer specific questions, and if they are asked to do so they must also be informed of their right to render a general verdict: *Pizza Pizza Ltd. v. Toronto Star Newspapers Ltd.* (1998), 42 O.R. (3d) 36 (Div. Ct.), at pp. 43-44, *per* Sharpe J. Finally, s. 108 of the Ontario *Courts of Justice Act* provides that in a defamation action tried by judge and jury, it is for the jury to decide questions of fact and to assess the quantum of damages.

**132**    The plaintiffs argue against a central role for the jury. In their view, if a conduct-based defence is recognized, it should be for the judge alone to determine whether it lies and whether it is established on the facts. This, they contend, is the only way to safeguard the nuanced constitutional balance between free expression and the protection of reputation.

**133**    This argument cannot be sustained. First, restricting the role of the jury in this manner may run afoul of the statutory rights accorded by s. 108 of the Ontario *Courts of Justice Act* (it is for the jury to decide questions of fact), and most certainly would violate s. 14 of the Ontario *Libel and Slander Act* (the jury cannot be required to decide preliminary questions, and must be permitted to render a general verdict). The argument is essentially a plea to the Court to amend the provisions of these Acts. This the Court cannot do.

[page697]

**134**    Second, permitting the jury to have the ultimate say on whether or not the new defence applies, is consistent with the jury's role with respect to the defence of fair comment. The *Reynolds* model, where "primary facts" are determined by the jury but the decision on responsible journalism is made by the judge, entails a complex back and forth between judge

and jury and may lead to interlocutory rulings, and in due course appeals from those interlocutory decisions. Moreover, confining the jury's role to preliminary fact-finding would entail seeking jury responses to numerous detailed questions, which may in turn "thwart many of the benefits sought through the doctrinal changes": Kenyon, at p. 433; see also Lord Phillips, M.R., in *Jameel v. Wall Street Journal Europe SPRL*, [2005] EWCA Civ 74, [2005] 4 All E.R. 356, at para. 70, lamenting the division of roles that has taken shape in English courts under *Reynolds*.

**135**     Third, it is not unusual for juries to render verdicts where constitutionally protected interests are at stake. They do so every day in criminal trials across the country. Sufficient safeguards exist in the proposed division of responsibility to ensure the appropriate constitutional balance is struck. The judge exercises a gatekeeper function in determining the legal issues and evidentiary sufficiency, and instructs the jury on all relevant factors, including the nature and importance of the *Charter* values of free expression and protection of reputation. The judge's decisions can be appealed for legal error.

> VI.   Application to the Facts of This Case

**136**     The evidence revealed a basis for three defences: (1) justification; (2) fair comment; and (3) responsible communication on a matter of public interest. All three defences should have been left to the jury. It is unnecessary to deal further with the [page698] defence of justification; no error is alleged in the trial judge's directions on this defence.

**137**     Where the judge retains genuine doubt as to whether a given statement should be characterized as fact or opinion, the question should be left to the jury to decide: *Scott v. Fulton*, 2000 BCCA 124, 73 B.C.L.R. (3d) 392. In this case, it was open to the jury to consider the statement attributed to Dr. Clark that "[e]veryone thinks it's a done deal" as a comment, or statement of opinion. The statement could be read as an idiomatic expression of an opinion about the *likelihood* of something, namely government approval, that had not yet come to pass. This would raise the defence of fair comment.

**138**     The defence of fair comment was left to the jury at trial. However, I agree with the Court of Appeal, *per* Feldman J.A., that the trial judge erred in his charge to the jury on fair comment. He failed to instruct the jury that "since Mr. Schiller was the conduit for the comment and not its maker, the fact that he did not honestly believe it could not be used as a foundation for finding malice unless in the context of the article, he had adopted the comment as his own" (Feldman J.A., at para. 93). This recalls Binnie J.'s observation in *WIC Radio* that "defamation proceedings will have reached a troubling level of technicality if the protection afforded by the defence of fair comment to freedom of expression ('the very lifeblood of our freedom') is made to depend on whether or not the speaker is prepared to swear to an honest belief in something he does not believe he ever said" (para. 35). Additionally, as also held in *WIC Radio*, the "fair-minded" component of the traditional test should not form part of a charge on fair comment. For the reasons given by Feldman J.A., at paras. 83-94 of her reasons, these problems in the trial judge's charge could have led the jury to wrongly conclude that the fair comment defence had been defeated by malice.

[page699]

**139**     It was also open to the jury to consider the critical "done deal" remark as a statement of fact. Read literally, it can be taken as an assertion that government approval for the development was actually already sealed, either formally behind closed doors or by tacit understanding. This raises the defence of responsible communication on a matter of public interest. The trial judge did not leave this or any similar defence to the jury.

**140**     In Ontario, an appellate court cannot order a new trial in a civil matter "unless some substantial wrong or miscarriage of justice has occurred": *Courts of Justice Act*, s. 134(6). Taken together, in my view, the errors I have described rise to this level and require a new trial. Since the facts and submissions on the new trial may differ from those on the first trial, detailed discussion of how the new trial should proceed would be inappropriate. However, on the assumption the evidence will mirror the evidence on the first trial, the following observations may be helpful.

Exhibit 4

1. The jury should be told that three defences may arise on the facts: (1) justification (truth); (2) fair comment, with respect to any statements of opinion; and (3) responsible communication on a matter of public interest, with respect to any statements of fact.

2. Since the statement most at issue (the "done deal" remark) can be viewed as opinion, the trial judge should instruct the jury on the defence of fair comment in accordance with this Court's decision in *WIC Radio*.

3. Since the statement can also be viewed as a statement of fact, raising the defence of [page700] responsible communication on a matter of public interest, the trial judge should rule on whether communication of the statement was in the public interest. On the evidence in the first trial, the answer to this question is affirmative. The communication related to issues of government conduct is clearly in the public interest.

4. The jury should be instructed to determine whether publication of the defamatory material was responsible, having regard to the factors enumerated above.

### VII.  Conclusion

**141**   I would dismiss the appeal and the cross-appeal, and affirm the order for a new trial. The respondents should have their costs of the main appeal in this Court.

The following are the reasons delivered by

**142**   ABELLA J.:-- I am in complete agreement with the Chief Justice's reasons for adding the "responsible communication" defence to Canadian defamation law. I also share her view that determining the availability of this defence entails a two-step analysis: the first to determine whether a publication is on a matter of public interest; and the second to determine whether the standard of responsibility is met. Yet while I agree that the first question is a matter of law for the judge to decide, I do not, with great respect, share her view that the jury should decide the second step. I see very little conceptual difference between deciding whether a communication is in the public interest and whether it is responsibly made. While both inquiries engage questions of fact and law, both are nonetheless predominantly legal issues. As a result, in my view the legal character of deciding whether the applicable standard of responsibility has been met in a given case is, [page701] like the public interest analysis, a matter for the judge.

**143**   The responsible communication analysis requires that the defendant's interest in freely disseminating information and the public's interest in the free flow of information be weighed against the plaintiff's interest in protecting his or her reputation. This is true no less of the second and determinative step as of the first. The exercise as a whole involves balancing freedom of expression, freedom of the press, the protection of reputation, privacy concerns, and the public interest. Each of these is a complex value protected either directly or indirectly by the *Canadian Charter of Rights and Freedoms* (*Edmonton Journal v. Alberta (Attorney General)*, [1989] 2 S.C.R. 1326, at p. 1336; *Canadian Broadcasting Corporation v. New Brunswick (Attorney General)*, [1991] 3 S.C.R. 459, at p. 475; *Hill v. Church of Scientology of Toronto*, [1995] 2 S.C.R. 1130, at para. 107; and *WIC Radio Ltd. v. Simpson*, 2008 SCC 40, [2008] 2 S.C.R. 420, at para. 2). Weighing these often competing constitutional interests is a legal determination. It is, therefore, a determination that the judge should undertake.

**144**   I accept that the jury's participation in defamation cases is firmly entrenched in the psyche of defamation law and that authorizing judges to decide both steps of the responsible communication analysis leaves juries with a limited role. But I am unpersuaded that it is inconsistent with the statutory scheme to leave the legal issues at stake here with the judge and any disputed facts with the jury. It is worth remembering that such a potentially determinative role for the judge already exists when the defence of absolute or qualified privilege is engaged (Raymond E. Brown, *The Law of Defamation in Canada* (2nd ed. (loose-leaf)), vol. 2, at pp. 12-289, 13-405 and 16-136). It is also useful to bear in mind the historical basis [page702] for the jury's preeminent role in defamation cases. It was an outgrowth of Britain's *Libel Act* of 1792 when juries were seen to be necessary as "watchdogs of democratic rights against unrepresentative governments" (New South Wales Law Reform Commission, Report 75, *Defamation* (1995), at para. 3.2, cited in *Australian Broadcasting Corp. v.*

*Reading*, [2004] NSWCA 411 (AustLII), at para. 143). More than two centuries later, this rationale is difficult to sustain, as is the primacy of the jury's role (Brown, vol. 3, at p. 17-115; *Jameel v. Wall Street Journal Europe SPRL*, [2005] EWCA Civ 74, [2005] 4 All E.R. 356, at para. 70, *per* Lord Phillips, M.R.; *Gatley on Libel and Slander* (11th ed. 2008), at p. 1241; and David A. Anderson, "Is Libel Law Worth Reforming?" (1991-1992), 140 U. Pa. L. Rev. 487, at p. 540).

**145**   By adopting the responsible communication defence, we are recognizing the sophistication and constitutional complexity of defamation cases involving communications on matters of public interest. What is most important is protecting the integrity of the interests and values at stake in such cases. This defence is a highly complex legal determination with constitutional dimensions. That takes it beyond the jury's jurisdiction and squarely into judicial territory.

**146**   Other than this concern over the proper division of labour between judge and jury, I agree with the Chief Justice's reasons and with her decision to order a new trial.

* * * * *

## APPENDIX

Cottagers teed off over golf course

Long-time Harris backer awaits Tory nod on plan


[page703]

Bill Schiller

FEATURE WRITER

Saturday Special

NEW LISKEARD -- During the past decade, millionaire lumber magnate Peter Grant -- one of the most powerful business people in northern Ontario -- has been generous with Mike Harris and the Conservatives.

In 1990, Grant, through his companies, gave Harris more than $14,000 to help him win the Conservative leadership.

In 1999, Grant poured $45,000 into Conservative pockets to speed their re-election, -- followed by another $21,000 last year.

Of this $80,000, at least $5,000 went to Natural Resources Minister John Snobelen and his Mississauga riding association.

But Peter Grant also wants something from the government.

Here, on a tiny peninsula on a cottage-speckled lake, where families have come for generations, Grant wants to take three small golf holes on his property and expand them into a 3,290-yard, nine-hole course.

To do so, he needs the Harris government -- with the support of Snobelen's ministry -- to sell him 10.5 hectares of crown land and approve the project.

The planned course will be private, so private in fact, it will be for Grant's own "personal use and enjoyment."

But in the minds of many who own cottages here on Twin Lakes, about 500 kilometres north of Toronto, Grant's dream of

http://web2.westlaw.com/result/delivery/PrintDoc.do?jobHa...

carving a course out of the northern wilderness for his own pleasure, is a nightmare.

"Herbicides, pesticides, fertilizers, will all wash into our lake," insists Bonnie Taylor, who might be forgiven for sounding a little proprietary. Her pioneering family first built on this spring-fed lake nearly 60 years ago.

Last winter, she wrote the province to say she's worried about the impact the course could have on lake and [page704] well water -- especially, she said, "with Walkerton still fresh on everyone's mind."

For his part, Grant refuses to be interviewed.

"Our client ... does not intend to discuss his personal affairs with you," his lawyers informed The Star by letter.

When a Star photographer went to take pictures at the site this month, men the OPP believe were Grant employees, accused the photographer of trespassing. They then tried to drive the photographer's vehicle off a public road, and finally followed the photographer out of town for almost 20 kilometres.

But for concerned cottagers back at lakeside -- the issue is water.

Grant already has provincial permission to draw as much as 300,000 litres per day from the lake to water his three golf holes.

According to environment ministry guidelines, the same amount of treated water could support a community of 750 to 1,500 people.

And ratepayers worry that if Grant's plan goes ahead, his need for water will grow.

It's a worry not without foundation: some 18-hole golf courses in the north have provincial permits to take as much as 2.2 million litres of water per day.

Grant's expanded course would also clear trees from almost 23.5 hectares in total: 10.5 hectares of crown land, and another 13 hectares of privately held land he also intends to buy for the project.

Perhaps most worrisome from the cottagers' perspective, planning documents show the course will use $20,000 worth of pesticides annually, including small amounts of Daconil, a highly effective pesticide that is also highly toxic to fish and invertebrates.

But locals aren't the only ones concerned about Grant's plans. Officials from the Ministry of Natural Resources are too. Currently conducting a limited environmental assessment, they've informed Grant of at least a dozen [page705] concerns they have about the project, from potential effects on water quality, to the impact on lake levels.

Grant's consultants are preparing a response.

But the ministry's concerns are small comfort to cottagers.

They know the expressed concerns of government officials don't always mean much when it comes to development projects led by supporters of the Premier.

"Everyone thinks it's a done deal because of Grant's influence -- but most of all his Mike Harris ties," says Lorrie Clark, who owns a cottage on Twin Lakes.

Earlier this year, the local cottagers' association invited Grant's consultants, as well as ministry officials to a meeting to discuss Grant's proposal. A number of cottagers brought copies of a Toronto Star article detailing how the Premier's best friend Peter Minogue complained "at political levels" to try to get his North Bay golf course and subdivision approved in

Exhibit 4

http://web2.westlaw.com/result/printdocument.aspx?PrintDoc.do?jobHa...

the face of opposition from the Ministry of Natural Resources.

Minogue's partners in that venture, known as Osprey Links, included the president of Harris' riding association and a veritable Who's Who of Harris' North Bay friends. Ministry objections were overruled just 12 days after a senior bureaucrat warned by memo that Minogue had begun complaining.

With that experience in mind, lawyer Peter Ramsay, a ratepayer and cottager rose at the public meeting here and put his concerns bluntly.

"Is this (Grant) project going to be decided by the Ministry of Natural Resources?" he asked officials present. "Or is it going to be decided by Queen's Park?"

A ministry official at the meeting, Greg Gillespie, said he couldn't speak for what happens at Queen's Park.


[page706]

"But we did our job," he said of the Osprey experience.

Such suspicions and anxiety over the approval process have set the stage for a classic confrontation, which -- in the cottagers' view -- pits the public good of ordinary Ontarians, many of whom are senior citizens, against a single, powerful, private interest: Peter Grant.

"This is a development that is not in the public interest," cottage owner Clark emphasizes, "but only a very private one."

For an outsider, however, looking at the history of the lake, one might think Grant is fighting an uphill battle.

After all, in 1985 the Ontario Municipal Board shut down a proposal to build a small subdivision on Twin Lakes out of concerns about potential environmental damage.

The board -- a kind of court of appeal for developers and citizens who disagree on a development -- sided with a consultant who argued that the lake was too sensitive, teetering on overdevelopment with 200 cottages, and any additional building might constitute an environmental hazard.

Those arguments won the day.

But Grant is undaunted.

Today, the same consultant who convinced the board to block that development more than 15 years ago, now consults for Grant.

Michael Michalski argues that Grant's development can be built with minimum impact and that "everything feasible" will be done to keep contaminants on site.

Not to be outdone, local citizens have hired their own consultants, Gartner Lee. They say neither Michalski nor anyone else can guarantee the lake's safety.

And so the scientific lines have been drawn in the sand.

But if politics and power were to have any bearing on the matter, some feel Grant would have the upper hand.

Exhibit 4

[page707]

In this rough and rugged stretch of northern Ontario, where local economies depend largely on timber and tourism, Grant is a powerful presence.

His company, Grant Forest Products, is an important local employer. The company's radio ads, which continually remind locals that Grant is "using our forests wisely," are part of public consciousness. And every autumn, a charity golf tournament Grant holds using two public courses -- the tournament culminates at his mini-course -- heralds the high point of this area's social season. It always makes front-page news.

So did the Premier's visit here last fall, when he attended a post-tournament reception for more than 600 at Grant's palatial home.

Grant, who has been running the event since 1998, proudly presented a cheque that day for $300,000 to help build a local senior's home.

Press accounts note that he's raised about $1 million for local causes, including area golf courses, over three years.

Up north, the charity event has distinguished him.

So has his selection of lobbyists down south at Queen's Park.

When it comes to looking after business interests there, Grant depends on North Bay lobbyist Peter Birnie. Records at Elections Ontario show Birnie is vice-president of Harris' riding association.

Meanwhile, on the personal front, Grant maintains a reputation for living large.

His home and corporate compound in the bush dwarfs the dozens of cottages that surround it.

His 14,500 square-foot house on 4.5 hectares of lavishly landscaped property, was once appraised at $1.9 million. Neighbours note the occasional helicopter coming and going through the bush.

The seven-bedroom main house has an indoor squash court with viewing gallery, a fully equipped gymnasium, and a Jacuzzi that can accommodate 15 people.


[page708]

Outside, tennis courts are equipped with banks of lights that illuminate the night sky. And down on the water, there's a 1,500-square-foot boat house.

There is also his three-hole mini-course -- that Grant calls Frog's Breath -- which can be configured to play as a tiny five.

Records show these holes were built on almost three hectares of crown land, which the province sold to Grant in April, 1998 for $20,000.

But records also show that two months earlier, in February, 1998, Grant had also applied to buy the 10.5 hectares he's still pursuing today.

These developments have residents up in arms.

http://web2.westlaw.com/result/DeliveryPrintDoc.do?jobHa...

"It's difficult living here and watching all this go on," says Nancy Kramp, a mother of four who, like Grant, lives permanently on Twin Lakes.

"It used to be dead silence out here. There was nothing but the sounds of wildlife. Now, there are always (golf course) machines running."

Kramp can't comprehend how the provincial government can think of selling 10.5 hectares of land so that one man may build a golf course for his own enjoyment.

She remembers a run-in she had with the Ministry of Natural Resources not so long ago over a sandbox.

"Around 1994, the ministry told us to move a sandbox we'd erected for our son," Kramp recalls, "four planks with sand in the middle, because it was on crown land. This sandbox seemed to be interfering with the natural habitat of the area. And now a nine-hole golf course is okay?"

It's not okay yet.

The Harris government has not sold the property to him.

Still, local politicians are preparing the way.

Today, five politicians who represent the people of Hudson Township here (population: 501), are scheduled to meet to discuss a motion to amend local zoning [page709] bylaws and, according to a published notice, "permit the construction of a personal golf course -- for the personal use of the property owner."

Local councillor Clinton Edwards says he doesn't really want to say whether he'll support it.

"I'm in a bit of a bind here," he says, somewhat haltingly. "My wife works for him (Grant). Employment is very hard to get up here," he adds.

News of impending zoning changes even before the government has sold Grant the land makes some cottagers distrustful about what might happen next.

"The people on this lake aren't mega-millionaires," says Alexandra Skindra, mother, grandmother and property owner.

"They're just regular people. Hard-working people. This shouldn't be happening."

Skindra and her husband Arkadis, 68, a retired nuclear plant designer, were planning on spending their retirement on the lake.

"I grew up here," explains Alexandra. "My kids grew up here. And I was hoping our five grandchildren could come here every summer."

"We don't have anything against Peter," Arkadis offers, hammer in hand as he renovates the front room of their cottage overlooking the water.

"But I can't see how this can go ahead and not damage the lake and the environment."

Down the way, Ira and Marion Murphy have spent 56 years on a tiny stretch of land that joins Twin Lakes with neighbouring Frere Lake.

Looking trim at 75, Ira, a retired Hydro supervisor, can point to the shore where he built a two-storey tree house for his granddaughters 18 summers ago.

Exhibit 4

For him, lake life is a precious thing, something interwoven with family.

"You know, we've known Peter since he was 3 years old," says Murphy, a handsome, gray-haired man with a taste for the outdoors.


 [page710]

"We've got nothing against him. We're just concerned about the lake, that's all."

Rudi Ptok, 71, says he's worried about run-off, and not just with pesticides, he says, but with the 400 kilograms of fertilizers per year that will be needed to keep Grant's course green too.

"They're probably going to have to blast out rock to build too," he says.

Ptok says Grant's consultants have confirmed they may well have to dynamite.

Looking worriedly out at the lake, Ptok says, "I don't even want to think about it."

(A.R., vol. XI, at pp. 4-12)

   *Appeal and cross-appeal dismissed, with costs of the appeal in this Court to the respondents.*


**Solicitors:**

*Solicitors for the appellants/respondents on cross-appeal: Fasken Martineau DuMoulin, Toronto.*

*Solicitors for the respondents/appellants on cross-appeal: Blake, Cassels & Graydon, Toronto.*

*Solicitors for the intervener the Ottawa Citizen: Gowling Lafleur Henderson, Ottawa.*

*Solicitors for the interveners the Canadian Newspaper Association, Ad IDEM/Canadian Media Lawyers Association, RTNDA Canada/Association of Electronic Journalists, Magazines Canada, the Canadian Association of Journalists, Canadian Journalists for Free Expression, the Writers' Union of Canada, the Professional Writers Association of Canada, the Book and Periodical Council, and PEN Canada: Brian MacLeod Rogers, Toronto.*

*Solicitor for the intervener the Canadian Broadcasting Corporation: Canadian Broadcasting Corporation, Toronto.*

*Solicitors for the intervener the Canadian Civil Liberties Association: Torys, Toronto.*


 [page711]

*Solicitors for the intervener Danno Cusson: Heenan Blaikie, Ottawa.*


cp/e/qllls

Exhibit 4