http://www.lexis.com/research/delivery/PrintDoc.do?jobHa...

*Indexed as:*

# Hill v. Church of Scientology of Toronto

**Morris Manning and the Church of Scientology of Toronto, appellants;**

**v.**

**S. Casey Hill, respondent, and**

**The Attorney General for Ontario, the Canadian Civil Liberties Association, the Writers' Union of Canada, PEN Canada, the Canadian Association of Journalists, the Periodical Writers Association of Canada, the Book and Periodical Council, the Canadian Daily Newspaper Association, the Canadian Community Newspapers Association, the Canadian Association of Broadcasters, the Radio-Television News Directors Association of Canada, the Canadian Book Publishers' Council and the Canadian Magazine Publishers' Association, interveners.**

**[1995] 2 S.C.R. 1130**

[1995] S.C.J. No. 64

File No.: 24216.

Supreme Court of Canada

1995: February 20; 1995: July 20.

**Present: La Forest, L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.**

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Constitutional law -- Charter of Rights -- Application -- Libel and slander -- Church of Scientology commencing criminal contempt proceedings against Crown attorney -- Church's counsel and representatives holding press conference on courthouse steps -- Counsel reading from and commenting on allegations in contempt motion -- Contempt allegations subsequently found to be untrue -- Crown attorney bringing action for damages in libel -- Whether Crown attorney's action for damages "government action" -- Whether Charter applies -- Canadian Charter of Rights and Freedoms, s. 32(1).*

*Libel and slander -- Common law of defamation -- Canadian Charter of Rights and Freedoms -- Whether common law of*

6/12/12 1:32 PM

Exhibit 5

*defamation complies with values underlying Charter -- Whether "actual malice" rule should be adopted.*

*Libel and slander -- Defences -- Qualified privilege -- Church of Scientology commencing criminal contempt proceedings against Crown attorney -- Church's counsel and representatives holding press conference on courthouse steps -- Counsel reading from and commenting on allegations in contempt motion -- Contempt allegations subsequently found to be untrue -- Crown attorney bringing action for damages in libel -- Whether defence of qualified privilege available.*

*Libel and slander -- Damages -- General damages -- Aggravated damages -- Punitive damages -- Church of Scientology commencing criminal contempt proceedings against Crown attorney -- Church's counsel and representatives holding press conference on courthouse steps -- Counsel reading from and commenting on allegations in contempt motion -- Contempt allegations subsequently found to be untrue -- Crown attorney bringing action for damages in libel -- Counsel and Church found jointly liable for general damages -- Church found liable for aggravated and punitive damages -- Whether cap should be imposed on general damages in defamation cases -- Whether damage awards should stand.*

The appellant M, accompanied by representatives of the appellant Church of Scientology, held a press conference on the courthouse steps. M, who was wearing his barrister's gown, read from and commented upon allegations contained in a notice of motion by which Scientology intended to commence criminal contempt proceedings against the respondent, a Crown attorney. The notice of motion alleged that the respondent had misled a judge and had breached orders sealing certain documents belonging to Scientology. The remedy sought was the imposition of a fine or his imprisonment. At the contempt proceedings, the allegations against the respondent were found to be untrue and without foundation. He thereupon commenced an action for damages in libel against the appellants. Both appellants were found jointly liable for general damages in the amount of $300,000 and Scientology alone was found liable for aggravated damages of $500,000 and punitive damages of $800,000. This judgment was affirmed by the Court of Appeal. The major issues raised in this appeal are whether the common law of defamation is consistent with the Canadian Charter of Rights and Freedoms and whether the jury's award of damages can stand.

      Held:     The appeal should be dismissed.

Per La Forest, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.: The respondent's action for damages does not constitute government action within the meaning of s. 32 of the Charter. The fact that persons are employed by the government does not mean that their reputation is automatically divided into two parts, one related to their personal life and the other to their employment status. Reputation is an integral and fundamentally important aspect of every individual; it exists for everyone quite apart from employment. The appellants impugned the character, competence and integrity of the respondent himself, and not that of the government. He, in turn, responded by instituting legal proceedings in his own capacity. There was no evidence that the Ministry of the Attorney General or the Government of Ontario required or even requested him to do so. Neither is there any indication that the Ministry controlled the conduct of the litigation in any way. The fact that the respondent's suit may have been funded by the Ministry does not alter his constitutional status or cloak his personal action in the mantle of government action. Further, even if there were sufficient government action to bring this case within s. 32, the appellants failed to provide any evidentiary basis upon which to adjudicate their constitutional attack.

The common law must be interpreted in a manner which is consistent with Charter principles. This obligation is simply a manifestation of the inherent jurisdiction of the courts to modify or extend the common law in order to comply with prevailing social conditions and values. In its application to the parties in this action, the common law of defamation complies with the underlying values of the Charter and there is no need to amend or alter it. The common law strikes an appropriate balance between the twin values of reputation and freedom of expression. The protection of reputation is of vital importance, and consideration must be given to the particular significance reputation has for a lawyer. Although it is not specifically mentioned in the Charter, the good reputation of the individual represents and reflects the innate dignity of the individual, a concept which underlies all the Charter rights. Further, reputation is intimately related to the right to privacy, which has been accorded constitutional protection. The "actual malice" rule should not be adopted in Canada in

6/12/12 1:32 PM

Exhibit 5

http://www.westlaw.com/...rango/delivery/PrintDoc.do?jobHa...

an action between private litigants. The law of defamation is not unduly restrictive or inhibiting. Freedom of speech, like any other freedom, is subject to the law and must be balanced against the essential need of individuals to protect their reputation.

Qualified privilege attaches to the occasion upon which the communication is made, and not to the communication itself. The legal effect of the defence of qualified privilege is to rebut the inference, which normally arises from the publication of defamatory words, that they were spoken with malice. Where the occasion is shown to be privileged, the bona fides of the defendant is presumed and the defendant is free to publish, with impunity, remarks which may be defamatory and untrue about the plaintiff. The privilege is not absolute, however, and can be defeated if the dominant motive for publishing the statement is actual or express malice. Malice is commonly understood, in the popular sense, as spite or ill-will. However, it also includes any indirect motive or ulterior purpose that conflicts with the sense of duty or the mutual interest which the occasion created. Malice may also be established by showing that the defendant spoke dishonestly, or in knowing or reckless disregard for the truth. Qualified privilege may also be defeated when the limits of the duty or interest have been exceeded. The fact that an occasion is privileged does not necessarily protect all that is said or written on that occasion. The information communicated must be reasonably appropriate in the context of the circumstances existing on the occasion when that information was given.

The traditional common law rule with respect to reports on documents relating to judicial proceedings is that, where there are judicial proceedings before a properly constituted judicial tribunal exercising its jurisdiction in open court, then the publication without malice of a fair and accurate report of what takes place before that tribunal is privileged.

However, the common law immunity was not extended to a report on pleadings or other documents which had not been filed with the court or referred to in open court. Prior to holding the press conference M had every intention of initiating the contempt action in accordance with the prevailing rules, and had given instructions to this effect. The fact that the proper documents were not filed until the next morning should not defeat the qualified privilege which attached to this occasion. M's conduct, however, far exceeded the legitimate purposes of the occasion. The circumstances of this case called for great restraint in the communication of information concerning the proceedings launched against the respondent. As an experienced lawyer, M ought to have taken steps to confirm the allegations that were being made. This is particularly true since he should have been aware of the Scientology investigation pertaining to access to the sealed documents. In those circumstances he was duty bound to wait until the investigation was completed before launching such a serious attack on the respondent's professional integrity. M failed to take either of these reasonable steps. As a result of this failure, the permissible scope of his comments was limited and the qualified privilege which attached to his remarks was defeated. The press conference was held on the courthouse steps in the presence of representatives from several media organizations. This constituted the widest possible dissemination of grievous allegations of professional misconduct that were yet to be tested in a court of law. His comments were made in language that portrayed the respondent in the worst possible light. This was neither necessary nor appropriate in the existing circumstances. While it is not necessary to characterize M's conduct as amounting to actual malice, it was certainly high-handed and careless and exceeded any legitimate purpose the press conference may have served. His conduct therefore defeated the qualified privilege that attached to the occasion.

When properly instructed, jurors are uniquely qualified to assess the damages suffered by the plaintiff. An appellate court is not entitled to substitute its own judgment as to the proper award for that of the jury merely because it would have arrived at a different figure. General damages in defamation cases are presumed from the very publication of the false statement and are awarded at large. It is members of the community in which the defamed person lives who will be best able to assess the damages. The jury as representative of that community should be free to make an assessment of damages which will provide the plaintiff with a sum of money that clearly demonstrates to the community the vindication of the plaintiff's reputation. No cap should be placed on general damages for defamation. First, the injury suffered by a plaintiff as a result of injurious false statements is entirely different from the non-pecuniary damages suffered by a plaintiff in a personal injury case. Second, at the time the cap was placed on non-pecuniary damages in personal injury cases, their assessment had become a very real problem for the courts and for society as a whole, which is not the case with libel actions. The award of $300,000 by way of general damages was justified in this case. Both appellants published the notice of motion. All persons who are involved in the commission of a joint tort are jointly and severally liable for the damages caused by that tort, and it would thus be wrong in law to have a jury attempt to apportion liability for general damages

Exhibit 5

between the joint tortfeasors. The reports in the press were widely circulated and the television broadcast had a wide coverage. The setting and the persons involved gave the coverage an aura of credibility and significance that must have influenced all who saw and read the accounts. The misconduct of the appellants continued after the first publication. Prior to the commencement of the hearing of the contempt motion, Scientology was aware that the allegations it was making against the respondent were false, yet it persisted with the contempt hearings, as did M. At the conclusion of the hearings, both appellants were aware of the falsity of the allegations. Nonetheless, when the libel action was instituted, the defence of justification was put forward by both of them. Although M withdrew the plea of justification, this was only done in the week prior to the commencement of the trial itself, and Scientology did not withdraw its plea until the hearing of the appeal. Finally, the manner in which the respondent was cross-examined by the appellants, coupled with the manner in which they presented their position to the jury, in light of their knowledge of the falsity of their allegations, are further aggravating factors to be taken into account.

Aggravated damages may be awarded in circumstances where the defendant's conduct has been particularly high-handed or oppressive, thereby increasing the plaintiff's humiliation and anxiety arising from the libellous statement. If aggravated damages are to be awarded, there must be a finding that the defendant was motivated by actual malice, which increased the injury to the plaintiff, either by spreading further afield the damage to the reputation of the plaintiff, or by increasing the mental distress and humiliation of the plaintiff. The factors that a jury may properly take into account in assessing aggravated damages include whether there was a withdrawal of the libellous statement made by the defendant and an apology tendered, whether there was a repetition of the libel, conduct that was calculated to deter the plaintiff from proceeding with the libel action, a prolonged and hostile cross-examination of the plaintiff or a plea of justification which the defendant knew was bound to fail. The general manner in which the defendant presented its case is also relevant. Further, it is appropriate for a jury to consider the conduct of the defendant at the time the libel was published. In this case, there was ample evidence upon which the jury could properly base their finding of aggravated damages. Every aspect of this case demonstrates the very real and persistent malice of Scientology.

Punitive damages may be awarded in situations where the defendant's misconduct is so malicious, oppressive and high-handed that it offends the court's sense of decency. They should only be awarded in those circumstances where the combined award of general and aggravated damages would be insufficient to achieve the goal of punishment and deterrence.

Unlike compensatory damages, punitive damages are not at large, and consequently courts have a much greater scope and discretion on appeal. The appellate review should be based upon the court's estimation as to whether the punitive damages serve a rational purpose, as they did in this case. Further, the circumstances presented in this exceptional case demonstrate that there was such insidious, pernicious and persistent malice that the award for punitive damages cannot be said to be excessive.

Per L'Heureux-Dubé J.: Cory J.'s reasons were generally agreed with, except with respect to the scope of the defence of qualified privilege. The common law of defamation, as it is applied to the parties in this action, is consistent with the values enshrined in the Charter. There is accordingly no need to amend or alter it or, in particular, to adopt the "actual malice" rule. The defence of qualified privilege, however, is not available with respect to reports of pleadings in purely private litigation upon which no judicial action has yet been taken. The defence is available only with respect to reports of judicial proceedings. While there is a right to publish details of judicial proceedings before they are heard in open court, such publication does not enjoy the protection of qualified privilege if it is defamatory.

**Cases Cited**

By Cory J.

Not followed: New York Times Co. v. Sullivan, 376 U.S. 254 (1964); referred to: Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326; RWDSU v. Dolphin Delivery Ltd., [1986] 2 S.C.R. 573; McKinney v. University of Guelph, [1990] 3 S.C.R. 229; Nelles v. Ontario, [1989] 2 S.C.R. 170; Lavigne v. Ontario Public Service Employees Union, [1991] 2 S.C.R. 211; MacKay v. Manitoba, [1989] 2 S.C.R. 357; B.C.G.E.U. v. British Columbia (Attorney General), [1988] 2 S.C.R. 214; R. v. Swain, [1991] 1 S.C.R. 933; R. v. Salituro, [1991] 3 S.C.R. 654; Dagenais v. Canadian

Exhibit 5

Broadcasting Corp., [1994] 3 S.C.R. 835; Re British Columbia Government Employees' Union, [1983] 6 W.W.R. 640; R. v. Oakes, [1986] 1 S.C.R. 103; Sweeney v. Patterson, 128 F.2d 457 (1942), cert. denied 317 U.S. 678 (1942); Reference re Alberta Statutes, [1938] S.C.R. 100; Switzman v. Elbling, [1957] S.C.R. 285; Boucher v. The King, [1951] S.C.R. 265; Cherneskey v. Armadale Publishers Ltd., [1979] 1 S.C.R. 1067; United States of America v. Cotroni, [1989] 1 S.C.R. 1469; R. v. Keegstra, [1990] 3 S.C.R. 697; R. v. Butler, [1992] 1 S.C.R. 452; Globe and Mail Ltd. v. Boland, [1960] S.C.R. 203; Derrickson v. Tomat (1992), 88 D.L.R. (4th) 401; De Libellis Famosis (1605), 5 Co. Rep. 125a, 77 E.R. 250; King v. Lake (1679), Hardres 470, 145 E.R. 552; Rosenblatt v. Baer, 383 U.S. 75 (1966); Vogel v. Canadian Broadcasting Corp., [1982] 3 W.W.R. 97; R. v. Dyment, [1988] 2 S.C.R. 417; Barr v. Matteo, 360 U.S. 564 (1959); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1985); Coughlin v. Westinghouse Broadcasting & Cable, Inc., 476 U.S. 1187 (1986); Derbyshire County Council v. Times Newspapers Ltd., [1993] 1 All E.R. 1011; Theophanous v. Herald & Weekly Times Ltd. (1994), 124 A.L.R. 1; Silkin v. Beaverbrook Newspapers Ltd., [1958] 1 W.L.R. 743; Adam v. Ward, [1917] A.C. 309; McLoughlin v. Kutasy, [1979] 2 S.C.R. 311; Horrocks v. Lowe, [1975] A.C. 135; Taylor v. Despard, [1956] O.R. 963; Netupsky v. Craig, [1973] S.C.R. 55; Douglas v. Tucker, [1952] 1 S.C.R. 275; Sun Life Assurance Co. of Canada v. Dalrymple, [1965] S.C.R. 302; Gazette Printing Co. v. Shallow (1909), 41 S.C.R. 339; Canadian Newspapers Co. v. Canada (Attorney General), [1988] 2 S.C.R. 122; Walker v. CFTO Ltd. (1987), 59 O.R. (2d) 104; Rantzen v. Mirror Group Newspapers (1986) Ltd., [1993] 4 All E.R. 975; Ley v. Hamilton (1935), 153 L.T. 384; Andrews v. Grand & Toy Alberta Ltd., [1978] 2 S.C.R. 229; Arnold v. Teno, [1978] 2 S.C.R. 287; Thornton v. Board of School Trustees of School District No. 57 (Prince George), [1978] 2 S.C.R. 267; Jill Fishing Ltd. v. Koranda Management Inc., [1993] B.C.J. No. 1861 (QL); Cassell & Co. v. Broome, [1972] 1 All E.R. 801; Blackshaw v. Lord, [1983] 2 All E.R. 311; Sutcliffe v. Pressdram Ltd., [1990] 1 All E.R. 269; Carson v. John Fairfax & Sons Ltd. (1993), 113 A.L.R. 577; Lawson v. Burns, [1976] 6 W.W.R. 362; Kerr v. Conlogue (1992), 65 B.C.L.R. (2d) 70; Egger v. Chelmsford, [1965] 1 Q.B. 248.

By L'Heureux-Dubé J.

Not followed: New York Times Co. v. Sullivan, 376 U.S. 254 (1964); referred to: RWDSU v. Dolphin Delivery Ltd., [1986] 2 S.C.R. 573; R. v. Salituro, [1991] 3 S.C.R. 654; Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835; R. v. Park, [1995] 2 S.C.R. 836; Gazette Printing Co. v. Shallow (1909), 41 S.C.R. 339; Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326.

**Statutes and Regulations Cited**

Act to amend the Courts of Justice Act, 1984, S.O. 1989, c. 67, s. 4.
Canadian Charter of Rights and Freedoms, ss. 1, 2(b), 32(1).
Constitution Act, 1982, s. 52.
Courts of Justice Act, R.S.O. 1990, c. C.43, s. 137(1).
Crown Attorneys Act, R.S.O. 1990, c. C.49.
Criminal Code, R.S.C., 1985, c. C-46, ss. 490(15), 504.
Libel and Slander Act, R.S.O. 1990, c. L.12.
Marriage Act, R.S.O. 1980, c. 256, s. 20(2).
Ministry of the Attorney General Act, R.S.O. 1990, c. M.17.

**Authors Cited**

Australia. Law Reform Commission. Report No. 11. Unfair Publication: Defamation and Privacy. Canberra: Australian Government Publishing Service, 1979.
Barrett, David A. "Declaratory Judgments for Libel: A Better Alternative" (1986), 74 Cal. L. Rev. 847.
Barron, Jerome A. "Access to the Press -- A New First Amendment Right" (1966-67), 80 Harv. L. Rev. 1641.
Bezanson, Randall P. "Libel Law and the Realities of Litigation: Setting the Record Straight" (1985), 71 Iowa L. Rev. 226.
Bollinger, Lee C. "The End of New York Times v Sullivan: Reflections on Masson v New Yorker Magazine", [1991] Sup. Ct. Rev. 1.
Brown, Raymond E. The Law of Defamation in Canada, 2nd ed. Scarborough, Ont.: Carswell, 1994 (loose-leaf).
Canadian Daily Newspaper Association. Response to A Consultation Draft of the General Limitations Act (September 1991).

Carter-Ruck on Libel and Slander, 4th ed. By Peter F. Carter-Ruck, Richard Walker and Harvey N. A. Starte. London: Butterworths, 1992.

Christie, George C. "Injury to Reputation and the Constitution: Confusion Amid Conflicting Approaches" (1976), 75 Mich. L. Rev. 43.

Epstein, Richard A. "Was New York Times v. Sullivan Wrong?" (1986), 53 U. Chi. L. Rev. 782.

Gatley on Libel and Slander, 8th ed. By Philip Lewis. London: Sweet & Maxwell, 1981.

Gatley on Libel and Slander in a Civil Action: With Precedents of Pleadings, 4th ed. By Richard O'Sullivan. London: Sweet & Maxwell, 1953.

Hawreluk, David. "The Lawyer's Duty to Himself and the Code of Professional Conduct" (1993), 27 L. Soc. Gaz. 119.

Ireland. Law Reform Commission. Report on the Civil Law of Defamation. Dublin: Law Reform Commission, 1991.

Lepofsky, M. David. "Making Sense of the Libel Chill Debate: Do Libel Laws 'Chill' the Exercise of Freedom of Expression?" (1994), 4 N.J.C.L. 169.

Leval, Pierre N. "The No-Money, No-Fault Libel Suit: Keeping Sullivan in its Proper Place" (1988), 101 Harv. L. Rev. 1287.

Lewis, Anthony. "New York Times v. Sullivan Reconsidered: Time to Return to 'The Central Meaning of the First Amendment'" (1983), 83 Colum. L. Rev. 603.

London, Martin. "The 'Muzzled Media': Constitutional Crisis or Product Liability Scam?". In At What Price? Libel Law and Freedom of the Press. New York: Twentieth Century Fund, 1993.

McLellan, A. Anne, and Bruce P. Elman. "To Whom Does the Charter Apply? Some Recent Cases on Section 32" (1986), 24 Alta. L. Rev. 361.

Salmond and Heuston on the Law of Torts, 20th ed. By R. F. V. Heuston and R. A. Buckley. London: Sweet & Maxwell, 1992.

United Kingdom. Report of the Committee on Defamation. London: H.M.S.O., 1975.

Veeder, Van Vechten. "The History and Theory of the Law of Defamation" (1903), 3 Colum. L. Rev. 546.

Waddams, S. M. The Law of Damages, 2nd ed. Toronto: Canada Law Book, 1991 (loose-leaf).

APPEAL from a judgment of the Ontario Court of Appeal (1994), 18 O.R. (3d) 385, 114 D.L.R. (4th) 1, 71 O.A.C. 161, 20 C.C.L.T. (2d) 129, affirming a judgment of the Ontario Court of Justice (General Division) awarding the respondent damages for libel against the appellants. Appeal dismissed.

Bryan Finlay, Q.C., and Christopher J. Tzekas, for the appellant Morris Manning.

Marc J. Somerville, Q.C., and R. Ross Wells, for the appellant the Church of Scientology of Toronto.

Robert P. Armstrong, Q.C., and Kent E. Thomson, for the respondent.

Lori Sterling and Hart Schwartz, for the intervener the Attorney General for Ontario.

Robert J. Sharpe and Kent Roach, for the intervener the Canadian Civil Liberties Association.

Edward M. Morgan, for the interveners the Writers' Union of Canada, PEN Canada, the Canadian Association of Journalists, the Periodical Writers Association of Canada, and the Book and Periodical Council.

Peter W. Hogg, Q.C., and Brian MacLeod Rogers, for the interveners the Canadian Daily Newspaper Association, the Canadian Community Newspapers Association, the Canadian Association of Broadcasters, the Radio-Television News Directors Association of Canada, the Canadian Book Publishers' Council and the Canadian Magazine Publishers' Association.

Solicitors for the appellant Morris Manning: Weir & Foulds, Toronto.

Solicitors for the appellant the Church of Scientology of Toronto: Gowling, Strathy & Henderson, Kitchener.

Solicitors for the respondent: Tory Tory DesLauriers & Binnington, Toronto.

Solicitor for the intervener the Attorney General for Ontario: The Ministry of the Attorney General, Toronto.

Solicitors for the intervener the Canadian Civil Liberties Association: Robert Sharpe and Kent Roach, Toronto.

Solicitors for the interveners the Writers' Union of Canada, PEN Canada, the Canadian Association of Journalists, the Periodical Writers Association of Canada, and the Book and Periodical Council: Davies, Ward & Beck, Toronto.

Solicitors for the interveners the Canadian Daily Newspaper Association, the Canadian Community Newspapers Association, the Canadian Association of Broadcasters, the Radio-Television News Directors Association of Canada, the

http://www.lexis.com/research/delivery/PrintDoc.do?jobHa...

Canadian Book Publishers' Council and the Canadian Magazine Publishers' Association: Blake, Cassels & Graydon, Toronto.

---

The judgment of La Forest, Gonthier, Cory, McLachlin, Iacobucci and Major JJ. was delivered by

**1    CORY J.**:-- On September 17, 1984, the appellant Morris Manning, accompanied by representatives of the appellant Church of Scientology of Toronto ("Scientology"), held a press conference on the steps of Osgoode Hall in Toronto. Manning, who was wearing his barrister's gown, read from and commented upon allegations contained in a notice of motion by which Scientology intended to commence criminal contempt proceedings against the respondent Casey Hill, a Crown attorney. The notice of motion alleged that Casey Hill had misled a judge of the Supreme Court of Ontario and had breached orders sealing certain documents belonging to Scientology. The remedy sought was the imposition of a fine or the imprisonment of Casey Hill.

**2    At** the contempt proceedings, the allegations against Casey Hill were found to be untrue and without foundation. Casey Hill thereupon commenced this action for damages in libel against both Morris Manning and Scientology. On October 3, 1991, following a trial before Carruthers J. and a jury, Morris Manning and Scientology were found jointly liable for general damages in the amount of $300,000 and Scientology alone was found liable for aggravated damages of $500,000 and punitive damages of $800,000. Their appeal from this judgment was dismissed by a unanimous Court of Appeal: (1994), 18 O.R. (3d) 385, 114 D.L.R. (4th) 1, 71 O.A.C. 161, 20 C.C.L.T. (2d) 129.

I.    Factual Background

**3    As** in all actions for libel, the factual background is extremely important and must be set out in some detail. At the time the defamatory statements were made, Casey Hill was employed as counsel with the Crown Law Office, Criminal Division of the Ministry of the Attorney General for the Province of Ontario. He had given advice to the Ontario Provincial Police ("OPP") regarding a warrant obtained on March 1, 1983 which authorized a search of the premises occupied by Scientology. During the execution of the search warrant on March 3 and 4, 1983, approximately 250,000 documents, comprising over 2 million pages of material, were seized. These documents were stored in some 900 boxes at an OPP building in Toronto.

**4    Immediately** following the seizure, Scientology retained Clayton Ruby to bring a motion to quash the search warrant and to seek the return of the seized documents. Casey Hill, who had gained experience and special skill in the area of search and seizure, acted as counsel for the Crown.

**5    The** litigation commenced on March 7, 1983 and continued throughout 1983 and 1984. On July 11, 1984, Osler J. ruled that solicitor-and-client privilege applied to 232 of the seized documents he had reviewed and ordered that they remain sealed pending further order of the court. Several sealing orders and endorsements were ultimately made by Justices of the Supreme Court of Ontario.

**6    Throughout** this period, Casey Hill dealt frequently with Clayton Ruby and other counsel for Scientology in connection with various matters ranging from the trivial to the significant. They were invariably resolved in a spirit of co-operation and professional courtesy, even in those situations where the parties proceeded with contested motions.

**7    In** March of 1983, Scientology retained Charles Campbell to make an application to Rosemarie Drapkin, the Deputy Registrar General of the Ministry of Consumer and Commercial Relations, requesting that its president, Earl Smith, be granted the authorization to solemnize marriages pursuant to s. 20(2) of the Marriage Act, R.S.O. 1980, c. 256.

One year later, Scientology commenced an application for judicial review of Rosemarie Drapkin's failure to approve that

Exhibit 5

application.

**8**    Rosemarie Drapkin believed that it would help her to assess the application if she could review the seized documents. To that end, Kim Twohig, a solicitor in the Civil Division of the Crown Law Office, approached Casey Hill in July 1984. He advised her that there was a motion outstanding before Osler J. for an order quashing the search warrant and that access would only be granted if a court order was obtained pursuant to s. 490(15) (formerly 446(15)) of the Criminal Code, R.S.C., 1985, c. C-46. He explained that there had been several interim rulings in this matter and stated that "this was probably the type of case where the judge hearing such an application would want notice given to Scientology".

**9**    During the last week of July 1984, Casey Hill travelled to Nassau to meet with the Attorney General of the Bahamas in respect of an ongoing criminal investigation. In the course of a telephone conversation, Kim Twohig conveyed to Casey Hill the urgent need she had to gain access to the documents as a date had been fixed to hear Scientology's application for judicial review. Casey Hill testified that he told Kim Twohig that her Criminal Code application would have to be served on the Crown Law Office, Criminal Division in the usual fashion to obtain its consent.

**10**    Kim Twohig prepared the necessary materials, including the notice of motion and an affidavit of Rosemarie Drapkin, and obtained the requisite consent from James Blacklock of the Crown Law Office, Criminal Division. The application was then filed in Weekly Court on July 30, 1984 with the assistance of Jerome Cooper, a solicitor with the Ministry of Consumer and Commercial Relations. No notice was given to Scientology. The following day, a consent order granting access to all of the seized documents was issued by Sirois J. in chambers without submissions from counsel.

**11**    In her testimony at the trial of this action, Kim Twohig agreed that she alone made the decision not to provide notice to Scientology of her application. She testified that she assumed that the presiding judge would determine whether notice was necessary or appropriate. It was only later that she realized that the order of Sirois J. might provide access to sealed documents.

**12**    By letter dated August 22, 1984, Rosemarie Drapkin wrote to Charles Campbell concerning Scientology's application and advised that she had "reviewed certain documents relating to the Scientology organization which were seized pursuant to the search warrant" issued on March 1, 1983. Attached to the letter was a list of 89 documents, some of which had purportedly been sealed by order of Osler J. It was this information which raised the concern of Scientology and its legal advisers.

**13**    In response, Clayton Ruby wrote a somewhat precipitous and very aggressive letter to the Solicitor General of Ontario dated August 28, 1984. In it he accused the OPP of acting "as if there were no rule of law" and of "simply ignoring solicitor/client privilege and making a mockery of the courts". He called for a "full investigation" and demanded disciplinary action be taken "against everyone involved". Clayton Ruby was not aware of the order of Sirois J. at that time. He simply assumed that those involved had acted improperly.

**14**    As early as September 5, 1984, Clayton Ruby, along with other counsel and representatives of Scientology, decided that what had occurred was "disgraceful and shocking" and constituted contempt. They arrived at this conclusion without having taken any steps to ensure the accuracy of their impressions.

**15**    In a letter addressed to Casey Hill dated September 6, 1984, Clayton Ruby asked for Casey Hill's assistance in obtaining information regarding the circumstances under which the order of Sirois J. had been granted and why Scientology had not received notice of the application. He requested a response within five days. It should be noted that at the time this letter was written, Clayton Ruby was a Bencher of the Law Society and Vice-Chairman of the Law Society's Discipline Committee.

**16**    The letter implied that there could be disciplinary proceedings brought before the Law Society of Upper Canada and that a contempt action might be instituted. Not surprisingly, it was given serious consideration by Casey Hill and others at the Ministry of the Attorney General. Hill sought the advice of his Director, Howard Morton. Morton wrote a letter to Ruby stating that in light of the serious nature of the allegations, he would not be able to reply within the five-day period imposed by Ruby.

Exhibit 5

**17**    On September 6 and 7, 1984, Michael Code (then an associate of Clayton Ruby) telephoned Casey Hill, Jerome Cooper and Kim Twohig to find out how access to the privileged documents had been obtained. They all conveyed a similar version of the past events and assured him that the sealed documents were not opened but rather that unsealed copies must have been examined. Code conceded in cross-examination that everyone he spoke to was cooperative.

**18**    On September 11, 1984, however, without making any further inquiries and without awaiting the reply from Casey Hill and Howard Morton, Ruby retained the appellant Morris Manning to advise Scientology in respect of possible contempt proceedings. On September 13, 1984, representatives of Scientology met with Morris Manning, Charles Campbell, Clayton Ruby, Michael Code and an articling student at Ruby's office. A decision was made to commence an application for criminal contempt against both Casey Hill and Jerome Cooper. Morris Manning testified that a critical piece of information which prompted him to bring the contempt application was the characterization by Michael Code of Casey Hill's attitude during their conversation. Casey Hill had allegedly said that if the Church missed sealing all copies of the privileged documents it was "too bad". In Morris Manning's opinion, this demonstrated a contemptuous attitude towards the court. He reached this conclusion without ever speaking to Casey Hill or any of the others involved in the incident such as Rosemarie Drapkin, Kim Twohig, James Blacklock, Jerome Cooper or Detective Inspector Ormsby, the senior officer of the OPP responsible for the investigation of Scientology. Nor had Morris Manning interviewed those representatives of Scientology who were directly involved in the sealing of the documents.

**19**    The evidence adduced at the contempt hearing clearly established that Casey Hill played no part in the application before Sirois J. and had nothing to do with the execution or filing of the consent on behalf of the Attorney General for Ontario. In fact, he was only informed of any difficulties associated with the order of Osler J. in late August 1984, when he received a telephone call from Detective Inspector Ormsby. At that time, Ormsby advised him that Rosemarie Drapkin had attended at the OPP building in which the seized documents were held with the order of Sirois J., but that she was denied access to the sealed documents. The sealed documents were never opened. What Rosemarie Drapkin may have seen were unsealed copies of the sealed documents that were probably located in different boxes than the sealed originals.

**20**    Between September 13 and 17, 1984, Morris Manning prepared a notice of motion for the contempt application returnable in Weekly Court some time in early January 1985. During this time, he did not make any attempt to determine what was being done with the seized documents or to ascertain whether any continuing breach of privilege was occurring.

(A)    The "Enemy Canada" File

**21**    Long before he gave advice to the OPP in connection with the search and seizure of documents which took place on March 3 and 4, 1983, Casey Hill had become a target of Scientology's enmity. Over the years, he had been involved in a number of matters concerning Scientology's affairs. As a result, it kept a file on him. This was only discovered when the production of the file was ordered during the course of this action. The file disclosed that from approximately 1977 until at least 1981, Scientology closely monitored and tracked Casey Hill and had labelled him an "Enemy Canada". Casey Hill testified that from his experience, persons viewed by Scientology as its enemies were "subject to being neutralized".

(B)    The Press Conference

**22**    In the file of Charles Campbell there was a note dated September 10 or 11, 1984 which made reference to a press conference to be held the following Monday, September 17, 1984. It appears, then, that before it had even consulted Morris Manning, Scientology intended to call a press conference

**23**    The press conference was organized by Earl Smith. He contacted a number of media organizations, including CFTO-TV, CBC television and The Globe and Mail and invited them to the event which was to be held in front of Osgoode Hall. Morris Manning was appearing on that day before the Court of Appeal in an unrelated matter and attended the press conference in his barrister's gown.

**24**    He testified that he answered a number of questions concerning the contempt proceedings and then, at the request of the media, read a passage from the notice of motion for the television cameras. Copies of the notice of motion were distributed to the media along with a typewritten document, prepared by Scientology, entitled "Chronology of Events

http://www.com/ext/com/caa/leg/de...t/PrintDoc.do?jobHa...

Leading to Contempt Motion".

**25**    The notice of motion in essence alleged that Casey Hill had participated in the misleading of Sirois J. and that he had participated in or aided and abetted others in the opening and inspection of documents which to his knowledge were sealed by Osler J.

**26**    On the evening of September 17, 1984, the CFTO broadcast was seen by an audience of approximately 132,000 people. The text of the broadcast is set out in Appendix A to these reasons. The CBC broadcast was seen by approximately 118,000 people. The text is found in Appendix B. The following morning, an article appeared in The Globe and Mail entitled "Motion of Contempt Launched by Church". Approximately 108,000 copies of the edition containing this article were distributed. The article is reproduced in Appendix C. All three publications repeated the allegations made in the notice of motion.

>            (C)    The Felske Memorandum

**27**    Patricia Felske is a Scientologist who had attended at the offices of the OPP on a regular basis since March 1983 for the purpose of reviewing the seized materials and ensuring that the privileged documents were sealed. Between August 29, 1984, and September 27, 1984, she, along with other representatives from Scientology, opened the sealed envelopes and verified their contents against photocopies of the documents that Rosemarie Drapkin had examined. Their purpose was to determine whether Ms. Drapkin had been granted access to the restricted materials.

**28**    On September 17, 1984, the day of the press conference, the Scientology investigation was well advanced and neither then nor later was there any indication that Drapkin gained access to sealed documents. Scientology and Manning nevertheless proceeded with the press conference before any conclusive findings had been made on this issue.

**29**    On November 2, 1984, Patricia Felske prepared a brief summary of her findings, entitled "Time Track Re: Solicitor and Client Privileged Documents", which she sent to Clayton Ruby, Charles Campbell, Morris Manning and Diane Martin, another of Scientology's lawyers. In it she concluded that "[t]here was no evidence to support any allegation that the sealed envelopes had been tampered with by the OPP" (emphasis added).

>            (D)    The Contempt Trial

**30**    The contempt trial was heard by Cromarty J. for 11 days beginning the next Monday, November 5, 1984. Morris Manning and Charles Campbell had carriage of the proceedings on behalf of Scientology. A number of witnesses were called by them, including Clayton Ruby, Michael Code, Kim Twohig, Rosemarie Drapkin, James Blacklock, Detective Inspector Ormsby and four other members of the OPP who had direct responsibility for the seized documents.

**31**    Following the presentation of Scientology's case, Cromarty J. dismissed the application on a motion for non-suit on December 7, 1984: 13 W.C.B. 231. He held that there was no evidence that Casey Hill participated in any stage of the application made before Sirois J. or that he should have been aware of any need for further inquiry into Kim Twohig's actions.

**32**    From the contents of the Felske Memorandum, which only came to light at the trial of the present action, it is evident that prior to the start of the contempt hearing, Scientology was well aware that no sealed envelopes had been opened. Yet, it still proceeded with a contempt prosecution against Casey Hill.

**33**    Morris Manning testified that he never received the Felske Memorandum and conceded that if he had been aware of it, he would have been obliged to disclose it to Casey Hill. However, on the weekend prior to the start of the contempt trial, Morris Manning was briefed by Charles Campbell. At trial, both Campbell and Ruby acknowledged that they had received the Felske Memorandum. In addition, Campbell testified that all important information concerning the prosecution was shared with everybody involved. It might be inferred that this would include Manning.

**34**    Further, Morris Manning met with Patricia Felske and two other representatives of Scientology during the weekend

prior to the hearing of the contempt motion. However, he testified that they were not interviewed for the purpose of giving evidence at the contempt trial nor were they called to do so. Cromarty J. characterized the failure to call these individuals as "a most eloquent omission".

**35**    There was another equally eloquent omission. The OPP officers who were called by Scientology to testify were not asked to produce the sealed envelopes they were directed to bring with them to court. If they had, it would have been obvious that the envelopes had not been tampered with.

>    (E)    The Attempt to Disqualify Casey Hill from the Search and Seizure Proceedings

**36**    As stated earlier, Scientology made an application in March 1983 to quash the search warrant which the OPP had used to seize its documents. This application was commenced before Osler J. prior to September 17, 1984, but was adjourned until the completion of the contempt proceedings. Throughout this time, Casey Hill represented the Crown as lead counsel.

**37**    The application was resumed on December 18, 1984.

By that time, the contempt charges had been dismissed as unfounded and this libel action had been commenced. Casey Hill continued to represent the Crown but made a full disclosure of all the relevant circumstances to Osler J. He submitted that the proceedings involved the interpretation and application of legal principles rather than the exercise of prosecutorial discretion and, as a consequence, his ability to act as responding counsel was not impaired.

**38**    Scientology, nevertheless, moved to disqualify Casey Hill on the ground that occasions might arise where he would have to exercise a discretion as to the production of a document and as to the significance to be attached to it. Scientology contended that this could reflect adversely upon it and, in due course result in a favourable consideration of Casey Hill's libel suit. Scientology was essentially suggesting that Casey Hill would use his position as Crown counsel to further his private interests. This was a serious attack on his professional integrity which added to the sting of the libel uttered to that point.

**39**    Osler J. emphatically rejected these arguments. He stated that it was fundamentally important for the Crown to "proceed courageously in the face of threats and attempts at intimidation or in the face of proceedings that have been found to be groundless but have obviously had the effect of harassment".

>    (F)    Pleas of Justification

**40**    On February 18, 1985, Scientology delivered its statement of defence in this action. Notwithstanding the findings contained in the Felske Memorandum prepared by its own members, and the conclusion reached by Cromarty J. in the contempt hearing, Scientology entered a plea of justification.

**41**    Scientology also put forward as true an allegation that Casey Hill directed and supervised the OPP in the opening and reviewing of 20 boxes of documents which had been sealed by order of Linden J. This was found by the Court of Appeal to constitute a separate allegation of contempt and a further attack upon the integrity of Casey Hill in the performance of his duties as Crown counsel.

**42**    Scientology maintained its plea of justification throughout the trial and did not withdraw it until the first day of the hearing before the Court of Appeal on December 6, 1993, some nine years after the original libel.

**43**    Morris Manning delivered his statement of defence on April 1, 1985, and also asserted a plea of justification which he did not withdraw until the week prior to the commencement of the trial. He persisted in this plea despite the decision of Cromarty J. dismissing the motion to commit Casey Hill for contempt and despite the overwhelming evidence indicating that the allegations made against Hill were false.

>    (G)    The Conduct of Scientology at Trial

**44**    Scientology continued its attack against Casey Hill throughout the trial of this action, both in the presence of the jury and in its absence. More than once, it reiterated the libel even though it knew that these allegations were false. Clearly, it sought to repeatedly attack Casey Hill's moral character. Some examples are set out below.

> (1)    The Cross-Examination of Casey Hill

**45**    Counsel for Scientology subjected Casey Hill to a lengthy cross-examination which the Court of Appeal correctly described as a "skilful and deliberate attempt at character assassination" (p. 452 O.R.). Counsel suggested that Casey Hill often improperly coached his witnesses and took the same approach with respect to his own testimony at the libel trial.

It was insinuated that Casey Hill was an untrustworthy person who would breach his undertakings as he had done in this case in relation to the sealed documents. Attempts were also made to blame him for the failure to give notice to Scientology concerning the application before Sirois J. even though he had been vindicated seven years earlier by Cromarty J.

> (2)    The "Veiled Threat" Against Clayton Ruby

**46**    Michael Code testified that during the course of his conversation with Casey Hill on September 6, 1984, the latter had made a veiled threat against Clayton Ruby which he described in the following terms:

> He [Casey Hill] suggests we may receive an ominous reply to Clay's complaints. He is awaiting a report back from the police. What he said to me was something to the effect that there was a police investigation of Mr. Ruby's conduct and basically, you better watch it. [Emphasis added.]

**47**    When Casey Hill was called in reply, he denied making any such threat or using the word "ominous" during the conversation. Rather, he testified that he had used the word "omnibus" in reference to a combined reply to the letters that Ruby sent to the Solicitor General and to himself.

**48**    In cross-examination, counsel for Scientology accused Casey Hill of fabricating this version of events. Not only did counsel suggest that Hill had lied on the stand, but the general tenor of his questioning implied that Hill was so unprincipled that he would use the power of the state to intimidate an opposing lawyer.

> (3)    The Closing Address to the Jury by Counsel for Scientology

**49**    During his closing address, counsel for Scientology contended that Casey Hill had demonstrated feigned and insincere emotion when he described his reaction to seeing the publication of the CFTO broadcast on the evening of September 17, 1984. He suggested to the jury that it may have been nothing more than a "skilled performance to tug at your heartstrings" in order to influence the verdict.

> (H)    The Events Following the Verdict of the Jury

**50**    The day after the jury's verdict, on October 4, 1991, Scientology republished the libel in a press release delivered to the media. A few weeks later, it issued another press release attacking the verdict of the jury as "outrageous" and "so exorbitant and so grossly out of proportion that it was influenced more by L.A. Law than Canadian legal tradition". Shortly thereafter, it proceeded with a motion before Carruthers J. to adduce evidence which, it contended, would bear "directly on the credibility and reputation of the plaintiff S. Casey Hill". That motion was later withdrawn.

II. Judgments Below

> (A)    Trial by Jury (Carruthers J. presiding)

**51**   This action for damages for libel was commenced on December 14, 1984. The trial before Carruthers J. and a jury lasted from September 3, 1991 until October 3, 1991. The questions posed to the jury and their answers were as follows:

SPECIAL VERDICT

QUESTIONS

A. With Respect to the Defendant, Morris Manning

1. Did the CBC broadcast refer to the plaintiff?

A. Yes

2.   Did Morris Manning instruct, authorize or consent to the publication of the Notice of Motion at the press conference?

A. Yes

B. With Respect to Both Defendants

3.   Are the words complained of in the CFTO and CBC broadcasts on September 17, 1984, the Globe & Mail article on September 18, 1984 and the Notice of Motion defamatory of the plaintiff?

A. Yes

4.   If the answer to Question 3 is "yes", what general damages, if any, is the plaintiff, Casey Hill, entitled to from the defendants, The Church of Scientology of Toronto and Morris Manning?

A. $300,000

5.   If your answer to Question 3 is "yes", is he entitled to any aggravated damages from the defendant, Morris Manning, in addition to any general damages already assessed, and if so, in what amount?

A. Nil

6.   If your answer to Question 3 is "yes", is he entitled to any aggravated damages from the defendant, The Church of Scientology of Toronto, in addition to any general damages already assessed, and if so, in what amount?

A. $500,000

7.   If your answer to Question 3 is "yes", is he entitled to any punitive damages from the defendant, The Church of Scientology of Toronto, and if so, in what amount?

A. $800,000

**52**   Following the verdict, the appellants made a motion before Carruthers J. requesting that he completely disregard the jury's assessment of damages because it was "outrageous, exorbitant and entirely out of proportion to the sting of the

defamation" ((1992), 7 O.R. (3d) 489, at p. 497).

Carruthers J. concluded that the jury was properly instructed as to the object and purpose of each head of damage and that there was evidence upon which the jury could have reached a conclusion that it was entitled to award damages under each of the three heads.

**53**    Carruthers J. refused to "invade the province of the jury" in order to make his own assessment of the damages (at p. 502). He noted that since both defendants vigorously opposed each of the several motions on behalf of the plaintiff to discharge the jury, it was not open to them to suggest that he fix damages himself.

> (B)    Court of Appeal (1994), 18 O.R. (3d) 385

**54**    The Court of Appeal, in its careful and extensive reasons, rejected the appellants' allegation that the common law of defamation violated s. 2(b) of the Canadian Charter of Rights and Freedoms. It did so for two reasons. First, the court held that it was nothing more than a "bare assertion" of unconstitutionality which could not support their constitutional challenge (at p. 414). Second, the court held that even if the constitutional challenge could be resolved in the absence of an evidentiary foundation, the appellants failed to show that the action for damages commenced by Casey Hill was a form of "government action" which was necessary in order to attract the application of the Charter. The court rejected the argument that Casey Hill's position as a public figure implicated the government in whatever action he pursued. It also dismissed the submission that the government funding of his action was relevant to this question.

**55**    The Court of Appeal then considered the argument that interpreting the common law in a manner consistent with the Charter required the adoption of the "actual malice" standard of liability set out in the reasons of the U.S. Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254 (1964). There, Brennan J. held that public officials could only collect damages for statements concerning their fitness for office in circumstances where they could demonstrate that the defamatory statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not" (p. 280). After noting that the common law concept of malice involves an assessment of different factors, such as animosity, hostility, ill will and spite, the court concluded that the adoption of the rule in New York Times v. Sullivan, supra, would result in a major change to the common law that was neither necessary nor merited. It found that the existing rule was historically based on sound policy reasons which recognized the importance of the protection of the reputation of individuals who assume the responsibilities of public officials.

**56**    The appellants also submitted that the trial judge erred in ruling that the circumstances of the press conference did not constitute an occasion of qualified privilege and in declining to charge the jury with respect to that defence. The Court of Appeal found that under the common law, qualified privilege attached only to the publication of documents read or referred to in open court. It was opposed to conferring a privilege on a press conference held for the purpose of disseminating to the public details of a pending legal proceeding at a time when no document in connection with that legal proceeding had yet been filed in any court office. In rejecting the argument that this Court's judgment in Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326, superseded the common law rule, the court stated that, while there is a right to publish details of judicial proceedings before they are heard in open court, "such publication does not enjoy the protection of qualified privilege if it is defamatory" (p. 427).

**57**    On the subject of general damages, the Court of Appeal examined the libellous statement, the circumstances of its publication and its effect on Casey Hill. It found that "[t]he false statements can be seen as little short of allegations of a criminal breach of trust" (p. 437), "calculated to engender in the minds of those who learned of [them] that they were very serious and entirely credible" (p. 438). Accordingly, they justified a very substantial award of general damages to compensate Casey Hill for the damage to his reputation and the injury to his feelings. This, it was held, should be the result even though he had received several promotions and appointments by the time of trial.

**58**    With respect to aggravated damages, the Court of Appeal examined the circumstances existing prior to, at the time of and following the publication of the libel. It concluded that the jury was entitled to find that its award for general damages was not large enough to provide adequate solatium to Casey Hill for the aggravation of his injury which was caused by Scientology's malicious libel and reprehensible conduct.

**59**    The court then turned its attention to the issue of punitive damages and concluded as follows at p. 459:

> What the circumstances of this case demonstrated beyond peradventure to the jury was that Scientology was engaged in an unceasing and apparently unstoppable campaign to destroy Casey Hill and his reputation. It must have been apparent to the jury that a very substantial penalty was required because Scientology had not been deterred from its course of conduct by a previous judicial determination that its allegations were unfounded nor by its own knowledge that its principal allegation [that the sealed documents had been opened] was false.

**60**    The court also observed that it would not interfere with the award of punitive damages on the ground that Scientology persisted in its attack on Casey Hill's reputation even after the jury's verdict.

**61**    On the question of pre-judgment interest, the court concluded that since the appellants had accommodated counsel for Casey Hill in order to permit him to participate in a Royal Commission, it would be unfair to charge them with prejudgment interest for this period. Also, in considering whether Morris Manning should bear an equal portion of the costs of the trial with Scientology, the court pointed out that much of the trial was devoted to the plea of justification pursued by Scientology alone. Furthermore, the majority of the damages were awarded against Scientology. Therefore, the court concluded that the trial costs should be apportioned, with Morris Manning paying only 30 percent of the assessed costs and Scientology the balance. However, it added that the parties should remain jointly and severally liable for all costs with each having a claim over against the other for any amount paid beyond their apportioned liability.

> III.    Analysis

**62**    Two major issues are raised in this appeal. The first concerns the constitutionality of the common law action for defamation. The second relates to the damages that can properly be assessed in such actions.

**63**    Let us first review the appellants' submissions pertaining to defamation actions. The appellants contend that the common law of defamation has failed to keep step with the evolution of Canadian society. They argue that the guiding principles upon which defamation is based place too much emphasis on the need to protect the reputation of plaintiffs at the expense of the freedom of expression of defendants. This, they say, is an unwarranted restriction which is imposed in a manner that cannot be justified in a free and democratic society. The appellants add that if the element of government action in the present case is insufficient to attract Charter scrutiny under s. 32, the principles of the common law ought, nevertheless, to be interpreted, even in a purely private action, in a manner consistent with the Charter. This, the appellants say, can only be achieved by the adoption of the "actual malice" standard of liability articulated by the Supreme Court of the United States in the case of New York Times v. Sullivan, supra.

**64**    In addition, the appellant Morris Manning submits that the common law should be interpreted so as to afford the defence of qualified privilege to a lawyer who, acting on behalf of a client, reads and comments in public upon a notice of motion which he believes, in good faith, has been filed in court, and which subsequently is filed. Let us consider first whether the Charter is directly applicable to this case.

> (A)    Application of the Charter

**65**    The appellants have not challenged the constitutionality of any of the provisions of the Libel and Slander Act, R.S.O. 1990, c. L.12. The question, then, is whether the common law of defamation can be subject to Charter scrutiny. The appellants submit that by reason of his position as a government employee, Casey Hill's action for damages constitutes "government action" within the meaning of s. 32 of the Charter. In the alternative, the appellants submit that, pursuant to s. 52 of the Constitution Act, 1982, the common law must be interpreted in light of Charter values.

I will address the s. 32 argument first.

Exhibit 5

(1)      Section 32: Government Action

**66**    Section 32(1) reads:

> 32. (1) This Charter applies
>
> (a)      to the Parliament and government of Canada in respect of all matters within the authority of Parliament including all matters relating to the Yukon Territory and Northwest Territories; and
>
> (b)      to the legislature and government of each province in respect of all matters within the authority of the legislature of each province.

**67**    In RWDSU v. Dolphin Delivery Ltd., [1986] 2 S.C.R. 573, McIntyre J., with regard to the application of the Charter to the common law, stated at pp. 598-99:

> It is my view that s. 32 of the Charter specifies the actors to whom the Charter will apply. They are the legislative, executive and administrative branches of government. It will apply to those branches of government whether or not their action is invoked in public or private litigation. . . . It will apply to the common law, however, only in so far as the common law is the basis of some governmental action which, it is alleged, infringes a guaranteed right or freedom. [Emphasis added.]

**68**    La Forest J., writing for the majority in McKinney v. University of Guelph, [1990] 3 S.C.R. 229, stressed the importance of this limitation on the application of the Charter to the actions of government. He said this at p. 262:

> The exclusion of private activity from the Charter was not a result of happenstance. It was a deliberate choice which must be respected. We do not really know why this approach was taken, but several reasons suggest themselves. Historically, bills of rights, of which that of the United States is the great constitutional exemplar, have been directed at government. Government is the body that can enact and enforce rules and authoritatively impinge on individual freedom. Only government requires to be constitutionally shackled to preserve the rights of the individual.

**69**    La Forest J. warned that subjecting all private and public action to constitutional review would mean reopening whole areas of settled law and would be "tantamount to setting up an alternative tort system" (p. 263). He expressed the very sage warning that this "could strangle the operation of society" (p. 262). See also McLellan and Elman, "To Whom Does the Charter Apply? Some Recent Cases on Section 32" (1986), 24 Alta. L. Rev. 361, at p. 367, cited in Dolphin Delivery Ltd., supra, at p. 597.

**70**    The appellants argue that at all material times Casey Hill was an agent of the Crown, acting on behalf of the Attorney General of Ontario, and that the defamatory statements which are the subject of the present action were made in relation to acts undertaken by him in that capacity. They further submit that Casey Hill commenced these legal proceedings at the direction and with the financial support of the Attorney General in order to vindicate the damage to the reputation of the Ministry resulting from criticism levelled at the conduct of one of its officials. It is, therefore, contended that this action represents an effort by a government department to use the action of defamation to restrict and infringe the freedom of expression of the appellants in a manner that is contrary to the Charter.

**71**    These submissions cannot be accepted. They have no legal, evidentiary or logical basis of support. Casey Hill's constitutional status for the purpose of the application of the Charter should not be determined by the nature of the allegations made against him. Rather, the determination of whether state involvement existed is dependent upon the circumstances surrounding the institution of the libel proceedings.

Exhibit 5

**72**     The fact that persons are employed by the government does not mean that their reputation is automatically divided into two parts, one related to their personal life and the other to their employment status. To accept the appellants' position would mean that identical defamatory comments would be subject to two different laws, one applicable to government employees, the other to the rest of society. Government employment cannot be a basis for such a distinction. Reputation is an integral and fundamentally important aspect of every individual. It exists for everyone quite apart from employment.

**73**     In order to establish the requisite government action for Charter scrutiny, the appellants argue that it is easy to distinguish between a janitor working in a government building who is simply an employee and a Crown Attorney who is an agent of the state. It is said that when a person who is clearly an agent of the state acts, he or she is acting for or on behalf of the state. I cannot accept this proposition. There are a significant number of public servants who represent the Crown in any number of ways. While it might be easy to differentiate between the extreme examples set forth by the appellants, the grey area between those extremes is too extensive and the functions of the officials too varied to draw any effective line of distinction. The experience in the United States following the decision in New York Times v. Sullivan, supra, is instructive in this regard. That case modified the common law in relation to defamation suits brought by public officials and touched off an intense debate with respect to who might be designated as a public official or figure rather than a private person. See, for example, G. C. Christie, "Injury to Reputation and the Constitution: Confusion Amid Conflicting Approaches" (1976), 75 Mich. L. Rev. 43.

**74**     There is no doubt that Crown Attorneys exercise statutory powers as agents of the government. See Ministry of the Attorney General Act, R.S.O. 1990, c. M.17; Crown Attorneys Act, R.S.O. 1990, c. C.49; and the Criminal Code, s. 504. Therefore, as McIntyre J. pointed out in Nelles v. Ontario, [1989] 2 S.C.R. 170, at p. 209, they benefit from the protection of any immunity which attaches to their office. However, they may become personally liable when they exceed their statutory powers. By extension, actions taken by Crown Attorneys which are outside the scope of their statutory duties are independent of and distinct from their status as agents for the government. Such was the case here.

**75**     The appellants impugned the character, competence and integrity of Casey Hill, himself, and not that of the government. He, in turn, responded by instituting legal proceedings in his own capacity. There was no evidence that the Ministry of the Attorney General or the Government of Ontario required or even requested him to do so. Neither is there any indication that the Ministry controlled the conduct of the litigation in any way. See Lavigne v. Ontario Public Service Employees Union, [1991] 2 S.C.R. 211, at pp. 311-14. Further, the fact that Casey Hill's suit may have been funded by the Ministry of the Attorney General does not alter his constitutional status or cloak his personal action in the mantle of government action. See McKinney, supra, at p. 269.

**76**     The private nature of these proceedings is apparent, as well, from the respondent's statement of claim, and particularly from the allegation contained in para. 19 that the defamatory statements:

> . . . constituting as they do statements of the most serious professional misconduct by the Plaintiff, have damaged his professional reputation and brought him into public scandal, odium and contempt, by reason of which the Plaintiff has suffered damage.

**77**     The position taken by the appellants at trial is also revealing. Scientology argued that Casey Hill was proceeding with the litigation to advance his "secondary private interest", that he was trying to "get back at [Scientology] for prosecuting him for contempt", and that the libel action amounted to "a risk-free opportunity . . . to pick up some easy money".

**78**     The personal nature of the libel action is also evident in the cross-examination of Casey Hill concerning his work with the OPP. At that time, counsel for Scientology stated that the libel action had nothing "to do with damages suffered by Mr. Hill. It's part of an attack motivated by the attitude towards the Church of Scientology, motivated by the fact that as a result of the contempt prosecution he is removed from prosecuting".

**79**     In my opinion, the appellants have not satisfied the government action requirement described in s. 32. Therefore, the Charter cannot be applied directly to scrutinize the common law of defamation in the circumstances of this case.

**80**     Even if there were sufficient government action to bring this case within s. 32, the appellants failed to provide any evidentiary basis upon which to adjudicate their constitutional attack. This Court has stated on a number of occasions that it will not determine alleged Charter violations in the absence of a proper evidentiary record. See, for example, MacKay v. Manitoba, [1989] 2 S.C.R. 357. In light of the conclusion that the government action requirement of s. 32 has not been met, I need not address this issue. Yet, I feel a brief comment is necessary because of the light it sheds on the manner in which the appellants have conducted themselves in this litigation.

**81**     The action was commenced in December 1984. By the fall of 1985, the appellants were made aware of the requirement to adduce constitutional evidence. In dismissing the appellants' pre-trial motion with respect to the constitutional issues, O'Driscoll J. clearly indicated that the constitutional questions must be decided upon evidence adduced at trial. The date for trial was fixed in January 1991 and confirmed in June. On September 4, 1991, two days into the proceedings, counsel for Scientology sought to adjourn the trial on the grounds that there was "a possibility of . . . seeking to call expert evidence in regard to the freedom of speech issue in this trial". Counsel conceded that he had not prepared or delivered any reports of experts in respect to this issue, and indeed, that he had not yet even consulted with experts. He simply wanted the adjournment in order to "explore that area". The request for adjournment was very properly dismissed.

**82**     There is no government action involved in this defamation suit. It now must be determined whether a change or modification in the law of defamation is required to make it comply with the underlying values upon which the Charter is founded.

(2) Section 52: Charter Values and the Common Law

    (a)      Interpreting the Common Law in Light of the Values Underlying the Charter
    (i)      Review of the Decisions Dealing With the Issue

**83**     This Court first considered the application of the Charter to the common law in Dolphin Delivery, supra. In that case, the issue was whether an injunction to restrain secondary picketing violated the Charter freedom of expression. It was held that, pursuant to s. 32(1) of the Charter, a cause of action could only be based upon the Charter when particular government action was impugned. Therefore, the constitutionality of the common law could be scrutinized in those situations where a case involved government action which was authorized or justified on the basis of a common law rule which allegedly infringed a Charter right. However, Dolphin Delivery, supra, also held that the common law could be subjected to Charter scrutiny in the absence of government action. McIntyre J. wrote, at pp. 592-93, that, in light of s. 52(1) of the Constitution Act, 1982, "there can be no doubt" that the Charter, applies to the common law:

> The English text provides that "any law that is inconsistent with the provisions of the Constitution is, to the extent of the inconsistency, of no force or effect". If this language is not broad enough to include the common law, it should be observed as well that the French text adds strong support to this conclusion in its employment of the words "elle rend inopérantes les dispositions incompatibles de tout autre règle de droit". . . . To adopt a construction of s. 52(1) which would exclude from Charter application the whole body of the common law which in great part governs the rights and obligations of the individuals in society, would be wholly unrealistic and contrary to the clear language employed in s. 52(1) of the Act. [Emphasis in Dolphin Delivery.]

In emphasizing that the common law should develop in a manner consistent with Charter principles, a distinction was drawn between private litigants founding a cause of action on the Charter and judges exercising their inherent jurisdiction to develop the common law. At page 603 this was written:

> Where, however, private party "A" sues private party "B" relying on the common law and where no act of government is relied upon to support the action, the Charter will not apply. I should make it clear, however, that this is a distinct issue from the question whether the

Exhibit 5

judiciary ought to apply and develop the principles of the common law in a manner consistent with the fundamental values enshrined in the Constitution. The answer to this question must be in the affirmative. In this sense, then, the Charter is far from irrelevant to private litigants whose disputes fall to be decided at common law. But this is different from the proposition that one private party owes a constitutional duty to another, which proposition underlies the purported assertion of Charter causes of action or Charter defences between individuals. [Emphasis added.]

**84**   Since 1986, this Court has subjected the common law to Charter scrutiny in a number of situations where government action was based upon a common law rule: B.C.G.E.U. v. British Columbia (Attorney General), [1988] 2 S.C.R. 214; R. v. Swain, [1991] 1 S.C.R. 933; R. v. Salituro, [1991] 3 S.C.R. 654; and Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835. However, Dolphin Delivery, supra, remains the only case which has closely examined the application of the Charter in the context of purely private litigation. Nevertheless, it is helpful to review the different approaches which have been suggested in those cases in order to better appreciate which principles should properly apply in cases of private litigation.

**85**   In R. v. Salituro, supra, the Crown called the accused's estranged wife as a witness. The common law rule prohibiting spouses from testifying against each other was found to be inconsistent with developing social values and with the values enshrined in the Charter. At page 670, Iacobucci J., writing for the Court, held:

Judges can and should adapt the common law to reflect the changing social, moral and economic fabric of the country. Judges should not be quick to perpetuate rules whose social foundation has long since disappeared. Nonetheless, there are significant constraints on the power of the judiciary to change the law. As McLachlin J. indicated in Watkins, supra, in a constitutional democracy such as ours it is the legislature and not the courts which has the major responsibility for law reform; and for any changes to the law which may have complex ramifications, however necessary or desirable such changes may be, they should be left to the legislature. The judiciary should confine itself to those incremental changes which are necessary to keep the common law in step with the dynamic and evolving fabric of our society.

Further, at p. 675 this Court held:

Where the principles underlying a common law rule are out of step with the values enshrined in the Charter, the courts should scrutinize the rule closely. If it is possible to change the common law rule so as to make it consistent with Charter values, without upsetting the proper balance between judicial and legislative action that I have referred to above, then the rule ought to be changed.

**86**   Unlike the present appeal and the decisions of this Court in B.C.G.E.U., Swain, and Dagenais, the common law rule in Salituro was not alleged to infringe a specific Charter right. Rather, it was alleged to be inconsistent with those fundamental values that provide the foundation for the Charter. Although the Court in Salituro considered whether Parliament had, through the Evidence Act, intended to preserve the common law rule, it did not undertake an analysis similar to that which would be required under s. 1 to determine if the Charter breach was justifiable. Rather, it proceeded to balance, in a broad and flexible manner, the conflicting values. The reasons examined the origins of the impugned common law rule and the justifications which had been raised for upholding it. These concerns were weighed against the Charter's recognition of the equality of women and, more specifically, against the concept of human dignity which inspires the Charter. It was held that the values which were set out in the common law rule did not represent the values of today's society which are reflected in the provisions of the Charter.

**87**   In B.C.G.E.U., supra, McEachern C.J.B.C. on his own motion issued an injunction against a union picketing in front of the courthouse: [1983] 6 W.W.R. 640. It was held that the common law rule giving rise to the picketing injunction breached s. 2(b). The breach was then found to be justified following a traditional s. 1 analysis.

http://web2.westlaw.com/result/PrintDoc.do?jobHa...

**88**     Subsequently, in R. v. Swain, supra, Lamer C.J. observed that the s. 1 analysis, which has evolved since R. v. Oakes, [1986] 1 S.C.R. 103, may not always provide the appropriate framework by which to evaluate the justifications for maintaining a common law rule. In R. v. Swain, the Crown raised the insanity defence, over objections by the accused, on the basis of the common law rule which authorized such a procedure. That rule was found to violate s. 7 of the Charter. At pages 978-79, Lamer C.J. held:

> Before turning to s. 1, however, I wish to point out that because this appeal involves a Charter challenge to a common law, judge-made rule, the Charter analysis involves somewhat different considerations than would apply to a challenge to a legislative provision. For example, having found that the existing common law rule limits an accused's rights under s. 7 of the Charter, it may not be strictly necessary to go on to consider the application of s. 1. Having come to the conclusion that the common law rule enunciated by the Ontario Court of Appeal limits an accused's right to liberty in a manner which does not accord with the principles of fundamental justice, it could, in my view, be appropriate to consider at this stage whether an alternative common law rule could be fashioned which would not be contrary to the principles of fundamental justice.

> If a new common law rule could be enunciated which would not interfere with an accused person's right to have control over the conduct of his or her defence, I can see no conceptual problem with the Court's simply enunciating such a rule to take the place of the old rule, without considering whether the old rule could nonetheless be upheld under s. 1 of the Charter. Given that the common law rule was fashioned by judges and not by Parliament or a legislature, judicial deference to elected bodies is not an issue. If it is possible to reformulate a common law rule so that it will not conflict with the principles of fundamental justice, such a reformulation should be undertaken. Of course, if it were not possible to reformulate the common law rule so as to avoid an infringement of a constitutionally protected right or freedom, it would be necessary for the Court to consider whether the common law rule could be upheld as a reasonable limit under s. 1 of the Charter.

Nevertheless, in R. v. Swain, the formal s. 1 analysis was undertaken since Oakes, supra, provided a familiar structure for analysis, the constitutional questions were stated with s. 1 in mind and the Court had the benefit of extensive argument on s. 1.

**89**     Finally, in Dagenais, supra, the CBC challenged a publication ban which prevented them from airing one of their programmes. It was held that where the common law rule on publication bans conflicted with Charter values, the common law rule must be varied in such a manner as to enable the Court to consider both the objective of a publication ban and the proportionality of the ban's effect on protected Charter rights. Without adopting a formal s. 1 analysis, it was held that this approach "clearly reflects the substance of the Oakes test applicable when assessing legislation under s. 1 of the Charter" (p. 878).

**90**     In light of these cases, then, it remains to be determined what approach should be followed when, in the context of private litigation with no government action involved, a common law rule is alleged to be inconsistent with the Charter.

(ii)     Approach That Should Be Followed

**91**     It is clear from Dolphin Delivery, supra, that the common law must be interpreted in a manner which is consistent with Charter principles. This obligation is simply a manifestation of the inherent jurisdiction of the courts to modify or extend the common law in order to comply with prevailing social conditions and values. As was said in Salituro, supra, at p. 678:

> The courts are the custodians of the common law, and it is their duty to see that the common law reflects the emerging needs and values of our society.

**92**     Historically, the common law evolved as a result of the courts making those incremental changes which were necessary in order to make the law comply with current societal values. The Charter represents a restatement of the fundamental values which guide and shape our democratic society and our legal system. It follows that it is appropriate for the courts to make such incremental revisions to the common law as may be necessary to have it comply with the values enunciated in the Charter.

**93**     When determining how the Charter applies to the common law, it is important to distinguish between those cases in which the constitutionality of government action is challenged, and those in which there is no government action involved. It is important not to import into private litigation the analysis which applies in cases involving government action.

**94**     In Dolphin Delivery, supra, it was noted that the Charter sets out those specific constitutional duties which the state owes to its citizens. When government action is challenged, whether it is based on legislation or the common law, the cause of action is founded upon a Charter right. The claimant alleges that the state has breached its constitutional duty. The state, in turn, must justify that breach. While criminal cases present the prime example of government action, challenges to government action can also arise in civil cases. The state's obligation to uphold its constitutional duties is no less pressing in the civil sphere than in the criminal. The two cases of B.C.G.E.U., supra, and Dagenais, supra, present a very specific type of "government action" in the civil context. In both cases, the Court was called upon to consider the operations of the Court and to determine the extent of its own jurisdiction to consider matters which were essentially public in nature. The cases did not involve strictly private litigation. Therefore, they must be approached with caution when considering what analysis should be applied in purely private civil litigation.

**95**     Private parties owe each other no constitutional duties and cannot found their cause of action upon a Charter right. The party challenging the common law cannot allege that the common law violates a Charter right because, quite simply, Charter rights do not exist in the absence of state action. The most that the private litigant can do is argue that the common law is inconsistent with Charter values. It is very important to draw this distinction between Charter rights and Charter values. Care must be taken not to expand the application of the Charter beyond that established by s. 32(1), either by creating new causes of action, or by subjecting all court orders to Charter scrutiny. Therefore, in the context of civil litigation involving only private parties, the Charter will "apply" to the common law only to the extent that the common law is found to be inconsistent with Charter values.

**96**     Courts have traditionally been cautious regarding the extent to which they will amend the common law. Similarly, they must not go further than is necessary when taking Charter values into account. Far-reaching changes to the common law must be left to the legislature.

**97**     When the common law is in conflict with Charter values, how should the competing principles be balanced? In my view, a traditional s. 1 framework for justification is not appropriate. It must be remembered that the Charter "challenge" in a case involving private litigants does not allege the violation of a Charter right. It addresses a conflict between principles. Therefore, the balancing must be more flexible than the traditional s. 1 analysis undertaken in cases involving governmental action cases. Charter values, framed in general terms, should be weighed against the principles which underlie the common law. The Charter values will then provide the guidelines for any modification to the common law which the court feels is necessary.

**98**     Finally, the division of onus which normally operates in a Charter challenge to government action should not be applicable in a private litigation Charter "challenge" to the common law. This is not a situation in which one party must prove a prima facie violation of a right while the other bears the onus of defending it. Rather, the party who is alleging that the common law is inconsistent with the Charter should bear the onus of proving both that the common law fails to comply with Charter values and that, when these values are balanced, the common law should be modified. In the ordinary situation, where government action is said to violate a Charter right, it is appropriate that the government undertake the justification for the impugned statute or common law rule.

However, the situation is very different where two private parties are involved in a civil suit. One party will have brought the action on the basis of the prevailing common law which may have a long history of acceptance in the community. That party should be able to rely upon that law and should not be placed in the position of having to defend it. It is up to the

party challenging the common law to bear the burden of proving not only that the common law is inconsistent with Charter values but also that its provisions cannot be justified.

**99**    With that background, let us first consider the common law of defamation in light of the values underlying the Charter.

(b)    The Nature of Actions for Defamation: The Values to Be Balanced

**100**    There can be no doubt that in libel cases the twin values of reputation and freedom of expression will clash. As Edgerton J. stated in Sweeney v. Patterson, 128 F.2d 457 (D.C. Cir. 1942), at p. 458, cert. denied 317 U.S. 678 (1942), whatever is "added to the field of libel is taken from the field of free debate". The real question, however, is whether the common law strikes an appropriate balance between the two. Let us consider the nature of each of these values.

(i)    Freedom of Expression

**101**    Much has been written of the great importance of free speech. Without this freedom to express ideas and to criticize the operation of institutions and the conduct of individual members of government agencies, democratic forms of government would wither and die. See, for example, Reference re Alberta Statutes, [1938] S.C.R. 100, at p. 133; Switzman v. Elbling, [1957] S.C.R. 285, at p. 306; and Boucher v. The King, [1951] S.C.R. 265, at p. 326. More recently, in Edmonton Journal, supra, at p. 1336, it was said:

> It is difficult to imagine a guaranteed right more important to a democratic society than freedom of expression. Indeed a democracy cannot exist without that freedom to express new ideas and to put forward opinions about the functioning of public institutions. The concept of free and uninhibited speech permeates all truly democratic societies and institutions. The vital importance of the concept cannot be over-emphasized.

**102**    However, freedom of expression has never been recognized as an absolute right. Duff C.J. emphasized this point in Reference re Alberta Statutes, supra, at p. 133:

> The right of public discussion is, of course, subject to legal restrictions; those based upon considerations of decency and public order, and others conceived for the protection of various private and public interests with which, for example, the laws of defamation and sedition are concerned. In a word, freedom of discussion means . . . "freedom governed by law." [Emphasis added.]

See also Cherneskey v. Armadale Publishers Ltd., [1979] 1 S.C.R. 1067, at pp. 1072 and 1091.

**103**    Similar reasoning has been applied in cases argued under the Charter. Although a Charter right is defined broadly, generally without internal limits, the Charter recognizes, under s. 1, that social values will at times conflict and that some limits must be placed even on fundamental rights. As La Forest J. explained in United States of America v. Cotroni, [1989] 1 S.C.R. 1469, at p. 1489, this Court has adopted a flexible approach to measuring the constitutionality of impugned provisions wherein "the underlying values [of the Charter] must be sensitively weighed in a particular context against other values of a free and democratic society . . .".

**104**    In R. v. Keegstra, [1990] 3 S.C.R. 697, for example, s. 319(2) of the Criminal Code was found to be justified as a reasonable limit on the appellant's freedom to spread falsehoods relating to the Holocaust and thus to promote hatred against an identifiable group. Dickson C.J. adopted the contextual approach to s. 1 and concluded that, since hate propaganda contributed little to the values which underlie the right enshrined under s. 2(b), namely the quest for truth, the promotion of individual self-development, and participation in the community, a restriction on this type of expression might be easier to justify than would be the case with other kinds of expression.

**105**   In R. v. Butler, [1992] 1 S.C.R. 452, the obscenity provisions of the Criminal Code, s. 163, were questioned. It was held, under the s. 1 analysis, that pornography could not stand on an equal footing with other kinds of expression which directly engage the "core" values of freedom of expression. Further, it was found that the fact that the targeted material was expression motivated by economic profit more readily justified the imposition of restrictions.

**106**   Certainly, defamatory statements are very tenuously related to the core values which underlie s. 2(b). They are inimical to the search for truth. False and injurious statements cannot enhance self-development. Nor can it ever be said that they lead to healthy participation in the affairs of the community. Indeed, they are detrimental to the advancement of these values and harmful to the interests of a free and democratic society. This concept was accepted in Globe and Mail Ltd. v. Boland, [1960] S.C.R. 203, at pp. 208-9, where it was held that an extension of the qualified privilege to the publication of defamatory statements concerning the fitness for office of a candidate for election would be "harmful to that 'common convenience and welfare of society'". Reliance was placed upon the text Gatley on Libel and Slander in a Civil Action: With Precedents of Pleadings (4th ed. 1953), at p. 254, wherein the author stated the following:

> It would tend to deter sensitive and honourable men from seeking public positions of trust and responsibility, and leave them open to others who have no respect for their reputation.

See also Derrickson v. Tomat (1992), 88 D.L.R. (4th) 401 (B.C.C.A.), at p. 408.

       (ii)    The Reputation of the Individual

**107**   The other value to be balanced in a defamation action is the protection of the reputation of the individual. Although much has very properly been said and written about the importance of freedom of expression, little has been written of the importance of reputation. Yet, to most people, their good reputation is to be cherished above all. A good reputation is closely related to the innate worthiness and dignity of the individual. It is an attribute that must, just as much as freedom of expression, be protected by society's laws. In order to undertake the balancing required by this case, something must be said about the value of reputation.

**108**   Democracy has always recognized and cherished the fundamental importance of an individual. That importance must, in turn, be based upon the good repute of a person. It is that good repute which enhances an individual's sense of worth and value. False allegations can so very quickly and completely destroy a good reputation. A reputation tarnished by libel can seldom regain its former lustre. A democratic society, therefore, has an interest in ensuring that its members can enjoy and protect their good reputation so long as it is merited.

**109**   From the earliest times, society has recognized the potential for tragic damage that can be occasioned by a false statement made about a person. This is evident in the Bible, the Mosaic Code and the Talmud. As the author Carter-Ruck, in Carter-Ruck on Libel and Slander (4th ed. 1992), explains at p. 17:

> The earliest evidence in recorded history of any sanction for defamatory statements is in the Mosaic code.

> In Exodus XXII 28 we find 'Thou shalt not revile the gods nor curse the ruler of thy people' and in Exodus XXIII 1 'Thou shalt not raise a false report: put not thine hand with the wicked to be an unrighteous witness'. There is also a condemnation of rumourmongers in Leviticus XIX 16 'Thou shalt not go up and down as a talebearer among thy people'.

**110**   To make false statements which are likely to injure the reputation of another has always been regarded as a serious offence. During the Roman era, the punishment for libel varied from the loss of the right to make a will, to imprisonment, exile for life, or forfeiture of property. In the case of slander, a person could be made liable for payment of damages.

**111**   It was decreed by the Teutons in the Lex Salica that if a man called another a "wolf" or a "hare", he must pay the sum of three shillings; for a false imputation of unchastity in a woman the penalty was 45 shillings. In the Normal

Costumal, if people falsely called another "thief" or "manslayer", they had to pay damages and, holding their nose with their fingers, publicly confess themselves a liar.

**112**    With the separation of ecclesiastical and secular courts by the decree of William I following the Norman conquest, the Church assumed spiritual jurisdiction over defamatory language, which was regarded as a sin. The Church "stayed the tongue of the defamer at once pro custodia morum of the community, and pro salute anim ae of the delinquent". See V. V. Veeder, "The History and Theory of the Law of Defamation" (1903), 3 Colum. L. Rev. 546, at p. 551.

**113**    By the 16th century, the common law action for defamation became commonplace. This was in no small measure due to the efforts of the Star Chamber to eradicate duelling, the favoured method of vindication. The Star Chamber even went so far as to punish the sending of challenges. However, when it proscribed this avenue of recourse to injured parties, the Star Chamber was compelled to widen its original jurisdiction over seditious libel to include ordinary defamation.

**114**    The modern law of libel is said to have arisen out of the case De Libellis Famosis (1605), 5 Co. Rep. 125a, 77 E.R. 250. There, the late Archbishop of Canterbury and the then Bishop of London were alleged to have been "traduced and scandalized" by an anonymous person. As reported by Coke, it was ruled that all libels, even those against private individuals, ought to be sanctioned severely by indictment at common law or in the Star Chamber. The reasoning behind this was that the libel could incite "all those of the same family, kindred, or society to revenge, and so tends per consequens to quarrels and breach of the peace" (p. 251). It was not necessary to show publication to a third person and it made no difference whether the libel was true or whether the plaintiff had a good or bad reputation. Eventually, truth was recognized as a defence in cases involving ordinary defamation.

**115**    It was not until the late 17th century that the distinction between libel and slander was drawn by Chief Baron Hale in King v. Lake (1679), Hardres 470, 145 E.R. 552, where it was held that words spoken, without more, would not be actionable, with a few exceptions. Once they were reduced to writing, however, malice would be presumed and an action would lie.

**116**    The character of the law relating to libel and slander in the 20th century is essentially the product of its historical development up to the 17th century, subject to a few refinements such as the introduction and recognition of the defences of privilege and fair comment. From the foregoing we can see that a central theme through the ages has been that the reputation of the individual is of fundamental importance. As Professor R. E. Brown writes in The Law of Defamation in Canada (2nd ed. 1994), at p. 1-4:

> "(N)o system of civil law can fail to take some account of the right to have one's reputation remain untarnished by defamation." Some form of legal or social constraints on defamatory publications "are to be found in all stages of civilization, however imperfect, remote, and proximate to barbarism." [Footnotes omitted.]

**117**    Though the law of defamation no longer serves as a bulwark against the duel and blood feud, the protection of reputation remains of vital importance. As David Lepofsky suggests in "Making Sense of the Libel Chill Debate: Do Libel Laws 'Chill' the Exercise of Freedom of Expression?" (1994), 4 N.J.C.L. 169, at p. 197, reputation is the "fundamental foundation on which people are able to interact with each other in social environments". At the same time, it serves the equally or perhaps more fundamentally important purpose of fostering our self-image and sense of self-worth. This sentiment was eloquently expressed by Stewart J. in Rosenblatt v. Baer, 383 U.S. 75 (1966), who stated at p. 92:

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.

**118**    In the present case, consideration must be given to the particular significance reputation has for a lawyer. The reputation of a lawyer is of paramount importance to clients, to other members of the profession and to the judiciary. A lawyer's practice is founded and maintained upon the basis of a good reputation for professional integrity and trustworthiness. It is the cornerstone of a lawyer's professional life. Even if endowed with outstanding talent and

indefatigable diligence, a lawyer cannot survive without a good reputation. In his essay entitled "The Lawyer's Duty to Himself and the Code of Professional Conduct" (1993), 27 L. Soc. Gaz. 119, David Hawreluk described the importance of a reputation for integrity. At page 121, he quoted Lord Birkett on the subject:

> The advocate has a duty to his client, a duty to the Court, and a duty to the State; but he has above all a duty to himself and he shall be, as far as lies in his power, a man of integrity. No profession calls for higher standards of honour and uprightness, and no profession, perhaps, offers greater temptations to forsake them; but whatever gifts an advocate may possess, be they never so dazzling, without the supreme qualification of an inner integrity he will fall short of the highest . . .

**119**   Similarly, Esson J. in *Vogel v. Canadian Broadcasting Corp.*, [1982] 3 W.W.R. 97 (B.C.S.C.), at pp. 177-78 stated:

> The qualities required of a lawyer who aspires to the highest level of his profession are various, but one is essential. That is a reputation for integrity. The programs were a massive attack upon that reputation. The harm done to it can never be wholly undone, and therefore the stigma so unfairly created will always be with the plaintiff.

> When the details of the Vogel affair have faded from memory, what will remain in the minds of many people throughout Canada is a lurking recollection that he was the centre of a scandal which arose out of his conduct in office.

**120**   Although it is not specifically mentioned in the Charter, the good reputation of the individual represents and reflects the innate dignity of the individual, a concept which underlies all the Charter rights. It follows that the protection of the good reputation of an individual is of fundamental importance to our democratic society.

**121**   Further, reputation is intimately related to the right to privacy which has been accorded constitutional protection. As La Forest J. wrote in *R. v. Dyment*, [1988] 2 S.C.R. 417, at p. 427, privacy, including informational privacy, is "[g]rounded in man's physical and moral autonomy" and "is essential for the well-being of the individual". The publication of defamatory comments constitutes an invasion of the individual's personal privacy and is an affront to that person's dignity. The protection of a person's reputation is indeed worthy of protection in our democratic society and must be carefully balanced against the equally important right of freedom of expression. In order to undertake the requisite balancing of values, let us first review the change to the existing common law proposed by the appellants.

>          (c)      The Proposed Remedy: Adopting the New York Times v. Sullivan "Actual Malice" Rule

**122**   In *New York Times v. Sullivan*, supra, the United States Supreme Court ruled that the existing common law of defamation violated the guarantee of free speech under the First Amendment of the Constitution. It held that the citizen's right to criticize government officials is of such tremendous importance in a democratic society that it can only be accommodated through the tolerance of speech which may eventually be determined to contain falsehoods. The solution adopted was to do away with the common law presumptions of falsity and malice and place the onus on the plaintiff to prove that, at the time the defamatory statements were made, the defendant either knew them to be false or was reckless as to whether they were or not.

**123**   At the outset, it is important to understand the social and political context of the times which undoubtedly influenced the decision in *New York Times v. Sullivan*, supra. The impugned publication was an editorial advertisement, placed in the appellant's newspaper, entitled "Heed Their Rising Voices". It criticized the widespread segregation which continued to dominate life in the southern states in the late 1950s and early 1960s. Prominent and well respected individuals, including Mrs. Eleanor Roosevelt, lent their name to the advertisement. It communicated information, recited grievances, protested abuses and sought financial support. The group or movement sponsoring the advertisement was characterized by Brennan J. as one "whose existence and objectives are matters of the highest public interest and concern"

Exhibit 5

http://web2.westlaw.com/result/documenttext/PrintDoc.do?jobHa...

(p. 266). Black J. described the controversy at the heart of the suit in the following terms at p. 294:

> One of the acute and highly emotional issues in this country arises out of efforts of many people, even including some public officials, to continue state-commanded segregation of races in the public schools and other public places, despite our several holdings that such a state practice is forbidden by the Fourteenth Amendment.

**124**   The advertisement did not mention by name the plaintiff, who was a white elected commissioner from Montgomery, Alabama. Only 35 copies of the edition of the New York Times which carried that advertisement were circulated in Montgomery, and only 394 were circulated in the entire state of Alabama. The trial took place in 1960, in a segregated court room in Montgomery, before a white judge and all-white jury. Damages of $500,000 U.S. were awarded. This would be the current equivalent in Canada of approximately $3.5 million.

**125**   The Supreme Court, in overturning the verdict, clearly perceived the libel action as a very serious attack not only on the freedom of the press but, more particularly, on those who favoured desegregation in the southern United States. It was concerned that such a large damage award could threaten the very existence of, in Black J.'s words, "an American press virile enough to publish unpopular views on public affairs and bold enough to criticize the conduct of public officials" (p. 294). This concern was intensified by the fact that a second libel verdict of $500,000 U.S. had already been awarded to another Montgomery commissioner against the New York Times. In addition, 11 other libel suits, arising out of the same advertisement, were pending against the newspaper.

**126**   Another motivating factor for this radical change to the common law was the American jurisprudence to the effect that the statements of public officials which came "within the outer perimeter of their duties" were privileged unless actual malice was proved. The rationale behind this privilege was that the threat of damage suits would "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties": Barr v. Matteo, 360 U.S. 564 (1959), at p. 571. The Supreme Court in the Sullivan decision held that analogous considerations supported the protection which it accorded to critics of the government.

> (d)   Critiques of the "Actual Malice" Rule
> (i)   Comments on the Decision in the United States

**127**   The "actual malice" rule has been severely criticized by American judges and academic writers. It has been suggested that the decision was overly influenced by the dramatic facts underlying the dispute and has not stood the test of time. See, for example, R. A. Epstein, "Was New York Times v. Sullivan Wrong?" (1986), 53 U. Chi. L. Rev. 782, at p. 787; Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749 (1985), at p. 767. Commentators have pointed out that, far from being deterred by the decision, libel actions have, in the post-Sullivan era, increased in both number and size of awards. They have, in this way, mirrored the direction taken in other tort actions. See Epstein, supra; R. P. Bezanson, "Libel Law and the Realities of Litigation: Setting the Record Straight" (1985), 71 Iowa L. Rev. 226, at pp. 228-29. It has been said that the New York Times v. Sullivan, decision has put great pressure on the fact-finding process since courts are now required to make subjective determinations as to who is a public figure and what is a matter of legitimate public concern. See Christie, supra, at pp. 63-64.

**128**   Perhaps most importantly, it has been argued the decision has shifted the focus of defamation suits away from their original, essential purpose. Rather than deciding upon the truth of the impugned statement, courts in the U.S. now determine whether the defendant was negligent. Several unfortunate results flow from this shift in focus. First, it may deny the plaintiff the opportunity to establish the falsity of the defamatory statements and to determine the consequent reputational harm. This is particularly true in cases where the falsity is not seriously contested. See Bezanson, supra, at p. 227.

**129**   Second, it necessitates a detailed inquiry into matters of media procedure. This, in turn, increases the length of discoveries and of the trial which may actually increase, rather than decrease, the threat to speech interests. See D. A. Barrett, "Declaratory Judgments for Libel: A Better Alternative" (1986), 74 Cal. L. Rev. 847, at p. 855.

Exhibit 5

**130**    Third, it dramatically increases the cost of litigation. This will often leave a plaintiff who has limited funds without legal recourse. See P. N. Leval, "The No-Money, No-Fault Libel Suit: Keeping Sullivan in its Proper Place" (1988), 101 Harv. L. Rev. 1287, at p. 1288; A. Lewis, "New York Times v. Sullivan Reconsidered: Time to Return to 'The Central Meaning of the First Amendment'" (1983), 83 Colum. L. Rev. 603; M. London, "The 'Muzzled Media': Constitutional Crisis or Product Liability Scam?" in At What Price? Libel Law and Freedom of the Press (1993), at pp. 17-20.

**131**    Fourth, the fact that the dissemination of falsehoods is protected is said to exact a major social cost by deprecating truth in public discourse. See L. C. Bollinger, "The End of New York Times v Sullivan: Reflections on Masson v New Yorker Magazine", [1991] Sup. Ct. Rev. 1, at p. 6; J. A. Barron, "Access to the Press -- A New First Amendment Right" (1966-67), 80 Harv. L. Rev. 1641, at pp. 1657-58.

**132**    A number of jurists in the United States have advocated a reconsideration of the New York Times v. Sullivan standard. These include one of the justices of the Supreme Court who participated in that decision. In Dun & Bradstreet, Inc., supra, White J. stated, in a minority concurring opinion with which Burger C.J. concurred on this point, that he had "become convinced that the Court struck an improvident balance in the New York Times case between the public's interest in being fully informed about public officials and public affairs and the competing interest of those who have been defamed in vindicating their reputation" (p. 767). He went on to state at pp. 767-69:

> In a country like ours, where the people purport to be able to govern themselves through their elected representatives, adequate information about their government is of transcendent importance. That flow of intelligence deserves full First Amendment protection. Criticism and assessment of the performance of public officials and of government in general are not subject to penalties imposed by law. But these First Amendment values are not at all served by circulating false statements of fact about public officials. On the contrary, erroneous information frustrates these values. They are even more disserved when the statements falsely impugn the honesty of those men and women and hence lessen the confidence in government. As the Court said in Gertz: "(T)here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." . . . Yet in New York Times cases, the public official's complaint will be dismissed unless he alleges and makes out a jury case of a knowing or reckless falsehood. Absent such proof, there will be no jury verdict or judgment of any kind in his favor, even if the challenged publication is admittedly false. The lie will stand, and the public continue to be misinformed about public matters. . . . Furthermore, when the plaintiff loses, the jury will likely return a general verdict and there will be no judgment that the publication was false, even though it was without foundation in reality. The public is left to conclude that the challenged statement was true after all. Their only chance of being accurately informed is measured by the public official's ability himself to counter the lie, unaided by the courts. That is a decidedly weak reed to depend on for the vindication of First Amendment interests . . .

> Also, by leaving the lie uncorrected, the New York Times rule plainly leaves the public official without a remedy for the damage to his reputation. Yet the Court has observed that the individual's right to the protection of his own good name is a basic consideration of our constitutional system, reflecting "'our basic concept of the essential dignity and worth of every human being -- a concept at the root of any decent system of ordered liberty.'" . . .

> The New York Times rule thus countenances two evils:

> first, the stream of information about public officials and public affairs is polluted and often remains polluted by false information; and second, the reputation and professional life of the defeated plaintiff may be destroyed by falsehoods that might have been avoided with a

reasonable effort to investigate the facts. In terms of the First Amendment and reputational interests at stake, these seem grossly perverse results. [Emphasis added.]

**133**   In the subsequent case of Coughlin v. Westinghouse Broadcasting & Cable, Inc., 476 U.S. 1187 (1986), the majority of the United States Supreme Court refused to grant certiorari. Burger C.J. and Rehnquist J. dissented because of their view that the court should re-examine New York Times v. Sullivan, supra, and "give plenary attention to this important issue" (p. 1187).

(ii)   Consideration of the Actual Malice Rule in the United Kingdom

**134**   The courts in England have refused to adopt the "actual malice" standard. In Derbyshire County Council v. Times Newspapers Ltd., [1993] 1 All E.R. 1011, the House of Lords considered an action brought by a municipal council against the publisher of a Sunday newspaper. The claim for damages, which was denied, arose from articles concerning the authority's management of its superannuation fund. In his reasons, Lord Keith stated that public interest considerations similar to those underlying the New York Times v. Sullivan, supra, decision were involved in that it was "of the highest public importance that a democratically elected governmental body, or indeed any governmental body, should be open to uninhibited public criticism" (p. 1017). However, the appropriateness of the "actual malice" standard was not considered and it was not incorporated into the law of England. In fact, Lord Keith stated that if the individual reputation of any of the local councillors had been wrongly damaged by the impugned publication, they could have brought an action for defamation in their personal capacity.

(iii)   The Australian Position on Actual Malice

**135**   The Australian case of Theophanous v. Herald & Weekly Times Ltd. (1994), 124 A.L.R. 1 (H.C.), considered an action brought by a member of that country's House of Representatives in response to a letter to the editor of a local newspaper which was critical of his views. Although a plurality of the seven judges sitting on the High Court held that the existing law of defamation curtailed the constitutionally protected right to political discussion, it rejected the adoption of the "actual malice" standard, stating at pp. 22-23:

Even assuming that, in conformity with Sullivan, the test is confined to plaintiffs who are public officials, in our view it gives inadequate protection to reputation. . . .

. . . the protection of free communication does not necessitate such a subordination of the protection of individual reputation as appears to have occurred in the United States.

(iv)   The Position Taken by International Law Reform Commissions

**136**   International law reform organizations have also criticized the New York Times v. Sullivan rule. The Australian Law Reform Commission's Report No. 11, Unfair Publication: Defamation and Privacy (the Kirby Committee Report) (1979), criticized the concept of "public official" on the basis that "a minor elected official or public servant [would be] in a more vulnerable position than a prominent businessman" (p. 252). The United Kingdom Report of the Committee on Defamation (the Faulks Committee Report) (1975), held that the rule "would in many cases deny a just remedy to defamed persons" (p. 169). Finally, the Irish Law Reform Commission's Report on the Civil Law of Defamation (the Keane Final Report) (1991), stated that "while the widest possible range of criticism of public officials and public figures is desirable, statements of fact contribute meaningfully to public debate only if they are true" (p. 82).

(e)   Conclusion: Should the Law of Defamation be Modified by Incorporating the Sullivan Principle?

**137**   The New York Times v. Sullivan decision has been criticized by judges and academic writers in the United States and elsewhere. It has not been followed in the United Kingdom or Australia. I can see no reason for adopting it in Canada in an action between private litigants. The law of defamation is essentially aimed at the prohibition of the publication of

injurious false statements. It is the means by which the individual may protect his or her reputation which may well be the most distinguishing feature of his or her character, personality and, perhaps, identity. I simply cannot see that the law of defamation is unduly restrictive or inhibiting. Surely it is not requiring too much of individuals that they ascertain the truth of the allegations they publish. The law of defamation provides for the defences of fair comment and of qualified privilege in appropriate cases. Those who publish statements should assume a reasonable level of responsibility.

**138**    The Canadian Daily Newspaper Association indicated, in its response to A Consultation Draft of the General Limitations Act (September 1991) at p. 3, that the law of libel is a "carefully-crafted regime" which has "functioned fairly for the media and for complainants for many years". Freedom of speech, like any other freedom, is subject to the law and must be balanced against the essential need of the individuals to protect their reputation. The words of Diplock J. in Silkin v. Beaverbrook Newspapers Ltd., [1958] 1 W.L.R. 743, at pp. 745-46, are worth repeating:

> Freedom of speech, like the other fundamental freedoms, is freedom under the law, and over the years the law has maintained a balance between, on the one hand, the right of the individual . . . whether he is in public life or not, to his unsullied reputation if he deserves it, and on the other hand . . . the right of the public . . . to express their views honestly and fearlessly on matters of public interest, even though that involves strong criticism of the conduct of public people.

**139**    None of the factors which prompted the United States Supreme Court to rewrite the law of defamation in America are present in the case at bar. First, this appeal does not involve the media or political commentary about government policies. Thus the issues considered by the High Court of Australia in Theophanous, supra, are also not raised in this case and need not be considered.

**140**    Second, a review of jury verdicts in Canada reveals that there is no danger of numerous large awards threatening the viability of media organizations. Finally, in Canada there is no broad privilege accorded to the public statements of government officials which needs to be counterbalanced by a similar right for private individuals.

**141**    In conclusion, in its application to the parties in this action, the common law of defamation complies with the underlying values of the Charter and there is no need to amend or alter it.

**142**    Consideration must now be given to the submission made on behalf of Morris Manning that the defence of qualified privilege should be expanded to include reports upon pleadings and court documents that have been filed or are at the point of being filed.

>              (f)      Should the Common Law Defence of Qualified Privilege be Expanded to Comply
>                       with Charter Values?

**143**    Qualified privilege attaches to the occasion upon which the communication is made, and not to the communication itself. As Lord Atkinson explained in Adam v. Ward, [1917] A.C. 309 (H.L.), at p. 334:

> . . . a privileged occasion is . . . an occasion where the person who makes a communication has an interest or a duty, legal, social, or moral, to make it to the person to whom it is made, and the person to whom it is so made has a corresponding interest or duty to receive it. This reciprocity is essential.

This passage was quoted with approval in McLoughlin v. Kutasy, [1979] 2 S.C.R. 311, at p. 321.

**144**    The legal effect of the defence of qualified privilege is to rebut the inference, which normally arises from the publication of defamatory words, that they were spoken with malice. Where the occasion is shown to be privileged, the bona fides of the defendant is presumed and the defendant is free to publish, with impunity, remarks which may be defamatory and untrue about the plaintiff. However, the privilege is not absolute and can be defeated if the dominant motive for publishing the statement is actual or express malice. See Horrocks v. Lowe, [1975] A.C. 135 (H.L.), at p. 149.

Exhibit 5

**145**    Malice is commonly understood, in the popular sense, as spite or ill-will. However, it also includes, as Dickson J. (as he then was) pointed out in dissent in Cherneskey, supra, at p. 1099, "any indirect motive or ulterior purpose" that conflicts with the sense of duty or the mutual interest which the occasion created. See, also, Taylor v. Despard, [1956] O.R. 963 (C.A.). Malice may also be established by showing that the defendant spoke dishonestly, or in knowing or reckless disregard for the truth. See McLoughlin, supra, at pp. 323-24, and Netupsky v. Craig, [1973] S.C.R. 55, at pp. 61-62.

**146**    Qualified privilege may also be defeated when the limits of the duty or interest have been exceeded. See The Law of Defamation in Canada, supra, at pp. 13-193 and 13-194; Salmond and Heuston on the Law of Torts (20th ed. 1992), at pp. 166-67. As Loreburn E. stated at pp. 320-21 in Adam v. Ward, supra:

> . . . the fact that an occasion is privileged does not necessarily protect all that is said or written on that occasion. Anything that is not relevant and pertinent to the discharge of the duty or the exercise of the right or the safeguarding of the interest which creates the privilege will not be protected.

**147**    In other words, the information communicated must be reasonably appropriate in the context of the circumstances existing on the occasion when that information was given. For example, in Douglas v. Tucker, [1952] 1 S.C.R. 275, the defendant, during an election campaign, stated that the plaintiff, who was the officer of an investment company, had charged a farmer and his wife an exorbitant rate of interest causing them to lose their property. The plaintiff maintained that the allegation was without foundation. In response, the defendant asserted that the plaintiff was facing a charge of fraud which had been adjourned until after the election. This Court held that the defendant had an interest in responding to the plaintiff's denial, thereby giving rise to an occasion of qualified privilege. However, it ruled that the occasion was exceeded because the defendant's comments went beyond what was "germane and reasonably appropriate" (p. 286).

**148**    In Sun Life Assurance Co. of Canada v. Dalrymple, [1965] S.C.R. 302, the district manager of the defendant insurance company threatened to resign and take the district agents with him. This Court held that it fell within the scope of the privilege for the company to make certain defamatory comments about the plaintiff in order to dissuade its agents from leaving.

**149**    The principal question to be answered in this appeal is whether the recitation of the contents of the notice of motion by Morris Manning took place on an occasion of qualified privilege. If so, it remains to be determined whether or not that privilege was exceeded and thereby defeated.

**150**    The traditional common law rule with respect to reports on documents relating to judicial proceedings is set out in Gatley on Libel and Slander (8th ed. 1981), at p. 252, in these words:

> The rule of law is that, where there are judicial proceedings before a properly constituted judicial tribunal exercising its jurisdiction in open court, then the publication without malice of a fair and accurate report of what takes place before that tribunal is privileged.

See, also, The Law of Defamation in Canada, supra, at pp. 14-35, 14-42; Carter-Ruck on Libel and Slander, supra, at pp. 140-41.

**151**    The rationale behind this rule is that the public has a right to be informed about all aspects of proceedings to which it has the right of access. This is why a news report referring to the contents of any document filed as an exhibit, or admitted as evidence during the course of the proceedings, is privileged. However, the common law immunity was not extended to a report on pleadings or other documents which had not been filed with the court or referred to in open court. Duff C.J. explained the reasoning for this in Gazette Printing Co. v. Shallow (1909), 41 S.C.R. 339, at p. 360:

> The publicity of proceedings involving the conduct of a judicial authority serves the important purposes of impressing those concerned in the administration of justice with a sense of public responsibility, and of affording every member of the community an

opportunity of observing for himself the mode in which the business of the public tribunals is carried on; but no such object would appear to be generally served by applying the privilege to the publication of preliminary statements of claims and defence relating only to private transactions; formulated by the parties themselves; in respect of which no judicial action has been taken, and upon which judicial action may never be invoked. It is only when such preliminary statements or the claims or defences embodied in them form the basis or the subject of some hearing before, or some action by, a court or a judicial officer, that their contents can become the object of any real public concern as touching the public administration of justice.

**152**   In Edmonton Journal, supra, at pp. 1338-40, I noted that the public scrutiny of our courts by the press was fundamentally important in our democratic society and that s. 2(b) protected not only speakers, but listeners as well. This right to report on court proceedings extended to pleadings and court documents filed before trial, since access to these documents served the same societal needs as reporting on trials. Even in private actions, such as those for wrongful dismissal or for personal damages, the public may well have an interest in knowing the kinds of submissions which can be put forward.

**153**   Both societal standards and the legislation have changed with regard to access to court documents. When the qualified privilege rule was set out in Shallow, supra, court documents were not open to the public. Today, the right of access is guaranteed by legislative provision, in this case s. 137(1) of the Courts of Justice Act, R.S.O. 1990, c. C.43. As well, s. 2(b) of the Charter may in some circumstances provide a basis for gaining access to some court documents. However, just as s. 137(1) provides for limitations on the right of access to court documents, so too is the s. 2(b) guarantee subject to reasonable limits that can be demonstrably justified in a free and democratic society. This Court's reasons in Canadian Newspapers Co. v. Canada (Attorney General), [1988] 2 S.C.R. 122, provide an illustration of the kind of restriction that has been upheld in relation to information flowing from court proceedings. In that case, the constitutionality of s. 442(3) of the Criminal Code was upheld. It imposed a publication ban on the identity of a complainant in sexual assault cases (or any information that might disclose her identity) upon the request of that complainant. There is no need to elaborate further on the scope of access, however, since it does not arise on the facts of this case. It is sufficient to observe that, in appropriate circumstances, s. 2(b) may provide the means to gain access to court documents. It follows that the concept of qualified privilege should be modified accordingly.

**154**   The public interest in documents filed with the court is too important to be defeated by the kind of technicality which arose in this case. The record demonstrates that, prior to holding the press conference, Morris Manning had every intention of initiating the contempt action in accordance with the prevailing rules, and had given instructions to this effect. In fact, the proper documents were served and filed the very next morning. The fact that, by some misadventure, the strict procedural requirement of filing the documents had not been fulfilled at the time of the press conference should not defeat the qualified privilege which attached to this occasion.

**155**   This said, it is my conclusion that Morris Manning's conduct far exceeded the legitimate purposes of the occasion. The circumstances of this case called for great restraint in the communication of information concerning the proceedings launched against Casey Hill. As an experienced lawyer, Manning ought to have taken steps to confirm the allegations that were being made. This is particularly true since he should have been aware of the Scientology investigation pertaining to access to the sealed documents. In those circumstances he was duty bound to wait until the investigation was completed before launching such a serious attack on Hill's professional integrity. Manning failed to take either of these reasonable steps. As a result of this failure, the permissible scope of his comments was limited and the qualified privilege which attached to his remarks was defeated.

**156**   The press conference was held on the steps of Osgoode Hall in the presence of representatives from several media organizations. This constituted the widest possible dissemination of grievous allegations of professional misconduct that were yet to be tested in a court of law. His comments were made in language that portrayed Hill in the worst possible light. This was neither necessary nor appropriate in the existing circumstances. While it is not necessary to characterize Manning's conduct as amounting to actual malice, it was certainly high-handed and careless. It exceeded any legitimate purpose the press conference may have served. His conduct, therefore, defeated the qualified privilege that attached to the

http://www.lexisnexis.com/research/retrieve/PrintDoc.do?jobHa...

occasion.

    (B)       Damages

        (1)      The Standard of Appellate Review

**157**    The appellants do not contend that the trial judge made any substantive error in his careful directions to the jury. Thus, there is no question of misdirection of the jury or of its acting upon an improper basis or of any jury consideration given to wrongfully admitted or excluded evidence. The sole issue is whether the quantum of the jury's award can stand.

**158**    Jurors are drawn from the community and speak for their community. When properly instructed, they are uniquely qualified to assess the damages suffered by the plaintiff, who is also a member of their community. This is why, as Robins J.A. noted in Walker v. CFTO Ltd. (1987), 59 O.R. (2d) 104 (C.A.), at p. 110, it is often said that the assessment of damages is "peculiarly the province of the jury". Therefore, an appellate court is not entitled to substitute its own judgment as to the proper award for that of the jury merely because it would have arrived at a different figure.

**159**    The basis upon which an appellate court can act was very clearly enunciated by Robins J.A. in Walker, supra. He stated at p. 110 that the court should consider:

> . . . whether the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate or, put another way, whether the verdict is so exorbitant or so grossly out of proportion to the libel as to shock the court's conscience and sense of justice.

**160**    The history of this action emphasizes the reasonableness of the jury's verdict. It was the appellants who had always insisted upon the jury assessing damages for the libel. When the jury had retired to consider their verdict, they returned after four hours with the sagacious question: "what if any are realistic maximums that have been assessed by society in recent history?". The trial judge prudently sought the advice of counsel on the question. Counsel for the appellants agreed with the trial judge that no guidance could be given to the jury as to the quantum of damages. The jury was so advised. They deliberated for another five hours and returned the verdict which is the subject matter of this appeal.

**161**    There can be no doubt that the decision of the trial judge on this issue, which was concurred in by counsel for the appellants, was correct. In Ontario, there is no statutory provision for giving guidelines to a jury on this issue. It is significant that in 1989, when the Courts of Justice Act was amended (S.O. 1989, c. 67, s. 4) to permit trial judges and counsel to give guidance to juries concerning damage awards in personal injury actions, no provision was made in the Act pertaining to libel actions or any other type of tort action. It would appear, then, that the legislators specifically left the assessment of damages in libel actions to the jury.

**162**    The appellants relied upon the case of Rantzen v. Mirror Group Newspapers (1986) Ltd., [1993] 4 All E.R. 975 (C.A.), to support their position that an appellate court should reduce this award. In that case, however, the English Court of Appeal was acting pursuant to newly enacted legislation. This legislation, passed in 1990, specifically provided that, in cases where the court had the authority to order a new trial on the ground that the damages awarded by a jury were excessive or inadequate, it could, instead of ordering a new trial, substitute a sum for damages which it considered to be proper. This statutory provision led the court in Rantzen to modify its approach to the review of a jury's assessment of damages. Therefore, this case is of little use.

**163**    If guidelines are to be provided to juries, then clearly this is a matter for legislation. In its absence, the standard which must be applied remains that the jury's assessment should not be varied unless it shocks the conscience of the court. With this in mind, let us first consider the jury's assessment of damages.

        (2)      General Damages

Exhibit 5

http://web2.westlaw.com/result/printing/PrintDoc.do?jobHa...

**164**    It has long been held that general damages in defamation cases are presumed from the very publication of the false statement and are awarded at large. See Ley v. Hamilton (1935), 153 L.T. 384 (H.L.), at p. 386. They are, as stated, peculiarly within the province of the jury. These are sound principles that should be followed.

**165**    The consequences which flow from the publication of an injurious false statement are invidious. The television report of the news conference on the steps of Osgoode Hall must have had a lasting and significant effect on all who saw it. They witnessed a prominent lawyer accusing another lawyer of criminal contempt in a setting synonymous with legal affairs and the courts of the province. It will be extremely difficult to correct the impression left with viewers that Casey Hill must have been guilty of unethical and illegal conduct.

**166**    The written words emanating from the news conference must have had an equally devastating impact. All who read the news reports would be left with a lasting impression that Casey Hill has been guilty of misconduct. It would be hard to imagine a more difficult situation for the defamed person to overcome. Every time that person goes to the convenience store, or shopping centre, he will imagine that the people around him still retain the erroneous impression that the false statement is correct. A defamatory statement can seep into the crevasses of the subconscious and lurk there ever ready to spring forth and spread its cancerous evil. The unfortunate impression left by a libel may last a lifetime. Seldom does the defamed person have the opportunity of replying and correcting the record in a manner that will truly remedy the situation. It is members of the community in which the defamed person lives who will be best able to assess the damages. The jury as representative of that community should be free to make an assessment of damages which will provide the plaintiff with a sum of money that clearly demonstrates to the community the vindication of the plaintiff's reputation.

> (a)    Should a Cap be Imposed on Damages in Defamation Cases?

**167**    The appellants contend that there should be a cap placed on general damages in defamation cases just as was done in the personal injury context. In the so-called "trilogy" of Andrews v. Grand & Toy Alberta Ltd., [1978] 2 S.C.R. 229, Arnold v. Teno, [1978] 2 S.C.R. 287, and Thornton v. Board of School Trustees of School District No. 57 (Prince George), [1978] 2 S.C.R. 267, it was held that a plaintiff claiming non-pecuniary damages for personal injuries should not recover more than $100,000.

**168**    In my view, there should not be a cap placed on damages for defamation. First, the injury suffered by a plaintiff as a result of injurious false statements is entirely different from the non-pecuniary damages suffered by a plaintiff in a personal injury case. In the latter case, the plaintiff is compensated for every aspect of the injury suffered: past loss of income and estimated future loss of income, past medical care and estimated cost of future medical care, as well as non-pecuniary damages. Second, at the time the cap was placed on non-pecuniary damages, their assessment had become a very real problem for the courts and for society as a whole. The damages awarded were varying tremendously not only between the provinces but also between different districts of a province. Perhaps as a result of motor vehicle accidents, the problem arose in the courts every day of every week. The size and disparity of assessments was affecting insurance rates and, thus, the cost of operating motor vehicles and, indeed, businesses of all kinds throughout the land. In those circumstances, for that one aspect of recovery, it was appropriate to set a cap.

**169**    A very different situation is presented with respect to libel actions. In these cases, special damages for pecuniary loss are rarely claimed and often exceedingly difficult to prove. Rather, the whole basis for recovery for loss of reputation usually lies in the general damages award. Further, a review of the damage awards over the past nine years reveals no pressing social concern similar to that which confronted the courts at the time the trilogy was decided. From 1987 to 1991, there were only 27 reported libel judgments in Canada, with an average award of $30,000. Subsequent to the decision in this case, from 1992 to 1995, there have been 24 reported libel judgments, with an average award of less than $20,000. This later figure does not include the award in Jill Fishing Ltd. v. Koranda Management Inc., [1993] B.C.J. No. 1861 (S.C.), which involved the assessment of damages for a number of different causes of action. Therefore, there is no indication that a cap is required in libel cases.

**170**    There is a great difference in the nature of the tort of defamation and that of negligence. Defamation is the intentional publication of an injurious false statement. While it is true that an actual intention to defame is not necessary to impose liability on a defendant, the intention to do so is nevertheless inferred from the publication of the defamatory

Exhibit 5

statement. This gives rise to the presumption of malice which may be displaced by the existence of a qualified privilege. Personal injury, on the other hand, results from negligence which does not usually arise from any desire to injure the plaintiff. Thus, if it were known in advance what amount the defamer would be required to pay in damages (as in the personal injury context), a defendant might look upon that sum as the maximum cost of a licence to defame. A cap would operate in a manner that would change the whole character and function of the law of defamation. It would amount to a radical change in policy and direction for the courts.

**171**    The courts in England have unequivocally rejected the comparison of libel and personal injury cases. See, for example, Cassell & Co. v. Broome, [1972] 1 All E.R. 801 (H.L.), at p. 824; Blackshaw v. Lord, [1983] 2 All E.R. 311 (C.A.), at pp. 337, 340; Sutcliffe v. Pressdram Ltd., [1990] 1 All E.R. 269 (C.A.), at pp. 281-82, 289; and Rantzen v. Mirror Group Newspapers (1986) Ltd., supra.

**172**    It is true that in Australia a majority of the High Court held in Carson v. John Fairfax & Sons Ltd. (1993), 113 A.L.R. 577, that some useful reference could be made to personal injury cases in assessing general damages. However, the 4-3 division in the court shows the serious concern which this issue engendered. McHugh J., a member of the minority, wrote (at p. 629):

> Awards in personal injury cases and defamation actions serve different purposes, have different elements and different histories. They are not comparable. I think that it is a mistake to believe that the pain and suffering component of a personal injury award can be isolated from the other components of that award and then compared to an award of compensatory damages in a defamation action.

**173**    In any event, I would observe that, if the trilogy were to be applied, the value of the cap in 1991 would be approximately $250,000. It follows that even if the appellants' contention on this issue was accepted, the general damages of $300,000 assessed by the jury would come very close to the range said to be reasonable by the appellants.

> (b)    Joint Liability for General Damages

**174**    Manning complains that the judge erred in refusing to accept his request that the verdict in general damages be rendered separately. He argues that his liability should be limited to the statement he made at the press conference and should not extend to the subsequent circulation of the notice of motion. The trial judge's error, he argues, contributed to the very high award by the jury. This position cannot be accepted.

**175**    It must be remembered that at trial: a) it was the position of Manning's counsel that Manning and Scientology should be jointly and severally liable for general damages in respect of each of the defamatory statements published by them; b) Scientology admitted that it published each of the defamatory statements at issue in the action; c) Manning admitted that he published each of the defamatory statements with the exception of the notice of motion; and d) the jury specifically found that Manning published the notice of motion.

**176**    Thus, both Manning and Scientology published the notice of motion. It is a well-established principle that all persons who are involved in the commission of a joint tort are jointly and severally liable for the damages caused by that tort. If one person writes a libel, another repeats it, and a third approves what is written, they all have made the defamatory libel. Both the person who originally utters the defamatory statement, and the individual who expresses agreement with it, are liable for the injury. It would thus be inappropriate and wrong in law to have a jury attempt to apportion liability either for general or for special damages between the joint tortfeasors Manning and Scientology. See Lawson v. Burns, [1976] 6 W.W.R. 362 (B.C.S.C.), at pp. 368-69; Gatley on Libel and Slander (8th ed.), supra, at p. 600. However, this comment does not apply to aggravated damages, which are assessed on the basis of the particular malice of each joint tortfeasor.

> (c)    Application of Principles to the Facts Established in this Case

**177**    It cannot be forgotten that at the time the libellous statement was made, Casey Hill was a young lawyer in the

Crown Law office working in the litigation field. For all lawyers their reputation is of paramount importance. Clients depend on the integrity of lawyers, as do colleagues. Judges rely upon commitments and undertakings given to them by counsel. Our whole system of administration of justice depends upon counsel's reputation for integrity. Anything that leads to the tarnishing of a professional reputation can be disastrous for a lawyer. It matters not that subsequent to the publication of the libel, Casey Hill received promotions, was elected a bencher and eventually appointed a trial judge in the General Division of the Court of Ontario. As a lawyer, Hill would have no way of knowing what members of the public, colleagues, other lawyers and judges may have been affected by the dramatic presentation of the allegation that he had been instrumental in breaching an order of the court and that he was guilty of criminal contempt.

**178**   This nagging doubt and sense of hurt must have affected him in every telephone call he made and received in the course of his daily work, in every letter that he sent and received and in every appearance that he made before the courts of the province of Ontario. He would never know who, as a result of the libellous statement, had some lingering suspicion that he was guilty of misconduct which was criminal in nature. He would never know who might have believed that he was a person without integrity who would act criminally in the performance of his duties as a Crown counsel. He could never be certain who would accept the allegation that he was guilty of a criminal breach of trust which was the essential thrust of the libel.

**179**   The publication of the libellous statement was very carefully orchestrated. Members of the press and the television media attended at Osgoode Hall in Toronto to meet two prominent lawyers, Morris Manning and Clayton Ruby. Osgoode Hall is the seat of the Court of Appeal and the permanent residence of the Law Society. The building is used as the background in a great many news reports dealing with important cases emanating from the Court of Appeal. In the minds of the public, it is associated with the law, with the courts and with the justice system. Manning went far beyond a simple explanation of the nature of the notice of motion. He took these very public steps without investigating in any way whether the allegations made were true.

**180**   At the time this press conference was called, Scientology members had been working with the sealed documents for some time and they had not yet discovered any of the sealed documents to have been opened. Yet, Scientology persisted in the publication of this libel against Hill, who was listed in their files as an "enemy".

**181**   Hill movingly described the effect the reading of the press reports of the press conference had upon him and of viewing the television broadcast. He put it in this way:

> I was sick. I was shocked. I understood from reading it that it related to access to the documents. The type of thing that Mr. Ruby and I had been dealing with over many months, and I was just incredulous.
>
> . . .
>
> I was horrified when I saw it. I had had a long history of dealing with counsel for the Church of Scientology. Small problems, medium-sized problems and very serious problems had been raised between us.
>
> Every effort was made to answer those issues as they came up. When I saw the newscast, I realized that there was really nothing I could do to stop the information from getting out. I thought it was false. I thought it was a very dramatic representation . A well-known lawyer as Mr. Manning was -- and he was gowned.
>
> . . .
>
> And he was standing before the High Court. The indication that I had been involved in opening sealed documents and giving permission was totally false. For me, in seeing it, it was equivalent to saying I was a cheat and that I had obstructed the course of justice. It was

an attack on my professional reputation and I had no way of stopping it.

. . .

I also have no way of knowing whether there are people in the community who would be in a position to place some reliance on the fact that regardless of the outcome of the criminal case, Manning, a prominent lawyer, and the Church of Scientology of Toronto, had still expressed a view on September 17th.

**182**   The factors which should be taken into account in assessing general damages are clearly and concisely set out in Gatley on Libel and Slander (8th ed.), supra, at pp. 592-93, in these words:

Section 1. Assessment of Damages

1451. Province of the jury. In an action of libel "the assessment of damages does not depend on any legal rule." The amount of damages is "peculiarly the province of the jury," who in assessing them will naturally be governed by all the circumstances of the particular case.

They are entitled to take into their consideration the conduct of the plaintiff, his position and standing, the nature of the libel, the mode and extent of publication, the absence or refusal of any retraction or apology, and "the whole conduct of the defendant from the time when the libel was published down to the very moment of their verdict. They may take into consideration the conduct of the defendant before action, after action, and in court at the trial of the action," and also, it is submitted, the conduct of his counsel, who cannot shelter his client by taking responsibility for the conduct of the case. They should allow "for the sad truth that no apology, retraction or withdrawal can ever be guaranteed completely to undo the harm it has done or the hurt it has caused." They should also take into account the evidence led in aggravation or mitigation of the damages.

**183**   There will of necessity be some overlapping of the factors to be considered when aggravated damages are assessed. This can be seen from a further reference to the Gatley text at pp. 593-94 where this appears:

1452. Aggravated damages. The conduct of the defendant, his conduct of the case, and his state of mind are thus all matters which the plaintiff may rely on as aggravating the damages. "Moreover, it is very well established that in cases where the damages are at large the jury (or the judge if the award is left to him) can take into account the motives and conduct of the defendant where they aggravate the injury done to the plaintiff. There may be malevolence or spite or the manner of committing the wrong may be such as to injure the plaintiff's proper feelings of dignity and pride. These are matters which the jury can take into account in assessing the appropriate compensation." "In awarding 'aggravated damages' the natural indignation of the court at the injury inflicted on the plaintiff is a perfectly legitimate motive in making a generous, rather than a more moderate award to provide an adequate solatium. . . that is because the injury to the plaintiff is actually greater, and, as the result of the conduct exciting the indignation, demands a more generous solatium."

**184**   In considering and applying the factors pertaining to general damages in this case it will be remembered that the reports in the press were widely circulated and the television broadcast had a wide coverage. The setting and the persons involved gave the coverage an aura of credibility and significance that must have influenced all who saw and read the accounts. The insidious harm of the orchestrated libel was indeed spread widely throughout the community.

**185**   The misconduct of the appellants continued after the first publication. Prior to the commencement of the hearing of

http://web2.westlaw.com/result/printDoc.do?jobHa...

the contempt motion before Cromarty J., Scientology was aware that the allegations it was making against Casey Hill were false. Yet, it persisted with the contempt hearings as did Morris Manning. At the conclusion of the contempt hearing, both appellants were aware of the falsity of the allegations. Nonetheless, when the libel action was instituted, the defence of justification was put forward by both of them. The statement of defence alleging justification or truth of the allegation was open for all the public to see.

Despite their knowledge of its falsity, the appellants continued to publish the libel. Although Manning withdrew the plea of justification, this was only done in the week prior to the commencement of the trial itself. For its part, Scientology did not withdraw its plea of justification until the hearing of the appeal. Finally, the manner in which Hill was cross-examined by the appellants, coupled with the manner in which they presented their position to the jury, in light of their knowledge of the falsity of their allegations, are further aggravating factors to be taken into account.

186    When all these facts are taken into account there is no question that the award of $300,000 by way of general damages was justified in this case.

(d)    Comparison with Other Libel Cases

187    At the outset, I should state that I agree completely with the Court of Appeal that each libel case is unique and that this particular case is in a "class by itself". The assessment of damages in a libel case flows from a particular confluence of the following elements: the nature and circumstances of the publication of the libel, the nature and position of the victim of the libel, the possible effects of the libel statement upon the life of the plaintiff, and the actions and motivations of the defendants. It follows that there is little to be gained from a detailed comparison of libel awards.

(3) Aggravated Damages

(a)    General Principles

188    Aggravated damages may be awarded in circumstances where the defendants' conduct has been particularly high-handed or oppressive, thereby increasing the plaintiff's humiliation and anxiety arising from the libellous statement. The nature of these damages was aptly described by Robins J.A. in Walker v. CFTO Ltd., supra, in these words at p. 111:

> Where the defendant is guilty of insulting, high-handed, spiteful, malicious or oppressive conduct which increases the mental distress -- the humiliation, indignation, anxiety, grief, fear and the like -- suffered by the plaintiff as a result of being defamed, the plaintiff may be entitled to what has come to be known as "aggravated damages".

189    These damages take into account the additional harm caused to the plaintiff's feelings by the defendant's outrageous and malicious conduct. Like general or special damages, they are compensatory in nature. Their assessment requires consideration by the jury of the entire conduct of the defendant prior to the publication of the libel and continuing through to the conclusion of the trial. They represent the expression of natural indignation of right-thinking people arising from the malicious conduct of the defendant.

190    If aggravated damages are to be awarded, there must be a finding that the defendant was motivated by actual malice, which increased the injury to the plaintiff, either by spreading further afield the damage to the reputation of the plaintiff, or by increasing the mental distress and humiliation of the plaintiff. See, for example, Walker v. CFTO Ltd., supra, at p. 111; Vogel, supra, at p. 178; Kerr v. Conlogue (1992), 65 B.C.L.R. (2d) 70 (S.C.), at p. 93; and Cassell & Co. v. Broome, supra, at pp. 825-26. The malice may be established by intrinsic evidence derived from the libellous statement itself and the circumstances of its publication, or by extrinsic evidence pertaining to the surrounding circumstances which demonstrate that the defendant was motivated by an unjustifiable intention to injure the plaintiff. See Taylor v. Despard, supra, at p. 975.

191    There are a number of factors that a jury may properly take into account in assessing aggravated damages. For example, was there a withdrawal of the libellous statement made by the defendants and an apology tendered? If there was,

Exhibit 5

this may go far to establishing that there was no malicious conduct on the part of the defendant warranting an award of aggravated damages. The jury may also consider whether there was a repetition of the libel, conduct that was calculated to deter the plaintiff from proceeding with the libel action, a prolonged and hostile cross-examination of the plaintiff or a plea of justification which the defendant knew was bound to fail. The general manner in which the defendant presented its case is also relevant. Further, it is appropriate for a jury to consider the conduct of the defendant at the time of the publication of the libel. For example, was it clearly aimed at obtaining the widest possible publicity in circumstances that were the most adverse possible to the plaintiff?

> (b)    The Application to the Facts of this Case

**192**    In this case, there was ample evidence upon which the jury could properly base their finding of aggravated damages. The existence of the file on Casey Hill under the designation "Enemy Canada" was evidence of the malicious intention of Scientology to "neutralize" him. The press conference was organized in such a manner as to ensure the widest possible dissemination of the libel. Scientology continued with the contempt proceedings although it knew its allegations were false. In its motion to remove Hill from the search warrant proceedings, it implied that he was not trustworthy and might act in those proceedings in a manner that would benefit him in his libel action. It pleaded justification or truth of its statement when it knew it to be false. It subjected Hill to a demeaning cross-examination and, in its address to the jury, depicted Hill as a manipulative actor.

**193**    It is, as well, appropriate for an appellate court to consider the post-trial actions of the defendant. It will be recalled that Scientology, immediately after the verdict of the jury, repeated the libel, thus forcing the plaintiff to seek and obtain an injunction restraining Scientology from repeating the libel. It did not withdraw its plea of justification until the hearing of the appeal. All this indicates that the award of aggravated damages was strongly supported by the subsequent actions of Scientology.

**194**    In summary, every aspect of this case demonstrates the very real and persistent malice of Scientology. Their actions preceding the publication of the libel, the circumstances of its publication and their subsequent actions in relation to both the search warrant proceedings and this action amply confirm and emphasize the insidious malice of Scientology. Much was made of their apology tendered at the time of the hearing in the Court of Appeal. There is a hollow ring to that submission when it is remembered that it was not until the fifth day of oral argument before the Court of Appeal that the apology was tendered. Scientology can gain little comfort from such a late and meaningless apology.

**195**    These damages were awarded solely against Scientology and are based upon the misconduct of that appellant. There is no question of Manning being in any way responsible for these damages. Indeed, there cannot be joint and several responsibility for either aggravated or punitive damages since they arise from the misconduct of the particular defendant against whom they are awarded. See, for example, Sun Life, supra, at p. 1310; Egger v. Chelmsford, [1965] 1 Q.B. 248 (C.A.), at pp. 263 and 265; Vogel, supra, at p. 171; S. M. Waddams, The Law of Damages (2nd ed. 1991), at pp. 11-23 and 11-24. Scientology's behaviour throughout can only be characterized as recklessly high-handed, supremely arrogant and contumacious. There seems to have been a continuing conscious effort on Scientology's part to intensify and perpetuate its attack on Casey Hill without any regard for the truth of its allegations.

> (4) Punitive Damages

> (a)    General Principles

**196**    Punitive damages may be awarded in situations where the defendant's misconduct is so malicious, oppressive and high-handed that it offends the court's sense of decency. Punitive damages bear no relation to what the plaintiff should receive by way of compensation. Their aim is not to compensate the plaintiff, but rather to punish the defendant. It is the means by which the jury or judge expresses its outrage at the egregious conduct of the defendant. They are in the nature of a fine which is meant to act as a deterrent to the defendant and to others from acting in this manner. It is important to emphasize that punitive damages should only be awarded in those circumstances where the combined award of general and aggravated damages would be insufficient to achieve the goal of punishment and deterrence.

**197**    Unlike compensatory damages, punitive damages are not at large. Consequently, courts have a much greater scope and discretion on appeal. The appellate review should be based upon the court's estimation as to whether the punitive damages serve a rational purpose. In other words, was the misconduct of the defendant so outrageous that punitive damages were rationally required to act as deterrence?

**198**    This was the test formulated by Robins J.A. in Walker v. CFTO Ltd., supra. In that case, he found that the general damages award of $908,000 was obviously sufficient to satisfy whatever need there was for punishment and deterrence.

He found that, in those circumstances, the $50,000 punitive damage award served no rational purpose. The Court of Appeal, in the case at bar, applied the same reasoning and upheld the award of punitive damages.

**199**    Punitive damages can and do serve a useful purpose. But for them, it would be all too easy for the large, wealthy and powerful to persist in libelling vulnerable victims. Awards of general and aggravated damages alone might simply be regarded as a licence fee for continuing a character assassination. The protection of a person's reputation arising from the publication of false and injurious statements must be effective. The most effective means of protection will be supplied by the knowledge that fines in the form of punitive damages may be awarded in cases where the defendant's conduct is truly outrageous.

          (b)       The Application to the Facts of this Case

**200**    There can be no doubt that the conduct of Scientology in the publication of the injurious false statement pertaining to its "enemy" was malicious. Its publication was carefully planned and carried out in a manner which ensured its widest possible dissemination in the most damaging manner imaginable. The allegation made against Hill was devastating. It was said that he had been guilty of breach of trust, breach of a court order and that his conduct and behaviour was criminal. Scientology's actions from the time of publication, throughout the trial, and after the trial decision was rendered constituted a continuing attempt at character assassination by means of a statement which it knew to be false. It was such outrageous conduct that it cried out for the imposition of punitive damages.

**201**    There might have been some concern that, in light of the award of general and aggravated damages totalling $800,000, there might not be a rational basis for punitive damages. However any lingering doubt on that score is resolved when Scientology's persistent misconduct subsequent to the trial is considered. On the very next day following the verdict, Scientology republished the libel in a press release delivered to the media. It then brought a motion to adduce fresh evidence which it stated would have a bearing "on the credibility and reputation of the plaintiff S. Casey Hill" which, if presented at trial, "would probably have changed the result". Its actions were such that Hill was forced to bring an application for an injunction enjoining Scientology from republishing the libel. In his reasons for granting the injunction, Carruthers J. stated that he was forced to take that action because "no amount awarded on account of punitive damages would have prevented or will prevent the Church of Scientology from publishing defamatory statements about the plaintiff". Even the injunction did not deter Scientology which moved to set it aside. Further, in its notice of appeal of the libel judgment, Scientology alleged that the trial judge had erred in ruling the decision of Cromarty J. in the contempt proceedings was res judicata of the issues raised in the libel trial.

**202**    During the appeal, it was conceded and the evidence and events confirmed that in all likelihood, no amount of general or aggravated damages would have deterred Scientology. Clearly then, this was an appropriate case for an award of punitive damages. Scientology did not withdraw its plea of justification until the first day of the oral argument in the Court of Appeal. Nor was any apology tendered by Scientology until the fifth day of oral argument before the Court of Appeal.

**203**    The award of punitive damages, therefore, served a rational purpose in this case. Further, the circumstances presented in this exceptional case demonstrate that there was such insidious, pernicious and persistent malice that the award for punitive damages cannot be said to be excessive. Scientology has alleged that the size of the award of punitive damages had a chilling effect on its right to freedom of expression. However as stated earlier, in spite of the slow and methodical progress of this case to trial and appeal, and despite the motion brought six years before the trial which drew attention to the need for evidence, Scientology adduced no evidence as to the chilling effect of the award. In its absence,

Exhibit 5

this argument should not be considered. It may be that different factors will have to be taken into consideration where evidence is adduced and where a member of the media is a party to the action. However, those are considerations for another case on another day.

### IV.    Disposition

**204**   The appeal is dismissed with costs.

APPENDIX A

#### CFTO BROADCAST

The Toronto Church of Scientology has filed charges of contempt of court against two provincial lawyers. The Church believes the lawyers violated a court order by opening sealed documents which were seized last year in a raid on the Church's headquarters. A report from CFTO's Tim Webber:

Webber:

> Eighteen months ago, more than one hundred O.P.P. officers stormed out of three buses and into the offices of the Church of Scientology. They seized hundreds of thousands of documents in two days of searching. Police said they were looking for evidence of tax fraud, consumer fraud and other indictable offences. Many of these seized documents were deemed confidential by the Church. Some they said were confessions between priests and penitents and they convinced a judge to order about two hundred of the documents sealed. Today, lawyers for the Church filed charges alleging that the sealing order has been violated.

Manning:

> The documents were ordered sealed by Mr. Justice Osler, pursuant to a request by counsel, in a very serious matter, and they were opened and revealed to persons whom we say were unauthorized to so do.

Webber:

> The charges are against Jerome Cooper, a lawyer for Consumer and Commercial Relations, and Crown Attorney S. Casey Hill. The documents filed today alleged that the two convinced another Supreme Court Justice to allow the Ministry of Consumer and Commercial Relations to view the sealed documents in the company of O.P.P. officers. One of the lawyers being charged, Jerome Cooper, today told us he had absolutely no comment on the matter. The trial date has already been set for the 17th of January, but lawyers for the Church of Scientology are hoping to convince the defendants and the Court so start even sooner.

APPENDIX B

#### CBC BROADCAST

The Church of Scientology has filed a suit against two Toronto based Crown Attorneys. The Church had its offices raided by police and documents seized in March of 1983. Lawyers for the Church say those documents were opened and read by persons not authorized to do so.

Manning:

Exhibit 5

They were confidential documents which have been ordered sealed by Supreme Court of Ontario Justices which were opened with the permission of counsel for the Crown. And this constitutes, in the opinion of the Church, a contempt of court. We've had a date set in January. But hopefully, we can get a date set earlier with the consent of the Chief Justice of the Trial Division, or the Chief Justice of Ontario on the basis that it's a very important matter. It's important to the administration of justice.

APPENDIX C

GLOBE AND MAIL

The Church of Scientology of Toronto is asking the Supreme Court of Ontario to find a Crown prosecutor and a lawyer with the Ontario Ministry of Consumer and Commercial Relations in contempt of court.

Morris Manning, a lawyer acting for the church, said in an interview yesterday that he has filed a motion asking for S. Casey Hill, a prosecutor with the Ontario Ministry of the Attorney-General, and Jerome Cooper, a lawyer with the Consumer Ministry, to be jailed or fined.

The motion claims that Mr. Cooper misled Mr. Justice Jean-Charles Sirois of the Supreme Court of Ontario into releasing to the Consumer Ministry documents seized by the Ontario Provincial Police in a raid on the Church's headquarters.

The motion says Judge Sirois was not told that many of the documents had been ordered sealed by another Ontario Supreme Court judge while the Church contests the legality of the search warrant used by the O.P.P. in the raid last year.

The motion claims Mr. Hill, who represented the Attorney-General during the search warrant hearings "aided and abetted in the misleading of Mr. Justice Sirois".

A hearing on the motion has been set for January 17.

The following are the reasons delivered by

**205**   L'HEUREUX-DUBÉ J.:-- I have had the advantage of reading the reasons of my colleague Justice Cory and, except on one point, generally agree with them as well as with his disposition of this appeal.

**206**   First, however, in order to dispel any possible confusion regarding the applicability of the Canadian Charter of Rights and Freedoms to the common law, I note that this issue can be easily summarized in the following two principles, both of which were first articulated by McIntyre J. in RWDSU v. Dolphin Delivery Ltd., [1986] 2 S.C.R. 573:

1.  The Charter does not directly apply to the common law unless it is the basis of some governmental action.
2.  Even though the Charter does not directly apply to the common law absent government action, the common law must nonetheless be developed in accordance with Charter values. (To the same effect, see R. v. Salituro, [1991] 3 S.C.R. 654, Dagenais v. Canadian Broadcasting Corp., [1994] 3 S.C.R. 835, and R. v. Park, [1995] 2 S.C.R. 836, per L'Heureux-Dubé J.)

In other words, the basic rule is that, absent government action, the Charter only applies indirectly to the common law.

**207**   In light of the above, I agree with Cory J. that where the common law is "challenged" on Charter grounds, a traditional s. 1 analysis will generally not be appropriate. Instead, "Charter values, framed in general terms, should be weighed against the principles which underlie the common law. The Charter values will then provide the guidelines for

6/12/12 1:32 PM

Exhibit 5

http://web2.westlaw.com/result/search2entry.PrintDoc.do?jobHa...

any modification to the common law which the court feels is necessary" (para. 97). As well, I agree with Cory J. that "the party who is alleging that the common law is inconsistent with the Charter should bear the onus of proving both that the common law fails to comply with Charter values and that, when these values are balanced, the common law should be modified" (para. 98). Such an approach is, in my view, consistent with the fact that, absent government action, the Charter only applies indirectly to the common law.

**208**    Applying this approach in the case at hand, I agree with Cory J.'s conclusion that the common law of defamation, as it is applied to the parties in this action, is consistent with the values enshrined in the Charter. Accordingly, I agree with my colleague that there is no need to amend or alter the common law. In particular, I agree that the "actual malice" rule adopted by the U.S. Supreme Court in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), should not be adopted into the Canadian common law of defamation.

**209**    Second, the one issue on which I part company with my colleague concerns the scope of the defence of qualified privilege. Traditionally, this Court has held that the defence of qualified privilege is available with respect to reports of judicial proceedings, but not with respect to reports of pleadings in purely private litigation upon which no judicial action has yet been taken: Gazette Printing Co. v. Shallow (1909), 41 S.C.R. 339. The appellants, however, argue that Shallow is no longer good law as it had been overtaken by this Court's more recent decision in Edmonton Journal v. Alberta (Attorney General), [1989] 2 S.C.R. 1326. My colleague appears to accept this argument. Accordingly, he broadens the scope of the defence of qualified privilege, making it available with respect to reports of pleadings upon which no judicial action has yet been taken. I disagree. In my view, Shallow and Edmonton Journal are entirely consistent.

In this respect, I adopt the following statement from the judgment of the Court of Appeal in the case at hand ( (1994), 18 O.R. (3d) 385, at p. 427):

> We were urged to extrapolate from Edmonton Journal the proposition that the common law of defamation should respect such constitutional forms of expression as the reporting of information pertaining to intended court proceedings by conferring qualified privilege on the occasion of the publication of such reports. With respect, we do not agree. Edmonton Journal struck down, in the name of freedom of expression, statutory provisions which sought to inhibit the publication of the details of pending matrimonial and other civil actions. But it by no means follows that the publication of such details should be accorded the mantle of qualified privilege if they are defamatory.

> Edmonton Journal and Gazette Printing stand together without conflict: there is a right to publish details of judicial proceedings before they are heard in open court, but such publication does not enjoy the protection of qualified privilege if it is defamatory. As Duff J. noted in the extract from p. 364 of Gazette Printing set out above, no such privilege is necessary if the statements published are true, and no such privilege is desirable if they are not true.

**210**    Subject to the above, I would dispose of this appeal as does my colleague Cory J.

cp/d/hbb

Exhibit 5