CANADA                                    YAR No. 353654

PROVINCE OF NOVA SCOTIA


<u>IN THE SUPREME COURT OF NOVA SCOTIA</u>


TROUT POINT LODGE LIMITED, VAUGHN PERRET AND
CHARLES LEARY
                                            PLAINTIFFS


– VERSUS –

DOUG K. HANDSHOE AND JANE DOE
(<u>ANNEMARIEBOUDREAUX@YAHOO.COM</u>)


                                            DEFENDANTS


---

<u>DECISION</u>

---


| | |
|---|---|
| HEARD BEFORE: | The Honourable Justice Suzanne Hood |
| COUNSEL: | Dr. Charles Leary Self-Represented as Agent and Officer of Trout Point Lodge Limited |
| PLACE: | Yarmouth JC1, Yarmouth, N.S. |
| DATE HEARD: | February 1, 2012 |

## INDEX
## TROUT POINT LODGE V. HANDSHOE
## FEBRUARY 1, 2012

Oral Decision   ...................................... 3

## EXHIBITS

EXHIBIT    DESCRIPTION ------------------------- PAGE

None

Exhibit 2

1          **FEBRUARY 1, 2012 AT 10:23 A.M.**
2

3          **THE COURT:**     We   begin   by   saying   that

4    because  I  am  giving  this  decision  orally  I

5    reserve  the  right,  should  it  be  required  to  be

6    reduced  to  writing,  to  edit  but  not  of  course

7    change the substance of it.

8          Trout  Point  Lodge,  Charles  Leary  and  Vaughn

9    Perret  have  obtained  default  judgment  against

10   Doug  Handshoe  in  an  action  filed  in  August  2011

11   and  amended  in  September  2011  for  defamation,

12   invasion   of   privacy,   injurious   falsehood,

13   intentional   interference   with   contractual

14   relations,  intentional  interference  with  economic

15   relations,  intentional  infliction  of  emotional

16   and  mental  distress  and  assault.    Default

17   judgment  was  entered  on  December  12,  2011  with

18   damages to be assessed.

19         The  plaintiffs  move  for  an  assessment  of

20   damages  on  January  12th,  2012.   Mr.  Handshoe  was

21   given  notice  of  a  hearing  for  the  assessment  of

22   damages.

1        The plaintiffs have provided a copy of a
2    FedEx tracking slip showing delivery to Mr.
3    Handshoe's home in Mississippi.    It notes the
4    materials were left at the house.    Efforts were
5    also made according to the testimony of Mr. Leary
6    to fax the documents to Mr. Handshoe's fax number
7    but the transmission was not complete as the fax
8    appeared to have been disconnected.    These
9    materials appear also to have been sent by email
10   and these documents are at Tab 3 to the materials
11   presented in evidence by Mr. Leary at the
12   hearing.    It appears from Mr. Handshoe's blog
13   that he had knowledge of the hearing since he
14   referred to receiving, "nastygrams," from Mr.
15   Leary and Mr. Perret in a blog dated January
16   17th, 2012.    Mr. Handshoe did not appear or
17   participate in the assessment of damages.
18       Default judgment is conclusive of a claim
19   set out in the statement of claim and that's in
20   the authority for that, among others, **is E. Sands**
21   **and Associates versus Dextras Engineering.**    The

Exhibit 2

1    amended statement of claim sets out in detail the

2    claims against Mr. Handshoe which are now to be

3    treated by this court as proven.   The statement

4    of claim lists many examples of the defamatory

5    comments made by Mr. Handshoe, below is a brief

6    summary of them.    The defamatory comments

7    originated with a news story which was published

8    in the Times-Picayune newspaper in Louisiana

9    about Jefferson Parish President Aaron Broussard

10   being involved in a political corruption scandal.

11   The plaintiffs were erroneously identified as

12   being connected with Mr. Broussard in a business

13   venture and Mr. Broussard was named in error as

14   owning Trout Point Lodge.    The allegations

15   against him are kickback schemes, money

16   laundering and fraud while in his office as

17   Parish President.

18        The defamatory comments later included

19   claims that Trout Point Lodge, Mr. Leary and Mr.

20   Perret had misled ACOA and that Mr. Leary

21   committed perjury in litigation with ACOA.    The

1   defamation continued with statements that Trout

2   Point Lodge was losing business or going bankrupt

3   because of the investigation of Mr. Broussard and

4   his inability to continue to support it.   Also

5   there were claims that Charles Leary and Vaughn

6   Perret had been involved in a series of

7   businesses which failed and are con men.   The

8   statements also contained anti-gay rhetoric and

9   homophobic comments.

10      After the original story was retracted by

11   the Louisiana newspaper that published it Mr.

12   Handshoe made statements that Mr. Leary and Mr.

13   Perret had improperly influenced it to retract

14   the story.   He also said that Mr. Leary and Mr.

15   Perret were improperly using the legal system by

16   commencing the defamation action.   Individual

17   plaintiffs have filed affidavits and in his

18   affidavit Mr. Leary has related incidents

19   affecting him and Trout Point Lodge.   He said in

20   that affidavit in Paragraph 26,

21

22      "Due to the publications on

```
 1                    Slabbed  and  by  Mr.  Handshoe
 2                    elsewhere  on  the  internet  I
 3                    have  a  very  real  fear  that
 4                    anyone      performing      due
 5                    diligence  on  us  as  business
 6                    people   or   innkeepers   will
 7                    discover    and      believe
 8                    Handshoe's publications."
 9

10      He also said in Paragraph 27,

11
12                    "I   felt   embarrassed   in   my
13                    local  community.   Mr.  Perret
14                    and  I  have  at  times,  changes
15                    our  usual  shopping  patterns  in
16                    Yarmouth   in   order   to   avoid
17                    persons   we   consider   friends
18                    who  may  have  read  the  Slabbed
19                    publications."
20

21      He   also   testified   about   the   stress   of   the

22      defamation   on   him   in   Paragraph   30   of   the

23      affidavit where he said,

24
25                    "In   April   2011   at   the   time   when
26                    Handshoe's   publication   about   us
27                    became  threatening  and  homophobic  I
28                    experienced  tightened  shoulder  and
29                    neck   muscles,   sleeplessness   and
30                    developed  a  severe  outbreak  of  fever
31                    blisters   for   which   I   had   to   take
32                    Zovirax,  and  antiviral  medication.
33                    Previously  I  always  slept  very  well
34                    never  waking  up  early.   Since  April
35                    2011   I   have   experienced   regular
36                    sleeplessness  particularly  waking  up
```

```
1      early in the morning worrying about
2      Slabbed and its effect on our
3      business."
4
```

5    His affidavit concluded with Paragraph 39 where

6    Mr. Leary says,

```
7
8      "I'm seriously concerned about
9      Slabbed hurting the Lodge's business
10     which Mr. Perret and I rely on as
11     our primary source of income. In
12     2011 occupancy rates at Trout Point
13     were three percent lower than in
14     2010. This represents a value of at
15     least $15,000."
16
```

17   Mr. Leary testified in court as well and his

18   evidence was about since the Notice of Action was

19   served and about the effect of the words of the

20   defendant on him and Trout Point Lodge.   Mr.

21   Perret also filed an affidavit in which he stated

22   the effects of the defamation on him.   He said in

23   his affidavit in Paragraphs 9 and 10,

```
24
25     "Mr. Handshoe's internet
26     publications have added a great deal
27     of stress to our lives including the
28     physical manifestations. I felt
29     genuinely afraid of his published
30     threats and of the existence of the
31     Slabbed Nation and members of that
```

```
1        group being in Nova Scotia.  I now
2        keep my doors locked at night
3        whereas previously I never feared
4        for my safety in my own home."
5
6    He says in his affidavit at Paragraph 11,
7
8        "I have told my personal physicians
9        in Spain and Nova Scotia about
10       stress and sleeplessness related to
11       the Handshoe publications.  My
12       physician Dr. Fernandez Negrara had
13       prescribed medication to help me
14       sleep after the Slabbed publications
15       commenced and to help control my
16       anxiety.  I have also experienced
17       embarrassment, humiliation and
18       irritability.  It was hard to get
19       through work in 2011 knowing that
20       nearly every day a new source of
21       embarrassment and business
22       disruption might be published by
23       Handshoe.  I've been embarrassed
24       that friends and acquaintances in
25       Yarmouth might confront me about the
26       Slabbed allegations.  I could never
27       be sure that members of the local
28       community might secretly harbour a
29       belief in the truth of the blogs
30       allegations."
31
32   In Paragraph 13 he says,
33
34       "Mr. Handshoe has also made
35       publications about my mother stating
36       that I "split" and left her with a
37       surrogate son in Louisiana.  I was
38       traumatized by his suggestions that
```

1          I had somewhat neglected or abused
2          my mother."
3

4     Mr. Perret also testified briefly, he said he had

5     lost his appetite in the last two weeks as a

6     result of the material which has been published

7     by Mr. Handshoe and the volume of it.    In

8     addition, materials were submitted to the court

9     which were testified to by Charles Leary.    These

10    included defamatory comments made after the

11    Louisiana newspaper printed a retraction of the

12    story.    They include references to a cover-up of

13    a crime and dirty secrets April 20th, 2011 that

14    Charles Leary and Vaughn Perret and others were

15    "bag holders" for Aaron Broussard and the

16    purported owners of Trout Point Lodge.    That same

17    blog referred to the fleecing of investors in

18    Trout Point Lodge by Mr. Broussard and his close

19    connection to Mr. Leary and Mr. Perret.    It also

20    refers to Charles Leary as a liar and a perjurer

21    in the litigation with ACOA.    And that blog was

22    April 26, 2011.

1       On August 15th, 2011 the blog refers to "a

2  Trout Point Lodge Jefferson Parish political

3  corruption scandal update" linking Trout Point

4  Lodge with the corruption scandal involving Aaron

5  Broussard. In that same blog he refers to Charles

6  Leary and Vaughn Perret in the context of "by

7  reporter, get a good story."

8       On August 16th his blog said that he was

9  meticulously laying down "the trail of scams and

10  political corruption that leads to Nova Scotia

11  and Trout Point Lodge."

12       After being served with a Notice of Action

13  further defamatory comments were made. On August

14  18th he wrote,

15
16          "First class bitches, common thugs
17          or just plain old morons."
18

19  He also refers to the "elite fraternity of crooks

20  and miscreants" who have sued him. On August

21  24th, 2011 he referred to "political wrongdoing

22  involving Leary and Perret in Canada and it had

23  nothing to do with Broussard *per se.*"

1    He continues to make accusations of fraud

2    against them and in bilking local contractors.

3    He refers to "the chances Trout Point Lodge will

4    be bankrupt within a year" and he said that on

5    August 30th, 2011.  In the same blog he refers to

6    the "nefarious practices" of Charles Leary and

7    Vaughn Perret.  He refers to them being involved

8    in money laundering.  He calls them "grifters"

9    and "grafters."  He accuses them of fabricating

10   positive reviews of Trout Point Lodge.

11   Ultimately he links them with organized crime.

12       These types of comments continued throughout

13   2011 and further defamatory comments were made

14   earlier this month, January 2012, when the Notice

15   of Assessment of Damages was served on him.  I

16   mentioned a few additional postings as follows.

17   There's a posting from September 14th, 2011,

18
19           "I'll add here, in case it is not
20           self-evident that I bill complete
21           dossiers on all the players in this
22           social group and I intend through
23           time to roll out each and every one
24           in excruciating detail as long as
25           the lawsuit in Canada is an

1                outstanding issue for Slabbed.  The
2                reason for this is that this band of
3                gay men act as a unit that will also
4                scatter like cockroaches when the
5                heat is applied."
6

7    In January of 2012 the blog says,

8
9                "Some of those names of the property
10               owners at Trout Point have well
11               documented connections to organized
12               crime here in the U.S.  From my
13               standpoint flushing all this out
14               only gets better from here."
15

16    Another blog from September 14th, 2011, sorry,

17    no, that's the same one.  A blog from January

18    29th of 2012,

19
20                "When I'm done even Perret's niece
21               who filed an affidavit in that **Fox 8**
22               case will understand her uncle is a
23               grifting scumbag pussy."
24

25    And on January 26, 2012 the blog says, "He,"

26    meaning Daquila (sp), "also has enough stroke to

27    tell Charles and Vaughn what to do at Broussard's

28    request."

29       There are many, many more blogs which

30    contained defamatory materials such as this which

1    are included in the materials filed with the

2    Court on January 30th.

3         Turning to the hearing, a comprehensive

4    brief was filed with the Court with many case

5    authorities.  Mr. Leary made an oral submissions

6    to the Court outlining the principles the Court

7    should consider in deciding the quantum of

8    damages for defamation, aggravated damages and

9    punitive damages.  In addition he referred to a

10   recent Ontario Court of Appeal decision with

11   respect to invasion of privacy which is also

12   claimed by the individual plaintiffs.

13        In questioning by the Court, Mr. Leary said

14   that the plaintiffs' other claims are subsumed in

15   the Claim of Defamation, that is the claims were

16   intentional interference with economic relations

17   for intentional interference with contractual

18   relations and injurious falsehood.

19        Mr. Leary submits that the invasion of

20   privacy, assault and intentional infliction of

21   emotional and mental distress stand alone and

1    individual  plaintiffs  seek  damages  for  these

2    separate from the defamation in related claims.

3        The  plaintiffs  seek  damages  of  $250,000  for

4    each of the three plaintiffs.  Aggravated damages

5    for each individual plaintiff as well as punitive

6    damages.  They say that their original demand of

7    aggravated  damages  of  $300,000  each  should  be

8    increased because the amount was requested before

9    the   recent   defamatory   remarks   which   have

10   continued since default judgment was entered and

11   in particular since Mr. Handshoe was given notice

12   of the assessment of damages.  He said they would

13   seek special damages for loss of business but it

14   is too difficult to prove although he believes

15   they   have   lost   business   because   of   the

16   defamation.

17       In  addition,  the  individual  plaintiffs,  as

18   I've said, seek damages for invasion of privacy.

19   In the **Jones** Decision the Ontario Court of Appeal

20   said that the range for such damages is up to

21   $20,000.   In  that  case  the  Court  of  Appeal

1    awarded damages in the amount of $10,000.  The

2    plaintiffs here say that the extent of the

3    invasion of privacy in that case was less than is

4    the case here.   plaintiffs also seek an

5    injunction preventing further defamatory comments

6    and a mandatory injunction seeking to have the

7    existing comments removed.

8         The leading case on defamation in Canada is

9    the Supreme Court of Canada Decision is **Hill v.**

10   **Church of Scientology of Toronto.**  In that case

11   Justice Cory writing for the majority referred to

12   the fact that the defamatory comments were

13   published on the local television news, reported

14   in the Globe and Mail and reported on by CBC.  He

15   referred to the audience numbers of those media

16   outlets and said that the audience for the local

17   T.V. station was approximately 132,000.  The

18   Globe circulation that day was 108,000 and the

19   CBC broadcast was seen by approximately 118,000.

20   He refers to that in Paragraph 26 of the

21   decision.

1       He said in Paragraph 108, and I quote,

2

3           "False allegations can so very
4           quickly and completely destroy a
5           good reputation.   A reputation
6           tarnished by libel can seldom regain
7           its former lustre."

8

9   And he said with respect to defamatory statements

10  in Paragraph 166,

11

12          "A defamatory statement can seep
13          into the crevices of the
14          subconscious and lurk there, ever
15          ready to spring forth and spread its
16          cancerous evil.   The unfortunate
17          impression left by a libel may last
18          a lifetime.   Seldom does a defamed
19          person have the opportunity of
20          replying and correcting the record
21          in a manner that will truly remedy
22          the situation."

23

24  Justice Cory later said in Paragraph 178 with

25  respect to Mr. Hill,

26

27          "He would never know who, as a
28          result of the libellous statement,
29          had some lingering suspicion that he
30          was guilty of misconduct which was
31          criminal in nature.   He would never
32          know who might have believed that he
33          was a person without integrity who
34          would act criminally in the
35          performance of his duties as a Crown

1  counsel.  He would never be certain
2  who would accept the allegation that
3  he was guilty of a criminal breach
4  of trust which was the essential
5  thrust of the libel."
6

7  In considering whether the jury award of damages

8  was appropriate, the Court quote from **Gatley** on

9  libel and slander in Paragraph 182.  In that text

10  the author states,

11
12  "The amount of damages is peculiarly
13  the province of the jury who in
14  assessing them will naturally be
15  governed by all the circumstances of
16  the particular case.  They're
17  entitled to take into their
18  consideration the conduct of the
19  plaintiff, his position in standing,
20  the nature of the libel, the mode
21  and extent of publication, the
22  absence or refusal of any retraction
23  or apology and 'the whole conduct of
24  the defendant from the time the
25  libel was published down to the very
26  moment of their verdict.  They may
27  take into consideration the conduct
28  of the defendant before action,
29  after action and in court on the
30  trial of the action.'  And also it
31  is submitted that the conduct of his
32  counsel who cannot shelter his
33  client by taking responsibility for
34  the conduct of the case.  They
35  should also allow 'for the sad truth
36  that no apology, retraction or
37  withdrawal can ever be guaranteed

Exhibit 2

```
 1          completely to undo the harm it has
 2          done or the hurt it has caused.'
 3          They should also take into account
 4          the evidence led in aggravation or
 5          litigation of the damages."
 6
 7   The Court then said in Paragraph 184,
 8
 9          "In  considering  and  applying  the
10          factors   pertaining   to   general
11          damages  in  this  case  it  will  be
12          remembered  that  the  reports  in  the
13          press were widely circulated and the
14          television  broadcast  had  a  wide
15          coverage.   The  setting  and  the
16          persons  involved  gave  the  coverage
17          an   air   of   credibility   and
18          significance   that   must   have
19          influenced all who saw and read the
20          accounts.  The insidious harm of the
21          orchestrated libel was indeed spread
22          widely throughout the community."
23
24    In  considering  the  issue  of  aggravated  damages
25   Justice  Cory  again  quoted  from  **Gatley**  in
26   Paragraph 183.
27
28          "The  conduct  of  the  defendant,  his
29          conduct  of  the  case  and  his  state of
30          mind  are  thus  all  matters  which  the
31          plaintiff   may   rely   on   his
32          aggravating the damages."
33
34          "Moreover   it   is   very   well
35          established  that  in  cases  where  the
```

1  damages are at large the jury or the
2  judge, if the award is left to him,
3  can take into account the motives
4  and conduct of the defendant where
5  they aggravate the injury done to
6  the plaintiff. There may
7  malevolence or spite or the manner
8  of committing the wrong may be such
9  as to injure the plaintiffs' proper
10 feelings of dignity and pride.
11 These are matters which the jury can
12 take into account in assessing the
13 appropriate compensation."
14

15 "In awarding aggravated damages the
16 natural indignation of the Court at
17 the injury inflicted on the
18 plaintiff is a perfectly legitimate
19 motive in making it generous rather
20 than a more moderate award to
21 provide an adequate solution. That
22 is because the injury to the
23 plaintiff is actually greater and as
24 a result of the conduct, exciting
25 the indignation, demands a more
26 generous solatium."
27

28 The Court then referred to the aggravating

29 circumstances in that case at Paragraph 185.

30
31 "The misconduct of the Appellants
32 continued after the first
33 publication. Prior to the
34 commencement of the hearing of the
35 contempt motion before Justice
36 Cromarty, Scientology was aware that
37 the allegations it was making
38 against Casey Hill were false. Yet

1           it persisted with the contempt
2           hearings as did Morris Manning. At
3           the conclusion of the contempt
4           hearing both appellants were aware
5           of the falsity of the allegations.
6           Nevertheless when the libel action
7           was instituted the defensive
8           justification was put forward by
9           both of them. The statement of
10          defense alleging justification or
11          truth of the allegation was open for
12          all the public to see. Despite
13          their knowledge of its falsity the
14          appellants continued to publish the
15          libel."
16

17      Finally the manner in which Hill was crossed

18  examined by the Appellant coupled with the manner

19  in which they presented their position to the

20  jury in light of their knowledge of the falsity

21  of their allegations are further aggravating

22  factors to be taken into account.

23        Justice Cory dealt with the issue of

24  aggravated damages in Paragraphs 188 and 189.

25
26          "Aggravated damages may be awarded
27          in circumstances where the
28          defendant's conduct has been
29          particularly high handed or
30          oppressive thereby increasing the
31          plaintiffs' humiliation and anxiety
32          arising from the libellous
33          statement."

1

2          The nature of these damages was aptly

3     described by Justice Robins in **Walker v. CFTO**

4     **Limited** in these words,

5

6               "Where the defendant is guilty of
7               insulting, high handed, spiteful,
8               malicious or oppressive conduct
9               which increase the mental distress
10              the humiliation and indignation,
11              anxiety, grief, fear and the like,
12              suffered by the plaintiff as a
13              result of being defamed, the
14              plaintiff may be entitled to what
15              has come to be known as aggravated
16              damages. These damages take into
17              account the additional harm caused
18              to the plaintiffs' feeling by the
19              defendant's outrageous and malicious
20              conduct. Like general or special
21              damages they are compensatory in
22              nature. Their assessment requires
23              consideration by the jury of the
24              entire conduct of the defendant part
25              of the publication of the libel and
26              continuing through to the conclusion
27              of the trial. They represent the
28              expression of natural indignation of
29              right-thinking people arising from
30              the malicious conduct of the
31              defendant."
32

33    In Paragraph 191 Justice Cory considered the

34    factors in that case that warranted an award of

35    aggravated damages. There are a number of

1    factors that a jury may properly take into

2    account in assessing aggravated damages. For

3    example, was there a withdrawal of the libellous

4    statement made by the defendants and an apology

5    tendered. If there was this may go far to

6    establishing that there was no malicious conduct

7    on the part of the defendant warranting an award

8    of aggravated damages. The jury may also

9    consider whether there was a repetition of the

10    libel, conduct that was calculated to deter the

11    plaintiff from proceeding with the libel action,

12    a prolonged and hostile examination of the

13    plaintiff or plea of justification which the

14    defendant knew was bound to fail. The general

15    manner in which the defendant presented its case

16    is also relevant. Further it is appropriate for

17    a jury to consider the conduct of the defendant

18    at the time of the publication of the libel. For

19    example was it clearly aimed at obtaining the

20    widest possible publicity in circumstances that

21    were the most adverse possible to the plaintiff.

1    The Supreme Court of Canada also considered
2    the issue of punitive damages beginning at
3    Paragraph 196 where the Court said,

4
5         "Punitive damages may be awarded in
6         the situation where the defendant's
7         conduct is so malicious, oppressive
8         and high handed that it offends…"
9

10   - missing a page.  Can we just, we'll just go
11   off the record for a moment, I have to find the
12   rest of that quote.

13
14              [RECESS 10:47 - 10:48 A.M.]
15

16   **THE COURT:**   The Supreme Court of Canada
17   dealt with the issue of punitive damages
18   beginning at Paragraph 196, where the Court said,

19

20         "Punitive damages may be awarded in
21         situations where the defendant's
22         misconduct is so malicious,
23         oppressive and high handed that it
24         offends the Court's sense of
25         decency."
26

27       Punitive damages bear no relation to what
28   the plaintiff should receive by way of

1   compensation.   Their aim is not to compensate the

2   plaintiff but rather to punish the defendant.    It

3   is the means by which the jury or Judge expresses

4   its   outrage   at   the   egregious   conduct   of   the

5   defendant.     They   are   in   the   nature   of   a   fine

6   which   is   meant   to   act   as   a   deterrent   to   the

7   defendant   and   to   others   from   acting   in   this

8   manner.    It   is   important   to   emphasize   that

9   punitive damages should only be awarded in those

10  circumstances where the combined award of general

11  and   aggravated   damages   would   be   insufficient   to

12  achieve the goal of punishment and deterrents.

13       One   of   the   important   factors   for   the   Court

14  was set out in Paragraph 202,

15

16           "During   the   appeal   it   was   conceded
17           and   the   evidence   and   events
18           confirmed   that   in all   likelihood   no
19           amount   of   general   or   aggravated
20           damages   would   have   deterred
21           Scientology.   Clearly then this was
22           an   appropriate   case   for   an   award   of
23           punitive damages."
24

25       It   is   important   that   each   case   of

1    defamation must be looked at on its own facts and

2    the awards given in other decisions are therefore

3    not of much assistance.

4        The Supreme Court of Canada acknowledged

5    this in the Hill Decision in Paragraph 187.

6    **Barrick Gold** is a decision of the Ontario Court

7    of Appeal dealing with defamation in the internet

8    context.   Justice Blair said in Paragraph 28

9    about internet defamation,

10
11            "Is there something about defamation
12            on the internet, cyber libel as it's
13            sometimes called, that distinguishes
14            it for purposes of damages from
15            defamation in another medium?   My
16            response to that question is yes."
17

18    He referred to the principles set out in **Hill** and

19    then in Paragraph 30 quoted from an Australian

20    decision the quote, "Ambiguity, universality and

21    utility," of the internet.   He continued in

22    Paragraph 31,

23
24            "Thus of the criteria mentioned
25            above, the mode and extent of
26            publication is particularly relevant
27            in the internet context, and must be

| | |
|---|---|
| 1 | considered carefully.  Communication |
| 2 | via the internet is instantaneous, |
| 3 | seamless, interactive, blunt, |
| 4 | borderless and far reaching.  It is |
| 5 | also impersonal and the anonymous |
| 6 | nature of such communication has |
| 7 | made itself create a greater risk |
| 8 | that the defamatory remarks are |
| 9 | believed." |
| 10 | |
| 11 | He then said in Paragraph 34, |
| 12 | |
| 13 | "Internet defamation is |
| 14 | distinguished from its less |
| 15 | pervasive cousins in terms of its |
| 16 | potential to damage the reputation |
| 17 | of individuals in corporations by |
| 18 | the features described above |
| 19 | especially its interactive nature, |
| 20 | its potential for being taken at |
| 21 | face value and its absolute and |
| 22 | immediate worldwide ubiquity and |
| 23 | accessibility.  The mode and extent |
| 24 | of publication is therefore |
| 25 | particularly significant |
| 26 | consideration in assessing damages |
| 27 | in internet defamation cases." |
| 28 | |
| 29 | In **Barrick Gold** an injunction was issued. |
| 30 | Justice Blair said in Paragraph 75, |
| 31 | |
| 32 | "A highly transmissible nature of |
| 33 | the tortious misconduct at issue |
| 34 | here is a factor to be addressed in |
| 35 | considering whether a permanent |
| 36 | injunction should be granted.  The |
| 37 | courts are faced with a dilemma.  On |

1  the one hand they can throw up their
2  collective hands in despair taking
3  the view that enforcement against
4  such (inaudible due to mumbling…)
5  transmissions around the world is
6  ineffective and concluding therefore
7  that only the jurisdiction where the
8  originator of the communication may
9  happen to be found can enjoin the
10 offending conduct.   On the other
11 hand they can at least protect
12 against the impugned conduct in
13 their own jurisdiction."
14

15 In this respect I agree with the following

16 observation of Justice Kirby in **Dow Jones**,

17
18 "Any suggestion that there can be no
19 effective remedy for the tort of
20 defamation or other civil wrongs
21 committed by the use of the internet
22 or such wrongs must simply be
23 tolerated as the price to be paid
24 for the advantages of the medium is
25 self-evidently unacceptable."
26

27 A permanent injunction was granted and the Court

28 said in Paragraph 78,

29 "I would set aside the decision of
30 the motions judge in this regard and
31 grant a permanent injunction as
32 requested restraining the defendants
33 from disseminating, posting on the
34 internet or publishing further
35 defamatory statements concerning
36 Barrick or its officers, directors

1    or employees."
2

3    ' In **Astley v. Verdun** The Ontario Supreme

4    ·Court of Justice, Superior Court of Justice cited

5    **Barrick Gold** and ordered an injunction and a

6    mandatory injunction against the defendant.    In

7    that case the defendant stated that in spite of

8    jury verdict against him he would continue to

9    "disparage and discredit the reputation of the

10   plaintiff," quoting from Paragraph 16.

11   Justice Chapnik in that case said in

12   Paragraph 33,

13
14           "Injunctive relief is an exceptional
15           remedy that will not be imposed by
16           the Courts lightly.    I certainly
17           agree with the defendant when he
18           states that any form of prior
19           restraint on freedom of speech is
20           extremely serious and can only be
21           imposed in the clearest and rarest
22           of cases.    This however is one of
23           those cases."
24

25   He then outlined in Paragraph 34 the

26   circumstances of the case which caused him to

27   grant in injunction.  He said,

```
1
2              "This is so given the plaintiffs'
3         high reputation and position in the
4         business community and the wide
5         circulation of the defamatory
6         statements calculated to destroy
7         that reputation as well as the
8         strong likelihood that the
9         publishing of defamatory statements
10        against the plaintiff will continue
11        and the real possibility that the
12        plaintiff will not actually be
13        compensated by the payment of
14        damages."
15

16   A prudent injunction was granted and the Court

17   said in Paragraph 35,

18
19              "Accordingly I order a permanent
20         injunction to issue against the
21         defendant, J. Robert Verdun
22         restraining him from disseminating,
23         posting on the internet or
24         publishing in any manner whatsoever,
25         directly or indirectly, any
26         statements or comments about the
27         plaintiff Robert M. Astley."
28

29   He also granted a mandatory injunction.  He said

30   in Paragraph 36,

31
32              "There will also be a mandatory
33         injunction requiring the defendant
34         to forthwith remove his blog
35         postings dated April 29, 2011 and
```

1  May 2nd, 2011 from the internet and
2  any similar postings that refer to
3  the   plaintiff   directly   or
4  indirectly."
5

6      In **Mina Mar Group v. Divine** Justice Perell

7  also quoted **Barrick Gold**. He granted an

8  injunction issuing out of an Ontario Court

9  against the defendant in New Jersey. He simply

10  said in Paragraph 28,

11
12  "In   accordance   with   the   above
13  authorities,   I   also   grant   a
14  permanent injunction restraining the
15  defendants    from    disseminating,
16  posting   on   the   internet   or
17  publishing    further    defamatory
18  statements    concerning    the
19  plaintiffs."
20

21      On the issue of invasion of privacy Mr.

22  Leary provided to the Court the recent decision

23  dated January 18th of 2012 of the Ontario Court

24  of Appeal in **Jones v. Tsige** in which the Court

25  concluded there is, at least in Ontario, a tort

26  of invasion, intrusion into seclusion otherwise

27  called invasion of privacy which is claimed by

28  the individual plaintiffs in this matter. The

1     facts in that case are very different from those

2     in this case.   The defendant had accused, had

3     accessed the plaintiff's personal banking

4     information on 174 occasions over a period of

5     four years.   However she did not publish or

6     distribute it but used it for her own purposes in

7     a dispute with the plaintiff's partner, the

8     former husband of the defendant.   She apologized

9     for her actions and the Court concluded she was

10    embarrassed and contrite.   The plaintiff claimed

11    $70,000 in damages for invasion of privacy and

12    exemplary damages of $20,000. The Court said the

13    range of damages for this claim is up to $20,000

14    and awarded $10,000.

15       I am satisfied that in an appropriate case

16    in Nova Scotia there can be an award for invasion

17    of privacy or as the Ontario Court of Appeal

18    called it, the intrusion upon seclusion.   I must

19    determine if in this case it is warranted

20    considering the principles set out in **Jones**.   In

21    **Jones** there was no accompanying claim for

1  defamation as there was no publication of

2  defamatory statements about the plaintiff.

3      In **Nitsopoulos v. Wong** the action was for

4  deceit and invasion of privacy. The action

5  concerned gaining entry to the plaintiff's home

6  and publishing information gained while there.

7  The action was brought outside the limits, the

8  time limits for a defamation action.

9      The facts in this case are that Mr.

10  Handshoe, on his blog, disclosed Mr. Leary's

11  business and home address and his location when

12  he was visiting Spain. With respect to Mr.

13  Perret, he said that he had abandoned his mother

14  when he left Louisiana for Canada and Mr. Perret

15  said he was traumatized by this statement.

16      Mr. Handshoe made extremely derogatory and

17  homophobic comments of the most outrageous kind

18  about Mr. Leary and Mr. Perret and their sexual

19  orientation including and posting as what I will

20  refer to as doctored photographs of a sexual

21  nature depicting them.

1    Invasion of privacy in the **Jones** case was

2    private and personal banking information having

3    been looked at many, many times. That sort of

4    financial and banking information is not usually

5    disclosed by people even to their closest friends

6    yet another bank employee who was not known to

7    the plaintiff looked at her private bank

8    information on numerous occasions.

9    In **Nitsopoulos** the defendant posed as a maid

10   for a Toronto cleaning service so she could write

11   a series of articles for the Globe and Mail

12   entitled "Maid for a Month." She gained access

13   to the plaintiff's home and her experiences are

14   profiled in the second of these articles. The

15   article published private details about the life

16   of the plaintiffs that she gained while in their

17   home. The plaintiffs alleged that they would not

18   have permitted the reporter into their home had

19   she not fraudulently misrepresented herself to

20   them. They claimed that they suffered harm to

21   their dignity, interests and personal autonomy,

1 their personal and home security and their mental

2 wellbeing.   The Court refused to grant summary

3 judgment to the defendants which they had sought

4 on the basis that there was no cause of action

5 for invasion of privacy.

6  In the **Jones** case the Ontario Court of

7 Appeal dealt with the issue of whether Ontario

8 law recognized a cause of action for invasion of

9 privacy.   Justice Sharpe writing for the Court

10 said in Paragraph 15,

11

12   "Aspects of privacy have long been
13   protected by causes of action such
14   as breach of confidence, defamation,
15   breach of copyright, nuisance, and
16   various property rights.  Although
17   the individual's privacy interest is
18   a fundamental value underlying such
19   claims, the recognition of a
20   distinct right of action for breach
21   of privacy remains uncertain."
22

23  Justice Sharpe referred to an article by

24 William L. Prosser entitled *Privacy* which was

25 published in the California Law Review 383.   He

26 said there were four torts which were quoted in

27 Paragraph 18;

1

2          1.          Intrusion   upon   the   plaintiff's

3   seclusion   or   solitude,   or   into   his   private

4   affairs;

5          2.          Public   disclosure   of   embarrassing

6   private facts about the plaintiff;

7          3.          Publicity which places the plaintiff

8   in a false light in the public eye;

9          4.          Appropriation,   for   the   defendant's

10   advantage,  of  the  plaintiff's  name  or  likeness.

11

12          He  said  the  most  relevant  of  these  is  the

13   intrusion   upon   seclusion   and   he   quoted   in

14   Paragraph   19   its   definition   from   *Restatement*,

15   *second restatement of torts* as follows,

16
17                  "One   who   intentionally   intrudes,
18              physically  or  otherwise,  upon  the
19              seclusion  of  another  or  his  private
20              affairs  or  concerns,  is  subject  to
21              liability  to  the  other  for  invasion
22              of   his   privacy,   if   the   invasion
23              would   be   highly   offensive   to   a
24              reasonable person."
25

26          He continued in Paragraph 20,

"The comment section of the *Restatement* elaborates this proposition and explains that the tort includes physical intrusions into private places as well as listening or looking, with or without mechanical aids, into the plaintiff's private affairs. Of particular relevance to this appeal, is the observation that other non-physical forms of investigation or examination into private concerns may be actionable. These include opening private and personal mail or examining a private bank account, even though there is no publication or other use of any kind of the information obtained."

The decisions he then (inaudible due to mumbling…) dealt largely with the collection of personal data. Chartered jurisprudence dealing with privacy has focussed on search and seizure in the criminal law context.

Justice Sharpe said in Paragraph 41 that there are three distinct privacy interests, the third being a relevant one in **Jones**. That is the informational privacy. He quoted from the Decision of the **Queen v. Tessling** in Paragraph 41 where the Supreme Court of Canada said,

"Beyond our bodies and the places where we live and work, however, lies the thorny question of how much information about ourselves and activities we are entitled to shield from the curious eyes of the state. This includes commercial information locked in a safe kept in a restaurant owned by the accused. Informational privacy has been defined as 'the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others.' Its protection is predicated on the assumption that all information about a person is, in a fundamental way, his own for him to communicate or retain as he sees fit."

In Paragraph 44 he referred to the *Universal Declaration of Human Rights* which provides,

"No one shall be subjected to arbitrary interference with his privacy, home or correspondence and proclaims that everyone has the right to the protection of the law against such interference or attacks."

Justice Sharpe said in Paragraph 45,

Exhibit 2

> "While the *Charter* does not apply to
> common law disputes between private
> individuals, the Supreme Court has
> acted on several occasions to
> develop the common law in a manner
> consistent with *Charter* values."

Justice Sharpe then reviewed privacy legislation

in Canada and the development of privacy law in

other jurisdictions.   He then said in Paragraph

67,

> "For over one hundred years,
> technological change has motivated
> the legal protection of the
> individual's right to privacy. In
> modern times, the pace of
> technological change has accelerated
> exponentially. Legal scholars such
> as Peter Burns have written of 'the
> pressing need to preserve privacy
> which is being threatened by science
> and technology to the point of
> surrender.' The internet and digital
> technology have brought an enormous
> change in the way we communicate and
> in our capacity to capture, store
> and retrieve information. As the
> facts of this case indicate,
> routinely kept electronic data bases
> render our most personal financial
> information vulnerable. Sensitive
> information as to our health is
> similarly available, as are records
> of the books we have borrowed or
> bought, the movies we have rented or
> downloaded, where we have shopped,

where we have travelled, and the
nature of our communications by cell
phone, e-mail or text message".

He then deals with law as it applied to the

case before the Court.  He said in Paragraph 71,

"The key features of this cause of
action are, first, that the
defendant's conduct must be
intentional, within which I would
include reckless; second that the
defendant must have invaded, without
lawful justification, the
plaintiff's private affairs or
concerns; and third, that a
reasonable person would regard the
invasion as highly offensive causing
distress, humiliation or anguish.
However, proof of harm to a
recognized economic interest is not
an element of the cause of action.  I
return below to the question of
damages, but state here that I
believe it important to emphasize
that given the intangible nature of
the interest protected, damages for
intrusion upon seclusion will
ordinarily be measured by a modest
conventional sum."

He continued in Paragraph 72,

"These elements make it clear that
recognizing this cause of action
will not open the floodgates.  A

Exhibit 2

1    claim for intrusion upon seclusion
2    will arise only for deliberate and
3    significant invasions of personal
4    privacy. Claims from individuals who
5    are sensitive or unusually concerned
6    about their privacy are excluded: it
7    is only intrusions into matters such
8    as one's financial or health
9    records, sexual practices and
10   orientation, employment, diary or
11   private correspondence that, viewed
12   objectively on the reasonable person
13   standard, can be described as highly
14   offensive."
15

16   He then referred to the competing claims of

17   freedom of expression and freedom of the press.

18   He said in Paragraph 73,

19
20   "Suffice it to say, no right to
21   privacy can be absolute and many
22   claims for the protection of privacy
23   will have to be reconciled with, or
24   even yield to, such competing
25   claims."
26

27   In Paragraph 87 Justice Sharpe set out the

28   considerations in determining damages where an

29   intrusion on seclusion has been found to exist.

30   In **Jones** there was no issue about freedom of

31   expression or freedom of the press.   The Ontario

32   Court of Appeal therefore did not have to

1    consider the balance to be struck between those

2    rights and privacy rights.

3        Justice Sharpe specifically mentioned

4    intrusion into matters involving a person's

5    sexual practices and orientation as being

6    possible subjects for a claim of intrusion upon

7    seclusion. However he said these intrusions must

8    be viewed objectively and be viewed as highly

9    offensive. Weight against this is freedom of

10   persons to express their opinions.

11       Certainly the comments made by Mr. Handshoe

12   deal with Mr. Leary's and Mr. Perret's sexual

13   orientation. They're anti-gay and homophobic,

14   they were very upsetting to both as were the

15   doctored up photographs, they're highly

16   offensive. However the issue of weighing the

17   effect of the intrusion on seclusion against the

18   issue of freedom of expression was not argued

19   before me. In such circumstances I conclude this

20   is not an appropriate case for the award of

21   damages for intrusion of seclusion.

Exhibit 2

1    In this regard I note as well the comments

2    of  Justice  Cory  in  **Hill**  where  he  said  with

3    respect to defamation,

4
5         "Reputation is intimately related to
6         the right to privacy which has been
7         accorded constitutional protection."
8

9    This  passage  was  also  quoted  by  Justice

10   Sharpe in Paragraph 43 of the **Jones** decision.

11   Because this is also a defamation action I

12   conclude this is a further reason to leave the

13   issue  of  a  cause  of  action  for  intrusion  on

14   seclusion for another day in another proceeding.

15   Now turning to the damage award with respect

16   to  Trout  Point  Lodge.   With  respect  to  the

17   corporate  plaintiff  it  is  clear  that  a

18   corporation can be defamed.  Damages were awarded

19   to  the  Barrick  Gold  Corporation  and  to  Dover

20   Investments Limited.  In the latter decision the

21   Court set out the principles in awarding damages

22   to a corporate plaintiff.

23   The Court said in Paragraph 19,

1
2          "Damages for a corporate plaintiff
3          are to compensate for the harm to
4          its goodwill and business
5          reputation.  The factors to be
6          considered in assessing damages
7          include the defendant's conduct, his
8          position and standing, the nature of
9          the defamation, the absence of an
10         apology or refusal to apologize and
11         his conduct throughout up to and
12         including at trial.  In addition to
13         general damages for defamation a
14         corporate plaintiff may be entitled
15         to special damages for specific
16         economic loss.  In addition general
17         damages for defamation in
18         exceptional cases a corporate
19         plaintiff may be entitled to an
20         award of punitive damages for
21         malicious, oppressive and high-
22         handed conduct.  Punitive damages
23         are intended to punish a defendant
24         rather than compensate a plaintiff.
25         Compensatory damages of substantial
26         may also be considered punishment
27         and should be taken into account
28         when determining whether an award of
29         punitive damages is warranted."
30

31    Trout Point Lodge has been stated to have been

32    funded by money illegally obtained through Mr.

33    Broussard and through the dishonest actions of

34    Mr. Leary and Mr. Perret and getting money from

35    ACOA and other investors.  It has been said to be

36    on the verge of bankruptcy.  These are things

1    which would cause potential guests to decide not

2    to come to Trout Point Lodge.

3        The defamation in my view has harmed the

4    goodwill of the business and its business

5    reputation.  It casts an unfavorable light on the

6    business which has otherwise received extremely

7    positive reviews in the Globe and Mail, the

8    National Post, US Today and the National

9    Geographic Traveler to mention just a few.

10       It has also been commended by well-known

11   publications such as Four Doors Guide to Atlantic

12   Canada and Forbes Traveller to name a few.

13       It has also been recognized as a Top 10

14   finalist in the National Geographic Society's

15   2009 Geo-tourism challenge.  Some of this

16   information is included at Tab 5 of the evidence

17   submitted at the hearing.

18            Mr. Leary points out in Paragraph 8
19            of his affidavit, "In addition to
20            its membership and prestigious hotel
21            and restaurant association Relais
22            and Chateaux Trout Point has always
23            maintained a four and one half star
24            rating from Canada Select.  It's the
25            only hotel in Atlantic Canada

1    inspected and recommended by Conde
2    Nast Johansens Guide and earned a
3    five green key rating from the hotel
4    association of Canada."
5

6    The defendant is persistent in his

7    statements that Trout Point Lodge is somehow

8    connected to the Jefferson Parish corruption

9    scandal and has benefitted financially from funds

10   illegally obtained. The defendant knows that the

11   original story linking Mr. Broussard with Trout

12   Point Lodge has been retracted and an apology

13   published. In the face of this the defamatory

14   comments continued.

15   Mr. Handshoe had refused to apologize or

16   retract and in fact has republished the original

17   statements and says they are true. In addition

18   he has alleged that the business is on the verge

19   of bankruptcy and has received funds improperly.

20   All this has been done through the internet

21   which has the potential to reach untold numbers

22   of potential guests of Trout Point Lodge

23   throughout the world.

1    The defamation has gone on now for two years

2    and there is no indication that the defendant

3    intends to stop.    The defendant's conduct

4    throughout has been to attempt to destroy the

5    reputation of the business.

6    In my view it may be very difficult to

7    change the perception of Trout Point Lodge caused

8    by the defamation and its reputation as a world

9    class resort has been damaged.

10   I conclude that the appropriate award of

11   damages for the defamation of Trout Point Lodge

12   is $75,000.

13   The individual plaintiffs have been called

14   dishonest, part of money laundering scheme

15   involving Mr. Broussard and part of a political

16   corruption scandal involving Mr. Broussard which

17   is now the subject of FBI investigation.

18   They are said to have lied and misled ACOA

19   and the Court in the ACOA action. Mr. Leary has

20   said to have perjured himself in that litigation.

21   They are said to have misused the justice system

1   in Nova Scotia for their own purposes.  They are

2   referred to as participating in nefarious schemes

3   being bag holders for Mr. Broussard, being

4   unsuccessful businessmen who have had a series of

5   failed businesses and being conmen.

6       Mr. Leary has said they have changed their

7   patterns of running errands to avoid running into

8   people who may ask them about the internet

9   information published about them.  They are

10  embarrassed and stressed by the defamation.

11      To paraphrase the Supreme Court of Canada

12  decision in **Hill**,

13
14          "They will never know who, as a
15          result of the defamation, still has
16          a lingering suspicion that they are
17          dishonest, schemers and con men and
18          were involved with Aaron Broussard
19          in the political corruption of which
20          he is accused.  They will never know
21          who might believe that they are
22          without integrity and were involved
23          in criminal activity."
24

25      These unfounded statements about the

26  character, business dealings and financial acumen

27  of these businessmen merit an award of damages

Exhibit 2

1    for each in the amount of $100,000.

2        Aggravated damages are beyond the damages

3    already awarded which are given when the injury

4    to a plaintiff are aggravated.   As Gatley on

5    libel and slander described it, they reflect a

6    natural indignation of the Court of the injury

7    inflicted.   As Justice Cory said in **Hill** they

8    take into account the additional harm caused to

9    the plaintiff's feelings by the defendant's

10   outrageous and malicious conduct.

11       Justice Cory in **Hill** considered the factors

12   in that case which the Court believed made such

13   an award by the jury in that case a reasonable

14   one.

15       I conclude that the following factors in

16   this case call for such an award here.   The

17   original story was retracted by the Times-

18   Picayune in New Orleans, nevertheless Mr.

19   Handshoe continued to spread the defamation.   He

20   then came up with additional statements

21   concerning events in Nova Scotia which defamed

1    the   defendants   beyond   the   original   defamation.

2    He   commented   on   other   business   ventures   of   the

3    plaintiffs   and   other   legal   matters   in   which   they

4    were   involved   misrepresenting   facts   and   attacking

5    the   reputations   with   statements   that   they   were

6    dishonest,   fraudsters   and   liars.   The   widespread

7    defamatory   continued   to   the   date   of   this   hearing

8    in   a   meeting   well   suited   to   spreading   the

9    defamation   far   and   wide   to   a   vast   number   of

10   internet   users.

11        Furthermore   there   was   conduct   by   the

12   defendant   in   trying   to   stop   the   plaintiffs   from

13   continuing   their   action   against   him.   He

14   threatened   to   release   dossiers   of   information   he

15   had   about   the   plaintiffs   and   other   unnamed   people

16   unless   the   action   was   discontinued.   All   of   this

17   is   outrageous   conduct   in   the   face   of   true   facts

18   about   the   plaintiffs.

19        Malice   is   an   essential   element   of   an   award

20   of   aggravated   damages   and   in   this   case   malice   is

21   alleged   in   the   statement   of   claim   in   Paragraph   93

Exhibit 2

1   and other places and is therefore deemed admitted

2   by virtue of the default judgment.

3       I therefore award an additional $50,000 to

4   each of Mr. Leary and Mr. Perret in aggravated

5   damages to express the indignation of the court.

6       As the Supreme Court of Canada said in **Hill**,

7   punitive damages are not compensatory in nature

8   but are meant to punish the defendant.   There

9   must be a rational purpose in awarding punitive

10  damages.   In **Hill** the Supreme Court of Canada

11  considered the actions of the Church of

12  Scientology and its officers during the course of

13  the litigation and focussed on its oppressive and

14  high handed conduct and the malice of which it

15  acted throughout.

16      The defendant in this case continued his

17  defamation after the newspaper printed a

18  retraction of its story linking Trout Point

19  Lodge, Mr. Leary and Mr. Perret with Aaron

20  Broussard and the serious criminal allegations

21  against him.   He redoubled his efforts after

1   being sued and continued his defamation after

2   judgment had been entered against him.    He

3   repeated the original defamatory statements.

4        Just prior to the hearing about damages

5   there were further defamatory statements.

6        Mr. Handshoe has stated that because of

7   legislation in the United States it would be

8   impossible for the plaintiffs to recover judgment

9   against him.    This is a factor in awarding

10  punitive damages.

11       I conclude there is a rational reason for

12  awarding punitive damages in this case for the

13  defendant's egregious misconduct which offends

14  the court's sense of decency.    It is to act as a

15  deterrent not only to Mr. Handshoe but also to

16  others who might be inclined to defame someone in

17  this fashion.

18       With respect to Trout Point Lodge I conclude

19  that the defamation award itself is an

20  appropriate award to punish the defendant for his

21  defamation of the corporate plaintiff.    With

1  respect to Mr. Leary and Mr. Perret I conclude

2  that there is a need for additional punishment of

3  the defendant because the defamation of them goes

4  beyond what has been said about the company.

5      In my view the award of general and

6  aggravated damages to Charles Leary and Vaughn

7  Perret is insufficient to properly denounce the

8  actions of Mr. Handshoe and serve the goal of

9  deterrence.

10     I therefore conclude that there should be an

11  additional $25,000 awarded to each of Charles

12  Leary and Vaughn Perret as punitive damages

13  against Mr. Handshoe.

14     I'm satisfied that an injunction should

15  issue.    The   principles   for   granting   of

16  injunctions in defamation cases were set out in

17  **Astley**.    **Barrick Gold** made it clear that

18  injunctions are available in cases of defamation.

19  In **Astley** Justice Chapnik said in Paragraph 21,

20

21          "Permanent     injunctions     have
22          consistently   been   ordered   after

```
1        findings of defamation where either:
2        (1) there is a likelihood that the
3        defendant will continue to publish
4        defamatory statements despite the
5        finding that he is liable to the
6        plaintiff for defamation; or (2)
7        there is a real possibility that the
8        plaintiff will not receive any
9        compensation, given that enforcement
10       against the defendant of any damage
11       award may not be possible."
12
```

13    Applying these factors to this case I look

14  at the conduct of the defendant which, from the

15  beginning, was defamatory and continued with more

16  fervor after a retraction was printed, was

17  published.  It became stronger and more malicious

18  and derogatory as the action was commenced and as

19  it proceeded to this assessment of damages.

20  There's been no retraction or apology but a

21  continued campaign of defamation against these

22  plaintiffs and homophobic comments about their

23  sexual preference.

24    It is clear from the evidence before me that

25  Mr. Handshoe will continue to publish the

26  defamatory material.  He says he's protected from

27  foreign defamation judgments such as the default

1    judgment in this proceeding by legislation in the

2    United States.

3         It also may be difficult if not impossible

4    for the plaintiffs to recover on their judgment.

5    It's not known what assets Mr. Handshoe has or

6    whether enforcement in the U.S. on the monetary

7    judgment will be possible.

8         I therefore conclude that an injunction

9    should issue. Mr. Handshoe is therefore enjoined

10    from dissemination, posting on the internet,

11    distributing or publishing in any manner

12    whatsoever, directly or indirectly statements or

13    comments about Trout Point Lodge, Charles Leary

14    and Vaughn Perret. This includes statements or

15    comments which refer to the three plaintiffs by

16    name, depiction or description. The mandatory

17    injunction shall also issue requiring Douglas

18    Handshoe to remove the defamatory comments,

19    statements and depictions from any internet site

20    on which he has posted them and any links to

21    those sites.

1    The plaintiffs seek solicitor client costs

2    of these proceedings.   However they have not

3    retained the services of counsel but have

4    represented themselves throughout.   It is true

5    that Vaughn Perret is a law graduate and has

6    practised law.   However he has non-practising

7    status and has never been approved to practise

8    law in Nova Scotia.   I therefore cannot conclude

9    that solicitor client costs are warranted.   That

10   is not to say that self-represented parties are

11   not entitled to their costs.   In Nova Scotia it

12   has been said that costs can be awarded to self-

13   represented parties beginning with the decision

14   in **MacBeth v. Dalhousie University** and more

15   recently in the Court of Appeal decision in **Crewe**

16   **v. Crewe.**

17       I've awarded the costs in the modest amount

18   of $4,000 to self-represented parties in **Salman**

19   **v. Al-Sheik Ali.**   In that case the self-

20   represented parties took part in multi-party

21   litigation and were well prepared and did not

1   cause any delays of five and one half days.

2        I conclude that in the circumstances of this

3   case there should be a modest costs award to

4   reflect the time spent on this matter by the

5   individual plaintiffs.   They brought the matter

6   on to court and obtained a default judgment.

7   They were well prepared for the one half day

8   hearing to assess damages but it was unopposed.

9        I therefore award them costs in the total

10   amount of $2,000.

11        The self-represented parties of the **Salman**

12   matter were also entitled their disbursements as

13   are the plaintiffs in this case.   They however

14   have not provided me with their disbursements.

15   If they wish to provide that information I will

16   consider their out of pocket costs and render a

17   further brief decision.   I should note however

18   that the final order in this matter therefore

19   cannot be issued until that is done.

20        That concludes my oral decision and I guess

21   the only question I have for the parties is do

1    you wish to make a claim for the disbursements

2    which will mean that the order can't be issued in

3    this proceeding until that's done.

4        **MALE VOICE:**    No My Lady, we would forego

5    the out of pocket costs.

6        **THE COURT:**    Thank you, so the order can

7    be issued sooner rather than later.    Thank you,

8    that concludes the matter.

9

10            **[END OF RECORDING 11:22 P.M.]**

11

12

13

14

15

16

17

18

19

20

21

22

## CERTIFICATE OF COURT TRANSCRIBER

I, Rita Newton, Court Transcriber, hereby certify that I have transcribed the foregoing and that it is a true and accurate transcript of an oral decision given in the matter of **Trout Point Lodge versus Douglas Handshoe,** taken by way of electronic recording in Halifax, Nova Scotia on February 1, 2012.

_____

Rita Newton, Certificate No. 2006-56

CERTIFIED COURT TRANSCRIBER,
PROVINCE OF NOVA SCOTIA

Halifax, Nova Scotia

February 20, 2012