Transcription of Supreme Court of Nova Scotia Proceeding
Trout Point Lodge et. al. v. Doug K. Handshoe
January 30, 2012 and January 31, 2012

January 31, 2012, 10:59 am

THE COURT: I'm hear to tell you that I haven't finished writing the decision. It took a great deal longer than I had anticipated. I worked on it until almost 11 o'clock last night and started again at 7 this morning, and I'm still not done. And I think it deserves further work. My intention would be to finish it today, and tomorrow morning at 10. Is that going to be possible for the two of you to come back?

MR PERRET: Whenever is convenient for you, My Lady.

THE COURT: 10 o'clock tomorrow morning. I do apologize brining you back in this morning, but it just . . . there was a great deal of material to review that I hadn't seen before yesterday and it's just taken more time than I had anticipated. And it deserves to be done properly. So I will reserve again until 10 o'clock tomorrow morning.

MR PERRET: Would you like more time?

THE COURT: No no I'm making good progress now, but it's not done yet.

Court closed.

_____

January 30, 2012, 1:18 pm

MR LEARY: My plan, My Lady, was just to be sworn and briefly provide some *viva voce* testimony, including just providing a summary of what is in the material of the book that was just presented to you.

THE COURT: Ok well this where we've got to distinguish between your role as a party who is going to give evidince and your role as representing yourselves as counsel where you're going to make submissions to the court. Your submissions to the court about the law are not evidence. If you need to take the witness stand to give me evidence about factual matters, then you can do that. But when are you're making submissions arising out of your written brief that's what you do from the counsel table.

MR LEARY: Yes, My Lady. What we wanted to do was just briefly give testimony in evidence, and then come back some legal arguments and then that would be the end.

THE COURT: Okay. . . You're going to testify first?

MR LEARY: Yes.

THE COURT: Okay . . . He is going to be affirmed.



20 12   No. _____
This is Exhibit " C- " referred to
in the affidavit of Charles Leary
(sworn/affirmed) before me
on _____ July 10 ___ 20 12
ELAINE L. D'ENTREMON
COMMISSIONER OF THE SUPRI
Signature COURT OF NOVA SCOTIA



**EXHIBIT**

tabbies"

"C"

Noise

Mr. Leary sworn.

MR PERRET: My Lady, you can find the documents that we will be referring to at Exhibit 16.

THE COURT: Okay

MR PERRET: I'm going to show Mr. Leary what it is that I'm referring to.

MR LEARY: I'll just also make also a brief statement as well. The materials other than what is case law in here are all materials that Mr. Perret and I, side by side, have downloaded, compiled, and printed within the past 2 or 3 days.

THE COURT: Okay.

MR LEARY: I can testify to their authenticity.

THE COURT: Well, now this is a Chambers Motion as an assessment of damages and the rules with respect to hearsay are relaxed on Chambers Motions, but I'll still have to be careful that I don't hear evidence that's not admitted, that's not admissible. Okay?

MR LEARY: Sure.

MR PERRET: Mr. Leary, Charles, do you have before you . . .

THE COURT: Can you just wait a second we want to make sure we can hear you. I think you need to be by the microphone.

MR PERRET: Okay . . . Charles, do you have the Louisiana Ethics complaint against Aaron Broussard before you?

MR LEARY: Yes, that's at tab 16 and I think it's 3 pages into the tab and it's a page headed State of Louisiana Division of Administrative Law. And this is material that was published in a newspaper article about the Louisiana Ethics Board having charges against Aaron Broussard. The newspaper published these court documents.

PERRET: And what's the nature of the charges against Mr. Broussard?

LEAR: Mr. Broussard is facing 2 charges. He received a thing of economic value in the form a Gift Certificate valued at 4500 dollars from the personal funds of government employees, and the 2nd charge is that he received a thing of economic value in the form of payments from a private company, Lagniappe Industries. Those are the only 2 charges. We've actually contacted the Louisiana Ethics Board to confirm that those were the only 2 charges faced by Mr. Broussard. We did that about 10 days ago, and uh . . .

PERRET: Was there ever . . .

2

THE COURT: Can I just stop you? We don't need to prove the defamation. You need to satisfy me about, I guess, any new things have happened since your Statement of Claim was filed that affect you as the plaintiffs or your company.

MR LEARY: Yes, My Lady, it does go to that.

MR PERRET: Yeah. It does. It touches on that.

THE COURT: I just don't want us to get like way off track here.

LEARY: No no, we're going to try to stay very focused.

PERRET: My Lady, these were things that were published subsequent to the service, or events also that occurred subsequent to the service; most of them. Do the ethics complaints mention Trout Point Lodge?

LEARY: No. No. They don't mention Trout Point Lodge. They don't mention Nova Scotia. They don't mention properties in Canada.

PERRET: No mention of Mr. Broussard's properties in Nova Scotia?

LEARY: No.

PERRET: Okay. Why is this important? Since the 13th this has been used . . .

LEARY: Mr. Handshoe on his blog has repeatedly represented that the Louisiana Ethics Board was still considering Ethics Board charges related to his Nova Scotia properties and that Trout Point Lodge was under investigation, and this is absolutely not the case. He's misrepresenting the documents of the Louisiana Ethics Board in his blog publications, and defaming Trout Point Lodge at the same time.

PERRET: In an attempt to extend the defamation?

LEARY: Yes.

PERRET: But couch it within legal terms and within the authority of the State behind it?

COURT: Well, okay, he has to give the evidence, okay?

PERRET: Okay.

LEARY: To give it context, I think it's in paragraph 12 of the Statement of Claim gives the origin of this whole thing.

COURT: Yes.

LEARY: But basically, Trout Point Lodge was misidentified as belonging to this Louisiana politician and being the subject of accusations of criminal and unethical activity. Um, and this is very serious matter in my view because there is actually a federal criminal investigation and there have been Grand Jury indictments handed down in Louisiana against Mr. Broussard, and one of Mr. Handshoe's constant themes is to continue the lie that Trout Point Lodge is somehow involved in those federal crimes. And

3

what we're trying to do with Tab 16 is just show that he takes documents, including official court documents, and misrepresents them.

PERRET: Okay. Charles, can you look at the Factual Basis before you.

LEARY: Yes, there's 2 pages. We just put in the first page and then the 7th page. It's U.S. States District Court, Eastern Distrcit of Louisiana, and it's a factual basis which was prepared by the U.S. Attorney's Office in their charges against Karen Parker, who is Mr. Broussard's ex wife.

PERRET: And what does it say?

LEARY: The important paragraph is on the 2nd page, which is actually page 7 of the Factual Basis. It's entitled "Broussard uses his public office for private gain." In that, the U.S. Attorney does refer to a holding company that Mr. Broussard was majority owner of. The U.S. Attorney does not identify where that holding company was located; and it states that that holding company owned an investment property in Canada. It does not say Nova Scotia, it just says in Canada; and that Mr. Broussard received income from this Canadian property.

PERRET: And what does Mr. Handshoe say?

LEARY: Mr. Handshoe says that this document says "Nova Scotia" and "Trout Point Lodge" and that it proves that Trout Point Lodge was laundering money for Mr. Broussard. That is how he represents it on his blog.

PERRET: Okay. I want to refer you to the last of those 3 exhibits in Tab 16. The letter from Roy d'Aquila, which was published on the 25th and excited the article which was published on the 26th [of January, 2012].

LEARY: Actually . . .

*noise of pages turing*

PERRET: It's in there.

THE COURT: It's the very first document in that Tab, is it not?

LEARY: Ah, yes it is. Okay.

THE COURT: Yes, I have that. Thank you.

LEARY: So this is a letter from Roy d'Aquila to Trout Point Lodge which I provided in an affidavit in the WVUE-Louisiana Media case. Mr. D'Aquila is the person who just died recently. And Mr. . . . the letter is about asking if Trout Point Lodge will put a rider on a building that was co-owned by Mr. Broussard and Mr. D'Aquila. The Lodge leases that building and they wanted to see if we would take over the insurance coverage for it or put a rider on it. And we never did. The Lodge declined to take on that expense. Mr. Handshoe on his blog represents this letter as proof that Aaron Broussard had a management role in Trout Point Lodge. A letter asking us if we would put a rider on a building he co-owned. As far as I can tell that does not show any management control, and in fact the fact that we didn't provide that coverage shows that Mr. Broussard didn't get his way and was not in any sort of

management or control position vis-a-vis Trout Point Lodge.

PERRET: In any conceivable circumstance, Charles, could Mr. Broussard have the authority to order Trout Point Lodge to do anything?

LEARY: No. Absolutely not.

PERRET: Have you ever been ordered by Mr. Broussard to do anything?

LEARY: No. Mr. Broussard has no control over Trout Point Lodge, never has. Um, so these are, this is, without getting into legal argument, these are just examples of total blatant misrepresentations trying to continue the defamation and the linking of Trout Point Lodge with federal crimes. Um . . .

PERRET: Charles, before you do you have the example of the publications after service?

LEARY: Yes, and that's what I wanted to move on to, was just a very . . . Maybe, My Lady, if I could I'll just quickly summarize the Table of Contents?

THE COURT: Sure.

LEARY:

---

1:59 pm

LEARY: And he repeatedly also, for instance on page 22 of that Tab, refers to us defrauding the Canadian federal government, particularly ACOA, which was never one of ACOA's allegations in their lawsuit, and mis-portrays that litigation. He not only says that I perjured myself, he also misrepresents that litigation as being something that's ongoing when that was settled quite some time ago now. Laundering money has been a major theme since the Amended Statement of Claim was filed. We're laundering Aaron Broussard's money for him.

PERRET: Those are Mr. Handshoe's words, Charles?

LEARY: Yes. . . .

2:06 pm
LEARY: And um in general he . . . a lot has happened over the past 2 weeks, 2-3 weeks, One thing being that Mr. Broussard . . . in early December, Mr. Broussard, his wife, and another public official in his administration were indicted by a Grand Jury, and the U.S. Attorney's Office and the FBI is still carrying out an active investigation of criminal wrongdoing. Obviously, no trial has been held, no one is guilty yet. Mr. Handshoe is constantly trying to associate us and Trout Point Lodge with that, and is actively encouraging his readers to go to the FBI and implicate us somehow in that scandal, trying to get people to put us under federal scrutiny for crimes, imagined crimes. You know that's very scary to us; no one wants to be investigated by the FBI. Even if one is completely innocent, the threat of undergoing something like that is substantial. These are very serious matters that need to be investigated, um, but . . . He also, I think he does this intentionally, he knows that there's a civil    5

proceeding against him in Nova Scotia, so he accuses us of perjury in Nova Scotia before the Nova Scotia judiciary, he accuses us of misleading the judiciary. He knows that we might go to authorities in the United States for cyberstalking or harassment, so he accuses of crimes. It's very hard to go to a police person and say "here, look at this, he's accusing us of crimes." We have reported his activities to the RCMP as well, and at one point the RCMP investigator said . . .

THE COURT: You can't tell me; that is definitely hearsay.

LEARY: Okay.

THE COURT: Okay. You can tell me that . . . there's no investigation ongoing.

LEARY: It's very stressful to have to refer a police officer to accusations that you are committing major crimes, which have no substantiation, but still it's intimidating.

Um . . .

And he's also . . . At Box 70 on page 42, "if you were sold a stake in either La Ferme d'Acadie or Cerro Coyote, Slabbed wants to hear from you." We do, we make a business out of small hotel projects where we have minority investors. And he is intentionally trying to suggest to those people that their investment is worthless, that we are scam artists; he tries to rile them up, which so far he hasn't been successful, but he intentionally tries to do that. He also, I believe, intentionally tries to make it difficult for us to ever try to do this sort of thing again. If his publications are still extant, our goodwill at Trout Point is damaged, our goodwill at Cerro Coyote is damaged, and people are going to be vary wary about investing money with us if they see these sorts of allegations. One of the insidious things as well in my opinion about Slabbed, is this gentleman is as far as I can tell a college graduate, he's a Certified Public Accountant in the United States, he states on his blog that he has been entrusted with beign an auditor for municipalities and I have found that he was once an auditor for a community college. He's in a position of trust, he's well educated, and his blog has the appearance and he represents it as being a serious legal affairs and insurance matters blog. It started after Hurricane Katrina as a discussion of insurance and legal matters int he wake of that horrible storm, and he has gone on with the serious demeanour of carrying out investigations to make all of these defamatory comments. And I think its reflected in our brief as well that people do believe him. They look at this stuff and they say "this must be credible." I have no doubt we have lost business because of these publications. It's very hard to quantify, but . . .

**2:14 pm**

LEARY: He also accuses us of having WWL Television pull a news report on the Broussard Ethics Board investigation from that TV station and suggests that we coerced them into doing that, which is not the case, we have never asked WWL Television to remove anything.

As here's a local favorite. He also accuses us of somehow being involved with the scandal that's alleged relating to the Southwest Shore Development Authority based in Yarmouth [Nova Scotia]. That somehow . . . Several years ago the Department of Environment had finished their plan for the Tobeatic Wilderness Area. Trout Point Lodge lies adjacent to the Wilderness Area, and they were encouraging people to form organizations that would take care of trails for public access to the Wilderness Area. And Mr. Broussard, who we have always admitted owned property on the Trout Point Road, that's no mystery, was a member and supporter of that trail concept, as were we personally and Trout Point

Lodge. And Mr. Handshoe . . . That was also for a brief period an initiative of SWSDA, when it was still in existence; the Southwest Shore Development Authority was in concert with the Department of Environment trying to get the first public access trail in the wilderness area, and Mr. Handshoe represents that as us being involved the illegal flow of monies involving the Southwest Shore Development Authority. He's been told by people other than us that that's a ridiculous proposition, but he keeps, he keeps it up.

PERRET: Charles, has, have we ever received monies from SWSDA?

LEARY: No. We've never received monies from SWSDA.

THE COURT: I think we've just about covered . . .

LEARY: Yeah I think Your Ladyship if you just look at the material it's pretty self explanatory. Let me just see if there's anything else. . . .


## Submissions on the Law
**2:39 pm**
LEARY: Unlike Scientology and the case of Mr. Manning, Mr. Handshoe admits to malice. One prominent example is admitting to Frank magazine here in Nova Scotia that he was "screwing with" the plaintiffs, and he admits to it in various other ways as well. And indeed, we have plead express malice in the pleadings, which I would assume would be deemed admitted. He has also sought to extort us, I would argue, out of our civil claim against him by saying "either drop your suit or I'll do worse to you." And while Mr. Handshoe did not hold a press conference in a lawyer's gown on the steps of the courthouse, as in Scientology, he has used the Internet to achieve wide distribution of his message and he has acted on various sites across the Internet besides just Slabbed. Many of his allegations have also been republished on blogs in Nova Scotia. As in Hill, Handshoe accuses the plaintiffs of misleading the court and of participation in other illegal acts. Unlike Hill, the list of crimes alleged is extensive and serious, including numerous felonies.

Like in Hill, allegations have been seen by hundreds of thousands of people, arguably. It's in the pleadings that Mr. Handshoe said in March of 2011, that he was surpassing 90,000 unique viewers a month and his defamatory statements have been up in some cases for 2 years. Unlike Hill and unlike TV a few decades ago, the Internet defamation has continued unabated for 2 years. . . .


**2:44 pm**
LEARY: Like in Hill, Handshoe knows or reasonably should have known that his allegations are groundless. He has ignored retractions and chosen to pursue this line of allegations out of express malice. While Handshoe has not appeared or entered a plea, as was the case in Scientology, he has continued to publish that his allegations are true and justified. And in Scientology, there were pleas of truth and justification which were only removed at the last minute. In fact, he has expanded the list of allegations and imputations made against the plaintiffs. Handshoe has accused the plaintiffs of threatening him and others, and of putting the lives of Slabbed contributors in danger. Unlike Hill, Handshoe has used the plaintiffs' private life and sexual orientation as devices of harassment and defamation. He uses gayness as a market of moral turpitude. As in Hill, and I'm quoting or paraphrasing, it will be extremely difficult to correct the impression left with viewers that Charles Leary, Vaughn Perret, and Trout Point Lodge must have been guilty of unethical and illegal conduct. As in Hill, paragraph 179, quote: the publication of the libellous statement was carefully orchestrated,

unquote, across the Internet at various web sites designed to inflict the most damage possible on the reputation of the personal plaintiffs and the goodwill of the corporate plaintiff. The misconduct of the defendant extends to urging Joyce Case-Harlow and others to report the plaintiffs to the FBI and making wild criminal accusations during the time period of an ongoing federal criminal investigation of Aaron Broussard, trying to get the plaintiffs truly implicated in criminal proceedings.

THE COURT: I just need you to go a little slower.
On Injunctive Relief
2:54 pm
LEARY: Mr. Handshoe's publications are full of references to the United States SPEECH which was enacted just last year [sic]. The SPEECH Act does make it more difficult for those holding foreign defamation judgments to have them enforced in the United States. Mr. Handshoe, as is his penchant, misrepresents what the Act actually says. The Act has 2 parts, stating in part "A" that if the jurisdiction of the foreign judgment does not have the same constitutionally protected free speech rights as in the United States, that the judgment will not be enforced. But it also has a provision "B" which states that even if that were the case in the jurisdiction, if the behavior and conduct, and the defamatory statements of the defendant would have been deemed to libellous under the standards of the state and the federal law in the United States where the defendant resides, then that judgment can be enforced. But still, there is another hurdle for us to go through.

OURT: Sure.