## <u>IN THE SUPREME COURT OF NOVA SCOTIA</u>
**Citation:** Atlantic Canada Opportunity Agency  v. La Ferme D'Acadie,
2008 NSSC 334

**Date:** 20081114
**Docket:** SK 180846
**Registry:** Kentville

**Between:**

The Atlantic Canada Opportunity Agency

Plaintiffs

and

La Ferme D'Acadie, Daniel Abel, Vaughn Perret, Charles Leary

Defendants

| | |
|---|---|
| **Judge:** | The Honourable Justice Arthur J. LeBlanc |
| **Heard:** | June 5, 2008, in Kentville, Nova Scotia |
| **Counsel:** | Randall P.H. Balcome, for the plaintiff |
| | Charles Leary, self-represented, for La Ferme D'Acadie |
| | Daniel Abel, Vaughn Perret, not in attendance |

**Exhibit 8**

Page: 2

**By the Court**:

[1]     The defendants/plaintiffs by counterclaim apply to have the statement of claim dismissed  for want of prosecution pursuant to *Civil Procedure Rule* 28.13. The respondent, who is the plaintiff and defendant by counterclaim in the action,    opposes the application and maintains that the affidavit and amending affidavit filed by the applicant are defective pursuant to Rules 38.02 and 38.11.


**Background**


[2]     In June 1998 the plaintiff, the Atlantic Canada Opportunities Agency, made a "repayable contribution" to a partnership involving the defendants, in order to assist in the startup of a cheesemaking and tourism business.  The partnership was subsequently dissolved and incorporated by the former partners, and part of the business was moved to another location.  In September 2001, the plaintiff declared that the partnership was in default of the repayable contribution agreement.  The plaintiff launched an action in June 2002, the defendants being Mr. Leary, his former partners and the partnership itself.  I note that Mr.

Leary acts both for himself and for the partnership on these applications;
when Mr. Leary is referred to, the reference includes the partnership, La
Ferme D'Acadie, where appropriate.

[3]     The plaintiff served Mr. Leary and the partnership but was unable
to serve the other former partners.  Mr. Leary served a demand for
particulars on the plaintiff, to which the plaintiff replied in September
2002.  Mr. Leary filed a defence and counterclaim, in reply to which the
plaintiff served a demand for particulars.  This demand went
unanswered.  The partnership did not file a defence and the plaintiff
obtained default judgment in November 2003.

[4]     Mr. Leary and his former solicitor were unaware of the default
judgment and the issue was never discussed or raised by any party until
more than one year later.  The plaintiff agreed to set aside the default
judgment in March 2005.  In April 2005, Mr. Leary answered the
plaintiff's demand for particulars. Subsequently, there was no activity on
the file until November 2007, when the plaintiff filed a Notice of Intention
to Proceed.  Mr. Leary filed a Notice of Intention to Act in Person in

February 2008.  He commenced this application on March 19, 2008.  He states in his affidavit that there were, in the interim, unsuccessful attempts to settle the claim, with offers by Mr. Leary being rejected or left unanswered.

[5]    Since the proceedings were initiated against the defendant and the partnership, certain of the plaintiff's officials have passed away or moved on to new employment.  Three employees who were involved in the dealings between the parties, Valerie Murray, Stewart McDonnell and Gregory Morrissey, have passed away.  Two others have taken up employment with other federal agencies, and while another is no longer employed by the plaintiff.

[6]    The applicant claims that broken pipes caused a flood in his home during the winter of 2002, resulting in the destruction of documents.  In August 2005, Hurricane Katrina wiped out the office of Daniel G. Abel, who was Mr. Leary's Louisiana attorney and business associate.  The applicant maintains that he kept records of the partnership's dealings with the plaintiff, as well as other business records, at this location.  In

Page: 5

the spring of 2006 a break-in at Trout Point Lodge in East Kemptville, NS,
resulted in the theft of a safe containing certain documents related to the
transactions which are the subject of this proceeding.

[7]   The respondent argues that the application should be rejected and
that the applicant's affidavit is defective, as it allegedly contains opinion
and conclusions, as well as frivolous, irrelevant and spurious allegations,
contrary to *Rule* 38.11.

**Issues**

[8]   Therefore, the issues that I have to resolve are the following:

    (1) Should portions of the defendant's affidavit be struck out,
and if so, of what evidential use are they?

    (2) Should the plaintiff's action be dismissed for want of
prosecution?

## Affidavits

[9]     The relevant provisions dealing with affidavits are the following:

38.02 (1)  An affidavit used on an application may contain statements as to the belief of the deponent with the sources and grounds thereof.

38.11 The court may order any matter that is scandalous, irrelevant or otherwise oppressive to be struck out of an affidavit.

38.12 With the leave of the court, an affidavit may be used in evidence and filed notwithstanding any irregularity in the form thereof or of the certificate on any exhibit.

[10]     With respect to the requirements of an admissible affidavit, Davison J. set out the following principles in *Waverley v. Nova Scotia (Attorney General)*, (1993), 123 N.S.R. (2d) 46 (S.C.), at para. 20:

1. Affidavits should be confined to facts. There is no place in affidavits for speculation or inadmissible material. An affidavit should not take on the flavour of a plea or a summation.

2. The facts should be, for the most part, based on the personal knowledge of the affiant with the exception being an affidavit used in an application. Affidavits should stipulate at the outset that the affiant has personal knowledge of the matters deposed to except where stated to be based on information and belief.

3. Affidavits used in applications may refer to facts based on information and belief but the source of the information should be referred to in the affidavit. It is insufficient to say simply that "I am advised".

4. The information as to the source must be sufficient to permit the court to conclude that the information comes from a sound source and preferably the original source.

5. The affidavit must state that the affiant believes the information received from the source.

[11]   In general, Mr. Leary's affidavit, filed March 19, 2008, contains a great deal of irrelevant material, as well as conclusions and arguments.  However, sufficient material remains that is relevant and admissible pursuant to *Rule* 38, such that I prefer to reject the inadmissible aspects and leave standing the remaining portion of the affidavit for the purpose of considering the application to strike for want of prosecution.

[12]   The applicant filed an amended affidavit on May 29, 2008.  From a review of this amended affidavit it is evident that the affidavit is contrary to the principles set out in *Waverley*, with much of the content being argumentative and irrelevant.  For example, paragraphs 8 and 9 contain information that is clearly irrelevant and frivolous with respect to attempts to serve the co-defendants.  The portion of the affidavit headed "Unequal Treatment" (at paragraphs 95-110) likewise has no relevance; Mr. Leary's allegation of "unequal treatment" based on his American nationality or his sexual orientation appears to be speculation.  Furthermore, in

numerous areas the affidavit takes on the flavor of a plea or summation.  One paragraph goes so far as to support Mr. Leary's position with a case reference (para. 39).

[13]   In certain portions of the amended affidavit, the affiant relies on information from individuals or sources that are not adequately identified.  For example, at paragraph 36 the defendant states that "at least three employees" informed him that a particular witness was deceased, offending the *Waverley* requirement for specific identification of the source

[14]   Mr. Leary states at paragraph 6 of an affidavit sworn on May 20, 2008, that "the lack of any documents available from the province of Nova Scotia further prejudices my defense and my counterclaims in this action, and this fact only came to my attention after my application for Dismissal for Want of Prosecution was already filed".  This paragraph is clearly an argument and does not belong in an affidavit.  As a result, this portion of this affidavit should be struck.  Mr. Abel's affidavit contains a similar argument, which should also be struck.

[15]   Having struck a good portion of Mr. Leary's affidavits, and portions of Mr.

Abel's affidavit, I must decide whether the entire affidavits should be struck or

whether they can be retained for the purpose of this application.  In *Waverley,*

*supra*, Justice Davison stated that a nonconforming affidavit might be retained so

long as it has some measure of evidential value.  He said, at para. 25:

> "During the course of oral submissions I made the suggestion that rather than having the
> applicants go to the expense of drafting further affidavits, the court could declare the
> limited basis on which the affidavit is to be received.  I considered that approach to be a
> pragmatic one which would not cause injustice to either party.  Judges are trained in
> rejecting information which is before them for certain purposes and accepting that
> information for other purposes.  Such a situation occurs frequently in criminal cases
> where a judge sitting without a jury is required to enter into an examination of the
> admissibility of evidence through a voir dire.  I expressed the view that a judge who hears
> [a particular] issue would not be tainted by the fact that the affidavits contain information
> which are irrelevant to the issue before him and that by stipulating the limited purpose for
> which the affidavits are received a more expeditious and less expensive result would be
> achieved."

[16]   In *Waverley*, Justice Davison ultimately struck two affidavits entirely and

retained portions of another affidavit.

[17]   Mr. Leary is self-represented.  It would be inappropriate to dismiss the

application entirely and require him to file further affidavits.  I am satisfied that I

am in a position to rely only on the portions of the affidavits that are relevant to

Mr. Leary's application to stay the proceedings against him.  In assessing his

application, I am considering the following evidence, drawn from the amended

affidavit of May 29, 2008:

> 1.    Not all of the former partners of the partnership were successfully served by the plaintiff;

2.    In December 2003, Mr. Leary received an e-mail from his counsel, John Bonn, indicating that no correspondence had been received from ACOA;

3.    Siobhan Doyle took over as solicitor for the ACOA file in mid-2003, and pursued default judgment without contacting the defendant or his counsel;

4.    Mr. Leary learned of the default judgment in late 2004;

5.    In March 2005, the plaintiff consented to setting aside the default judgment;

6.    Mr. Leary's counsel informed him that no action between the parties occurred between July 2005 and November 2007;

7.    In November 2007, ACOA changed solicitors and filed a Notice of Intention to Proceed;

8.    The defendant and his partners engaged in extensive correspondence with Mike Hosford and Valerie Murray;

9.    Kirk Cox had no recollection of Mr. Leary, or of the situation between ACOA and the defendants, from his time working for the Minister of State for Nova Scotia;

10.     In 2002, there was a flood in the defendant's house, caused by broken water pipes and certain documents were destroyed;

11.     In 2005, Hurricane Katrina destroyed documents held by Mr. Leary's American attorney, Mr. Abel, which, Mr. Leary believes, included 90% of his documentary evidence.  In the spring of 2006, a break and enter at Trout Point  resulted in the apparent loss of business documents of Mr. Leary's, which were in a safe that was stolen.  These two incidents caused the defendant to lose documents including business records, payrolls, cheesemaking records, invoices, licenses and permits.

12.     Mr. MacDonald, Ms. Murray and Mr. Morrissey have passed away, while other officials have moved to different departments of the federal government or are no longer employed with the federal government.  Mr. MacDonald, Ms. Murray and Mr. Morrissey all played pivotal roles in the application and administration of the loans.

**Dismissal for Want of Prosecution**

[18]   The applicant relies on *C.P.R.* 28.13  as the basis for his  application for dismissal for want of prosecution.  This rule  provides:

> Where a plaintiff does not set a proceeding down for trial, the defendant may set it down for trial, or apply to the court to dismiss the proceeding for want of prosecution and the court may order the proceeding to be dismissed or make such order as is just.

[19]   In order to successfully argue that the proceedings should be dismissed for want of prosecution, the applicant must address three criteria, which were described as follows in *Moir v. Landry* (1991), 104 N.S.R. (2d) 281; 1991 CarswellNS 135 (S.C.A.D.), by Hallett J.A., for the court:

> 4   It is clear that the principles to be followed in determining an application for dismissal are as set out by Cooper, J.A., in *Martell v. Robert McAlpine Ltd.* (1978), 25 N.S.R. (2d) 540 at p. 545 as follows:
>
> > I now direct my attention to the principles which should govern the exercise of a judge's discretion in deciding whether or not an application for dismissal of an action for want of prosecution should be granted. There must first have been inordinate and inexcusable delay on the part of the plaintiff or his lawyers and, secondly, as put by Russell, L.J., in *William C. Parker Ltd. v. Ham & Son Ltd.*, [1972] 3 All E.R. 1051, at p. 1052:
> >
> > > "...that such delay will give rise to a substantial risk that it is not possible to have a fair trial of the issues in the action or is such as is likely to cause or to have caused serious prejudice to the defendants..."
>
> 5   These principles were cited with approval by Chipman, J.A., in *Attorney General of Canada v. Foundation Company of Canada Ltd. et al* (1990), 99 N.S.R. (2d) 327 at p. 333.  These principles are also spelled out by Salmon, L.J., in *Allen v. Sir Alfred McAlpine & Sons, Ltd. et al.*, [1968] 1 All E.R. 543 at p. 561 where Salmon, L.J., stated:
>
> > "A defendant may apply to have an action dismissed for want of prosecution either (a) because of the plaintiff's failure to comply with the Rules of the Supreme Court or (b) under the court's inherent jurisdiction. In my view it matters not whether the application comes under limb (a) or (b), the same principles apply. They are as follows: In order for such an application to succeed, the defendant must show:
> >
> > > (i) that there has been inordinate delay.  It would be highly undesirable and indeed impossible to attempt to lay down a tariff so many years or more on one side of the line and a lesser period on the other.  What is or is not inordinate delay must depend on the facts of each particular case.  These vary infinitely from case to

case, but it should not be too difficult to recognize inordinate delay when it occurs.

(ii) that this inordinate delay is inexcusable. As a rule, until a credible excuse is made out, the natural inference would be that it is inexcusable.

(iii) that the defendants are likely to be seriously prejudiced by the delay. This may be prejudice at the trial of issues between themselves and the plaintiff, or between each other, or between themselves and the third parties. In addition to any inference that may properly be drawn from the delay itself, prejudice can sometimes be directly proved. As a rule, the longer the delay, the greater the likelihood of serious prejudice at the trial.

If the defendant establishes the three factors to which I have referred, the court, in exercising its discretion, must take into consideration the position of the plaintiff himself and strike a balance.  If he is personally to blame for the delay, no difficulty arises.  There can be no injustice in his bearing the consequences of his own fault. If, however, the delay is entirely due to the negligence of the plaintiff's solicitor and the plaintiff himself is blameless, it might be unjust to deprive him of the chance of recovering the damages to which he could otherwise be entitled."

[20]   In Nova Scotia, an element of causation has been read into the third factor; that is, there must be a causal connection between the delay and the prejudice before the plaintiff's claim can be dismissed: *Clarke v. Ismaily* (2002), N.S.R. (2d) 112. The burden is on the applicant to prove that the inordinate and inexcusable delay of the plaintiff has caused him prejudice.

[21]   Even if the three factors are satisfied by the applicant, there remains a discretion to dismiss the application if there are cogent reasons to do so.

[22]   A contextual approach is required on an application for dismissal.  The conduct of the plaintiff is not considered in isolation, but in connection with the conduct of the defendant.  Acquiescence or waiver by the defendant are factors to be taken into account in assessing the plaintiff's conduct.

[23]   The Court of Appeal has stated that "[t]here is no duty on a defendant to actually take positive steps to move the matter forward or to send out warnings and exhortations to the plaintiff to proceed.  However, the presence or absence of these actions may be relevant in determining whether the defence acquiesced in the slow tempo of litigation": *Canada (Attorney General) v. Foundation Co. of Canada* (1990), 99 N.S.R. (2d) 327; 1990 CarswellNS 124 (S.C.A.D.).

[24]   Determining whether there was inordinate delay requires the consideration of the length of the delay.  Mr. Leary essentially argues that there were two periods of delay, each lasting more than two years, for a total of six years' delay since the action was commenced.  There is no clear indication, however, of the beginning and end of each period of alleged delay.  The plaintiff claims that the delay is 2.3

years, from July 2005, when Mr. Leary made an offer to settle, until November

2007, when the plaintiff filed a Notice of Intention to Proceed.

[25]   I am satisfied that the period of time that passed before the default judgment

was set aside does not constitute delay on the part of the plaintiff.  A Demand for

Particulars was made and responded to in the latter part of 2002.  In November

2002, Mr. Leary submitted a Defence and Counterclaim.  The plaintiff then made a

Demand for Particulars in January 2003.  This demand went unanswered.  The lack

of expedience on the part of Mr. Leary in failing to respond to this demand shows

at least a degree of acquiescence to the slow pace of litigation during this period.

Any delay at this time was Mr. Leary's responsibility, rather than the plaintiff's.

[26]   The partnership did not enter a defence and default judgment was entered in

November 2003.  Mr. Leary alleges that he was not made aware of this default

judgment, nor was his solicitor.  However, in November 2004, the plaintiff

indicated an intention to proceed to Mr. Leary's counsel.  Due to an apparent mis-

communication, the parties agreed to set aside the default judgment in March 2005.

Despite this mis-communication, both sides were attempting to take steps to move

the matter to trial.  Although the pace was somewhat slow, it cannot be said that

the plaintiff actually delayed the proceedings.

[27]   The plaintiff served an Amended Demand for Particulars in March 2005, to

which Mr. Leary responded in April 2005.  There was no further communication

between the parties until November 2007.

[28]   The plaintiff seeks to use July 2005 as the benchmark of the start of the

delay, and the date of the application as being the final day of the period of delay.

It is my view that the appropriate period of delay is between March 2005 and

November 2007, a period of 2.75 years.

[29]   There is no fixed amount of time that automatically renders a delay

inordinate.  The plaintiff's conduct is a relevant consideration: *Buxton  v. Sable

Offshore Energy Inc.*, 2007 NSSC 105, at para. 12.  The plaintiff concedes that 1.4

months of the delay is inexcusable, but maintains that the entirety of the delay is

not inordinate.  He mentions procedural difficulties with the case, although these

were resolved prior to the beginning of the period of delay.  So far as the

proceedings are concerned, and the defendants are concerned, the plaintiff was

simply inactive.  In the circumstances, I am satisfied that the delay of 2.75 years is inordinate.

[30]   Having determined that the length of the delay was inordinate, the next question that I have to determine is whether the delay is excusable.  Certainly, part of this period of delay was excusable.  Two different lawyers were assigned to work on this matter during the period of inactivity.

[31]   In June 2005, Mr. Gillis was unable to work full-time due to health problems, and in September 2005, Ms. Doyle assumed responsibility for the file. In December 2006 she took maternity leave. The plaintiff acknowledges that a portion of the delay between Ms. Doyle assuming responsibility for the file and taking maternity leave is inexcusable.  However, once he was able to return to work in September 2007, Mr. Gillis transferred responsibility for the matter to Mr. Balcome, who took action within two months.

[32]   I believe that the delay is inordinate but excusable, given the circumstances under which this delay occurred.  Although the applicant alleges that the plaintiff is a sophisticated Federal Government agency, I do not have the impression that Mr.

Gillis, who was initially retained to represent the plaintiff, was aware of the delay

that occurred when he was absent until his return to work after dealing with his

medical issues.

[33]   In the event that I am wrong, and that the delay is inexcusable, then I have to

consider whether the defendant suffered prejudice as a result.  The onus to

establish prejudice is generally with the applicant; I stated the following in *Buxton*:

> [30]      In  *Moir v. Landry* (1991), 104 N.S.R. (2d) 281, Justice Hallett, writing
> for the Court of Appeal, noted that the onus to establish prejudice falls on the
> defendant/applicant, except in cases of unusually long delay. He referred to
> [*Martell v. Robert McAlpine Ltd*. (1978), 25 N.S.R. (2d) 540], which involved a
> delay of ten years.  However, I note the following statement in *Moir* at p. 284:
>
> > A plaintiff has a right to a day in Court and should not likely be deprived
> > of that right. Therefore, it is only in extreme cases of inordinate and
> > inexcusable delay that a Court should presume serious prejudice to the
> > defendant in the absence of evidence to support such a finding.

[34]   As discussed above, Mr. Leary submits that he has lost a quantity of

documents due to natural causes and theft.  He also points to potential witnesses

who have died or moved to other employment.  It is necessary to establish the

evidential value and necessity of the lost documents, as well as the causation of the

loss.  The alleged prejudice can be divided into three categories: individuals with

personal knowledge who have passed away or left ACOA's employment and are

unavailable; lost documentary evidence; and general fading of memory.

[35]   As to the first category of loss evidence, I note that Ms. Murray passed away

in May 1999.  The action was commenced in 2002 and the period of delay did not

begin until 2005.  There is no causal connection between the delay and the loss of

Ms. Murray's evidence.  Mr. MacDonald, who was Director of Programs for the

plaintiff, passed away in January 2004.  According to the applicant, Mr.

MacDonald was among one of the three most important defense witnesses.  I am

not satisfied that Mr. McDonald's testimony was as critical to the defendants' case

as is asserted.  In any event, the death of Mr. McDonald occurred prior to the

delay.  It may be that he had relevant evidence to offer, but I am not convinced that

it impossible to have evidence of his statements or writings available to the court.

In the case of Mr. Morrissey, there is no evidence as to exactly when he passed

away, and no evidence to establish the likelihood that his evidence would be

critical to the defense or the counterclaim.

[36]   Insofar as individuals who have moved to different employment, whether in

other government agencies or otherwise, it is my conclusion that these witnesses

are indeed available for trial.  Pursuant to the *Civil Procedure Rules* these

individuals can be compelled to attend at discovery or at trial.  This analysis

applies equally to Mr. Hosford, who is not currently employed with the plaintiff. In

this regard, I note the following comments in Buxton:

> [24]      The applicants also claim that they are prejudiced by the status of two of
> their witnesses.  The defendant claims that Ralph Gorby and Teresa Drew, who
> now reside outside of this province, are no longer employed in this province.  On
> this issue, I refer to *C. (A.C.) v. Children's Aid Society of Central Manitoba*
> (1988), 51 Man. R. (2d) 226 (C.A.).  I am bound, however, by the Nova Scotia
> Court of Appeal decision in *Clarke v. Sherman*, [2002 NSCA 64; 205 N.S.R. (2d)
> 112 (C.A.)], where the Court stated:
>
> > The fact that two of the appellant's treating medical practitioners, Dr.
> > Canham and Dr. Larsen, are now living in the United States is not a
> > serious prejudice attributable to any delay on Mr. Clarke's part in pursuing
> > his claim. Their residing out of this jurisdiction is an inconvenience, but
> > arrangements to question them - should they have any relevant evidence to
> > give - are hardly unique in a case of this kind. Further, the fact that parties
> > to an action now live in Ontario simply means that discoveries will likely
> > be conducted there and that the party witnesses will have to travel to Nova
> > Scotia for trial. Such inconvenience does not amount to a serious prejudice
> > traceable to the appellant. Extra steps or added expenses on account of it
> > can be dealt with by way of costs in due course.

[37]   With respect to the documents that have been lost, such as business records,

including electronic and hard copies, their loss is not attributable in any way to the

plaintiff.  It is admitted that the loss of these documents will put the defendant at a

disadvantage and may cause him some prejudice.  Nonetheless, because he may

suffer some prejudice does not transfer the cause of the prejudice to the plaintiff. In

any event these occurrences, floods, hurricanes and robbery were unforeseen and

uncommon.  Even if the plaintiff had been more expedient in prosecuting the case, it is not at all certain that these documents would not have been lost, regardless of the length of the delay.

[38]   Although there may be some loss in memory of some of the key witnesses, it is my conclusion that such a loss of memory is not a causally connected to the delay.  Their memory will be aided by a review of documents that they prepared contemporaneous to the discussions.  Furthermore, there is no evidence as to exactly what memory has been lost.  The general fading of memory over time does not necessarily amount to such loss of memory that the defense or counterclaim will be fatally undermined.

**Conclusion**

[39]   If I were to exercise my discretion to stay the proceedings, it would deny the plaintiff the right to present a claim because of the conduct of its legal counsel.  In my opinion it would be unjust to so deprive the plaintiff in these circumstances.  When Mr. Gillis was retained, there is no reason to believe that it was foreseeable that the progress of the claim would be delayed on account of his medical

Page: 22

condition or Ms. Doyle's absence. There is no evidence relating to either counsel that leads me to conclude that their conduct in any way prevented the applicant from fully defending the claim and advancing the counterclaim.

[40]   I wish to note that Mr. Leary has filed additional material since the application was heard. I have not considered this post-hearing material, as to do so would be, in effect, to reopen the hearing.

[41]   I therefore dismiss the defendants' application and award costs to the plaintiff/respondent in the amount of $500.00, payable in the cause.

**J.**

**Exhibit 8**