# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

TROUT POINT LODGE, LIMITED, A Nova Scotia
Limited Company; VAUGHN PERRET and
CHARLES LEARY                                             **PLAINTIFFS**

**VERSUS**                        **CIVIL ACTION NO:  1:12CV00090 LG-JMR**

**DOUG K. HANDSHOE**                                     **DEFENDANT**

---

## BRIEF OF PLAINTIFFS TROUT POINT LODGE, LTD., A NOVA SCOTIA LIMITED COMPANY; VAUGHN PERRET; AND CHARLES LEARY IN REPLY TO DEFENDANT DOUG K. HANDSHOE'S SUPPLEMENTAL REPLY MEMORANDUM

---

I.

INTRODUCTION

In his latest Supplemental Reply Memorandum of Defendant [Doc. No. 27], Douglas K. Handshoe ("Defendant") does nothing to change what are now manifestly clear points about the SPEECH Act entitling Plaintiffs to summary judgment.  First, in employing the minimum contacts analysis, the Nova Scotia Court had jurisdiction over Defendant by virtue of his publications focusing on matters and events in Nova Scotia and by virtue of Plaintiffs' injury to reputation in Nova Scotia.  There can be no doubt that Defendant knew or should have known he could be hailed into Canadian court for publishing his false and defamatory rantings.

Secondly, as it relates to the Nova Scotia proceeding, Canadian law is at least as protective as United States law on free speech rights.  While Canadian law generally does not require the defamation plaintiff to plead and prove falsity, the Plaintiffs specifically pleaded and proved by documentary evidence, sworn testimony, and affidavits that the publications in issue

were false.  Likewise, while Canadian law generally does not require a defamation plaintiff to prove fault, Plaintiffs specifically did so by meeting the *New York Times* malice standard since Defendant published in reckless disregard for the truth.

Thirdly, since Plaintiffs pleaded and proved falsity and reckless disregard for the truth, they clearly proved a case of defamation against Defendant just as the case would have been made in and decided by a Mississippi court.  That is, Plaintiffs pleaded and proved all elements of a Mississippi defamation claim.

However, since Defendant, in his last brief, went into such great detail on falsity and alleged public figure status of Plaintiffs, Plaintiffs will, out of an abundance of caution, go to into detail to rebut those arguments.

## II.

## ARGUMENT

In Defendant's latest brief as well as in previous briefs, Defendant incorrectly characterizes Plaintiffs' pleadings of defamation as somehow limited to their summary of defamatory stings located at Paragraphs 21-24 of the Plaintiffs' Amended Statement of Claim ("Amended Complaint").  Defendant intentionally ignores specific pleadings of defamatory words later in the Amended Complaint, in which the Plaintiffs followed proper pleading practices in both Nova Scotia and Mississippi, including the pleading of actual malice—that is, specifically pleading the defamatory words and indicating how they are defamatory.

> Quite consistently . . . courts have found that Mississippi law requires that a complaint for defamation must provide allegations of sufficient particularity so as to give the defendant or defendants notice of the nature of the complained-of statements.  Accordingly, this Court has held that a plaintiff must set forth the allegedly defamatory statement in the complaint.  Likewise, this Court has held that the failure to plead the of and concerning' element of a defamation suit may be raised at the pleading stage and made the

subject of a motion to dismiss.  Mississippi's state courts have also
imposed stricter pleading requirements on defamation claims.

*Hayne v. The Innocence Project*, 2011 WL 198128 (S.D. Miss. Jan. 20, 2012) (alteration of
original).

In the Amended Complaint at Paragraph 43 through Paragraph 102, the Plaintiffs detailed
Defendant's defamatory statements of fact, including using direct quotations from Defendant's
published words. Defendant knows this, and admitted in his action for declaratory relief, which
Defendant withdrew, at Paragraph 17 that Plaintiffs had detailed "a host of additional allegations
related to written statements on the blog" in the Amended Complaint.

Plaintiffs describe how the statements were defamatory in the Complaint. Defendant's
publications are replete with sundry accusations of criminal acts involving moral turpitude that
are unrelated to the "factual bases for the defendant's allegedly defamatory statements" that are
presented as "evidence" in Defendant's instant brief. None of these Exhibits comply with Rule 56
of the Federal Rules of Federal Procedure. The Defendant has never justified, explained or
rebutted the defamatory statements the Plaintiffs have describe in their pleadings. These
defamatory statements are also exactly the kind of publications that the Nova Scotia Court's
decision focused upon.

As Judge Starr noted in *Ollman v. Evans*:

> A classic example of a statement with a well-defined meaning is an
> accusation of a crime. To be sure, such accusations are not records
> of sense perceptions. Quite to the contrary, they depend for their
> meaning upon social normative systems. But those norms are so
> commonly understood that the statements are seen by the
> reasonable reader or hearer as implying highly damaging facts.
> Post-*Gertz* courts have therefore not hesitated to hold that
> accusations of criminal conduct are statements "laden with factual
> content" that may support an action for defamation. "Corruption,"
> at least in the context of public service, was deemed to imply
> factual allegations of bribery or other official malfeasance.

*Ollman v. Evans*, 750 F.2d 970, 980 (C.A.D.C. 1984) (alteration of original).  Plaintiffs' specific allegations in their Complaint bear little resemblance to the allegations Defendant falsely claims are at issue on pages 2 and 3 of his Brief [Doc. No.27], which are mostly straw men.

Defendant has provided nothing to rebut the falsity of the published statements of fact detailed in Paragraphs 43-102 of the Complaint, which the Plaintiffs labeled as false in their pleadings. Any Mississippi court would find such statements defamatory *per se* if the Defendant could not demonstrate their truth after the Plaintiffs demonstrated their falsity. In addition, Plaintiffs pleaded in a manner acceptable to post-*New York Times* defamation law, and the Plaintiffs' Amended Complaint reflects that. In their Amended Complaint, Plaintiffs pleaded the following:

113.    The defendants' publications were replete with inaccuracies and an apparent inattention to basic ethics and duties to check facts before publishing.

114.    The defendants never contacted the plaintiffs for information before any of their repeated Internet publications about the plaintiffs, which extended from January, 2010 to at least August, 2011 and were all in continuous publication.

115.    The false statements set forth in the defendants' publications exposed the plaintiffs to public contempt, ridicule, aversion and disgrace, and induced an evil opinion of the plaintiffs in the minds of right-thinking persons and deprived the plaintiffs of their friendly intercourse in and commerce with society.

116.    In their writing and publishing activities the defendants acted and continue to act in a reckless and malicious manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible writers, editors, and publishers. The Defendants practiced a total disregard of the consequences, and acted without caring whether the content that they published around the world was true or false. This was malicious conduct arising from the Defendants not having made easily-accomplished & reasonable inquiries into the truth about the Plaintiffs, from unsubstantiated conspiracy theories about "the powers that be," and from an intentional refusal to give weight to retractions of previous news media reports. The means or sources to discover the truth were readily available to the Defendants. Alternatively, the Defendants deliberately refrained from making any inquiry whatever.

117:   The Plaintiffs state that at all relevant times they were not subjects of public interest.

Exhibit "1" to Plaintiff's Motion for Summary Judgment [Doc. No. 6].

The crux of Plaintiffs' claims against Defendant involve numerous allegations of what Mississippi courts refer to as serious crimes of moral turpitude, *i.e.*, major crimes. These include involvement in fraud, being "bag men," participation in organized crime, racketeering, money laundering, funneling kickbacks, and perjury to name a few. *See* the August 21, 2012 Affidavit of Vaughn Perret. The Nova Scotia Court's decision makes this abundantly clear. The Defendant's intentional misrepresentations about the ACOA litigation or the Plaintiffs' real or perceived sexual orientation are not at the heart of any legal controversy.

There is no substantial truth, only complete falsity, concerning Defendant's continuous campaign of defamatory allegations of criminal activity against Plaintiffs. Defendant is a member of an increasingly prominent and problematic community of persons who use blogs to defame or intentionally inflict emotional distress, and then claim protections reserved for media and discussions on topics of legitimate public interest. In fact, Defendant cites no case to show that a self-proclaimed "investigative blogger" is considered "media" for the purposes of a defamation claim. Without any controlling or persuasive authority on the issue, one cannot conclude that this Defendant is a member of the "media."

Defendant accuses Plaintiffs of "harping" on facts; however when Defendant continues to make false and injurious statements of fact, they must be rebutted. In addition, the SPEECH Act requires Plaintiffs to make a factual showing that a Mississippi court would have also found Defendant liable for defamation.

Second, the Defendant makes blatant misrepresentations of the factual record as well as the evidence filed thus far in this proceeding. Defendant states that Plaintiffs have contested that

they were at one point accused of being in default on a repayable contribution by a Canadian funding agency. This is a false claim. Such an allegation is not contained anywhere in the Plaintiffs' pleadings or submissions to the Nova Scotia court.

The Plaintiffs have based no allegations of defamation on such a claim. They have based allegations of defamation on intentional misrepresentations of this judicial record by the Defendant, including accusations of criminal fraud, misuse of the justice system, and perjury—things never contemplated in the earlier referenced ACOA lawsuit or its unambiguous judicial history in Nova Scotia. Plaintiffs also complain that the Defendant has misrepresented the litigation as ongoing, when in fact the litigation has already been amicably settled.

Defendant, for instance, cites a decision of the Nova Scotia Supreme Court to justify the allegation that "at one point they were accused of being in default on a repayable contribution generously awarded to them by the Atlantic Canada Opportunities Agency." The Plaintiffs did not complain of this allegation. Instead, they complained that Defendant accused them of fraud using government monies, of the illegal transfer of funds, of representing that the litigation was ongoing when in fact it was discontinued, and of blatantly misrepresenting the published judicial record, largely through gross omissions, and accused Trout Point of defaulting. The publications to which Plaintiffs object are enumerated in the August 21, 2012 Affidavit of Dr. Charles Leary. For example, the Plaintiffs objected to the following publications:

- You see the girls have left a trail of financial wreckage in Canada reportedly screwing over trade venders and others building the Lodge and that harebrained exotic cheese farm La Ferme D'Acadie where they shafted the Atlantic Canada Opportunities Agency.

- In part 1 of this series I covered the genesis of Trout Point development and the associated fleecing of the ACOA by our three amigos Danny Abel, Vaughn Perret and Charles Leary. The fallout was slow in developing though as certain employees at the ACOA that were involved with the La Ferme D'Acadie disaster actually died in the interim and the ACOA was not especially diligent in pursuing

repayment of the tax money given to the 3 American partners. When the ACOA filed suit Trout Point did not contest it and a default judgment was entered.

- The dispute was the crash and burn of the Nova Scotia boutique farm and rolling over some of the money into Trout Point. The ACOA wanted their money back because it is clear they feet [sic] the girls were less than honest in dealing with them and according to local lore so do the trade venders that originally did business with Team Trout Point. . . . At this point Leary has lost at every point of the proceedings in Nova Scotia. He was compelled to disclose the names of the owners in La Ferme d'Acadie and produce records in the Canadian equivalent of discovery. He claims in sworn testimony the records were all gone and he denied Danny Abel was involved.

- Now if I paid taxes in Nova Scotia I think I'd want an explanation and full accounting of the ownership of Trout Point Lodge and it's relationship to the failed venture La Ferme D'Acadie as it appears the shifting of assets and ownership could well indicate that the ACOA was defrauded.

*See* the August 21, 2012 Affidavit of Dr. Charles Leary.

Not only has Trout Point Lodge never been involved in the ACOA litigation as a party or otherwise, thus being unable to default, Defendant never reported the Plaintiffs' counterclaims or legal victories, including winning a production order from the Supreme Court directed to ACOA, a setting aside of a disclosure order, and recognition from the Court of Appeal that the counterclaims—including spoliation after the close of pleadings of hundreds of documents by a federal funding agency-- were far from frivolous.

Notably, Defendant's brief acts as though Plaintiffs' Complaint is about reporting that they were sued by ACOA, completely ignoring the perjury allegation. It is not. Yet Defendant uses the settled ACOA litigation to bolster his accusation of perjury against Dr. Charles Leary ("Plaintiff Leary"). Not only has Plaintiff Leary specifically denied this allegation in an affidavit filed with this Court, the Courts of Nova Scotia also repudiated Defendant's allegations of perjury. Of course, neither ACOA nor anyone else ever accused Plaintiff Leary of perjury. Only Defendant has in the instant matter.

Because the ACOA litigation was never a matter of public controversy in Nova Scotia or anywhere else, the Defendant cannot use the "public controversy defense" where no public controversy existed or should exist. *See Hutchinson v. Proxmire*, 443 U.S. 157, 158 (1979); *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 158 (1979).

Most importantly, Defendant cannot decide what Plaintiff Leary supposedly lied about when he purportedly perjured himself. In April 2011, Defendant stated that Plaintiff Leary lied about the destruction of documents & records.  In August 2011, it was fraudulently shifting assets,  In August 2012, in his brief to this Honorable Court, [Doc. No. 27]. Defendant states that Plaintiff Leary lied about the ownership of La Ferme d'Acadie. Which is it? The truth is, Defendant has no idea because Plaintiff Leary never committed perjury. All of Defendant's accusations are self-manufactured.

The published judicial record in the ACOA action had to do, in part, with a procedural argument involving a now-defunct Nova Scotia civil procedure rule that pertained to necessary disclosure of the members of Nova Scotia partnerships at the time a cause of action accrued, as well as the timing of La Ferme d'Acadie's transition from a partnership to a corporation. *See* the August 21, 2012 Affidavit of Dr. Charles Leary.  After a careful deliberation that lasted more than four months, the Court of Appeal set aside the order having to do with that rule—something Defendant fails to mention. Defendant also lacks knowledge of the details of Plaintiffs' legal arguments in that case, or the internal business workings of La Ferme d'Acadie.

Finally, as previously stated in other briefs, the real or perceived sexual orientation of the Plaintiffs was not a decisive issue in Justice Hood's adjudication.

Defendant demonstrates either a reckless disregard of the details of this long-settled litigation or an intentional desire to misrepresent the public record admittedly known to him. As

attested to in Plaintiff Leary's previously filed affidavit, Defendant completely ignores the

subsequent Nova Scotia judicial history, decisions, and fact finding, all of which is public record.

Defendant fails, for instance, to note that the Nova Scotia Supreme Court granted a production

order aimed at ACOA or that the Nova Scotia Court of Appeals set aside the Disclosure Order in

October, 2009.  Justice Hamilton gave the following reasons on the disclosure order:

> I agree events have overtaken the Disclosure Order so that it is no
> longer needed. That being the case, it is not necessary to deal with
> the judge's unfortunate failure to give reasons. In these particular
> circumstances and, in the interests of judicial efficiency, I am
> satisfied that it is in the interests of justice that the Disclosure
> Order be set aside in total to the effect that ACOA cannot rely on it
> to obtain any information from the appellants and the appellants
> may proceed to prosecute their crossclaim. Accordingly, pursuant
> to new *Rule* 90.48(1)(e) I would set aside the Disclosure Order in
> its entirety . . . . One can understand the appellants' exasperation
> and confusion with the way in which this case has unfolded. The
> record here is not stellar. At the hearing counsel for ACOA
> admitted that the process and progress to date has been "abysmal".
> I need not particularize its shortcomings in order to deal with what
> I see as the principal and narrow issues on appeal.  Dr. Leary's
> excellent submissions make it clear that the appellants' complaints
> are hardly frivolous and deserve a hearing. However, the issues
> raised in their defence and counterclaim are matters to be
> determined at trial, where the evidence from both sides can be
> tested in the crucible of cross-examination on the witness stand.
> Our disposition of this appeal will clear away the procedural debris
> so that the parties may pursue their litigation, with dispatch.

*Ferme d'Acadie v. Atlantic Canada Opp. Agency,* 2009 N.S.C.A. 104, at ¶¶ 22-22.  ACOA

settled with the Plaintiffs within 6 months of that decision.

As previously argued, the Plaintiffs are not public figures, but this point is irrelevant

since they have assumed and met the burden of providing Defendant acted in reckless disregard

of the truth. Defendant has not pointed to a single source that ties the Plaintiffs to the Jefferson

Parish scandal, besides the Defendant's own blog. Defendant cannot himself create the

controversy on which one's status as a public figure is premised. *Cf. Hutchinson,* 443 U.S. 111,

135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."). The Defendant may have initially relied on *The Times-Picayune* and station WVUE, but both outlets have retracted their respected remarks that purported to connect the Plaintiffs with the Jefferson Parish scandal. As stated in the *Zerangue v. TSP Newspapers, Inc.,* when a source changes its story but the secondary publisher ignores the retraction and continues the defamation, there is evidence of actual malice to ignore that change and continue the prior defamation. 814 F.2d 1066, 1072 (5th Cir. 1987). Nonetheless, Defendant maintains his defamatory and unsubstantiated allegations against Plaintiffs, and has caused damage to Plaintiffs' reputation. *See* the August 21, 2012 Affidavit of Sheri Leigh White.

In his last brief, [Doc. No. 27], Defendant completely ignores his numerous published allegations that all of the plaintiffs engaged in scamming investors, misusing public monies, lying to the Nova Scotia Court, misusing the justice system, coercion of major media, money laundering for Aaron Broussard, funneling kickbacks for Mr. Broussard, involvement in organized crime, and other nefarious and morally reprehensible activities. These unsubstantiated allegations are the crux of the Nova Scotia litigation, not whether the Plaintiffs are gay or whether they were involved in a now amicably-settled civil lawsuit with ACOA.

Defendant states that entering a final Louisiana Ethics Board complaint into evidence and showing that it did not mention the Plaintiffs is not proof of falsity. Plaintiffs disagree. In late 2011, Defendant repeatedly published that the Ethics Board was actively investigating the Plaintiffs and Mr. Broussard on allegations involving illicit business with government contractors. In fact, reliable, publicly-available information disproved this allegation, and Defendant knew this. He republished *The Times-Picayune* article and uploaded a link to his blog

on the same day it was published. This story is still available online, *The Times-Picayune* reported on January 11, 2011:

> The Louisiana Board of Ethics has filed a total of three dozen ethics charges against former Jefferson Parish President Aaron Broussard, his former top administrator, Tim Whitmer, and Whitmer's wife, Dawn.
>
> The bulk of the violations are tied to an agreement between the Whitmers' private insurance agency and the board of a public West Jefferson hospital while Broussard and Tim Whitmer were in parish government.
>
> Whitmer's insurance agency, Lagniappe Industries, had a deal to sell and manage voluntary insurance policies for employees at West Jefferson Medical Center. Lagniappe itself also faces 26 ethics charges.
>
> Whitmer and Broussard also face alleged violations tied to their annual tradition of collecting $4,500 from department directors and executive staff for Broussard's Christmas gift.

Richard Rainey, *Aaron Broussard, Time Whitmer face ethics charges in Jefferson Parish scandal*, THE TIMES-PICAYUNE, Jan. 11, 2011, http://www.nola.com/politics/index.ssf/2011/01/aaron_broussard_and_tim_whitme.html.  The Ethics Board filed the charges on December 17, 2012, to avoid any statutes of limitations issues, according to the same article.  *Id.*

In the evidentiary hearing, the Plaintiffs presented evidence not only that the Ethics Board complaint did not mention them, but also that the Board never made any allegations related to Nova Scotia.  The Plaintiffs brought the only extant allegations to the Nova Scotia Court's attention in January, 2012:

> MR PERRET: Okay . . . Charles, do you have the Louisiana Ethics complaint against Aaron Broussard before you?
>
> MR LEARY: Yes, that's at tab 16 and I think it's 3 pages into the tab and it's a page headed State of Louisiana Division of Administrative Law. And this is material that was published in a newspaper article about the Louisiana Ethics Board having charges against Aaron Broussard.

The newspaper published these court documents.

PERRET: And what's the nature of the charges against Mr. Broussard?

LEAR: Mr. Broussard is facing 2 charges. He received a thing of economic value in the form a Gift Certificate valued at 4500 dollars from the personal funds of government employees, and the 2nd charge is that he received a thing of economic value in the form of payments from a private company, Lagniappe Industries. Those are the only 2 charges. We've actually contacted the Louisiana Ethics Board to confirm that those were the only 2 charges faced by Mr. Broussard. We did that about 10 days ago, and uh . . .

PERRET: Was there ever . . .

THE COURT: Can I just stop you? We don't need to prove the defamation. You need to satisfy me about, I guess, any new things have happened since your Statement of Claim was filed that affect you as the plaintiffs or your company.

MR LEARY: Yes, My Lady, it does go to that.

MR PERRET: Yeah. It does. It touches on that.

THE COURT: I just don't want us to get like way off track here.

LEARY: No no, we're going to try to stay very focused.

PERRET: My Lady, these were things that were published subsequent to the service, or events also that occurred subsequent to the service; most of them. Do the ethics complaints mention Trout Point Lodge?

LEARY: No. No. They don't mention Trout Point Lodge. They don't mention Nova Scotia. They don't mention properties in Canada.

PERRET: No mention of Mr. Broussard's properties in Nova Scotia?

LEARY: No.

PERRET: Okay. Why is this important? Since the 13th this has been used . . .

LEARY: Mr. Handshoe on his blog has repeatedly represented that the Louisiana Ethics Board was still considering Ethics Board charges related to his Nova Scotia properties and that Trout Point Lodge was under investigation, and this is absolutely not the case. He's misrepresenting the documents of the Louisiana Ethics Board in his blog publications, and defaming Trout Point Lodge at the same time.

PERRET: In an attempt to extend the defamation?

LEARY: Yes.

*See* Exhibit "C" to the July 9, 2012 Affidavit of Dr. Charles Leary [Doc. No. 17].

Defendant specializes in taking documents that third parties, like *The Times-Picayune*, the United States Attorney's Office, and the Louisiana Ethics Board, publish and then intentionally misrepresenting them to his tens of thousands of readers. He "cherry picks" facts that suit his version of events. His misrepresentations are false and defamatory.

Defendant asserts facts that substantially misrepresent an underlying source or would be known only by those investigating and/or prosecuting the Louisiana case against Mr. Broussard.

For instance, at the January 2012 Evidentiary Hearing, Plaintiffs entered into evidence the Factual Basis of the United States Attorney's Office.  [Doc. No. 27].  The Defendant also relied on this document. The Plaintiffs submitted it as proof of Defendant's habit of making intentional factual misrepresentations and making publications that were directly contradicted by their original sources.  That Defendant relies on sources that directly contradict the veracity of his own publications, and this evidences malice.  *See Carson v. Allied News Co.*, 529 F.2d 206, 212 (7th Cir. 1976). Unless Defendant has inside sources in the Federal Grand Jury or United States Attorney's Office, to publish that Plaintiffs are involved with a holding company that owns property somewhere in Canada and are part of criminal wrongdoing is malicious defamation. The Plaintiffs have repeatedly stated that they were not engaged as partners or associates with Mr. Broussard in any business enterprises. This remains unrebutted.

Defendant asserts that because Plaintiff Trout Point Lodge did business with, which is not the same as being in business with, Mr. Broussard, that allegations of the Plaintiffs criminal wrongdoing and involvement in a political scandal are substantially true and justified. If everyone who did business with Mr. Broussard was subject to allegations of criminal wrongdoing, this would be a very large group indeed.  In his brief, Defendant argues "guilt by association," a method he has employed on his blog *Slabbed* for over 2 years.

Plaintiffs also entered into evidence and provided affidavit testimony on the Roy d'Aquila letter that the Defendant identified. Defendant claims this letter renders his allegations that Mr. Broussard controlled Trout Point Lodge substantially true. Instead, this letter's plain meaning evidences the untruth in Defendant's publications. It shows that Mr. Broussard made a request made to Trout Point Lodge; subsequently Plaintiffs denied that request. *See* Exhibit "C" to Doc. No. 17.  It is unreasonable to conclude that saying "no" to Mr. Broussard and his partner illustrates that Mr. Broussard controlled Trout Point Lodge and used it in criminal activities when Plaintiff Leary has gone on the record affirmatively denying Mr. Boussard's involvement. *See* Exhibit "C" to Doc. No. 17.  Nonetheless, Defendant continues to make public statements regarding Plaintiffs involvement with Mr. Broussard.  The following are excerpts from the Defendants various blog posts, as detailed in Plaintiff Leary's affidavit:

- On January 29, 2012: "Slabbed broke the letter written by Roy D'Aquila to Trout Point Lodge ordering the Libel Tourists Charles Leary and Vaughn Perret to insure Broussard's cabin on the Lodge's main insurance policy

.

- On January 25, 2012: Headline: "Aaron Broussard never had any management involvement with Trout Point Lodge no siree. You say any different and we'll sue your ass in Nova Scotia" [while publishing the d'Aquila letter below the headline].

- On January 26, 2012: "he was telling Charlie and Vaughn, on Broussard's behalf, to put Riverbend on the Lodge's main insurance policy. Of course you say that and they will sue."

- Also on January 26, 2012: "Mainly because D'quilla [sic] was benefitting from them Ashton. He is also has enough stroke to tell Charles and Vaughn what to do at Broussard's request. The original allegation was Broussard was making Parish venders rent his property at Trout Point. I think D'Aquilla's letter proves not only that Leary and Perret were Aaron Broussard's strawmen but they were also complicit in the alleged criminal activity.

- Their fraudulent actions in Canada cross over into more torts than what AMV has described in her civil rights case against the Parish and that does not count criminal implications. I'll add that Telemachus has sent me email indicating that he/she is in fear for her life as a result of the actions perpetrated by Leary, who I think we've demonstrated is clearly acting as Aaron Broussard's straw man in Canada.

*See* August 21, 2012 Affidavit of Dr. Charles Leary.

Astoundingly, Defendant even admits that "the extent of plaintiffs actual involvement in the Broussard scandal is unknown" that there may be no involvement whatsoever. [Doc. No. 27] Such injurious and inflammatory guessing games are not protected by *New York Times v. Sullivan* and its progeny.[1] Justice Kennedy in *Masson v. New Yorker Magazine*, examined the substantial truth argument. He stated

---

[1] At page 5 of Defendant's Brief, Defendant asserts that the d'Aquila letter was "uncovered" as part of a lawsuit against WVUE/Fox 8. [Doc. No. 27]. In fact, the Plaintiff provided the letter in that case precisely because it demonstrated an arms-length business relationship with Broussard and nothing more. Nothing was "uncovered."

Defendant makes several admissions in his final brief that unmistakably demonstrate, at a minimum, recklessness and/or knowledge of probable falsity in what were unmistakably "black or white," serious allegations of crimes against Plaintiffs. They include allegations of perjury, fraud, money laundering, funneling of kickbacks, etc. *See* the August 21, 2012 Affidavit of Vaughn Perret. "A classic example of a statement with a well-defined meaning is an accusation of a crime" *Ollman v. Evans*, 750 F.2d 970, 980 (C.A.D.C. 1984). Examples of Defendant's knowledge of the probable falsity include:

- "the extent of plaintiffs actual involvement in the Broussard scandal is unknown"

- plaintiffs "may have had no knowledge of the corruption at all"

- "whether they [the plaintiffs] were aware of Broussard's wrongdoings or not"

- "If the statements were false . . ."

- "At most they [the defamatory publications] were made with ill will . . ."

> Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified. Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced. Our definition of actual malice relies upon this historical understanding . . . . Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language. And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning.

*Masson v. New York Magazine,* 501 U.S. 496, 517 (1991) (alteration of original).

Thus, where Defendant relies on sources, the test is whether the alteration of meaning would have a different effect on the mind of the reader than what the original source actually said.

Defendant's startling admission that plaintiffs may have had no knowledge of the corruption at all and that the extent of the plaintiffs' actual involvement in the Broussard scandal

---

&bull; "Defendant remains confident in the truth of his reporting. However, if it were later discovered that plaintiffs in fact were not involved in any of Broussard's alleged wrongdoings . . ."

[Doc. No. 27].

In. *Guam Federation of Teachers v. Ysrael*, the Court stated:

> In this case, Ysrael's own testimony as an adverse witness is enough to get the plaintiffs to the jury under the New York Times standards. He repeatedly admitted that he did not know whether what he said was true. He repeatedly admitted that he did nothing, or almost nothing, to verify his charges. As to most of his statements, he repeatedly admitted that he knew of no facts to support them; he either relied upon unspecified rumor or upon nothing at all. He simply asserted that he believed that what he said was true. Such an assertion is not enough to support a directed verdict in his favor. If it were, mere swearing could, as a matter of law, defeat any action to which the New York Times principles are applicable.

*Guam Federation of Teachers v. Ysrael*, 492 F.2d 438, 439 (9th Cir. 1974).

Defendant has admitted "that he did not know whether what he said was true." *See Guam Federation*, 492 F.2d 438. Defendant's admission as a witness taken together with his admissions in the instant brief add up to an admission that (a) Defendant has never had any idea if Plaintiffs knew of alleged corruption, (b) Plaintiffs may have been completely unaware of what are still only alleged crimes by Mr. Broussard, (c) the Defendant's publications may have been false, (d) Defendant made them at a minimum with classical common law malice (*i.e,*. ill will), and (e) underlying facts supporting his allegations "remain to be discovered" despite his belief in their truth.

is unknown, combined with his blatant misrepresentation of the original sources he relied upon, points decisively to sufficient evidence to permit the conclusion that the defendant in fact should have entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Time, Inc. v. Pape*, 401 U.S. 279, 291-92 (1971).

The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. "Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

In Defendant's only affidavit, he swears at Paragraph 6 that "all of the statements on his blog are either true or widely reported allegations of fact from other media." [Doc. No. 8, Ex. 1]. Yet Defendant fails to identify a single "other media" source or submit any such "allegations of fact" into the record. Defendant cites *The Times-Picayune*, but that newspaper has stated: "The newspaper believes there is no basis for making any implication that Trout Point Lodge, Limited or its owners, Daniel Abel, Vaughn Perret, or Dr. Charles Leary, were involved in any wrongdoing and, indeed, never intended to make any such implication." [Doc. No. 17]. In his original motion for summary judgment, Defendant states:

> During his time in office, Broussard owned a lodge in Nova Scotia, Canada, which he used to funnel kickbacks from contractors doing business with Jefferson Parish, facts set forth in the Factual basis of an indicted co-defendant. Media reports have revealed that plaintiffs, Charles Leary and Vaughn Perret, co-owned and/or managed this property.

[Doc. No. 8].

How Defendant suggests this Court reconcile his bald-faced assertions that "all statements are true" and "Plaintiffs co-owned and/or managed a property used to funnel kickbacks" with his admission that "the extent of the plaintiffs' actual involvement in the Broussard scandal is unknown" remains totally unexplained and inexplicable. This is admission, at a minimum, demonstrates Defendant's reckless disregard for the truth.  Obviously, Defendant had reasons to doubt the veracity of his publications about the Plaintiffs.  Both *The Times-Picayune* and Fox 8 News retracted their statements. Instead, Defendant fabricates "whole cloth" stories about the Plaintiffs.  Neither media outlets nor the United States Attorney's Office have ever mentioned the Plaintiffs in relation to the Factual Basis the United States Attorney's office submitted and to which the Defendant refers.

In addition, not only is there the doctrine of substantial truth, there is also the principle in Mississippi defamation law of substantial falsity. Substantial falsity often comes into play when a defamation Defendant intentionally omits information from sources. As this honorable court recently observed in *Hayne v. The Innocence Project*:

> The threshold question in a defamation suit is whether the published statements are false. The Court may assess the falsity of the allegedly defamatory statement prior to any submission to a jury.  A published statement may be technically false-where the fact or facts reported therein are simply untrue. However, a published statement may also be "substantially false," where an underlying implication drawn from facially true statements is sufficient to render the statements false. Such an underlying implication may be created by the omission of crucial information. Furthermore, the overall tone or structure of a story may so distort the truth as to make the underlying implication of the story false, even where no material omissions are involved.

*Hayne v. The Innocence Project*, 2011 WL 198128, at *4 (S.D. Miss. Jan. 20, 2011) (alteration of original).

Further, the Court stated in *Daniel Goldreyer, Limited. v. Dow Jones & Co., Inc.*:

> The selective reporting of facts, and the deliberate omission of exculpatory or non-defamatory facts to make a "story" at the expense of the subject may indeed be probative on the issues of irresponsibility and malice. The deliberate presentation of selected facts to put the subject in the worst possible light certainly can create an inference of malice and a reckless disregard for the truth. What is deliberately omitted from a story to distort it may well raise questions of malice for a jury to consider. When there is a question as to whether the challenged story so differed from the source material as to create a false impression, a jury can properly consider whether it is libelous.

*Daniel Goldreyer, Limited. v. Dow Jones & Co., Inc.*, 678 N.Y.S.2d 453, 457 (N.Y.Sup., 1998) (alteration of original).

Defendant tries to use *Zerangue v. TSP Newspapers, Inc.*, however the facts in *Zerangue* clearly aid the Plaintiffs, not the Defendant. In *Zerangue,* a newspaper published incorrect facts about crime Zerangue and his co-plaintiff had been convicted of years earlier. *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1068-69 (5th Cir. 1987) The newspaper published a retraction, but then within a very short period of time, again published the mistruth that Zerangue had been convicted of the felony receiving stolen goods. *Id.* at 1069-70. The Court stated:

> Applying this somewhat complex legal scheme to the instant case, we find that the district court did not err in granting summary judgment to TSP Newspapers for publishing the March 14th story written by LeBlanc. LeBlanc may have been negligent in relying on his memory to write the story and in failing to investigate further. However, the precedents clearly establish that failure to investigate does not rise to the level of actual malice unless the story showed obvious inaccuracies.

*Id.* at 1071 (alteration of original).

The *Zerangue* Court, however, stated that the question of "whether the district court correctly found no genuine issue as to TSP's malice in publishing the same error a second time on April 11" is much more difficult. *Id.* at 1071. The Court went on to say:

> Zerangue and Carriere have raised more than the possibility that a jury might disbelieve Dixon. They have produced some evidence concerning the Daily World's operations and the close interrelation of events and people, from which a jury could infer the requisite knowledge or reckless disregard. Were this not a first amendment case, Zerangue and Carriere would have done enough to reach a jury . . . . Balancing these two interests mandates that a publisher have clear first amendment protection from liability for the *first* nonmalicious publication of an erroneous story. However, once the publisher knows that the story is erroneous — as in the instant case — the argument for weighting the scales on the side of first amendment interests becomes less compelling.

*Id.* at 1072 (emphasis in original).

Notably, Defendant repeatedly published distinct criminal allegations concerning the Plaintiffs and continues to do so. The *Zerangue* Court held "that Zerangue and Carriere did produce enough evidence that the second erroneous article was published knowingly or recklessly to obtain a jury trial on the issue." *Id.* at 1072. The Court also refused to overturn the district court on its decision regarding "substantial truth," reasoning there was a substantial difference between being accused of a felony and being accused of a misdemeanor. *Id.* at 1073-74.

Defendant misleads this Court when he says that he "has never stated that Aaron Broussard owned Trout Point Lodge." [Doc. No. 27]. Amazingly, he uses a self-serving publication made after the Nova Scotia judgment and after the commencement of the instant proceedings (April 2, 2012) to "prove" this fact. The proof to the contrary in his still extant blog publications is overwhelming. Justice Hood also found that he had published that Mr. Broussard was the real owner of Trout Point. It is also apparent that Defendant frequently makes self-contradictory assertions over time and lacks credibility:

- On September 9, 2011, Defendant quoted verbatim a correction published on the front page of the Times-Picayune: we circle back to my post on the topic from January, 2010 which excerpted one of Rainey's reports:

A photo caption in some Thursday editions of The Times-Picayune said that former Jefferson Parish President Aaron Broussard owns a stake in a luxury development centered around Trout Point Lodge in Nova Scotia. An accompanying story quoted Bennett Powell, owner of a Metairie insurance claims adjusting firm that does business with Jefferson Parish, as saying that Broussard's property was Trout Point Lodge. Charles Leary, managing director of Trout Point, said Broussard has no "ownership or management involvement with Trout Point Lodge, Limited." Corporate records in Canada do not list Broussard as an officer of Trout Point Lodge Limited.

Broussard, "does not and has never had any ownership or management involvement with Trout Point Lodge, Limited." The message went on to say Broussard owns a "vacation home on the same road."

[Doc. No. 17].  These assertions are bald face lies.

• April 26, 2011:

I'd submit this was a miscalculation of gargantuan proportions for several reasons, which will become clear as I roll out this series of posts on Aaron Broussard's connections to Trout Point Lodge and its purported owners, Charles Leary, Danny Abel and Vaughn Perret. I say purported because others were sold 2% ownership interests in the Trout Point development as touted by Broussard and those folks are the bagholders in this deal .

. . .

This much is true, Trout Point Lodge nor [sic] its purported owners are involved in what we call the Jefferson Parish Political Corruption Scandal [this is despite the contradictory representation to this court in Defendant's last brief, page 2, that it is substantially true that Plaintiffs are "tied to" the Jefferson Parish corruption scandal].

*See* the August 21, 2012 Affidavit of Dr. Charles Leary.

• August 24, 2011: There is no doubt the timing of Rich Rainey's series of articles on Trout Point Lodge and Aaron Broussard's connections thereto could not have come at a more inopportune time for the three owners of the lodge, Danny Abel, Charles Leary and Vaughn Perret. While Rainey focuses his articles on the curious Nova Scotia connection involving Broussard and the complaint to the Louisiana Ethics Commission, Rainey's articles contained some damning evidence of potential wrongdoing involving Leary and Perret in Canada and it had nothing to do with Broussard per se [despite numerous contradictory assertions

that Plaintiffs were controlled by and fronting Broussard in organized criminal activity].

*See* the August 21, 2012 Affidavit of Dr. Charles Leary.

- January 25, 2012: "I am now able to roll outs parts 3 and 4 of my series on Aaron Broussard's business activities in Nova Scotia including Broussard's use of his straw men at Trout Point Lodge to obtain personal data on those who posted about his dirty deeds here on Slabbed."

*See* the August 21, 2012 Affidavit of Dr. Charles Leary.

- January 26, 2012: "Their [the plaintiffs] fraudulent actions in Canada cross over into more torts than what AMV has described in her civil rights case against the Parish and that does not count criminal implications. I'll add that Telemachus has sent me email indicating that he/she is in fear for her life as a result of the actions perpetrated by Leary, who I think we've demonstrated is clearly acting as Aaron Broussard's straw man in Canada."

. . .

Ashton O'Dwyer [frequent Slabbed commenter]: Pardon me for being obtuse, but while I can comprehend, and put my arms around, "curatorships" awarded to Aaron Broussard in Jefferson Parish by upstanding Members of the State Judiciary, like "The Honorable" Glen Ansardi (and others). And while I can understane [sic] the Judge's benevolent bestowing of undeserved financial benefits on Mr. Broussard because of illicit relationships between and among Mr. Broussard and the Judge's family, I have some TROUBLE connecting the dots to Nova Scotia.  Will someone enlighten me, please. Thank you. Ashton O'Dwyer.  Doug Handshoe in reply: Mainly because D'quilla [sic] was benefitting from them Ashton.  He is also has enough stroke to tell Charles and Vaughn what to do at Broussard's request.  The original allegation was Broussard was making Parish venders rent his property at Trout Point.  I think D'Aquilla's letter proves not only that Leary and Perret were Aaron Broussard's strawmen but they were also complicit in the alleged criminal activity.

*See* the August 21, 2012 Affidavit of Dr. Charles Leary.

III.

CONCLUSION

For the reasons set forth in this and their previously filed briefs, summary judgment should be entered in favor of Plaintiffs.

Respectfully submitted, this the 21st day of August, 2012.

Trout Point Lodge, Limited, Vaughn Perret and Charles Leary

By:   s/  Henry Laird
      Henry Laird, Mississippi Bar No. 1774

## CERTIFICATE OF SERVICE

I, Henry Laird, do hereby certify that I have sent a true and correct copy of the foregoing Plaintiffs' Reply to Defendant's Supplemental Reply Memorandum by using the ECF system to the following:

G. Gerald Cruthird, Esquire
Post Office Box 1050
Picayune, Mississippi  39466
Email:  ggeraldc@bellsouth.net

Jack E. Truitt, Esquire
The Truitt Law Firm, LLC
149 North New Hampshire Street
Covington, LA  70433
Email:  mail@truittlaw.com

This the 21st day of August, 2012.

s/  Henry Laird
Henry Laird

Henry Laird (MSB No. 1774)
Email:  hlaird@joneswalker.com
Jaklyn Wrigley (MSB No. 103773)
Email:  jwrigley@joneswalker.com
Jones, Walker, Waechter, Poitevent,
Carrère & Denègre, LLP
2510 14th Street, Suite 1125 (39501)
Post Office Drawer 160
Gulfport, MS  39502
Telephone: (228) 864-3094
Facsimile: (228) 864-0516