UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 11-299 |
| v. | * | SECTION: "HH" (SHF) |
| AARON F. BROUSSARD | * | |
| THOMAS G. WILKINSON | * | |
| | * * * | |

**GOVERNMENT'S NOTICE OF INTENT TO INTRODUCE INTRINSIC EVIDENCE OR, ALTERNATIVELY, NOTICE OF "OTHER ACT" EVIDENCE PURSUANT TO RULE 404(b) OF THE FEDERAL RULES OF EVIDENCE**

**NOW INTO COURT,** through the undersigned Assistant United States Attorneys, comes the United States, and hereby notifies the defendants of its intent to introduce intrinsic evidence of other crimes, wrongs, and acts, in its case-in-chief, or alternatively, notifies the defendants of its intent to introduce other crimes, wrongs, and acts in its case-in-chief pursuant to Rule 404(b) of the Federal Rules of Evidence.

**I. INTRODUCTION & SUMMARY OF ARGUMENT**

From in or around 2002 through 2010, defendant Aaron F. Broussard ("Broussard"), the former Jefferson Parish President, with the assistance of others, including defendant Thomas G. Wilkinson ("Wilkinson") engaged in widespread pattern of abusing his political office for private gain in a number of different ways. The pending indictment alleges three ways in which Broussard

1



EXHIBIT

"B"

sought to enrich or benefit himself or his family by abusing his office: (1) accepting bribes and payoffs from, among others, Bill Mack ("Mack") of First Communications Company ("FCC"), a Jefferson Parish vendor, in exchange for his influence and official acts to steer Parish and other business to FCC; (2) devising a scheme to employ, among others, his girlfriend and later-wife, Karen Parker ("Parker") with a job paid for by the taxpaying citizens of Jefferson Parish that she was not qualified and, in fact, did not perform; and (3) rewarding Wilkinson for, among other things, undertaking personal favors for Broussard including Wilkinson's efforts to use his influence at a local private school to assist a Broussard family member with the competitive admissions process. In each of these episodes, Broussard benefitted, including by his family collecting hundreds of thousands of dollars in unearned salary due to Parker's employment, and tens of thousands of dollars in bribes from his bribe payor(s). Likewise defendant Wilkinson, the Parish Attorney, benefitted from the conspiracy he had with Broussard as he enjoyed, among other things, Broussard's retention as Parish Attorney upon his taking office, and an approximately 84% increase in salary during Broussard's tenure.

These three instances, however, are not the only instances where Broussard, with the assistance and/or knowledge of others including Wilkinson, abused his position for private gain. In fact, Broussard had been using his influence as the Parish President to enrich himself for years -- evidence which, among other things, harmonizes with the charged conspiracy and reflects the corrupt intent and pattern of conduct of the former Parish President and which the Government intends to introduce at trial, including:

- Broussard's receipt of other things of value from Jefferson Parish contractors,

2

including obtaining a large ownership interest in a company holding Canadian resort property for little or no capital contribution and having the Parish vendors supply the capital to maintain the company and its holdings;

- Misusing thousands of dollars in campaign funds and spending those funds his personal uses; and

- Factual allegations, including abuse of office, relating to charges brought against Broussard by the Louisiana Board of Ethics relating Broussard's tenure as Parish President.

As set forth in more detail below, the nearly identical characteristics (including purpose, time, personnel, and subject matter) between the above-listed wrongful conduct and the charged conduct reflects the intrinsic nature of this evidence – they are merely unlisted overt acts in furtherance of the charged conspiracy. *See infra*, Parts IV.A-C. Under controlling Fifth Circuit law, this evidence is intrinsic to the Indictment and is accordingly admissible. *See id.* Alternatively, these wrongful acts are also admissible under Rule 404(b) of the Federal Rules of Evidence to prove Broussard's intent, knowledge, common plan, and pattern of conduct relating to his repeated abuse of political office. *See infra*, Parts V.A-B.

## II.   FACTUAL BACKGROUND

The Court is well aware of the facts of this case and therefore, they will only be repeated to the extent necessary for purposes of this Notice. A more detailed summary of the facts can be found in the pending Indictment and the Government's Opposition to defendant Thomas G. Wilkinson's Motion to Dismiss. *See* Rec. Doc. Nos. 117 (Indictment) and 142 (Opposition to Wilkinson's Motion to Dismiss).

## III.   NOTICE OF EVIDENCE OF ADDITIONAL ACTS

Through this pleading, the Government puts the defendants on notice of its intent to admit

evidence of the following wrongful acts, all of which are relevant, probative, and necessary to provide the jury with a complete picture of the overarching conspiracy set forth in the Indictment:[1]

- *Broussard's receipt of a major ownership interest in a company holding Canadian resort property for little or no capital contribution, which was instead supplied by various Parish vendors*

Beginning in or around 2002, a company named Nova Scotia Enterprises, LLC ("NSE"), was formed. *See* Exhibit A at 1-5 (Articles of Organization and Initial Report of NSE). NSE was a holding company for several pieces of vacation rental property located in the Canadian province of Nova Scotia. *See* Ex. A at 11 (Operating Agreement of NSE at Section 2.3, noting purpose of company is to acquire and own real property). At various times from 2002 through 2010, there were up to twelve partners in NSE – many of which were Jefferson Parish contractors or prospective contractors. *See id.* at 32-34 (attachments to NSE Operating Agreement). Broussard was also a partner in NSE. *See id.* at 34. However, unlike almost every other partner in NSE, Broussard was given a large, *42% interest* in NSE for a small capital contribution to the company. *See id.* at 34 (reflecting Broussard's ownership interest) & 56 (NSE spreadsheet reflecting contributions made by NSE partners and noting that Broussard's contribution as approximately $782.60). By contrast, nearly $50,000 was contributed by several other NSE partners for the upkeep and maintenance of properties. *See id.* at 56. Significantly, many of the NSE investors who supplied the vast majority of the funds obtained a much *smaller* ownership interest than Broussard in NSE. *See id.* at 32-34 (reflecting 3% or 6% interest obtained by other partners in NSE). Most importantly and not coincidentally, during Broussard's tenure, many of the NSE partners, through their various

---

[1]If applicable, a representative sample of some of the documentary evidence the Government seeks to admit relating to these acts is attached here. Additionally, for each of the wrongful acts, the Government anticipates presenting testimonial evidence at trial.

corporations, received contracts with, and work in, Jefferson Parish, worth millions of dollars, at the same time they were funding NSE and Broussard's corporate interest in it. Finally, Broussard sought, at the conclusion of his tenure as Parish President, to sell his ownership share in NSE – which was purchased for very little – for nearly $200,000, an extraordinary return on the minimal investment supplied by Broussard. *See id.* at 57-60 (correspondence and promissory note regarding Broussard sale). Thus, in sum, the Government will present evidence reflecting that various Jefferson Parish vendors (who sought and received work when Broussard was Parish President) supplied investments (a thing of value) for a company owned, in large part, and managed by, Broussard. *See* Exhibit A at 1-60.

- *Broussard's misuse of thousands of dollars in campaign contributions to pay for personal expenses*

From 2003, when he was first elected, through 2007, when he was re-elected, Broussard ran a political campaign that took in thousands of dollars annually from contributors. By law, such contributions are made for the purpose of supporting, opposing or otherwise influencing the nomination or election of a person to public office. *See* LSA-R.S 18:1483(6)(a). Broussard was prohibited by law from expending contributions for any personal use unrelated to a political campaign or the holding of public office or party position. *See* LSA-R.S. 18:1505.2(I)(1). Broussard was also required to report, on his annual campaign finance report, all legitimate campaign expenditures, which are defined as payments made for the purpose of supporting election to public office and included monies spent for general operating expenses. *See* LSA-R.S. 18:1483(9)(a). During this period of time (2003-2007), though being prohibited from doing so, Broussard spent tens of thousands of dollars in campaign contributions for personal expenses, all unrelated to political

campaigns or the holding of public office. For example, Broussard spent thousands of dollars, donated by voters, for an annual Lake Tahoe trip/vacation unrelated to his holding of office. *See* Exhibit B at 1-8 (campaign checks for annual Lake Tahoe trip). Broussard likewise spent over $1,000 on maintenance of a fish tank from contributors' wallets. *See id.* at 9-10. Thousands of dollars were also spent by Broussard from his campaign account for the purchase of Mardi Gras tickets and accessories. *See id.* at 11-18 (campaign checks for Mardi Gras purhcases). Broussard also used his campaign account to purchase tens of thousands of dollars in framing and artwork, along with thousands of dollars for sports tickets and wedding, holiday, and other gifts for friends. *See id.* at 19-34 (campaign checks for art expenses), 35-42 (campaign checks for miscellaneous gifts).

- *Broussard's receipt of things of value from Jefferson Parish contractors*

The pending Indictment specifically alleges a bribery scheme between Broussard and Bill Mack, a Jefferson Parish vendor, whereby Mack would corruptly pay Broussard approximately $1,500.00 per month in exchange for Broussard's efforts to steer Mack and his company, First Communications Company, telecommunications work. The Indictment also alleges Wilkinson's knowledge of, and role in, the Broussard-Mack bribery. Broussard's receipt of monies from Mack, however, was not the only time Broussard received things of value from Jefferson Parish vendors. At trial, the Government seeks to present testimonial evidence that Broussard, during his tenure as Parish President, received other things of value from Jefferson Parish contractors including dinners, gifts, and other things of value totaling thousands of dollars.

- *Pending ethics charges against Broussard due to misuse of office*

In December 2010, the Louisiana Board of Ethics filed several charges against Broussard for

6

misusing his office in a form similar to the evidence noted above. On December 17, 2010, the Louisiana Board of Ethics charged Broussard with a violation of Louisiana Revised Statute 42:1111A for receiving an improper thing of value from a Jefferson Parish employee. *See* Exhibit C at 1-3. On that same date, the Louisiana Board of Ethics filed additional charges against Broussard for misuing his political office -- specifically, with receiving compensation from a Jefferson Parish contractor. *See* Exhibit C at 4-6. These ethics charges, like the evidence noted above, reflect Broussard's corrupt intent, the same state of mind required for the charged scheme in this case.

## IV.    THE DEFENDANTS' WRONGFUL ACTS ARE INTRINSIC EVIDENCE

In determining whether to admit relevant evidence, courts must first determine whether such evidence is "intrinsic" or "extrinsic." *See, e.g., United States v. Crawley*, 533 F.3d 349, 354 (5th Cir. 2008); *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005). Generally, evidence of other acts is intrinsic "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *Freeman*, 434 F.3d at 374 (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)). Where the evidence is "intrinsic" to the offenses charged, Rule 404(b) does not apply and the evidence is admitted with no further analysis. *See, e.g. Crawley*, 533 F.3d at 354; *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007); *Powers*, 168 F.3d at 749-50.

Evidence is also considered intrinsic if a conspiracy is alleged and the Government seeks to admit evidence of wrongful acts of the conspirators not specifically listed in the indictment, but committed in furtherance of the conspiracy. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749; *Garcia Abrego*, 141 F.3d at 174-76; *see also United States v. Quesada*, 512 F.2d 1043,

1046 (5th Cir. 1975). Such evidence may be admissible as intrinsic evidence as part of the

Government's proof to show how the conspiracy came about, how it was structured, the purpose and

modus operandi of the conspiracy, and how the defendants became members. *See, e.g., Watkins*, 591

F.3d at 784-85 (citations omitted); *Garcia Abrego*, 141 F.3d at 175 (citations omitted); *United States*

*v. Coleman*, 78 F.3d 154, 156-57 (5th Cir. 1996); *see also* 22 Charles A. Wright & Kenneth W.

Graham, Jr., *Federal Practice and Procedure* § 5239, at 450-51 (1978) ("[i]n cases where the

incident offered is a part of the conspiracy alleged in the indictment, the evidence is admissible...

because it is not an 'other' crime."). Unlisted acts committed in furtherance of the charged

conspiracy are admissible if they are factually similar – *in subject matter, purpose, personnel, and*

*time* – to the specifically listed acts contained in the indictment. *See, e.g., Watkins*, 591 F.3d at 784-

85; *United States v. Carvajal*, 206 Fed. Appx. 391, 394 (5th Cir. 2006) (unpublished) (in drug

conspiracy, non-pled drug deliveries to co-conspirator, which were then sold to others as part of the

charged conduct, created logical link with the charged conspiracy and were thus intrinsic); *Garcia*

*Abrego*, 141 F.3d at 175 (non-pled murders committed by defendant in drug conspiracy case were

intrinsic because they were committed in furtherance of the charged enterprise); *see also United*

*States v. Lucas*, 516 F.3d 316, 347 (5th Cir. 2008) (in environmental case involving discharge from

septic tanks contained on lots sold by real estate developer, evidence of the developer's bribes to

county supervisor in obtaining environmental approvals were overt acts in furtherance of the overall

conspiracy and thus admissible).

For example, in *United States v. Watkins*, 591 F.3d 780 (5th Cir. 2009), the Fifth Circuit held

that two prior acts of transporting drugs – although not pled in the indictment – were nonetheless

admissible as intrinsic evidence to the charged conspiracy because of their similarities. *See* 591 F.3d

at 784-86. Specifically, the Fifth Circuit in *Watkins* noted that the two uncharged drug transports (1) utilized the same conspirators; (2) involved nearly identical modus operandi; (3) were similar in execution; and (4) were temporally proximate to the charged conspiracy. *See id.* at 785. The Fifth Circuit thus concluded the other acts were done in furtherance of the charged conspiracy and were accordingly intrinsic. *Id.*; *see Powers*, 168 F.3d at 749 (non-pled energy transactions between defendants were intrinsic because of their similarities in structure and because they reflected the conspiratorial relationship between the defendants); *United States v. Nichols*, 750 F.2d 1260, 1264-65 (5th Cir. 1985) (non-pled evidence of defendants' earlier efforts to import drugs was intrinsic evidence based on the similarities between the non-pled acts and the charged conduct); *see also United States v. Matthews*, 1994 WL 660543, at *1-2 (E.D. La. 1994) (non-pled drug transactions were admissible as overt acts based on their similarities with the listed overt acts).[2]

As applied here, the three episodes of wrongful conduct the Government seeks to admit – Broussard's improper ownership of NSE paid for by Parish vendors and receipt of other things of value from Jefferson Parish vendors; Broussard's misuse of his campaign funds; and the pending ethics charges – are acts committed by Broussard and others (including co-conspirators who will testify in this case) in furtherance of the charged conspiracy and these acts are therefore intrinsic and

---

[2]This rationale is not just limited to drug cases; in *United States v. McCormick*, 2010 WL 2616624 (3d Cir. 2010) (unpublished), the Third Circuit, in a corruption case involving extortion and bribes, held that an earlier payment by a city contractor to a public official – which was not pled in the indictment – was, again, nonetheless admissible as intrinsic evidence. *See* 2010 WL 2616624, at *1-2. In *McCormick*, the Third Circuit upheld the district court's ruling that the uncharged bribe payment was intrinsic to the conspiracy charge because it provided important proof regarding the defendant's membership, purpose, and participation in the charged conspiracy. *See id.* at *2; *see also United States v. Plaskett*, 2008 WL 441938, at *1 (D.V.I. Feb. 8, 2008) (in corruption case, non-pled evidence of kickback scheme was intrinsic because it established the defendant's participation in the charged conspiracy).

admissible.

### A. Ownership of Canadian Resort Property & Receipt of Things of Value from Contractors

Broussard's receipt of things of value from Jefferson Parish contractors – including his receipt of an ownership interest in NSE for little contribution – mirrors his acceptance of bribes from Mack, conduct charged in the pending Indictment. *Compare* Exhibit A at 11-60 *with* Rec. Doc. No. 117 at 14-20, 22-23 (allegations and overt acts involving Broussard bribery with Mack). As to subject matter, Broussard's receipt of his ownership interest in NSE – paid for by Jefferson Parish contractors – is no different than the payoffs he was receiving from Mack, albeit in a different, corporate form, as opposed to the individual checks he received from Mack. *Compare* Exhibit A at 11-60 *with* Rec. Doc. No. 117 at 14-20, 22-23. His receipt of dinner, gifts, and other items from Jefferson Parish vendors, again, is no different than his receipt of monies from Mack. As to the temporal relationship, like the charged conduct with Mack, Broussard's relationship with NSE began in 2002, when it was formed. *See* Ex. A at 1-5. The value and ownership Broussard received from NSE (paid for by Parish vendors) took place from in or around 2002 through in or around 2010, which includes the very years Broussard was receiving payoffs from Mack. *See* Ex. A at 1-60. Similarly, the value of the dinners, gifts, etc. Broussard was receiving from vendors took place during his tenure as Parish President, just like the charged conduct. Finally, both the wrongful conduct involved with NSE and other gifts from Parish vendors, on the one hand, and Mack/FCC, on the other hand, involves the same modus operandi: a public official (Broussard) receiving things of value (payoffs/gifts or ownership interests in corporate interests) where the payors receive work from the Parish under Broussard's purview. *Compare* Ex. A at 11-60 *with* Rec. Doc. No. 117 at 14-

20, 22-23. The many similarities reflect that Broussard's receipt of things of value from vendors (such as his NSE corporate interest, paid for by vendors seeking and obtaining work in Jefferson Parish), is merely an overt act – and thus admissible as intrinsic evidence – committed in furtherance of the charged conspiracy. *See, e.g.*, *Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749-50 (similarities in structure, timing, and personnel between non-pled business transactions and the charged transactions reflected that the non-pled acts were overt acts committed to further the conspiracy); *see also McCormick*, 2010 WL 2616624, at *1-2; *Plaskett*, 2008 WL 441938, at *1; *Matthews*, 1994 WL 660543, at *1-2 (non-pled drug transactions were similar in time, personnel, and execution, and they were thus overt acts committed in furtherance of the charged conspiracy).

## B.    Personal Expenses paid by Campaign Funds

Likewise, Broussard's improper use of his campaign funds is admissible as an overt act in furtherance of the charged conspiracy. The conspiracy alleges that Broussard "sought to and did abuse his political office... in an effort to personally enrich himself." *See* Rec. Doc. No. 117 at 8. Concomitantly, the pending Indictment alleges that Broussard, with the assistance of others, sought to defraud the Parish and its citizens. *See id.* His misuse of campaign funds – funds derived from donors, including Parish constituents – is exactly the same subject matter as the charged indictment, just with a different payoff mechanism. The personnel between this wrongful episode and the charged conduct includes overlapping personnel, including defendant Broussard and one of his co-conspirators who has now pled guilty, Karen Parker. Additionally, Broussard's co-defendant, Wilkinson, was participated in some of Broussard's events paid for by campaign funds, including the Lake Tahoe trip. Temporally, Broussard's misuse of campaign funds occurred during the same time period as the charged conduct. *See* Ex. B at 1-42. Finally, the purpose between the charged

11

conduct and the misuse of his campaign funds was undoubtedly the same: to enrich Broussard through the abuse of his political office. *See id.* As with his receipt of monies and other things of value from Parish vendors, the similarities between his misuse of campaign funds and the charged conduct reflect that it is an intrinsic overt act in furtherance of the charged conspiracy and, as such, is admissible. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749-50; *see also McCormick*, 2010 WL 2616624, at *1-2; *Plaskett*, 2008 WL 441938, at *1; *Matthews*, 1994 WL 660543, at *1-2 (non-pled drug transactions were similar in time, personnel, and execution, and they were thus overt acts committed in furtherance of the charged conspiracy).

## C. Broussard's Ethics Charges

The pending ethics charges lodged against Broussard, along with the substance of those charges, are also overt acts in furtherance of the charged conspiracy. Both involve similar personnel (including Broussard as the hub of the wrongful conduct); subject matter (the pending ethics charges detail Broussard's wrongful receipt of things of value from Parish employees and contractors, just like the bribery charges); timing (the substance of the ethics charges took place from 2007 through 2009, the same years in which Broussard was executing his bribery and fraud scheme); and purpose (again, Broussard seeking to use his political office for personal enrichment). *Compare* Exhibit C at 1-6 *with* Rec. Doc. No. 117. Like the other wrongful conduct noted above, the ethics charges are thus admissible as overt acts in furtherance of the charged conspiracy. *See, e.g., Watkins*, 591 F.3d at 784-85; *Powers*, 168 F.3d at 749-50; *see also McCormick*, 2010 WL 2616624, at *1-2; *Plaskett*, 2008 WL 441938, at *1; *Matthews*, 1994 WL 660543, at *1-2 (non-pled drug transactions were similar in time, personnel, and execution, and they were thus overt acts committed in furtherance of the charged conspiracy).

12

## V.     RULE 404(b) ALTERNATIVELY PERMITS THE ADMISSION OF EVIDENCE OF THE DEFENDANTS' WRONGFUL ACTS

If the Court finds the evidence of the other wrongful acts to be "extrinsic," it must evaluate the admissibility of that evidence through the prism of Rule 404(b) which provides that evidence of "other crimes, wrongs, or acts" may be admissible to show, among other things, "intent, preparation, plan, [and] knowledge." FED. R. EVID. 404(b). In analyzing the admissibility of Rule 404(b) evidence, the Fifth Circuit follows the two-part test developed in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978). *See, e.g.*, *United States v. Sanders*, 343 F.3d 511, 517-18 (5th Cir. 2003). The first prong of the *Beechum* test is to determine whether the evidence is "relevant to an issue other than the defendant's character," such as intent, knowledge, plan, pattern of conduct, or motive. *See, e.g.*, *United States v. Schmidt*, 229 F.3d 1148, 2000 WL 1239189, at *9-10 (5th Cir. 2000) (unpublished); *Beechum*, 582 F.2d at 911. If satisfied, the second prong of the *Beechum* test is to determine whether the evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice and... meet[s] the other requirements of rule 403." *Beechum*, 582 F.2d at 911. The Fifth Circuit has held that "all probative evidence is by its very nature prejudicial" and as a result, should only be excluded "sparingly." *Powers*, 168 F.3d at 459 (citations omitted).

### A.     The Wrongful Schemes Are Admissible to Prove the Defendants' Intent.

Where a conspiracy is charged and the defendants raise the issue of intent – as the defendants have done here[3] – the Fifth Circuit routinely admits extrinsic act evidence because the Government is entitled to introduce the evidence to rebut the defendants' contentions regarding alleged lack of

---

[3]*See* Paul Rioux, *Broussard denies slate of 6 charges; Ex-Jefferson leader: 'It's a beautiful day,'* NEW ORLEANS TIMES-PICAYUNE, February 29, 2012 at B1 (Broussard's attorney stating "[b]ut the thing about it is that [Broussard] didn't do anything improper.") (attached as Exhibit D).

intent, especially given the difficulties associated with proving conspiracy charges:

> "[c]harges of conspiracy involve considerations not present in other criminal prosecutions... In every conspiracy case, ... a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government. Evidence of such extrinsic offenses as may be probative of a defendant's state of mind is admissible unless he 'affirmatively takes the issue of intent out of the case.'"

*United States v. Roberts*, 619 F.2d 379, 382-83 (5th Cir. 1980) (alterations not in original) (citations omitted); *Schmidt*, 2000 WL 1239189, at *10 (citation omitted); *see also United States v. Sanders*, 343 F.3d 511, 518 (5th Cir. 2003); *United States v. Gordon*, 780 F.2d 1165, 1174 (5th Cir. 1986); *United States v. Zeuli*, 725 F2d 813, 816 (1st Cir. 1984). Where the extrinsic acts are factually proximate to the charged conduct – especially as it relates to the issue of intent – the extrinsic evidence is relevant. *See, e.g.*, *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173 (citing *Beechum*, 582 F.2d at 911); *United States v. Bailey*, 990 F.2d 119, 124 (3d Cir. 1993).

For example, in *United States v. Bailey*, 990 F.2d 119 (3d Cir. 1993), the Third Circuit, in a public official bribery scheme, admitted extrinsic evidence of a non-pled bribe accepted by the defendant, a state legislator, in exchange for official acts, including the public official's support and assistance of a bill pending in the state legislature. *See* 990 F.2d at 124. In determining relevancy, the Third Circuit analyzed the temporal relationship between the non-pled bribe and the charged conduct; the similarities between the two schemes; and whether the defendant placed intent at issue. *See id.* Ultimately, the Third Circuit found the non-pled bribe closely related to the charged conduct because they bore a temporal relationship (both bribes took place during the same legislative session) and were similar in factual matter, since both bribes involved the acceptance of money for the defendant's use of his political office. *See id.* Because the government was required to prove the

14

public official's intent, the Third Circuit held that "[t]he evidence of a prior similar act of accepting money for his actions as a legislator was admissible to show intent and absence of mistake" and, indeed, its admission was "necessary to counter [the defendant's] claim of lack of intent." *Id.* (citation omitted). Scores of other cases, with analogous facts, have reached the same conclusion.[4]

Moreover, in fraud-based cases, courts analyzing relevancy of evidence under *Beechum* have held that where the state of mind required for the charged conduct and the state of mind of the "other acts" is the same, the relevancy test under *Beechum* is met. *See Crawley*, 553 F.3d at 354-55 (citations omitted); *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173-74 ("[a] finding that the offenses involved the same state of mind renders the extrinsic evidence relevant to an issue other than character because it lessens the likelihood that the defendant acted with lawful intent in connection with the charged offense."). Here, as set forth below, the three episodes of wrongful conduct the Government seeks to admit are admissible to prove the intent of Broussard and others because they contain many, and in some cases, identical, parallels with the charged conduct and reflect the defendants' deceitful intent.

## 1. Ownership of Canadian Resort Property

Broussard's receipt of his NSE ownership interest – paid for by Parish vendors – reflects the

---

[4]*See, e.g.*, *United States v. Weston,* 962 F.2d 8, 1992 WL 90554, at *3-4 (4th Cir. 1992) (in corruption case, evidence of other bribery scheme, which was not charged in the indictment, was admissible to prove intent); *United States v. Bruno*, 809 F.2d 1097, 1106 (5th Cir. 1987) (in public corruption case, admission of prior non-pled bribery schemes was relevant to prove intent); *United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986) (in insurance fraud conspiracy, evidence of uncharged, fraudulent actions in connection with prior loans was admissible under Rule 404(b) to prove, among others, intent); *see also United States v. Saada*, 212 F.3d at 223-24 (3d Cir. 2000) (evidence of defendant's involvement in another fraud is admissible to prove, among others things, intent to defraud); *United States v. Primrose*, 718 F.2d 1484, 1491-92 (10th Cir. 1983) (evidence of 45 non-pled kickbacks received by defendant public official was admissible to show intent) (citations omitted).

same fraudulent and corrupt intent he had in perpetrating the schemes charged in the indictment. Indeed, the similarities are striking – they involved the same purpose (Broussard to enriching himself based on the abuse of his political office); mode of execution (receiving payoffs/things of value from Parish vendors); personnel (Broussard and various Parish vendors); and time period (Broussard's receipt of these things of value took place from 2002-2010). *Compare* Ex. A at 1-60 *with* Rec. Doc. No. 117 at 14-20, 22-23. His receipt of an ownership interest in NSE is "not tenuous to the charges in the indictment because it involve[s] the acceptance of money for the use of his political office." *Bailey*, 990 F.2d at 124. Moreover, just like Broussard's illegal arrangement with Mack, he sought to structure the NSE deal in a way that "legitimizes" the transaction as a business transaction, as opposed to the corrupt one that it was – a fact that cuts against any anticipated argument by Broussard that he was mistaken in his belief that monies from contractors was prohibited by law. *See, e.g. Jenkins*, 785 F.2d at 1395 ("[t]he fact that [the defendant] used fraudulent means [in a prior bad act] is probative on issues of intent, knowledge, good faith and absence of mistake..."). The intent necessary for Broussard to seek and receive payoffs from Parish vendors like Mack is the identical state of mind necessary for his receipt of a hefty ownership interest in NSE paid for by Parish vendors. The similarities in conduct reflects this corrupt intent and, because Rule 404(b) permits the introduction of wrongful act evidence to prove Broussard's intent, his receipt of an ownership interest in NSE – a thing of value paid for by Parish vendors – is admissible. *See Bailey*, 990 F.2d at 124; *Weston*, 1992 WL 90554, at *2-3; *Bruno*, 809 F.2d at 1106; *Jenkins*, 785 F.2d at 1385; *Primrose*, 718 F.2d at 1491-92.

### 2. Personal Expenses paid by Campaign Funds

Broussard's fraudulent and corrupt intent, as charged in the Indictment, is further proven by

16

his solicitation of funds from campaign contributors for the ostensible purpose of supporting his election when, in reality, Broussard would use these funds for myriad personal reasons. *See* Exhibit B at 1-42. This uncharged conduct is relevant because it is factually proximate to the charged conduct: it required the same fraudulent intent, during the same time period, as the conduct alleged in the Indictment. Accordingly, under Rule 404(b) of the Federal Rules of Evidence, it is admissible. *See Crawley*, 553 F.3d at 354-55 (where state of mind in perpetrating the non-pled conduct is the same as the charged conduct, extrinsic act evidence is admissible) (citations omitted); *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173-74; *Davis*, 2003 WL 1837708, at *2 (where the extrinsic evidence is similar to the charged conduct, relevancy is "heighten[ed].").

### 3. Broussard's Receipt of Things of Value from Jefferson Parish Vendors

Like his ownership interest in NSE, Broussard's receipt of other things of value from Jefferson Parish vendors reflects the same corrupt and fraudulent intent he had when perpetrating the charged scheme. As with the above-listed wrongful conduct, it is factually proximate – Broussard's already been charged with receiving bribes and payoffs from Bill Mack; the 404(b) evidence the Government seeks to admit here is his receipt of bribes and payoffs, in several forms, from various other Jefferson Parish contractors. The timing is similar – both took place during the years of his parish presidency. Finally, and perhaps most important is that Broussard's state of mind is identical – in receiving bribes from Parish vendors in exchange for his official acts, Broussard employed a corrupt state of mind, as he did with the scheme alleged in the Indicmtnent. Accordingly, under Rule 404(b) and applicable case law, the Government's evidence of Broussard's receipt of things of value is admissible. *See Bailey*, 990 F.2d at 124; *Weston*, 1992 WL 90554, at *2-3; *Bruno*, 809 F.2d at 1106; *Jenkins*, 785 F.2d at 1385; *Primrose*, 718 F.2d at 1491-92.

### 4.    Broussard's Ethics Charges

Like his receipt of an ownership interest in NSE, the pending ethics charges – which detail Broussard's improper receipt of things of value from Parish vendors or employees – reflect many similarities with the charged conduct. These similarities include the same purpose; mode of execution; personnel; and timing. Because Broussard required the same fraudulent to undertake his bribery scheme with Mack as he did with the substance of the ethics charges, this evidence is admissible to demonstrate Broussard's intent under Rule 404(b). *See Crawley*, 553 F.3d at 354-55 (where state of mind in perpetrating the non-pled conduct is the same as the charged conduct, extrinsic act evidence is admissible) (citations omitted); *Sanders*, 343 F.3d at 518; *Gordon*, 780 F.2d at 1173-74; *Davis*, 2003 WL 1837708, at *2 (where the extrinsic evidence is similar to the charged conduct, relevancy is "heighten[ed].").

### B.    The Wrongful Schemes Are Also Admissible to Prove the Defendants' Knowledge and Pattern of Conduct.

Courts also routinely admit evidence of non-pled schemes to prove the knowledge of the defendants, including knowledge of a particular industry or knowledge of how the charged scheme or operation functioned. *See, e.g. United States v. Marti*, 294 Fed. Appx. 439, 446-47 (11th Cir. 2008) (unpublished) (in healthcare fraud and kickback scheme, admitting extrinsic evidence of separate, non-pled scheme to prove the defendant's knowledge of doctors and healthcare clinics); *United States v. Nguyen*, 504 F.3d 561, 574 (5th Cir. 2007) (admitting extrinsic evidence of real estate scheme to prove intent and knowledge in charged real estate scheme); *United States v. Williams*, 900 F.2d 823, 825-27 (5th Cir. 1990) (admitting extrinsic evidence of similar offense to prove, among other things, knowledge of the scheme). For example, in *United States v. Nguyen*, 504

F.3d 561 (5th Cir. 2007), the Fifth Circuit admitted evidence of two fraudulent and non-pled real

estate transactions to show that the charged real estate scam followed a similar pattern and

demonstrated the defendant's intent and knowledge of the industry and the charged operation. *See*

504 F.3d at 574. Even though the uncharged real estate transactions were separate transactions, the

*Nguyen* court found that "the evidence of [the uncharged real estate scams] demonstrated how the

operation worked and therefore established [the defendant's] knowledge and intent." *Id.* at 574.

Courts have additionally admitted evidence of non-pled schemes to prove that the defendants

employed a common plan or pattern of conduct charged in the indictment. *See United States v.*

*Aguilar*, 59 Fed. Appx. 326, 329, 2003 WL 509671, at *3 (10th Cir. 2003) (unpublished) (in case

charging defendant with aiding and abetting marriage for the purpose of evading immigration laws,

evidence of defendant's prior advice and other attempts to arrange marriages for illegal aliens was

admissible to prove common plan); *United States v. Murphy*, 768 F.2d 1518, 1535 (7th Cir. 1985)

(in extortion case involving state judge who extorted defendants and accepted bribes in connection

with fixing cases, evidence that judge had received envelopes of cash on a monthly basis was

admissible prove a common plan); *United States v. Adcock*, 558 F.2d 397, 401-02 (8th Cir. 1977)

(in extortion and tax case, testimony concerning genesis of extortion scheme was admissible to show

common plan); *United States v. Sims*, 430 F.2d 1089, 1092 (6th Cir. 1970) (in bribery case,

testimony implicating the defendant in similar bribery schemes was admissible to show common

design). As set forth below, all three episodes of wrongful conduct are relevant to prove Broussard's

knowledge and employment of a common plan or pattern of conduct.

19

1.   **Ownership of Canadian Resort Property & Receipt of Other Things of Value From Jefferson Parish Vendors**

As noted above, Broussard sought to obtain things of value from Jefferson Parish vendors in a concealed manner. The indictment alleges one way in which Broussard did this: receiving monthly checks from a vendor in which he sought to mask the purpose of the payments. *See* Rec. Doc. No. 117 at 14-20, 22-23. His receipt of an ownership interest in NSE, as well as his receipt of other things of value (gifts, etc.) from vendors are other forms of the same conduct: receiving something of value paid for by Jefferson Parish vendors. *See* Ex. A at 1-60. This conduct reflects Broussard's knowledge of concealment of his illegality, as well as his employment of a similar pattern or plan of conduct to abuse his office for private gain while attempting to mask the purpose of the payoffs in an effort to hide the wrongfulness of his arrangements. *See Aguilar*, 59 Fed. Appx. at 329, 2003 WL 509671, at *3; *Murphy*, 768 F.2d at 1535; *Adcock*, 558 F.2d at 401-02; *Sims*, 430 F.2d at 1092 (in bribery case, testimony implicating the defendant in similar bribery schemes was admissible to show common design). Accordingly, because it reflects Broussard's knowledge and pattern of conduct, it is admissible under Rule 404(b). *See id.*

2.   **Personal Expenses paid by Campaign Funds**

The wrongful spending of campaign funds for personal uses demonstrates the knowledge of Broussard in abusing the trust placed in him as a public official in a way that continued to enrich Broussard, just as he did in the charged conspiracy. *See Marti*, 294 Fed. Appx. at 447; *Nguyen*, 504 F.3d at 574. Additionally, the expenditures of personal funds from campaign contributors, just like the placement of his unqualified love interest in a specially-created job funded by taxpayer monies, fits a plan or pattern of conduct employed by Broussard: abuse his office in a way that enriches him.

Such a structure reflects a plan or pattern of conduct Broussard implemented to achieve his corrupt intentions. *See Aguilar*, 59 Fed. Appx. at 329, 2003 WL 509671, at *3; *Murphy*, 768 F.2d at 1535; *Adcock*, 558 F.2d at 401-02; *Sims*, 430 F.2d at 1092.

### 3. Broussard's Ethics Charges

As with his ownership in NSE, the substance of Broussard's ethics charges – his receipt of things of value from Jefferson Parish vendors and employees – demonstrates the overarching purpose and pattern of conduct in this case: a public official seeking to abuse his office for private gain. Once again, the knowledge of *how* to structure a transaction to mask its illegality is demonstrated by the ethics charges, just as he attempted to do with the payoffs he was receiving from Mack and his company, FCC. *See Aguilar*, 59 Fed. Appx. at 329, 2003 WL 509671, at *3; *Murphy*, 768 F.2d at 1535; *Adcock*, 558 F.2d at 401-02; *Sims*, 430 F.2d at 1092. Similarly, the pattern of conduct between this episode and the charged conduct is the same. *See id.* Accordingly, this evidence is admissible. *See id.*

### C. Evidence of the Defendants' Acts is More Probative Than Prejudicial.

Probative evidence is, by its very nature, prejudicial; it is only when the prejudicial effect *substantially outweighs* the probative value of the evidence that it should be excluded. *See, e.g.* FED. R. EVID. 403; *Beechum*, 582 F.2d at 911-18 (emphasis added). Indeed, probative evidence should only be excluded when it is of such an "inflammatory nature that [it] could lead the jury to decide the case on an improper basis." *United States v. Dowl*, 2009 WL 1507412, at *7 (E.D. La. 2009). The Fifth Circuit has held that, when making a determination under Rule 403 as to extrinsic evidence, trial courts should review the similarities between the non-pled evidence and the charged scheme; the more factually proximate the evidence is, the more likely the probative value outweighs

any prejudicial effect. *See, e.g. United States v. Mendoza*, 587 F.3d 682, 689 (5th Cir. 2009); *Beechum*, 582 F.2d at 915. Here, the highly probative nature of the four types of wrongful conduct -- which include nearly identical schemes and conduct as those charged in the Indictment[5] -- unquestionably outweighs any prejudicial effect the defendants may assert. *See United States v. Wolford*, 2010 WL 2802404, at *3-4 (5th Cir. July 15, 2010) (unpublished) (evidence of pornographic images of children, as well as transcripts of anonymous online internet chats relating to the defendant's interest in having sex with minor children, were more probative than prejudicial in case against defendant charged with enticing a minor to have sex) (citation omitted); *Mendoza*, 587 F.3d at 689 (in drug case, evidence of defendant's prior involvement in conspiracy to sell drugs was more probative than prejudicial, particularly because the defendant placed his intent at issue and because of the factual and temporal similarities between the uncharged conduct and the charged conduct) (citations omitted); *United States v. Shows*, 307 Fed. Appx. 818, 822, 2009 WL 139575, at *3-4 (5th Cir. 2009) (unpublished) (in tax evasion case, evidence of defendant's lack of prior year tax returns were more probative than prejudicial because, in part, they negated the defendant's good faith defense) (citation omitted); *United States v. Roberts*, 619 F.2d 379, 383-84 (5th Cir. 1980) (in gambling prosecution, prior convictions of defendant for crimes identical to those for which he was on trial were more probative than prejudicial).[6] Given the high hurdles of proving the Government's

---

[5] *See supra*, Parts IV.A-C.

[6] *See also Bailey*, 990 F.2d at 124-25 (evidence of public official's acceptance of a bribe was more probative than prejudicial and "was not the sort which excites emotionalism in a jury so as to lead [] to an irrational verdict"); *United States v. Zeuli*, 725 F.2d 813, 816-17 (1st Cir. 1984) (in extortion case, evidence of uncharged extortion scheme was more probative than prejudicial because it was relevant to intent and it would not lead to a genuine risk that the "emotions of the jury will be excited to irrational behavior").

case, the many similarities between the non-pled conduct and the charged scheme,[7] and controlling Fifth Circuit case law, the probative nature of this evidence outweighs any prejudicial effect. *See id.* Moreover, to the extent the Court is concerned about this evidence, the Fifth Circuit has repeatedly approved the use of limiting instructions to ward off any potential prejudice. *See, e.g. Shows*, 307 Fed. Appx. at 822, 2009 WL 139575, at \*3-4; *Crawley*, 533 F.3d at 355; *Nguyen*, 504 F.3d at 574; *Sanders*, 343 F.3d at 518; *United States v. Cihak*, 137 F.3d 252, 258 (5th Cir. 1998). Accordingly, Rule 403 does not serve as a basis to exclude the probative evidence described herein.

## VI. THE EVIDENCE MAY BE ADMITTED WITHOUT A PRE-TRIAL HEARING

In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court concluded that a court may issue a ruling on evidence seeking to be admitted under Rule 404(b) without a pre-trial hearing. *See* 485 U.S. at 687-88. In that case, the Court held that "the district court need not itself make a preliminary finding that the Government has proved the 'other act' by a preponderance of the evidence before it submits 'similar acts' and other Rule 404(b) evidence to the jury." *Id.* In that opinion, the Court admitted similar prior property crimes, without proof thereof by a preponderance of the evidence, to show guilty knowledge, system, and intent. *See Huddleston*, 485 U.S. at 687-88 ("[t]he text ... [of Rule 404(b)] ... contains no intimation ... that *any preliminary showing* is necessary before such evidence may be introduced for a proper purpose.") (emphasis added). To meet its low burden under *Huddleston*, the government need only provide "*some evidence* that the defendant committed the bad act." *United States v. Crawley,* 533 F.3d 349, 354 (5th Cir. 2008); *United States v. Gonzalez-Lira*, 936 F.2d 184, 189 (5th Cir. 1991); *see also Beechum*, 582 F.2d at 913 (if a jury could "reasonably find" the fact to exist, that fact may be admitted into evidence).

---

[7]*See supra*, Part IV.

Here, a pre-trial hearing as to the proof of these acts is unnecessary for several reasons. First, the substantial amount of evidence attached hereto clearly meets the low burden that *Huddleston* and *Beechum* set: that is, the evidence establishes that, among others, Broussard committed or assisted in committing, these wrongful acts. *See, e.g.*, Exs. A at 1-60 (NSE corporate records reflecting Broussard's role); B at 1-42 (Broussard's campaign checks); C at 1-6 (Ethics charges pending against Broussard). Additionally, all of the attached evidence has been produced in discovery in this case or is otherwise publicly-available. Consequently, the Court can readily determine the admissibility of the items attached before trial and without conducting a pre-trial hearing. *See, e.g. Huddleston*, 485 U.S. at 690-91; *Crawley*, 533 F.3d at 354; *Dowl*, 2009 WL 1507412, at \*4-7 (admitting intrinsic and extrinsic evidence without a pre-trial hearing).[8]

---

[8]Moreover, to the extent Broussard testifies in his own defense, the rules of evidence and applicable authorities permit the cross-examination of his with respect to these bad acts. *See, e.g.* FED. R. EVID. 608(b) (permitting the introduction of specific instances of conduct for cross-examination purposes if the acts concern the witness's character for truthfulness); FED. R. EVID. 611(b) (cross-examination can concern matters affecting the credibility of the witness); *United States v. Akpan*, 407 F.3d 360, 373 (5th Cir. 2005) (a defendant "forfeit[s] the protection of Rule 404(b) when [the defendant] place[s] his character at issue by testifying at trial.") (alterations not in original). Here, the wrongful acts noted above clearly concern Broussard's credibility and character for truthfulness. *See, e.g. United States v. Oriyomi*, 449 Fed. Appx. 681, 682 (9th Cir. Aug. 29, 2011) (unpublished) "[e]vidence of prior frauds is considered probative of the witness's character for truthfulness or untruthfulness" under Rule 608(b)) (citation omitted); *Akpan*, 407 F.3d at 373 (perjury, fraud, swindling, forgery, bribery, and embezzlement are instances of misconduct clearly probative of truthfulness) (citation omitted).

## VII.  CONCLUSION

For the reasons mentioned above, the United States respectfully submits that the evidence of the defendants' acts, as set forth above, should be admitted during its case-in-chief as being relevant and extremely probative as they relate to the acts charged in the pending Indictment.

Dated: August 31, 2012                    Respectfully Submitted,

JIM LETTEN
UNITED STATES ATTORNEY


/s/ Matthew S. Chester
MATTHEW S. CHESTER
Texas Bar No. 24045650
BRIAN M. KLEBBA
New York Bar No. 2938728
DANIEL P. FRIEL
Massachusetts Bar No. 660583
Assistant United States Attorneys
650 Poydras Street, Suite 1600
New Orleans, Louisiana  70130
Telephone:  (504) 680-3000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Matthew S. Chester
Matthew S. Chester
Assistant U.S. Attorney

# EXHIBIT A



# UNITED STATES OF AMERICA
## State of Louisiana

### Fox McKeithen
#### SECRETARY OF STATE

*As Secretary of State, of the State of Louisiana, I do hereby Certify that*

a copy of the Articles of Organization and Initial Report of

**NOVA SCOTIA ENTERPRISES, L.L.C.**

Domiciled at KENNER, LOUISIANA,

Was filed and recorded in this Office on May 20, 2002,

And all fees having been paid as required by law, the limited liability company is authorized to transact business in this State, subject to the restrictions imposed by law, including the provisions of R.S. Title 12, Chapter 22.

*In testimony whereof, I have hereunto set my hand and caused the Seal of my Office to be affixed at the City of Baton Rouge on,*

May 20, 2002



BFR 35274067K
*Secretary of State*

CERTIFICATE SS 102 S (R-3/66)

FOX McKEITHEN
Secretary of State
Received & Filed
DATE  MAY 2 0 2002

ARTICLES OF ORGANIZATION

OF

NOVA SCOTIA ENTERPRISES, L.L.C.

UNITED STATES OF AMERICA

STATE OF LOUISIANA

PARISH OF JEFFERSON

**************************************************************************

BE IT KNOWN, that on this 9th day of May, 2002, before me, the undersigned, a Notary Public, in and for the Parish of Jefferson, State of Louisiana, duly commissioned and qualified, personally came and appeared, AARON F. BROUSSARD, a person of the full age of majority and domiciled in the Parish of Jefferson, State of Louisiana of who declared under oath and to me, Notary, in the presence of the undersigned competent witnesses, that he hereby avails himself of the provisions of the Louisiana Limited Liability Company Law (**LSA R.S. 12:1301, et seq.**), and does hereby organize a limited liability company pursuant to said law, under and in accordance with the following Articles of Organization to-wit:

### ARTICLE I

The name of this limited liability company is **NOVA SCOTIA ENTERPRISES, L.L.C.**

### ARTICLE II

The purpose of this limited liability company is to engage in any lawful activity for which limited liability companies may be formed under Chapter 22 of Title 12 of the Louisiana Revised Statutes Annotated.

### ARTICLE III

The company shall be managed by a manager or managers.

## ARTICLE IV

NOVA SCOTIA ENTERPRISES, L.L.C., is organized for a term beginning with the effective date of the organization of **NOVA SCOTIA ENTERPRESES, L.L.C.** and ending on December 31, 2099.

## ARTICLE V

The full name and street address of the organizer is AARON F. BROUSSARD, 3329 Florida Avenue, Kenner, Louisiana 70065.

**THUS DONE AND PASSED**, in multiple originals, in the Parish of Jefferson, State of Louisiana, on the date, herein first above written, in the presence of the undersigned competent witnesses who have hereto signed their names with the said appearer and me, Notary, after due reading of the whole.

WITNESSES:

_____
AARON F. BROUSSARD

_____
NOTARY PUBLIC

## INITIAL REPORT

### OF

### NOVA SCOTIA ENTERPRISES, L.L.C.

1. The name of this Limited Liability Company is NOVA SCOTIA ENTERPRISES, L.L.C.

2. The location and Municipal Address of this limited liability company's registered office is 3329 Florida Avenue, Kenner, Louisiana 70065.

3. The full name and Municipal Address of the limited liability company's registered agent is: AARON F. BROUSSARD, 3329 Florida Avenue, Kenner, Louisiana 70065.

4. The full name and Municipal Address of the limited liability company's first manager is:

   A.   AARON F. BROUSSARD
        3329 Florida Avenue
        Kenner, Louisiana 70065

The organizer hereby places his signature on this Initial Report on this 9th day of May, 2002.

**AARON F. BROUSSARD**

## AFFIDAVIT OF ACKNOWLEDGMENT
## AND ACCEPTANCE OF APPOINTMENT BY
## DESIGNATED REGISTERED AGENT

STATE OF LOUISIANA

PARISH OF JEFFERSON

On this 9th day of May, 2002, before me, a Notary Public in and for the State and Parish as aforesaid, personally came and appeared, AARON F. BROUSSARD, a person of the full age of majority and domiciled in the Parish of Jefferson, State of Louisiana, who is to me known, and who, being duly sworn, did hereby acknowledge to me that he does hereby accept the appointment of Registered Agent for and on behalf of **NOVA SCOTIA ENTERPRISES, L.L.C.**, which is a limited liability company authorized to transact business in the State of Louisiana pursuant to the provisions of the Title 12, Chapter 22 of the revised statutes of the State of Louisiana.

NOVA SCOTIA ENTERPRISES, L.L.C.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS 9TH DAY OF MAY, 2002

NOTARY PUBLIC

## OPERATING AGREEMENT OF NOVA SCOTIA ENTERPRISES, L.L.C.

THIS OPERATING AGREEMENT (the "Agreement") is entered into on this 24th day of July, 2002, by and between Nova Scotia Enterprises, L.L.C., and the Members of the Company.

**WHEREAS**, on May 20, 2002, the Company was formed as a limited liability company pursuant to the provisions of the Louisiana Limited Liability Law; and

**WHEREAS**, the Company was formed for the purpose of engaging in any lawful activity of business permitted to a limited liability company formed under the Act, including but not limited to the acquisition, rental, and management, of real estate, more particularly, certain real estate located in the Province of Nova Scotia, Country of Canada.

**NOW, THEREFORE,** in consideration of the premises, and of good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby mutually agree to be legally bound as follows:

### SECTION I
### Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

*"Adjusted Capital Account Deficit"* means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)     the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2 or is deemed obligated to restore pursuant to Regulation Sections 1.704-2(g)(1) and (i)(5) (i.e., the Interest Holder's share of Minimum Gain and Member Minimum Gain); and

(ii)     the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

*"Adjusted Capital Balance"* means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.2.3.4.1 and 4.4 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

*"Agreement"* means this Operating Agreement, as amended from time to time.

1

"*Capital Account*" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)     an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii)     an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of Loss, and an item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted in a manner consistent with that Regulation.

"*Capital Contribution*" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"*Capital Proceeds*" means the gross receipts by the Company from a Capital Transaction.

"*Capital Transaction*" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"*Cash Flow*" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as

026

determined by the Manager. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

*"Code"* means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

*"Company"* means the limited liability company formed in accordance with this Agreement.

*"Interest"* means a Person's share of the Profits and Losses of, and the right to receive distributions and allocations from, the Company.

*"Interest Holder"* means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

*"Involuntary Withdrawal"* means, with respect to any Member, the occurrence of any of the following events:

(i)     the Member makes an assignment for the benefit of creditors;

(ii)    the Member files a voluntary petition or bankruptcy;

(iii)   the Member is adjudged bankruptcy or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv)    the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v)     the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi)    Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii)   any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

3

027

(viii)  if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix)  if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x)  if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi)  if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(xii)  if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or

(xiii)  the Member fails to make an Initial Capital Contribution, or Additional Capital Contribution as provided for in Sections 3.1 and 3.2.

*"Member"* means each Person signing this Agreement and any Person who subsequently is admitted as a Member of the Company.

*"Member Loan Nonrecourse Deductions"* means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

*"Member Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(i) for "partner nonrecourse debt minimum gain".

*"Membership Rights"* means all of the rights of a Member in the Company, including a Member's: (i) Interest; (ii) right to inspect the Company's books and records; and (iii) right to vote on matters coming before the Company.

*"Minimum Gain"* has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

*"Negative Capital Account"* means a Capital Account with a balance of less than zero.

*"Nonrecourse Deductions"* has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions of a taxable year of the Company equals the excess, if any, of net increase, if any, in the amount of distributions during such year of proceeds of a Nonrecourse Liability that are allocable to an increase in Minimum Gain, determined according to the provisions of Regulation Section 1.704-2(c).

4

028

*"Nonrecourse Liability"* has the meaning set forth in Regulation Section 1.704-2(b)(3).

*"Percentage"* means, as to a Member, the Percentage set forth after the Member's name on Exhibit A, as amended from time to time, and, as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

*"Person"* means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

*"Positive Capital Account"* means a Capital Account with a balance greater than zero.

*"Profit"* and *"Loss"* means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii)     any expenditures of the Company described in Code Section 705(a)(2)(B), (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)     gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v)     in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)     notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit and Loss.

*"Regulation"* means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

5

"*Secretary*" means the Secretary of State of Louisiana.

"*Transfer*" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, disposition, or other transfer, and, when used as a verb, means voluntary to sell, hypothecate, pledge, assign, dispose of, or otherwise transfer.

"*Voluntary Withdrawal*" means a Member's disassociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## SECTION II
### Formation and Name:  Office; Purpose; Term

2.1     *Organization.*  The parties have organized a limited liability company pursuant to the LLC Law and the provisions of this Agreement.

2.2     *Name of the Company.*  The name of the Company shall be Nova Scotia Enterprises, L.L.C.  The Company may do business under that name and under any other name or names which the Manager selects.  If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall file a trade name certificate as required by law.

2.3     *Purpose.*  The Company is organized to purchase, acquire, buy, sell, own, trade in, hold, develop, lease, manage, subdivide, and otherwise deal in and with real property and improvements and to do any and all things necessary, convenient, or incidental to that purpose.

2.4     *Term.*  The term of the Company shall begin upon the date of the Articles of Organization and Initial Report by the Secretary and shall continue until December 31, 2099, unless its existence is sooner terminated pursuant to Section VII of this Agreement.

2.5     *Registered Office.*  The registered office of the Company in the State of Louisiana shall be located at 3329 Florida Avenue, Suite 220, Kenner, Louisiana 70065 or at any other place within the State of Louisiana which the Manager selects.

2.6     *Registered Agent.*  The name and address of the Company's registered agent in the State of Louisiana shall be Aaron F. Broussard, 3329 Florida Avenue, Suite 220, Kenner, Louisiana 70065.

2.7     *Members.*  The name, present business address, taxpayer identification number, Class, and Percentage of each Member are set forth on Exhibit A.

2.7.1   The Class A Members shall have a 54% Membership Interest collectively and shall be accorded the rights and abide by the obligations of Class A Members as contained in this Agreement.

2.7.2  The Class B Members shall have a 46% Membership Interest collectively and shall be accorded the rights and abide by the obligations of Class B Members as contained in this Agreement.

## SECTION III
### Members; Capital; Capital Accounts

3.1  *Initial Capital Contributions.*  Upon the execution of this Agreement, the Class A Members shall contribute to the Company cash in the amounts respectively set forth on Exhibit A.

3.2  *Additional Capital Contributions.*

3.2.1 If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Interest Holder of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each Interest Holder's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Interest Holder's additional Capital Contribution is due and payable, which date shall be thirty (30) days after the notice has been given. It is anticipated that Capital Contributions shall be required from the Class A Members beginning in the year 2002 through the year 2011. At that time, the Promissory Note given to the Seller for the purchase price of that certain property known as "Riverbend Lodge", shall be paid in full. Subsequent thereto, and beginning in the year 2012, all Class A and Class B Members, shall be required to make Capital Contributions, if required, in proportion to the Ownership Interest of each Interest Holder.

3.2.2 Except as provided in Section 3.2.1, no Interest Holder shall be required to contribute any additional capital to the Company, and no Interest Holder shall have any personal liability for any obligation of the Company.

3.2.3 If an Interest Holder fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the nondefaulting Interest Holder's Capital Contribution (the "Unpaid Contribution"). To the extent the Unpaid Contribution is contributed by any other Interest Holder, the defaulting Interest Holder's Percentage shall be reduced and the Percentage of each Interest Holder who makes up the Unpaid Contribution shall be increased, so that each Interest Holder's Percentage is equal to a fraction, the numerator of which is that Interest Holder's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders. The Manager shall amend Exhibit A accordingly. This remedy is in addition to any other remedies allowed by law or by this Agreement. Additionally, if an Interest Holder fails to pay when due, all or any portion of any Capital Contribution, the Manager, may undertake the sale of the Interest of that Member, to any Person, firm, or entity, including any other Interest Holder, at a reasonable price. The Interest Holder who fails to pay when due, all or any portion of any Capital Contribution, hereby consents to the transfer of that Interest Holder's Percentage. The Interest Holder acquiring the prior Interest

7

Holder's Percentage shall become a new Member and the Manager shall amend Exhibit A accordingly.

3.3    *No Interest on Capital Contributions.*  Interest Holders shall not be paid interest on their Capital Contributions.

3.4    *Return of Capital Contributions.*  Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive any return of any Capital Contribution.

3.5    *Form of Return of Capital.*  If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but Cash in return of the Interest Holder's Capital Contribution.

3.6    *Capital Accounts.*  A separate Capital Account shall be maintained for each Interest Holder.

3.7    *Loans.*  Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree.

### SECTION IV
### Profit, Loss, and Distributions

4.1    *Distributions of Cash Flow and Allocations of Profit or Loss Other Than Capital Transactions.*

4.1.1 *Profit or Loss Other Than from a Capital Transaction.*  After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Interest Holders designated as Class A Members in full for the taxable years 2002 through 2011. Subsequent thereto, and beginning in the year 2012, Profit or Loss shall be allocated to all Interest Holders in proportion to their Percentage Ownership Interest.

4.1.2 *Cash Flow.*  Cash Flow for each taxable year of the Company from 2002 through 2011 shall be distributed in full to the Interest Holders designated as Class A Members no later than forty-five (45) days after the end of the taxable year. Subsequent thereto, and beginning in the year 2012, Cash Flow shall be distributed to the Interest Holders in proportion to their Percentage Ownership Interest.

4.2    *Distributions of Capital Proceeds and Allocation of Profit or Loss from a Capital Transaction.*

4.2.1 *Profit.* After giving effect to the special allocations set forth in Sections 4.3, profit from a Capital Transaction shall be allocated as follows:

4.2.1.1 If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

4.2.1.2 Any profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders so that their Capital Account Balances shall be in proportion to, and to the extent of, the amounts distributable to them pursuant to Sections 4.2.3.4.1 and 4.2.3.4.2.

4.2.1.3 Any profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.2 *Loss.* After giving effect to the special allocations set forth in Section 4.3, loss from a Capital Transaction shall be allocated as follows:

4.2.2.1 If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2 Any loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3 *Capital Proceeds.* Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1 to the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2 to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

4.2.3.3 to the establishment of any reserves which the Manager deems necessary for liabilities or obligations of the Company; then

4.2.3.4 the balance shall be distributed as follows:

4.2.3.4.1 to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2 the balance, to the Interest Holders in proportion to their Percentages.

9

### 4.3    *Regulatory Allocations.*

4.3.1    *Qualified Income Offset.*  No Interest Holder shall be allocated Losses or deductions if the allocation causes the Interest Holder to have an Adjusted Capital Account Deficit.  If an Interest Holder received (1) an allocation of Loss or deduction (or item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.   This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2    *Minimum Gain Chargeback.*  Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain or Member Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share (i) of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g)(2), or (ii) Member Minimum Gain, computed in accordance with Regulation Section 1.704-2(i)(5).  Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain or Member Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year.  It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Sections 1.704-2(f) or 1.704(i)(4), as applicable.

4.3.3    *Contributed Property and Book-Ups.*  In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution).  If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.  Any elections or other decisions relating to such Code Section 704(c) allocations shall be made by the Manager.  Allocations pursuant to this Section 4.3.3 are solely for purposes of federal, state and local taxes and shall not be taken into

034

account in computing any Interest Holder's Capital Account or share of Profit or Loss or any other item in the nature of income or gain or expense or loss.

4.3.4   *Code Section 754 Adjustment.*   To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5   *Nonrecourse Deductions.*   Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6   *Member Loan Nonrecourse Deductions.*   Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

4.3.7   *Guaranteed Payments.*   To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8   *Unrealized Receivables.*   If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holders' Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Manager.

4.4   *Liquidation and Dissolution.*

4.4.1   If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Sections 4.1 or 4.2 and any items in the nature of income, gain. Losses or deductions specially allocated in accordance with Section 4.3, if any, and distributions, if any, of cash or property pursuant to Sections 4.1 and 4.2.3.

4.4.2   No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5   *General.*

4.5.1   Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Manager.

4.5.2   If any assets of the Company are distributed in kind to the Interest Holders, other assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest in indivision with all other Interest Holders so entitled.  Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Manager.  The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 or Section 4.3, as applicable, and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3   All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4   The Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Section IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

4.5.5   *Withholding.*  All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be

12

treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

## SECTION V
### Management: Rights, Powers, and Duties

5.1    *Management.*

5.1.1  *Manager.* The Company shall be managed by a Manager, who may, but need not, be a Member. Aaron F. Broussard is hereby designated to serve as the initial Manager. The initial Manager is a Class B Member, and shall provide management services to the Company without cash compensation from the Company.

5.1.2  *General Powers.* The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including, without limitation, for Company purposes, the power to:

5.1.2.1  acquire by purchase, lease, or otherwise, any property, whether movable or immovable, corporeal or incorporeal;

5.1.2.2  construct, operate, maintain, finance, and improve, and to own, mortgage, or lease any property, whether movable or immovable, corporeal or incorporeal;

5.1.2.3  sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

5.1.2.4  enter into agreements and contracts and to give receipts, releases and discharges;

5.1.2.5  purchase liability and other insurance to protect the Company's properties and business;

5.1.2.6  borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments including mortgages, pledges, and other security instruments containing the usual and customary Louisiana security clauses including confession of judgment, the right to executory process, waiver of appraisal and the pact de non alienando;

5.1.2.7  execute or modify leases with respect to any part or all of the assets of the Company;

5.1.2.8  prepay, in whole or in part, refinance, amend, modify, or extend any mortgages (including mortgages containing the usual and customary

waiver of appraisal and the pact de non alienando) or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

5.1.2.9 execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

5.1.2.10 make any and all expenditures which the Manager, in its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting, and other related expenses incurred in connection with the organization and financing and operation of the Company;

5.1.2.11 enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

5.1.2.12 invest and reinvest Company reserves in short-term instruments or money market funds.

5.1.3 *Extraordinary Transactions.* Notwithstanding anything to the contrary in this Agreement, the Manager shall not undertake any of the following without the approval of the Members:

5.1.3.2 any Capital Transaction;

5.1.3.2 the Company's lending of its money;

5.1.3.3 the admission of additional Members to the Company;

5.1.3.4 the Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies; except for the acquisition and operations of the Company in Nova Scotia, Canada.

5.1.3.5 the Company's electing to exercise any Purchase Option pursuant to Sections 6.1.4 or 6.4.

5.1.4 *Limitation on Authority of Members.*

5.1.4.1 No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

038

5.1.4.2 This Section 5.1 supersedes any authority granted to the Members pursuant to Section 1318(B) of the LLC Law. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company harmless with respect to the loss or expense.

5.1.5  *Removal of Manager.* The Class A Members holding 54% of the Ownership Interest shall have the right to remove the Manager then acting, and elect a new Manager. The Class A Members, shall, before removal of the Manager, consider the credentials of the then existing Manager, and the Performance of the Manager, as it relates to the attainment of the stated activity of the Company.

5.2  *Meetings of and Voting by Members.*

5.2.1  A meeting of the Members may be called at any time by the Manager or by those Members holding at least 36% of the Percentages then held by Members. Meetings of Members shall be held at the Company's principal place of business or at any other place designated by the Person calling the meeting. Not less the than ten (10) or more than ninety (90) days before each meeting, the Person calling the meeting shall give written notice of the meeting to each Member entitled to vote at the meeting.   The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than 36% of Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

5.2.2  Except as otherwise provided in this Agreement, the affirmative vote of Members holding at least 36% of the Percentages then held by Members shall be required to approve any matter coming before the Members, including a decision to sell, exchange or liquidate the real property owned by the Company.

5.2.3  In lieu of holding a meeting, the Members may vote to otherwise take action by a written instrument indicating the consent of Members holding a majority of the Percentages then held by Members.

5.2.4  Except as otherwise provided in this Agreement, wherever the LLC Law requires unanimous consent to approve or take any action, that consent shall mean, in all cases, rather than the consent of all Members, the consent of Members holding 54% or more of the Percentages then held by Members.

5.3  *Personal Services.*

039

5.3.1   A Class A Member may perform legal, consulting, or other professional services for the Company upon approval by the Manager, and shall be compensated for said services, including the reimbursement of expenses. The Class B Member having a 4% Ownership Interest shall perform accounting services for the Company, prepare the Company's tax returns for each taxable year, prepare the K-1 Statements for each Member, and shall provide other accounting services to the Company. This Class B Member shall receive no cash compensation for these services from the Company. The Manager is authorized and empowered to hire a management company for rental of the real estate owned by the Company, as well as a law firm for legal representation and an Accounting Firm for accounting and tax advice in Nova Scotia, Canada.

5.3.2   The Manager shall not be entitled to compensation for services performed for the Company. The initial Manager, who shall be a Class B Member owning a 42% Ownership Interest, shall provide management services to the Company under the terms and conditions of this Operating Agreement.

5.4   *Duties of Parties.*

5.4.1   The Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Member for any action taken or any failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law, unless the action was taken or omission was made fraudulently or in bad faith or unless the action or omission constituted gross negligence.

5.4.2   Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Manager or Member, or of any Affiliate of any Manager or Member, to conduct any other business or activity whatsoever, and no Manager or Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Manager's and Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Manager or any other Member or the Manager's or any Member's Affiliates.

5.4.3   Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with the Manager or with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5   *Liability and Indemnification.*

040

5.5.1   The Manager or any Member shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Manager or any Member within the scope of the authority conferred on the Manger or any Member by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement.

5.5.2   The Company shall indemnify the Manager or any Member for any act performed by the Manager or any Member within the scope of the authority conferred on the Manager or any Member by this Agreement, except for fraud, gross negligence, or an intentional breach of this Agreement.   The Company shall promptly notify the Members whenever the Manger or any Member has been indemnified by the Company for any act, matter, or thing whatsoever.

5.6     *Power of Attorney.*

5.6.1   *Grant of Power of Attorney.*  Each Member hereby irrevocably constitutes and appoints the Manager (with full power of substitution and resubstitution) as the Member's true and lawful attorney and agent with full power and authority in the Member's name, place, and stead to execute, swear to, acknowledge, deliver, file, and record in the appropriate public offices:

5.6.1.1 Articles of Organization and all such certificates that the Manager considers necessary or appropriate to form, qualify or continue the Company as a limited liability company or conduct the business of the Company in the jurisdictions in which the Company may conduct business or own or lease property;

5.6.1.2 All amendments to this Agreement, amendments to the Articles of Organization of the Company, and other instruments that the Manager considers necessary or appropriate to effect a change or modification of the Company in accordance with the terms of this Agreement, including, without limitation, those amendments relating to the admission of additional or substitute Members or the withdrawal of Members and amendments approved pursuant to the provisions hereof;

5.6.1.3 One or more fictitious or trade name certificates; and

5.6.1.4 All articles and certificates of dissolution, conveyances, and other instruments that the Manager considers necessary or appropriate to effect the acquisition, disposition, pledge, mortgage, hypothecation, encumbrance, or exchange or any assets of the Company, or the dissolution and termination of the Company.

5.6.2   *Irrevocable Nature of Power of Attorney.*  The power of attorney granted herein shall be considered to be coupled with an interest, shall be irrevocable, and, to the extent permitted by applicable law, shall survive the death, interdiction, withdrawal, resignation, retirement, expulsion, bankruptcy, dissolution, or termination of existence of a Member or Interest Holder.  It shall also survive the Transfer of an Interest,

except that if the Transferee is admitted as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Manager, as attorney in fact, to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Manager as attorney in fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Manager as attorney in fact taken in good faith under this power of attorney. Any person dealing with the Company may conclusively presume and rely upon the fact that any such instrument executed by the Manager as attorney in fact and agent herein appointed is valid and binding without further inquiry.

## SECTION VI
### Transfer of Interests and Withdrawals of Members

6.1   *Transfers.*

6.1.1   No Person may Transfer all or any portion of or any interest or rights in the Person's Membership Rights or Interest unless the following conditions ("Conditions of Transfer") are satisfied:

6.1.1.1 The Transfer will not require registration or Interests or Membership Rights under any federal or state securities laws;

6.1.1.2 The transferee delivers to the Company a written agreement to be bound by the terms of Section VI of this Agreement;

6.1.1.3 The Transfer will not result in the termination of the Company pursuant to Code Section 708;

6.1.1.4 The Transfer will not result in the Company being subject to the Investment Company LLC Act of 1940, as amended;

6.1.1.5 The Transferor or the Transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number, and (ii) the transferee's initial tax basis in the Transferred Interest;

6.1.1.6 The Transferor complies with the provisions set forth in Section 6.1.4; and

6.1.1.7 The Transferee of the Interest is approved by at least 51% of the Ownership Interest of the Members.

6.1.2   If the Conditions of Transfer are satisfied, then a Member or Interest Holder may Transfer all or any portion of that Person's Interest. The Transfer of an Interest pursuant to this Section 6.1 shall not result, however, in the Transfer of any of the Transferor's other Membership Rights, if any, and the Transferee of the Interest shall

042

have no right to: (i) become a Member, or (ii) exercise any Membership Rights other than those specifically pertaining to the ownership of an Interest.

6.1.3   Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null, and void, and of no force or effect. Any Person to whom Membership Rights are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

6.1.4   *Right of First Offer.*

6.1.4.1 If an Interest Holder (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transfer shall notify the Company of that desire (the "Transfer Notice"). The Transfer Notice shall describe the Transferor Interest. The Company shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the amount the Transferor would receive if the Company were liquidated and an amount equal to the Appraised Value (as determined pursuant to Section 6.4) were available for distribution to the Members pursuant to Section 4.4.

6.1.4.2 The Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 P.M. local time at the Company's principal office on the sixtieth (60th) day following the date the Transfer Notice is given to the Company.

6.1.4.3 At any time during the Transfer Period, the Company may elect to exercise the Purchase Option by giving written notice of its election to the Transferor. The Transferor shall not be deemed a Member for the purpose of voting on whether the Company shall elect to exercise the Purchase Option.

6.1.4.4 If the Company elects to exercise the Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the date of the notice of election or more than thirty (30) days after the expiration of the Transfer Period.

6.1.4.5 If the Company elects to exercise the Purchase Option, the Purchase Price shall be in cash on the Transfer Closing Date.

6.1.4.6 If the Company fails to exercise the Purchase Option, the Transferor shall be permitted to offer and sell the Transferor Interest to any Class A or Class B Member for a period of ninety (90) days (the "Free Transfer Period") after the expiration of the Transfer Period at a price not less than the Purchase Price. If the

D43

Transferor does not Transfer the Transfer Interest pursuant to this Section shall cease and terminate.

6.1.4.7 Any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

6.2     *Voluntary Withdrawal.*  No Member shall have the right or power to Voluntarily Withdraw from the Company.

6.3     *Involuntary Withdrawal.*   Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder but shall not become a Member.  Neither the Member who has involuntarily withdrawn nor the successor to such Member's Interest shall be entitled to receive in liquidation of the Interest the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company.

6.4     *Appraisal Value.*

6.4.1   The term "Appraised Value" means the appraised value of the equity of the Company's assets as hereinafter provided.  Within fifteen (15) days after demand by either one to the other, the Company and the Transferor (as the Transferor is defined in Section 6.1.4) shall each appoint an appraiser to determine the value of the equity of the Company's assets.  If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value.  If the two appraisers cannot agree upon the equity value of Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's assets and determine the value of the equity therein, and shall render a written report of his opinion thereon.  Each party shall pay the fees and other costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

6.4.2   The equity value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

## SECTION VII
### Dissolution, Liquidation, and Termination of the Company

7.1     *Events of Dissolution.*   The Company shall be dissolved upon the happening of any of the following events:

044

7.1.1   when the period fixed for its duration in Section 2.4 has expired; or

7.1.2   upon the unanimous written agreement of the Members.

7.2    *Procedure for Winding Up and Dissolution.*  If the Company is dissolved, the Manager shall wind up its affairs.  On winding up the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4.

7.3    *Filing of Certification That Company Has Been Liquidated and Dissolved.* If the Company is dissolved, the Manager shall promptly file with the Secretary that Certificate described in LLC Law Section 1340(A)(1).  If there is no Manager, then the Certificate shall be filed by the remaining Members; if there are no remaining Members, the Certificate shall be filed by the last Person to be a Member; if there is no Manager, remaining Members, or a Person who last was a Member, the Certificate shall be filed by the legal or personal representatives of the Person who last was a Member.

## SECTION VIII
### Books, Records, Accounting, and Tax Elections

8.1    *Bank Accounts.*  All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name.  The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2    *Books and Records.*

8.2.1   The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company for the last three most recent years; a copy of the Articles of Organization and Operating Agreement and all amendments to the Articles and Operating Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, and local tax returns for the last three most recent years.

8.2.2   The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

8.2.3   Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

8.3   *Annual Accounting Period.*   The annual accounting period of the Company shall be its taxable year.  The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

8.4   *Reports.*   Within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was a Member at any time during the taxable year then ended; (i) an annual compilation report, prepared by the Company's independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the Company to any Member, the Manager, or any Affiliate in respect of the taxable year.  In addition, with seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.  At the request of any Member, and at the Member's expense, the Manager shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

8.5   *Tax Matters Partner.*   Lawrence W. Stoulig, Jr. shall be the Company's tax matters partner ("Tax Matters Partner").  The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6221, *et seq.*  The Tax Matters Partner shall keep all Members informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner.  A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company.  The Tax Matters Partner shall not compromise any dispute with the Internal Revenue Service without the approval of the Class A Members.

8.6   *Tax Elections.*   The Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754.  The decision to make or not make an election shall be at the Manger's sole and absolute discretion.

8.7   *Title to Company Property.*

8.7.1   Except as provided in Section 8.7.2, all property (whether movable or immovable, corporeal or incorporeal) acquired by the Company shall be acquired by the Company in its name.

8.7.2   The Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name.

046

Without limiting the foregoing, the Manager may cause title to be acquired and held in his name or in the names of the trustees, nominees, or straw parties of the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company and all of that property shall be treated as Company property.

## SECTION IX
## General Provisions

9.1    *Assurances.*    Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2    *Notifications.*    Any notice, demand, consent, election, offer approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notice are to be directed to those substitute addresses or addressees.

9.3    *Specific Performance.*    The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4    *Amendment.*    Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5    *Applicable Law.*    All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Louisiana. All questions as to the ownership, rental, or management of the real property in Nova Scotia, Canada shall be governed by the internal law of that Jurisdiction.

9.6     *Section Titles.*   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7     *Binding Provisions.*   This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8     *Jurisdiction and Venue.*   Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the Eastern District of Louisiana or any Louisiana State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9     *Terms.*   Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the Person may in the context require.

9.10    *Separability of Provisions.*   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid, illegal, or unenforceable, the same shall not impair the operation of or affect any other portions of this Agreement, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had never been contained herein. Notwithstanding the foregoing, however, no provision shall be severed if it is clearly apparent under the circumstances that the parties would not have entered into this Agreement without such provision.

9.11    *Counterparts.*   This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12    *Estoppel Certificate.*   Each Member shall, within ten (10) days after written request by the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof. If the certificate is not received within that ten (10) day period, the Manager shall execute and deliver the certificate on behalf of the requested Member, without qualification, pursuant to the power of attorney granted in Section 5.6.

9.13    For as long as that certain property known as "Riverbend Lodge", is owned by the Company, each Member shall be entitled to occupy said property, for a period of two (2) weeks, during the "off-peak" rental season without payment of rent to

048

period of two (2) weeks, during the "off-peak" rental season without payment of rent to the Company. However, each Member will be responsible for any usual and customary costs incurred for cleaning of the property and for preparation for the next occupant. It is anticipated that a meeting of the Members will be held in December of each year, in order to allocate the occupancy time in one (1) week segments through a lottery system. The Manager, shall conduct a lottery, and shall provide the allocation of occupancy time to each Member.

**IN WITNESS WHEREOF**, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

(SIGNATURES TO FOLLOW)

**CLASS A MEMBERS**                    **CLASS B MEMBERS**



NOVA SCOTIA ENTERPRISES, L.L.C.

BY:

MANAGER

**EXHIBIT A**

## TO OPERATING AGREEMENT OF NOVA SCOTIA ENTERPRISES, L.L.C.

### Class A Member, Capital and Percentages

|  | | Initial Capital Contribution | Percentage |
|---|---|---|---|
| 1. Name:<br>Address:<br>Tax ID No.: | ████████ | $6,550.00 | 3% |
| 2. Name:<br>Address:<br>Tax ID No.: | ████████ | $6,550.00 | 3% |
| 3. Name:<br>Address:<br>Tax ID No.: | ████████ | $6,550.00 | 6% |
| 4. Name:<br>Address:<br>Tax ID No.: | ████████ | $6,550.00 | 6% |
| 5. Name:<br>Address:<br>Tax ID No.: | ████████ | $6,550.00 | 6% |

051

|  | Initial Capital Contribution | Percentage |
|---|---|---|
| 6. Name: ████████ Address: Tax ID No.: | $6,550.00 | 6% |
| 7. Name: ████████ Address: Tax ID No.: | $6,550.00 | 6% |
| 8. Name: ████████ Address: Tax ID No.: | $6,550.00 | 6% |
| 9. Name: ████████ Address: Tax ID No.: | $6,550.00 | 6% |
| 10. Name: ████████ Address: Tax ID No.: | $6,550.00 | 6% |

052

## EXHIBIT B

## TO OPERATING AGREEMENT OF NOVA SCOTIA ENTERPRISES, L.L.C.

### Class B Members, Capital, and Percentage

|  |  |  | Initial Capital<br>Contribution | Percentage |
|---|---|---|---|---|
| 1. | Name: | Aaron F. Broussard | $0 | 42% |
|  | Address: | 3329 Florida Avenue, Suite 220<br>Kenner, LA 70065 |  |  |
|  | Tax ID No.: | ██████8950 |  |  |
| 2. | Name: | ███████████ | $0 | 4% |
|  | Address: | ███████████ |  |  |
|  | Tax ID No: | ███████████ |  |  |

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:  ████████████████████████████████

Address:  ████████████████████████████████

Social Security Number:  ████████████████

Signature:  ████████████████████████

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 3% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ███████████████████████████

Address: ███████████████████████████

Social Security Number: █████████████

Signature: _ ██████████████████████

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ███████████████████████████

Address: ███████████████████████████

Social Security Number: ██████████████████

Signature: ████████████████████

I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ███████████████████

Address: ███████████████████

Social Security Number: ██████████████

Signature: ████████████████

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:



Address

Social Security Number:

Signature: _

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:

Address:

Social Security Number:

Signature:

      I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 3% Ownership Interest.

      I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name:



Address:

Social Security Number:



Signature:

     I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

     I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

# NOVA SCOTIA ENTERPRISES, L.L.C.

## CLASS A MEMBER

Name:

Address:

Social Security Number:



Signature: _____

    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

# NOVA SCOTIA ENTERPRISES, L.L.C.

## CLASS A MEMBER

Name: ███████████████████████████

Address: ███████████████████████████

Social Security Number: ███████████████████

Signature: _____█████████████_____


    I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

    I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

062

## NOVA SCOTIA ENTERPRISES, L.L.C.

### CLASS A MEMBER

Name: ████████████████████████

Address: ████████████████████████

Social Security Number: ████████████████

Signature: ████████████████████████

     I hereby authorize Aaron F. Broussard, Managing Member of Nova Scotia Enterprises, L.L.C., upon payment of my Capital Contribution, to list my name on Exhibit A to the Operating Agreement, as Class A Member of Nova Scotia Enterprises, L.L.C. having a 6% Ownership Interest.

     I hereby agree to be bound by the terms and conditions of the Operating Agreement of Nova Scotia Enterprises, L.L.C.

June 14, 2005

████████████

Re: *Nova Scotia Enterprises, L.L.C.*
    *Notice to Waive Right of First Offer (Section 6.1.4.)*

Dear ████

    Please accept this notification as my formal waiver of exercising my option under Section 6.1.4. of our Operating Agreement to match the offer tendered to Aaron F. Broussard for his Membership Interest as outlined in his letter and attachment dated June 14, 2005; AND FURTHER, I am not recommending that the Company, Nova Scotia Enterprises, L.L.C., match said offer or acquire the interest of Aaron F. Broussard.

                                   ████████████████

                                   MEMBER

                                  6/16/05
                                  DATE

064