1:12 cv90

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 5, 2013

———

No. 13-60002

———

Lyle W. Cayce
Clerk

TROUT POINT LODGE, LIMITED, a Nova Scotia Limited Company,
VAUGHN PERRET, and CHARLES LEARY,

Plaintiffs-Appellants,

v.

DOUG K. HANDSHOE,



Defendant-Appellee.

———

Appeal from the United States District Court
for the Southern District of Mississippi

———

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This case requires us to construe the newly-enacted Securing the Protection of our Enduring and Established Constitutional Heritage Act (the "SPEECH Act"), 28 U.S.C. § 4102. Appellants Trout Point Lodge, Ltd. ("Trout Point Lodge"), Vaughn Perret ("Perret"), and Charles Leary ("Leary") (collectively, "Trout Point") seek to enforce a defamation-based default judgment that they obtained against Appellee Doug K. Handshoe ("Handshoe") in Nova Scotia, Canada. We agree with the district court that Trout Point cannot satisfy its burden under the SPEECH Act to show that either (A) Nova Scotian law provided at least as much protection for freedom of speech and press in

No. 13-60002

Handshoe's case as would be provided by the First Amendment and relevant state law, or (B) Handshoe would have been found liable for defamation by a Mississippi court. 28 U.S.C. § 4102. Accordingly, we AFFIRM.

## I.

Handshoe, a Mississippi citizen, owns and operates Slabbed.org, a public-affairs blog with the tagline "Alternative New Media for the Gulf South." He describes Slabbed.org as a "forum for local residents and other interested parties to gather and share information regarding various political and legal issues that impact the Gulf Coast."

One of the blog's focal points over the last few years has been Aaron Broussard, the former Parish President of Jefferson Parish, Louisiana.[1] Broussard was indicted in the United States District Court for the Eastern District of Louisiana and pleaded guilty to charges of bribery and theft in September 2012. Handshoe claims that Slabbed.org has been "instrumental" in reporting the "ongoing corruption scandal, indictment, and guilty plea" involving Broussard.

During his time in office, Broussard owned property in Nova Scotia. The property sat on Trout Point Road, very close to Trout Point Lodge, a hotel that Perret and Leary own and operate.[2] In about January 2010, Handshoe began publishing entries on Slabbed.org alleging a link between Broussard and Trout Point Lodge, Perret, and Leary. At or near the same time, the *Times-Picayune*,

---

[1] In addition to his blog, the record indicates that Handshoe engages in several other forms of internet communication. For example, he maintains a Twitter account for Slabbed.org and posts comments on several other web sites.

[2] Daniel Abel, a non-party to this suit, is also a principal owner of Trout Point Lodge.

2

No. 13-60002

a New Orleans newspaper, published an article indicating that Broussard had an ownership interest in Trout Point Lodge and that Jefferson Parish contractors had paid to rent the premises. The *Times-Picayune* retracted this assertion and issued a correction after Perret and Leary alerted the paper to purported "factual errors in [its] reporting." It appears that the corporate parent of the *Times-Picayune* also took the Slabbed.org blog offline after Perret and Leary demanded this retraction. The district court determined that Handshoe, "apparently in reaction to his blog being taken offline," found another web host for his site and "began an internet campaign to damage Perret and Leary."[3] Specifically, Handshoe posted several updates regarding Trout Point Lodge, Perret, and Leary, which the district court noted "can be characterized as derogatory, mean spirited, sexist, and homophobic."

Trout Point filed suit in the Supreme Court of Nova Scotia (the "Nova Scotia Court") on September 1, 2011, alleging defamation and related claims. Trout Point's First Amended Statement of Claim referred to publications on Slabbed.org and related third-party web sites, which it asserted "were directly defamatory and were also defamatory by both true and false innuendo in that they would tend to lower the opinion or estimation of the plaintiffs in the eyes of others who read the defamatory publications as a series, or alternatively, in parts." At the outset, the First Amended Statement of Claim asserted four

---

[3] In April 2011, Handshoe wrote: "I think by now even our most casual readers know our successor website, Slabbed.org was knocked offline courtesy of the Times Picayune's corporate parent Advance Publications and this started a chain of events that resulted in Slabbed temporarily being moved back to WordPress. I'd submit this was a miscalculation of gargantuan proportions for several reasons, which will become clear as I roll out this series of posts on Aaron Broussard's connections to Trout Point Lodge and its purported owners . . . ."

3

No. 13-60002

primary sources of reputational harm: (1) content linking Trout Point with the "Jefferson Parish Political Corruption Scandal," the "sting" of which was that "Trout Point Lodge and its owners were somehow involved in corruption, fraud, money laundering, and 'pay to play' schemes involving Jefferson Parish President Aaron Broussard and his administration"; (2) the "clear imputation" that Trout Point "misled investors and court officials in litigation" with the Atlantic Canada Opportunities Agency ("ACOA"), the "sting" of which was that "Leary perjured himself, investors were misled, businesses nefariously changed ownership, and that the ACOA litigation is ongoing, with the plaintiffs [losing] every step of the way"; (3) the "imputation" that the "Trout Point Lodge business is actively failing, near bankruptcy, having once relied on the good graces of Aaron Broussard," along with the "related imputation" that Perret and Leary "have had a series of failed businesses that used other people's money, creating a pattern," the "sting" of which was that Trout Points's "13-year-old business is on the verge of bankruptcy, that the plaintiffs will take the money and run, and that the plaintiffs are either con artists or have no business acumen whatsoever"; and (4) the "unabashed anti-gay, anti-homosexual rhetoric and rants of the defendant," used to "amplify and support the three other stings listed above" and "support[] and shore[] up all the other defamatory imputations."

The First Amended Statement of Claim continued to describe several specific blog posts on Slabbed.org, reciting much of the offensive language that Handshoe used to refer to Perret and Leary. Some of the alleged defamatory statements indicated Handshoe's poor opinion of Perret and Leary, for example, that they "had Champagne taste on a beer budget," "work as a unit to grift their

4

No. 13-60002

way through life," and were either "first-class b-tches, common thugs, or plain ol' morons."

In stating its defamation claim, Trout Point generically alleged that Handshoe's publications were false and malicious.  It did not, however, make any specific statements to refute the truth of the individual blog posts at issue.[4] For example, the First Amended Statement of Claim included no information regarding Trout Point's actual connection to Broussard, if any, or its financial solvency.

Trout Point purportedly served Handshoe with a notice of the First Amended Statement of Claim in Mississippi, but Handshoe did not appear in the Nova Scotia action.  In December 2011, the Nova Scotia Court entered a default judgment against Handshoe (the "Nova Scotia Judgment").  The Nova Scotia Judgment provided: "In accordance with the Civil Procedure Rule 31.12(4), Douglas K. Handshoe is now taken to have admitted, for the purposes of this action, the claims made against him in the Statement of Claim."

The Nova Scotia Court set the matter for a hearing to assess damages.  At the hearing, Perret and Leary testified and offered additional evidence regarding Handshoe's allegedly defamatory statements and the damage that

---

[4] Specifically, Trout Point made the blanket assertion that the Slabbed.org posts were "replete with inaccuracies and an apparent inattention to basic ethics and duties to check facts before publishing," and that "the false statements set forth in the defendants' publications exposed the plaintiffs to public contempt, ridicule, aversion, and disgrace, and induced an evil opinion of the plaintiffs in the minds of right-thinking persons and deprived the plaintiffs of their friendly intercourse in and commerce with society."  The First Amended Statement of Claim further alleged that Handshoe acted in a "reckless and malicious manner without due consideration for the standards of information gathering an dissemination ordinarily followed by responsible writers, editors, and publishers," disregarding whether the published content was "true or false."

No. 13-60002

they inflicted on Trout Point Lodge, and Perret and Leary individually. Following the hearing, the court issued an oral decision summarizing the relevant Canadian law, the content of the publications at issue, and the harm that Trout Point purportedly suffered. Ultimately, the court awarded Trout Point Lodge $75,000 in general damages, and Leary and Perret each $100,000 in general damages, $50,000 in aggravated damages, and $25,000 in punitive damages. It also awarded $2,000 in costs.[5]

Trout Point enrolled the Nova Scotia Judgment in the Circuit Court of Hancock County, Mississippi, in March 2012 in an attempt to collect its damages award. Handshoe removed the action to the United States District Court for the Southern District of Mississippi pursuant to the SPEECH Act. The parties agreed that all issues were strictly legal in nature and, therefore, elected to submit the matter to the district court on cross-motions for summary judgment.

The district court entered summary judgment in Handshoe's favor, finding that Trout Point failed to meet its burden under the SPEECH Act to show that "Handshoe was afforded at least as much protection for freedom of

---

[5] In addition to monetary relief, the Nova Scotia Court entered a permanent injunction against Handshoe, "restraining him from disseminating, posting on the Internet or publishing, in any manner whatsoever, directly or indirectly, any statements about the plaintiffs, Trout Point Lodge, Charles L. Leary, and [Vaughn] J. Perret." The injunction included "publication, circulation and promotion on the blog named Slabbed, and any similar or other publications." The court added, for "further particularity," that Handshoe "shall not publish or cause to be published or otherwise disseminate or distribute in any manner whatsoever . . . any statements or other communications which refer to the plaintiffs by name, depiction or description." It ordered Handshoe to immediately remove any such material from publication. Trout Point does not seek to enforce the injunction in this action. Rightly so, as the injunction does not comport with even the most basic protections against prior restraints on speech in the United States. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (explaining the heavy presumption that a prior restraint on speech is unconstitutional).

No. 13-60002

speech in [the Nova Scotia] action as he would have in a domestic proceeding or, alternatively, that Handshoe would have been found liable for defamation by a domestic court." Trout Point timely appealed.

## II.

We review *de novo* a district court's grant of summary judgment, applying the same standard as the district court. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford*, 264 F.3d at 498 (citing *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994)).

## III.

This action depends on our interpretation of the SPEECH Act. The task of statutory interpretation begins and, if possible, ends with the language of the statute. *In re Nowlin*, 576 F.3d 258, 261–62 (5th Cir. 2009) (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)). When the language is plain, we "must enforce the statute's plain meaning, unless absurd." *Id.*; *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a

7

No. 13-60002

statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992))).  We determine whether statutory language is plain or ambiguous "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

Many commentators have explained that Congress enacted the SPEECH Act in 2010 in response to the perceived threat of "libel tourism," a form of international forum-shopping in which a plaintiff chooses to file a defamation claim in a foreign jurisdiction with more favorable substantive law.[6]  In enacting the statute, Congress found that "by seeking out foreign jurisdictions that do not provide the full extent of free-speech protections to authors and publishers that are available in the United States" and by suing United States authors or publishers in those foreign jurisdictions, some persons were "obstructing" the free expression rights of domestic authors and publishers and "chilling" domestic citizens' First Amendment interest in "receiving information on matters of importance."[7]  *See* Findings to Pub. L. No. 111-223, § 2, 124 Stat.

---

[6] *See, e.g.*, Lili Levi, *The Problem of Trans-National Libel*, 60 Am. J. Comp. L. 507, 508 n.1, 509–10 (2012); Andrew R. Klein, *Some Thoughts on Libel Tourism*, 38 Pepp. L. Rev. 375, 391 (2011); Doug Rendleman, *Collecting a Libel Tourist's Defamation Judgment?*, 67 Wash. & Lee L. Rev. 467, 468 (2010); Tara Sturtevant, *Can the United States Talk the Talk & Walk the Walk When it Comes to Libel Tourism: How the Freedom to Sue Abroad Can Kill the Freedom of Speech at Home*, 22 Pace Int'l L. Rev. 269, 269 (2010); Robert L. McFarland, *Please Do Not Publish This Article in England: A Jurisdictional Response to Libel Tourism*, 79 Miss.. L.J. 617, 625 (2010); Sarah Staveley-O'Carroll, *Libel Tourism Laws: Spoiling the Holiday and Saving the First Amendment?*, 4 N.Y.U. J. L. & Liberty 252, 264 (2009).

[7] Before Congress enacted the SPEECH Act, some courts had refused to enforce foreign defamation judgments on First Amendment public-policy grounds. *See, e.g.*, *Bachchan v. India Abroad Publ'ns, Inc.*, 585 N.Y.S.2d 661, 665 (N.Y. Sup. Ct. 1992) (stating that the First

No. 13-60002

2380, reproduced in the Notes section of 28 U.S.C. § 4101. It further found that "[g]overnments and courts of foreign countries scattered around the world have failed to curtail this practice . . . and foreign libel judgments inconsistent with United States [F]irst [A]mendment protections are increasingly common." *Id.*

With these findings in mind, the SPEECH Act provides that a domestic court "shall not recognize or enforce a foreign judgment for defamation" unless it satisfies both First Amendment and due process considerations. *See* 28 U.S.C. § 4102. We focus our inquiry on the statute's "First Amendment considerations" provision.

Under the "First Amendment considerations" provision of the SPEECH Act, a foreign defamation judgment is unrecognizable and unenforceable unless

> (A) the defamation law applied in the foreign court's adjudication provided at least as much protection for freedom of speech and press in that case as would be provided by the [F]irst [A]mendment to the Constitution of the United States and by the constitution and law of the State in which the domestic court is located; or
>
> (B) even if the defamation law applied in the foreign court's adjudication did not provide as much protection for freedom of speech and press as the [F]irst [A]mendment to the Constitution of the United States and the constitution and law of the State, the party opposing recognition or enforcement of that foreign judgment would have been found liable for defamation by a domestic court applying the [F]irst [A]mendment to the Constitution of the United

---

Amendment "would be seriously jeopardized by entry of [a] foreign libel judgment granted pursuant to standards deemed appropriate in England but considered antithetical to the protections afforded [to] the press by the U.S. Constitution"); *Telnikoff v. Matusevitch*, 702 A.2d 230, 251 (Md. 1997) ("[A]t the heart of the First Amendment . . . is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. The importance of that free flow of ideas and opinions on matters of public concern precludes Maryland recognition of Telnikoff's English libel judgment." (internal quotation marks and citation omitted)).

No. 13-60002

States and the constitution and law of the State in which the domestic court is located.

§ 4102(a)(1).

Although there is no case law directly interpreting these two prongs, the plain language of the statute suggests two distinct options for a party seeking to enforce a foreign defamation judgment: one focused on the law applied by the foreign forum and one focused on the facts the parties presented in the foreign proceeding.[8] Put differently, a party may enforce a foreign defamation judgment in a domestic court if either (A) the law of the foreign forum, as applied in the foreign proceeding, provides free-speech protection that is coextensive with relevant domestic law,[9] or (B) the facts, as proven in the foreign proceeding, are sufficient to establish a defamation claim under domestic law. We address each prong in turn.

A.

---

[8] When construing a statute, a court should give effect, if possible, to every word and every provision Congress used. *See, e.g., Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant" (internal quotation marks omitted)). Also, if possible, the court interprets provisions of a statute in a manner that renders them compatible, not contradictory. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." (internal quotation marks and citations omitted)).

[9] The statute does not require that *all* of a foreign forum's law be coextensive with the First Amendment, but rather only the law applied "in that case." § 4102(a)(1)(A). For example, presume that the free speech jurisprudence of Country X is identical to domestic law in every respect except as applied to public figures. Applying prong one of the "First Amendment considerations" inquiry, a defamation judgment awarded against a non-public figure in Country X would be enforceable in the United States, as the law applied to the case was coextensive with the First Amendment. It would not be enforceable, however—at least not on the basis of § 4102(a)(1)(A)—against a public figure.

10

No. 13-60002

There is no meaningful dispute that the law applied by the Nova Scotia Court provides less protection of speech and press than First Amendment and Mississippi law.  Canadian defamation law is derivative of the defamation law of the United Kingdom, which has long been substantially less protective of free speech.  As Justice Black noted in *Bridges v. California*:

> No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed.  . . .  Ratified as it was while the memory of many oppressive English restrictions on the enumerated liberties was still fresh, the First Amendment cannot reasonably be taken as approving prevalent English practices.  On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society.

314 U.S. 252, 265 (1941).  Thus, while Canadian law generally comports with England's traditional common-law approach, the United States has parted ways with its northern neighbor in matters of free speech.[10]

------

[10] Although English common law in the colonial era prohibited prior restraints on speech, a publisher was subject to punishment for "improper, mischievous, or illegal" statements, regardless of their truth.  *See* Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 1.5 (citation omitted); *see also* Van Vechten Veeder, *The History and Theory of the Law of Defamation*, 3 Colum. L. Rev. 546 (1903) (offering an extensive overview of early defamation law in England).  Although both English and Canadian defamation law have evolved somewhat, Canadian law generally aligns with the English approach.  *See* Rodney A. Smolla, Law of Defamation § 1:9.75 (2013).  The United States's First Amendment law does not.  *See Chaplinsky v. New Hampshire*, 315 U.S. 568, n.3 (1942) ("The protection of the First Amendment, mirrored in the Fourteenth, is not limited to the Blackstonian idea that freedom of the press means only freedom from restraint prior to publication."); *see also Bachchan*, 585 N.Y.S.2d at 665 (holding that an English libel judgment was unenforceable because it was "antithetical to the protections afforded the press by the U.S. Constitution"); *Telnikoff*, 877

No. 13-60002

The most critical legal difference here is that a Canadian plaintiff—unlike a plaintiff subject to First Amendment and Mississippi state law—need not prove falsity as an element of its prima facie defamation claim.   Rather, in Canada, truth is a defense that a defamation defendant may raise and, if so, must prove. *Compare Grant v. Torstar*, (2009) 3 S.C.R. 640, para. 28–32 (Can.) (holding that "falsity and damages are presumed" if a plaintiff proves the elements of a prima facie defamation case), *with Blake v. Gannet Co.*, 529 So. 2d 595, 602 (Miss. 1988) (holding that a defamation plaintiff bears the burden of proving falsity).[11]   *See* Eugenie Brouillet, *Free Speech, Reputation, and the Canadian Balance*, 50 N.Y.L. Sch. L. Rev. 33, 52 (2006) ("In the Canadian common law, the courts have chosen a low threshold for the establishment by the plaintiff of a prima facie cause of action in defamation, offering considerable protection to his right to reputation. The balance in favor of free speech is restored by a number of defenses, but the burden of proof rests on the

---

F. Supp. 1 (holding that an English libel judgment was not enforceable because it was "contrary to U.S. libel standards").

[11] Canadian law is also less protective than domestic law regarding the standard of proof that applies to statements about public figures.  Specifically, domestic law requires a plaintiff to prove, by clear and convincing evidence, that the alleged defamers acted with actual malice; Canadian law does not. *Compare Gannett Co.*, 529 So. 2d at 600, *with Hill v. Church of Scientology of Toronto*, (1995) 2 S.C.R. 1130 (Can.).

Handshoe asserts that this legal difference is important here because Trout Point is a vortex public figure and, therefore, Trout Point must meet the heightened "actual malice" standard. *See Eason v. Fed. Broad. Co.*, 697 So. 2d 435, 438 (Miss. 1997) (defining a vortex public figure as "one who is otherwise a private citizen but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest" (citation omitted)).  We need not decide this issue because Trout Point failed to demonstrate that it proved falsity in the Nova Scotia proceeding, the more basic requirement to uphold the Nova Scotia Judgment.

12

No. 13-60002

defendant. In comparison, . . . American laws both seem to show a certain bias towards freedom of expression and freedom of the press; the burden of proof of the wrongful nature of the injury to reputation lies in both cases with the person defamed." (footnote omitted). Thus, Trout Point cannot satisfy the first prong of the First-Amendment considerations inquiry; that is, the law applied in the Nova Scotia proceeding did not provide at least as much protection for freedom of speech and press as Handshoe would have received under domestic law.

B.

The more challenging question in this case arises from the statute's second prong: whether a Mississippi court presented with the same facts and circumstances would have found Handshoe liable for defamation. The answer depends on whether the facts Trout Point proved in the Nova Scotia proceeding were sufficient to demonstrate falsity under the United States Constitution and Mississippi state law. In Mississippi, "[t]he threshold question in a defamation suit is whether the published statements are false. Truth is a complete defense to an action for libel. The plaintiff bears the burden to prove such falsity." *Armistead v. Minor,* 815 So. 2d 1189, 1194 (Miss. 2002) (quotations and citations omitted). Significantly, statements that are "substantially true" are not defamatory in Mississippi. *Id.* "As the United States Supreme Court has noted, minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.* (internal quotation marks omitted) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S 496, 517 (1991)).

No. 13-60002

Applying First Amendment and Mississippi law, the district court concluded that Trout Point failed to prove falsity in the Nova Scotia proceeding:

> [H]ad the Plaintiffs filed their defamation action in Mississippi, they would be required to prove falsity before they would be entitled to damages. Handshoe has not published any specific allegations about what role he believes Leary and Perret played in Broussard's crimes. It is possible this is because Handshoe does not have any information indicating Plaintiffs were involved in Broussard's criminal activity. Handshoe, has, however, made numerous more generalized allegations about connections between Leary, Perret, Abel, and Broussard. Some of these statements seem to be based in fact; others appear[] to be conspiracy theories that may or may not be substantiated. As noted above, under the law of Mississippi, even those statements that are "substantially true" are protected speech. And this Court cannot determine, based on the record before it, the truth or falsity of Handshoe's claims that the Plaintiffs are connected to Aaron Broussard's criminal activities. Nor should it enforce a judgment in an action that, if brought in this Court, would depend upon the plaintiff's proof that the statements at issue are false.

On appeal, Trout Point criticizes the district court's reasoning because it "hinges entirely upon the faulty premise that [Trout Point] failed to prove the falsity of the publications at issue."[12] Trout Point relies on two key sources to establish

---

[12] Trout Point asserts that the district court may have relied on sources outside of the summary judgment record to reach this conclusion. The district court did refer to the number of posts regarding Trout Point that appeared on Slabbed.org in 2012 and a separately-filed case pending in the Eastern District of Louisiana, in which the plaintiffs alleged a connection between Trout Point and Broussard. These are matters about which the court was entitled to take judicial notice. *See, e.g., Kitty Hawk Aircargo, Inc. v. Chao.,* 418 F.3d 453, 457 (5th Cir. 2005) (taking judicial notice of approval by the National Mediation Board published on the agency's website); *Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of Texas agency's website). Moreover, careful review of the district court opinion demonstrates that it did not use these sources to reach any conclusion. Thus, we reject Trout Point's

No. 13-60002

the falsity of Handshoe's statements: (1) the allegations in Trout Point's First Amended Statement of Claim, deemed admitted by the Nova Scotia Judgment, and (2) the Nova Scotia Court's purported factual findings made in the course of awarding damages.  In our view, neither is sufficient to establish that a Mississippi court confronted with the same facts and circumstances would have found Handshoe liable for defamation.  We turn first to the allegations deemed admitted by Nova Scotia Judgment.

1.

In Mississippi, a plaintiff may obtain a default judgment when the defendant "has failed to plead or otherwise defend" the case.  Miss. R. Civ. P. 55(a); *see also* Fed. R. Civ. P. 55(a).  But a default judgment is not appropriate if the plaintiff's allegations are insufficient to state a claim.  *DynaSteel Corp. v. Aztec Indus., Inc.*, 611 So. 2d 977, 988 (Miss. 1992) (reversing a punitive damages award pursuant to a default judgment where the plaintiff's "blanket assertions" were insufficient to support the relief awarded); *see Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001) (upholding district court's denial of entry of default judgment because, even if true, the plaintiff's allegations did not support a finding of liability).[13]

If a court does award a default judgment, it is "unassailable on the merits

---

argument.

[13] *See also Waldron v. Milana*, No. 5:10-CV-0065 GTS/DEP, 2013 WL 2445047, at *5 (N.D.N.Y. June 5, 2013) (declining to award a default judgment on a defamation claim where the facts alleged were "not sufficient to state a claim" because the alleged injury occurred outside of the limitations period).

No. 13-60002

*but only so far as it is supported by well-pleaded allegations, assumed to be true."* *Leach v. Shelter Ins. Co.*, 909 So. 2d 1283, 1287–88 (Miss. Ct. App. 2005) (emphasis added) (citing *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).[14] "Allegations that are in effect conclusions of law are not considered well-pleaded allegations . . . and a defendant will not be held to have admitted such averments on default." *DynaSteel*, 611 So. 2d at 985. Thus, a default judgment does not equate to "a general admission or an absolute confession." *Leach*, 909 So. 2d at 1287–88.[15]

Applying these principles here, Trout Point failed to show that a state or federal court in Mississippi faced with the First Amended Statement of Claim would have awarded a default judgment in its favor. Although Handshoe's failure to answer or otherwise defend the case satisfies the basic prerequisite for

---

[14] These cases apply the comment to Mississippi Rule of Civil Procedure 55, which states that, upon entry of default, a "defendant has no further standing to contest the factual allegations of [a] plaintiff's claim for relief." Miss. R. Civ. P. 55 cmt.; *Hankins v. Md. Cas. Co./Zurich Am. Ins. Co.*, 101 So. 3d 645, 653 (Miss. 2012) (relying on rule and comment to conclude that factual allegations were "uncontested" upon entry of a default judgment).

[15] Mississippi courts treat a default judgment "as a conclusive and final adjudication of the issues necessary to justify the relief awarded." Miss. R. Civ. P. 55 cmt.; *see Hogan v. Buckingham ex rel. Buckingham*, 730 So. 2d 15, 20 (Miss. 1998) (relying on rule and comment); *Chassaniol v. Bank of Kilmichael*, 626 So. 2d 127, 132 (Miss. 1993) (same). By analogy to *res judicata* principles, an issue is necessary to justify the relief awarded if the judgment "'could not have been rendered without deciding the matter.'" *See Miss. Emp. Sec. Comm'n v. Phila. Mun. Separate Sch. Dist. of Neshoba Cnty.*, 437 So. 2d 388, 401 (Miss. 1983) (quoting *Haring v. Prosise*, 462 U.S. 306, 315 (1983)); *see also Franklin Collection Serv., Inc. v. Stewart*, 863 So. 2d 925, 929 (Miss. 2003) (applying *res judicata* principles to a default judgment). Here, because falsity was not "necessary to justify" the Nova Scotia Judgment, it is not a "conclusive and final adjudication" of that issue.

No. 13-60002

default,[16] the allegations in the First Amended Statement of Claim—particularly those regarding the falsity of Handshoe's statements—are not particularly well-pleaded for at least three reasons.

First, the First Amended Statement of Claim is unclear regarding whether all, or just some, of Handshoe's statements are false. At the outset, it indicates that Handshoe's statements were "defamatory by both *true* and false innuendo." (emphasis added). In explaining the particular statements at issue, the First Amended Statement of Claim repeatedly emphasizes that the statements were "defamatory," in that they would tend to lower one's opinion of Trout Point.[17] But it specifically alleges falsity with respect to only a limited few of the statements, and offers no facts to rebut or undermine most of Handshoe's statements.[18] Although Trout Point includes some generic allegations of falsity

---

[16] *Am. States Ins. Co. v. Rogillio*, 10 So. 3d 463, 467 (Miss. 2009) (affirming a district court's default judgment after a defendant failed to answer or otherwise defend an action).

[17] Trout Point argues that Handshoe's statements are defamatory *per se*.   In Mississippi, there are five categories of defamation *per se*:

> (1) Words imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment[;] (2) Words imputing the existence of some contagious disease[;] (3) Words imputing unfitness in an officer who holds an office of profit or emolument, either in respect of morals or inability to discharge the duties thereof[;] (4) Words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of a profession, trade or business; and in this and some other jurisdictions[; and] (5) words imputing to a female a want of chastity.

*Speed v. Scott*, 787 So. 2d 626, 632 (Miss. 2001) (quoting *W.T. Farley, Inc. v. Bufkin*, 132 So. 86, 87 (1931)). Even assuming that some of the alleged statements are defamatory *per se*, that simply means that Trout Point need not establish special damages as a prerequisite to recovery. *Id.* It does not eliminate the falsity requirement. *Id.*

[18] Compare, for example, paragraph 54 of the First Amended Statement of Claim with paragraph 100. Paragraph 54 alleges: "Publishing that Trout Point Lodge was not doing well

17

No. 13-60002

towards the end of its defamation claim—specifically in paragraphs 113, 115, 116, and 118—this catch-all language offers little guidance regarding whether some or all of the statements are allegedly false, especially in light of the First Amended Statement of Claim's earlier reference to "true innuendo" as a source of harm.[19]

For this reason, Trout Point cannot show that a state or federal court in Mississippi would grant a default judgment based on the First Amended Statement of Claim.  Indeed, a Mississippi court has affirmed dismissal where a complaint failed to specify which of a series of statements constituted slander. *Chalk v. Bertholf*, 980 So. 2d 290, 298–99 (Miss. Ct. App. 2007) (emphasis added) ("Because the complaint did not contain any information as to the substance or effect of the statements with which the appellants allege they were slandered, Bertholf and Bryant were left with approximately two hours worth of radio air time to analyze and attempt to guess which parts of the radio show the appellants alleged slanderous in order to begin their defense."). Similarly, here, a Mississippi court could deny a default judgment because the First Amended Statement of Claim does not clearly and specifically allege that each of the

---

financially is defamatory of the corporate plaintiff.  Public reports of poor business performance would tend to lower the esteem of the corporate plaintiff in the eyes of a reasonable person." Trout Point does not specifically allege that the statement is false, nor does it claim that, for example, its financial performance had not declined. Paragraph 100, on the other hand, states: "Defendant Handshoe states that the Plaintiff Trout Point Lodge advertises heavily on TripAdvisor. This is defamatory, and *untrue*, designed to make it appear as though plaintiff is in dire economic straights and has resorted to drastic measures to advertise." (emphasis added).

[19] Trout Point also makes some generic allegations that the statements were false in raising its related claims, for example, in paragraphs 130 and 143.

No. 13-60002

relevant statements is false.

Second, some of the publications at issue are statements of unverifiable opinion. For example, Trout Point based its defamation claim, in part, on the allegation that Handshoe used "unabashed anti-gay, anti-homosexual rhetoric and rants of the defendants" intended to "engender[] discrimination and hatred." The First Amended Statement of Claim complains that Handshoe referred to Perret and Leary as "'girls,' 'blow buddies,' 'queer f-g scum,' and 'b-tches,' published more than one reference to a gay-themed movie, and posted video clips of movies and music videos commonly associated with gay stereotypes." While less grotesque, many of the other statements at issue also involve expressions of opinion; for example, that Trout Point had "Champagne taste on a beer budget," that Perret and Leary were a "litigious bunch," and that the Nova Scotia action was "foolish and frivolous."

Though offensive, these statements generally are not actionable in Mississippi. The Mississippi Supreme Court has recognized that "name calling and verbal abuse are to be taken as statements of opinion, not fact, and therefore will not give rise to an action for libel." *Johnson v. Delta-Democrat Pub. Co.*, 531 So. 2d 811, 814 (Miss. 1988) (collecting cases). "[N]othing in life or our law guarantees a person immunity from occasional sharp criticism, nor should it. . . . [N]o person avoids a few linguistic slings and arrows, many demonstrably unfair." *Ferguson v. Watkins*, 448 So. 2d 271, 276 (Miss. 1984). Thus, statements of opinion are actionable "only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion." *Id.*; *see also Tex. Beef Grp. v. Winfrey*, 201 F.3d 680, 688 (5th Cir.

19

No. 13-60002

2000) ("[O]pinions, though strongly stated, . . . based on truthful established fact, . . . are not actionable under the First Amendment."); *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 564 (5th Cir. 1997) ("Defamation law should not be used as a threat to force individuals to muzzle their truthful, reasonable opinions and beliefs.").[20] Here, although some of Handshoe's opinions certainly imply facts (*e.g.*, that Trout Point was involved in the Aaron Broussard scandal), his bare "linguistic slings and arrows" do not. Indeed, counsel for Trout Point conceded at oral argument that Handshoe's offensive insults and opinion statements would not be actionable in Mississippi. Thus, Trout Point cannot show that a state or federal court in Mississippi would grant a default judgment on these opinion-based allegations.

Finally, a state or federal court in Mississippi could view some of the allegations in the First Amended Statement of Claim as legal conclusions, as opposed to well-pleaded facts. The Mississippi Supreme Court's decision in *DynaSteel* illustrates this point. 611 So. 2d at 985. There, the court held that punitive damages were not recoverable on a default judgment because the allegations in the complaint, taken as true, were insufficient to support a finding of bad faith. *Id.* It stated:

> Allegations that are in effect conclusions of law are not considered well-pleaded allegations, however, and a defendant will not be held to have admitted such averments on default. Aztec alleged in its

---

[20] Mere labeling of a statement as a "fact" or an "opinion" is not dispositive in determining its actionability. *Roussel v. Robbins*, 688 So. 2d 714, 723 (Miss. 1996). "A statement, even if phrased as an opinion, will not enjoy constitutional protection if the court concludes that its substance or gist could reasonably be interpreted as declaring or implying an assertion of fact." *Id.* (quoting *Keohane v. Wilkerson*, 859 P.2d 291, 296 (Colo. 1993)).

No. 13-60002

complaint that DynaSteel obstinately and willfully refused to pay Aztec and that such conduct constituted gross bad faith. Given the legal significance attached to the phrases "obstinate and willful refusal to pay" and "bad faith refusal to pay", inquiries into the truth of assertions are not purely factual but at least mixed questions of law and fact. All we can take as admitted from these blanket assertions is that DynaSteel did not pay Aztec. The issue of whether DynaSteel's failure to pay constituted such bad faith as to rise to the level of an independent tort is not one that can be taken as admitted but instead must be decided by the court.

*Id.* (internal citations omitted). Here, Trout Point's allegations of falsity are unaccompanied by any facts that contradict or otherwise undermine the allegedly defamatory statements.[21] Given the legal significance attached to the word "falsity," Mississippi law requires Trout Point to do more than merely cry "false" to prove its claim.[22] Therefore, even deemed admitted, the allegations likely would have been insufficient—without subsequent evidence, analysis, and fact-finding—to satisfy Trout Point's burden in a Mississippi court.

For these three reasons, Trout Point failed to show that the allegations in the First Amended Statement of Claim, standing alone and taken as true, would be sufficient to support a defamation claim in a Mississippi court. Trout

---

[21] A federal district court in Maryland applying analogous state law recently awarded a default judgment in a defamation case, but only after determining that "the complaint not only alleges that these statements from the Article are 'untrue,' it also sets forth a variety of facts that, when taken in the light most favorable to Plaintiffs, tend to show that GAP is a legitimate, government-approved program. Falsity of the above statements is therefore properly alleged." *Russell v. Railey*, No. DKC-08-2468, 2012 WL 1190972, at *4 (D. Md. Apr. 9, 2012).

[22] Because statements that are "substantially true" are not actionable in Mississippi, whether a statement is false as a technical matter may differ from whether it is "false" as a legal matter.

No. 13-60002

Point asserts a second ground to establish falsity, however: the Nova Scotia Court's purported factual findings that Handshoe's statements were false and malicious. We turn next to that issue.

2.

As a threshold matter, the plain language of the SPEECH Act suggests that the purported "factual findings"[23] of the Nova Scotia Court are irrelevant to the enforceability inquiry. The critical question is not whether the Nova Scotia Court found falsity, but rather whether a state or federal court in Mississippi faced with the allegations in the First Amended Statement of Claim would have done so. *See* § 4102(a)(1)(B) (requiring the party seeking to enforce the foreign defamation judgment to establish that the defendant "would have been found liable for defamation by a domestic court applying the [F]irst [A]mendment to the Constitution of the United States and the constitution and law of the State in which the domestic court is located"). Moreover, the Nova Scotia Court issued its factual findings at a damages hearing that occurred *after* it had already granted default judgment in favor of Trout Point.

But even assuming, *arguendo*, that the Nova Scotia Court's factual findings have some bearing on the enforceability inquiry, they are insufficient to demonstrate falsity. As the district court summarized, the Nova Scotia Court's oral decision "does not contain specific findings of fact with respect to the falsity of Handshoe's statements." Indeed, despite repeated entreaties at

---

[23] The Nova Scotia Court did not issue formal findings of fact. Rather, it commented on the evidence in the course of issuing an oral opinion awarding Trout Point compensatory, aggravated, and punitive damages. We assume *arguendo* that the court's comments constitute factual findings.

22

No. 13-60002

oral argument, Trout Point could not identify a single specific allegation in the Statement of Claim that the Nova Scotia Court found was actually false. Rather, the Nova Scotia Court noted generically that some statements were "erroneous," but remained silent as to the truth of others.[24] The only statement with arguably global reach is that Handshoe's conduct was "outrageous" in the "face of true facts" about Trout Point. This simply is not direct enough to constitute a meaningful factual finding that *all* of Handshoe's statements were false.[25]

In analyzing the Nova Scotia Court's oral opinion and purported factual findings, it is important to note that the court based its damages award on allegations and evidence that a Mississippi court would not have credited. For one, the Nova Scotia Court considered numerous statements that did not appear in the First Amended Statement of Claim, many of which occurred *after*

_____

[24] *Compare, e.g.,* "The plaintiffs were erroneously identified as being connected with Mr. Broussard in a business venture and Mr. Broussard was named in error as owning Trout Point Lodge," *with* "The defamation continued with statements that Trout Point Lodge was losing business or going bankrupt because of the investigation of Mr. Broussard and his inability to continue to support it. . . . The statements also contained anti-gay rhetoric and homophobic comments."

[25] Trout Point emphasized that certain evidence, specifically, affidavits and testimony by Perret and Leary, demonstrated the falsity of Handshoe's statements. But this evidence, like the purported factual findings, was admitted at the damages hearing *after* the Nova Scotia Court had already issued the Nova Scotia Judgment. Even if we consider this evidence, it still does not establish that *all* of the alleged statements were, in fact, false. Moreover, it refers to numerous statements of opinion and publications that post-dated the First Amended Statement of Claim. Thus, for essentially the same reasons discussed above, we hold that the evidence Trout Point cites is insufficient to show that Trout Point would have been entitled to relief in a Mississippi court.

23

No. 13-60002

Trout Point filed its case.[26]  In Mississippi, a "default judgment may not extend to matters outside the issues raised by the pleadings or beyond the scope of the relief demanded."[27]  Miss. R. Civ. P. 54(c) cmt.  Indeed, Trout Point itself acknowledges that "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises."  Thus, a Mississippi court would not grant relief based on statements that did not appear in the plaintiffs' complaint.  Moreover, the Nova Scotia Court awarded damages based on the name-calling and verbal abuse discussed above, which is not actionable in Mississippi.  In sum, much of the conduct that underlies the Nova Scotia Court's oral opinion and damages award would not give rise to relief in Mississippi.

## IV.

Before we conclude, we note that the SPEECH Act also contains a "jurisdictional considerations" provision, which requires "the party seeking recognition or enforcement of the foreign judgment" to show that "the exercise of personal jurisdiction by the foreign court comported with the due process requirements that are imposed on domestic courts by the Constitution of the United States."  § 4102(b).

---

[26] For example, the Nova Scotia Court noted in its oral opinion that "further defamatory comments were made earlier this month, when the Notice of Assessment of Damages was served on [Handshoe]."

[27] For this reason, we do not look to the content of the publications (beyond what is specifically alleged in the First Amended Statement of Claim) to determine whether a state or federal court in Mississippi would have found Handshoe liable for defamation.

No. 13-60002

Handshoe asserts that Trout Point also failed to satisfy this provision because the Nova Scotia Court's exercise of personal jurisdiction over him did not comport with our nation's due process requirements. He makes a strong argument that Nova Scotia was not the "focal point" of the statements that preceded the First Amended Statement of Claim. *Cf. Calder v. Jones*, 465 U.S. 783, 788–90 (1984). But we, like the district court, need not resolve whether Handshoe had the requisite minimum contacts with Nova Scotia at the time that Trout Point filed suit, as Trout Point's failure to satisfy the First Amendment considerations provision of the SPEECH Act is fatal to its claim.

## V.

For the above-stated reasons, Trout Point failed to satisfy its burden to show that either (1) Canadian law offers as much free speech protection as the United States Constitution and Mississippi state law, or (2) a Mississippi court presented with the same facts and circumstances would have found Handshoe liable for defamation. Accordingly, we hold that the Nova Scotia Judgment is unrecognizable and unenforceable. We AFFIRM.